No. 23-10718

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,
Plaintiffs-Appellees,

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms; Defense Distributed; Second Amendment Foundation, Incorporated; Not An L.L.C., doing business as JSD Supply; Polymer80, Incorporated,
Intervenor Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,
Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Texas

———————————

## EMERGENCY MOTION PURSUANT TO
## CIRCUIT RULE 27.3 FOR STAY PENDING APPEAL

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MICHAEL S. RAAB
ABBY C. WRIGHT
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
*202-514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT .......................................................................................3

ARGUMENT .......................................................................................8

I.    The Government Is Likely to Prevail on the Merits...............................8

    A.    The Challenged Provisions Comport with the Statute ..............................8

    B.    The District Court's Vacatur Was Overbroad ..........................................13

II.   The Remaining Factors Favor a Stay.................................................... 16

CONCLUSION .................................................................................... 21

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# INTRODUCTION

The district court wholly vacated a rule that ensures the continued effective implementation of firearm safety laws, including by addressing the growing threat to public safety posed by the proliferation of unserialized firearms. Because that decision is unfounded and threatens critical public-safety interests, the government respectfully seeks a stay of the judgment pending appeal. The government requests that the Court either (1) grant this stay motion by Tuesday, July 25, when the district court's 7-day administrative stay expires, or (2) enter its own administrative stay to allow for the orderly resolution of this motion. If the Court declines to grant a stay pending appeal, the government requests that it enter an administrative stay of at least ten days to permit the Supreme Court to consider an application for a stay, should the Solicitor General elect to file one.

Congress enacted licensing, background check, and recordkeeping requirements to ensure that law enforcement may trace firearms used in crimes and that firearms are not sold to those, such as felons, who cannot lawfully possess them. In delineating these requirements, Congress defined "firearm" to include, as relevant here, "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive," as well as the "frame or receiver" (that is, the major structural component) "of any such weapon." 18 U.S.C. § 921(a)(3). This definition reflects Congress's understanding that limiting the statute only to operational weapons would have allowed persons to circumvent the statute by selling

1

firearms that may readily be converted into operational weapons without obtaining a license, marking such weapons with traceable serial numbers, keeping records, or running background checks.

Responding to technological advances and the proliferation of products permitting individuals to easily assemble firearms sold outside Congress's regulatory scheme, ATF promulgated a rule: *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (Rule). As relevant to plaintiffs' claims, the Rule updates regulatory defintions to clarify that firearms parts kits or aggregations of parts that enable a purchaser to readily assemble an operational weapon, or readily construct a functional frame or receiver, fall within the statutory definition of "firearm." In addition, the Rule contains myriad other provisions, not addressed in the district court's opinion, generally aimed at ensuring the continued effective implementation of the statutory requirements.

The Rule does not prohibit the purchase, sale, or possession of any firearm, nor does the Rule prohibit an individual from making a firearm. Rather, the Rule reinforces compliance with Congress's gun-safety regime. It ensures that background checks are conducted before individuals purchase firearms from federal firearms licensees and that licensees mark firearms with serial numbers and keep records to enable law enforcement to trace firearms used in crimes.

The district court granted summary judgment to plaintiffs on their claims that two portions of the Rule are contrary to law. And it purported to "vacate" the entire

Rule—rather than only the provisions it found unlawful—and as applied to everybody. That decision was erroneous. The challenged provisions of the law comport fully with the statute, and the district court identified no basis that could support its overbroad remedy. Because the Rule serves critical interests that will be irreparably impaired by the vacatur, this Court should enter a stay pending appeal.

## STATEMENT

**1.** Congress has enacted requirements for persons who import, manufacture, or deal in "firearms." 18 U.S.C. §§ 922-923. Such persons must obtain a federal firearms license, *id.* § 923(a), maintain certain records of firearm acquisition and transfer, *id.* § 923(g)(1)(A), and conduct a background check before transferring firearms to a non-licensee, *id.* § 922(t). In addition, Congress has required importers and manufacturers to identify firearms with a serial number on the receiver or frame. *Id.* § 923(i).

The statutory scheme hinges on the definition of "firearm." Congress defined that term to include "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive" as well as "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). Because Congress did not define the terms "frame" or "receiver," ATF in 1986 defined "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968). That regulation provided direction as to which portion of a weapon constituted the frame or receiver for licensing, serialization, and

3

recordkeeping purposes and ensured that a component necessary for the weapon's functioning could be traced if the weapon were used in a crime. *See* 87 Fed. Reg. at 24,652.

**2.** In the last half-century, advances in weapon design have rendered ATF's regulatory definition incomplete. Today, most weapons have a split or multi-piece receiver, or they incorporate a striker rather than a hammer. *See* 87 Fed. Reg. at 24,652. Thus, as many as 90% of firearms do not have a single component that houses a hammer, a bolt or breechblock, and a firing mechanism; under an overly literal application of the 1968 regulation, those firearms would have no frame or receiver. *Id.*

In addition, technological advances have made it easier to create firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers. Some entities have been selling these items without complying with statutory requirements. 87 Fed. Reg. at 24,652. Such sales permit persons who have not completed a background check to easily assemble firearms. And because these firearms usually lack serial numbers, they are difficult for law enforcement to trace if they are used in crimes. *Id.* at 24,652, 24,659.

**3.** ATF promulgated the Rule. As relevant to plaintiffs' claims, the Rule amends certain regulatory definitions to ensure they reflect the modern realities of firearm design.

First, the Rule amends the regulatory definition of "firearm." As explained, the statutory definition includes weapons that are "designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Weapon parts kits—some of which contain all components necessary to easily assemble a functional weapon and even templates and tools—have increasingly been sold without compliance with statutory licensing, recordkeeping, and background check requirements. 87 Fed. Reg. at 24,662. The Rule clarifies that the term "firearm" includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* at 24,662, 24,727, 24,735. Second, the Rule clarifies that frames and receivers that are partially complete, disassembled, or nonfunctional (such as a frame or receiver parts kit) constitute frames or receivers subject to regulation if they are designed to, or may readily be converted to, function as a frame or receiver. *Id.* at 24,663, 24,727-28, 24,739.

In addition, the Rule contains a host of other provisions generally aimed at ensuring the continued effective implementation of the statutory serializing, recordkeeping, and licensing requirements, particularly given the modern realities of firearm design. For example, the Rule contains updated definitions to ensure that each firearm has a frame or receiver subject to the statutory requirements, in keeping with Congress's intent to ensure one part of each firearm is so regulated. *See* 87 Fed. Reg. at 24,652, 24,727, 24,735.

The Rule also contains various provisions related to regulating silencers and mufflers. For example, the Rule identifies the particular part of a muffler or silencer as the "frame or receiver" subject to licensing, background check, and marking requirements and explains when and how those marking requirements apply to silencer parts and to complete silencers. 87 Fed. Reg. at 24,739, 24,747-78.

And the Rule contains provisions requiring licensees to serialize unmarked firearms if they are taken into the dealer's inventory. 87 Fed. Reg. at 24,653, 24,742-44. The Rule also extends the time for which licensees are required to maintain records from 20 years to the duration of the licensee's business or licensed activity. *See id.* at 24,690, 24,746-47.

Finally, the Rule provides: "[I]n the event any provision of this rule," or "the application of such provision" to "any person or circumstance," is determined to be invalid, "the remainder" of the Rule, and "the application of the provisions of [the Rule] to any person or circumstance[,] shall not be affected and shall be construed so as to give them the maximum effect permitted by law." 87 Fed. Reg. at 24,730.

**4.** Plaintiffs and intervenor-plaintiffs—collectively, two individual firearm owners, two advocacy organizations, and five entities that manufacture or distribute items regulated by the Rule—filed or joined this lawsuit. They claim that two portions of the Rule are contrary to law: (1) the definitions of "frame" and "receiver" to include partially complete, disassembled, or nonfunctional frames and receivers that may readily be converted to functional frames and receivers; and (2) the definition of

"firearm" to include a weapon parts kit that is designed to, or may readily be assembled to, function as a firearm. *See* Add.9. In a series of previous opinions, the district court granted preliminary injunctions limited to the individual plaintiffs and some of the manufacturer plaintiffs and their customers. In granting that relief, the court concluded that the two challenged provisions of the Rule were likely contrary to the statute, but it also concluded that broader relief was not necessary to redress plaintiffs' injuries. *See, e.g.*, Dkt. 89, at 19-20.

The district court has now entered summary judgment for the plaintiffs and vacated the Rule in its entirety, without any consideration of severability. As relevant here, the court concluded that plaintiffs are correct that the two challenged provisions of the Rule are contrary to law. Add.25-35. As a remedy, the district court vacated the Rule. Add.37. In entering that relief, the court did not address the Rule's discussion of severability or the possibility of vacating only the challenged provisions. Nor did the court conclude that a universal vacatur—of the entire Rule and as applied to everybody, including non-parties—was justified by equitable balancing or necessary to redress plaintiffs' asserted injuries. Instead, the court stated that vacatur is the "default remedy." *Id.*

On July 18, the district court denied the government's request for a stay pending appeal but entered a 7-day administrative stay of its judgment to permit the government to "seek emergency appellate relief." Add.41.

## ARGUMENT

All four of the familiar factors governing the grant of a stay pending appeal favor staying the vacatur order in its entirety—or, in the alternative, staying the overbroad portions of that order. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). The district court erred in vacating any portion of the Rule, and its vacatur should be stayed pending appeal. At the very least, the court had no warrant to stay the many portions of the Rule that the court did not address, and any remedy should have been limited to the parties themselves.

## I.    The Government Is Likely to Prevail on the Merits

### A.    The Challenged Provisions Comport with the Statute

1. The Rule clarifies that the terms "frame" and "receiver" include a "partially complete, disassembled, or nonfunctional frame or receiver" that "is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The district court's conclusion that this definition is unlawful misunderstands both the statute and the Rule.

As the Rule explains, the text of the statute does not "define the term 'frame or receiver,'" instead leaving it to the agency to define "at what point an unregulated piece of metal, plastic, or other material becomes a 'frame or receiver' that is a regulated item under Federal law." 87 Fed. Reg. at 24,685. And nothing in the statute precludes ATF from exercising that authority to determine that the relevant point comes before the frame or receiver is fully complete and is instead when the frame or

receiver reaches a stage where it is readily convertible to a functional frame or receiver. There is not, for example, any statutory language specifying that to be subject to regulation, a "frame" or "receiver" must be "fully complete" or "operable."

To the contrary, the statutory text and structure make clear Congress's intent to permit ATF to adopt an interpretation like the one in the Rule. When defining weapons, Congress has repeatedly made clear that non-operational weapons that are either "designed to" or may "readily" be converted or restored to operational weapons are included. *See, e.g.*, 18 U.S.C. § 921(a)(3)(A) ("firearm"); 26 U.S.C. § 5845(b)-(d) ("machinegun," "rifle," "shotgun"). These provisions reflect the reality—borne out by experience—that any other approach would permit persons to circumvent statutory requirements by producing nearly complete weapons readily converted into operational ones. In including a similar provision in the regulatory definitions of "frame" and "receiver," ATF acted consistently with those congressional determinations and with the statutory scheme.

And ATF's interpretation generally accords with previous regulatory practice. As the Rule explains, "ATF has long held that a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a critical stage of manufacture," which is "when it is brought to a stage of completeness that will allow it to accept the firearm components to which it is designed for [sic], using basic tools in a reasonable amount of time." 87 Fed. Reg. at 24,685 (brackets in original) (quotation omitted). The Rule's clarification that partially complete frames or receivers

constitute frames or receivers when they are designed to, or readily converted to, house the applicable component accords with this previous approach while also providing additional clarity to regulated entities by elaborating on language that has long been used in similar contexts. *Cf. id.* at 24,663, 24,668, 24,685.

In nevertheless concluding that the statute precludes this definition, the district court primarily observed that Congress defined "firearm" to include weapons that are "designed to or may readily be converted to" function as firearms but did not specifically include a similar phrase in the provision of the statute stating that a "firearm" includes the "frame" or "receiver" of a weapon. Add.25-28; *see* 18 U.S.C. § 921(a)(3)(A)-(B). That concern proceeds from the incorrect premise that § 921(a)(3)(B) defines "frame or receiver" and so some inference may be drawn from the nonexistence of "readily" language in that provision. But that provision states only that the term "firearm" includes "the frame or receiver of any such weapon." *See* 18 U.S.C. § 921(a)(3)(B). It does not then provide any definition of "frame" or "receiver," leaving it to the agency to do so in interpreting the statute. It is implausible to think Congress precluded ATF from following the statute's lead and determining that the terms "frame" and "receiver" include partially complete, disassembled, or nonfunctional frames or receivers that may "readily" be converted to functional ones.

Finally, although the court suggested (Add.28-30) that the Rule impermissibly permits ATF to "regulate a component as a 'frame or receiver' even after ATF determines that the component in question is not a frame or receiver," that suggestion

10

is incorrect. The Rule explains when a partially complete frame or receiver is a frame or receiver within the meaning of the statute: when it is designed to or may readily be converted to a functional one. And that result mirrors Congress's approach in related contexts. For example, as with ATF's definitions, Congress has defined items that may readily be converted into operational firearms or machineguns as "firearms" or "machineguns" themselves. *See* 18 U.S.C. § 921(a)(3)(A); 26 U.S.C. § 5845(b).

2. The Rule further clarifies that a "firearm" subject to regulation under the statute encompasses "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 87 Fed. Reg. at 24,727, 24,735; *see* 27 C.F.R. § 478.11. That provision of the Rule is also consistent with the statute.

The statutory text and structure, as well as precedent, make clear that ATF's determination that certain weapon parts kits constitute "firearms" is correct. Congress defined "firearm" to include any weapon that "is designed to" or "may readily be converted to expel a projectile." 18 U.S.C. § 921(a)(3)(A). And a kit that includes parts enabling a purchaser to readily assemble an operational firearm plainly satisfies the statute's definition: such an assemblage of parts is both "designed to" and "may readily be converted to" function as a firearm. Indeed, plaintiffs have never suggested any other purpose for which such a kit could possibly be designed.

A weapon parts kit is essentially an unassembled firearm, and courts have long recognized that even disassembled, or nonoperational, weapons constitute "firearms"

11

for Gun Control Act purposes. For example, in *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993), this Court held that a "disassembled" shotgun, which had the barrel removed from the stock, constituted a "firearm" under a provision of the Sentencing Guidelines reflecting the Act's definition. This Court explained that "[b]ecause Ryles' disassembled shotgun could have been 'readily converted' to an operable firearm," it was a "firearm" for purposes of the Guidelines enhancement. *Id.*; *see also, e.g.*, *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006); *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017) (all similar). Moreover, any contrary interpretation would allow circumvention of the statute, enabling felons and other prohibited persons to obtain readily assembled unserialized firearms by purchasing weapon parts kits online and thwarting law enforcement's ability to trace firearms that are used in crimes.

In nevertheless concluding that the statute does not permit ATF to regard weapon parts kits as "firearms," the district court primarily relied on its belief that the statute "does not cover weapon *parts*, or aggregations of weapon parts." Add.32. But that attempt to carve aggregations of weapon "parts" out of the definition of "firearm" fails given the statutory text. The statute makes clear that weapons that are "designed to" or "may readily be converted to expel a projectile" are firearms, regardless of whether the weapons are currently operable or assembled. 18 U.S.C. § 921(a)(3)(A). A weapon parts kit that both is designed to allow a purchaser to assemble his own firearm and includes the parts necessary to allow such ready

12

assembly plainly meets that definition. It was thus unnecessary (and would have been superfluous) for Congress to separately regulate parts or aggregations of parts as such.

Finally, the district court's error is underscored by the irrational consequences it engenders. There is no substantive distinction between a "disassembled" or "nonfunctional" firearm—which all agree falls within the statute—and a weapon parts kit. There is no indication in the text or statutory scheme that Congress intended to allow such a kit to evade the licensure, background check, marking, or recordkeeping requirements enumerated in the Gun Control Act. Such a result would create a substantial loophole allowing anyone, including convicted felons, to purchase a disassembled weapon that may be assembled in short order.

## B.    The District Court's Vacatur Was Overbroad

Independently, the government is likely to demonstrate that the district court's vacatur of the entire Rule was vastly overbroad. At the least, the court should have limited any vacatur to the provisions of the Rule it held invalid and to the plaintiffs in this case.

1. As explained, in addition to the two provisions that the district court addressed, the Rule contains a host of other provisions, generally aimed at ensuring the continued effective implementation of the statutory licensing, background check, serialization, and recordkeeping requirements. These include, for example, additional unchallenged updates to the definition of "frame" and "receiver" to reflect modern

firearms, amended regulations governing the marking of mufflers and silencers, and an extension of preexisting recordkeeping requirements. *See supra* pp. 5-6.

Where a court holds specific portions of a rule unlawful, those portions should be severed from the remainder when doing so "will not impair the function of the [rule] as a whole, and there is no indication that the regulation would not have been passed but for its inclusion." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988); *see also, e.g.*, *Southwestern Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (concluding that two "portions of the final rule" are "unlawful" and thus "vacat[ing] those portions of the rule"). Here, ATF clearly intended that as much of the Rule as possible go into effect. *See* 87 Fed. Reg. at 24,730 (severability clause). In nevertheless vacating the entire Rule, the district court did not conclude that the remaining provisions were unlawful or were inseparably intertwined with the two challenged provisions—indeed, the court did not address the Rule's severability clause or this aspect of the scope of relief at all. In those circumstances, vacatur of the entire Rule was impermissible.

2. In addition, the district court erred in vacating the challenged provisions of the Rule as applied to non-parties. In explaining that decision, the court did not suggest that such relief was necessary to remedy any injuries to the plaintiffs or was supported by equitable principles. Instead, the court appeared to believe that party-specific vacatur would be "more akin to an injunction" than to "vacatur" and that universal vacatur is thus "the default remedy" for APA violations. Add.37.

14

That is incorrect. Even assuming universal vacatur is authorized by the APA[1], this Court has treated such relief as a discretionary equitable remedy—not as automatic or compelled. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality op.) (directing the district court to consider on remand remedies more limited than universal vacatur); *see also id.* ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018))); *Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand). That makes sense; the APA makes explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground."  5 U.S.C. § 702(1).

The error in the district court's universal remedy is underscored by its comparison of vacatur to injunctions. The problems caused by universal injunctions are well catalogued; they include that such injunctions conflict with principles of Article III and equity, circumvent Rule 23's class-action requirements, "incentivize forum shopping," "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law," and overburden courts' "emergency dockets." *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring); *cf. Morehouse Enters. v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. argued Mar.

---

[1] Properly construed, the APA does not even permit "universal" vacatur, *see United States v. Texas*, 143 S. Ct. 1964, 1980-85 (2023) (Gorsuch, J., concurring), but the government recognizes that this Court's precedent has condoned such relief in at least some circumstances.

14, 2023) (challenge to Rule). And those concerns apply equally to universal vacatur. *Texas*, 143 S. Ct. at 1985-86 (Gorsuch, J., concurring). For those reasons, universal vacatur should, at a minimum, be reserved for "truly extraordinary circumstances." *Id.*

Here, as explained, the district court identified no such extraordinary circumstances supporting universal, rather than party-specific, relief. Thus, the Court should have "limit[ed] the solution to the problem," *see NRDC v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020) (quotation omitted), by vacating the challenged provisions only as to plaintiffs.

## II.    The Remaining Factors Favor a Stay

1. The government and the public will suffer irreparable injury if the vacatur order is not stayed. As the Rule explains, unserialized firearms have proliferated in recent years; in 2021, nearly 20,000 such firearms were reported to ATF as having been recovered from potential crime scenes, and the United States has recently brought many criminal cases "to counter the illegal trafficking of unserialized privately completed and assembled weapons, the possession of such weapons by prohibited persons, and other related Federal crimes." 87 Fed. Reg. at 24,656-57. This "proliferation of untraceable firearms severely undermines" law enforcement's ability to engage in the "integral" process of "determin[ing] where, by whom, or when" a firearm used in a crime was manufactured and "to whom [it was] sold or otherwise disposed," *id.* at 24,656, 24,659, thereby impairing law enforcement's ability to apprehend violent individuals who may pose an ongoing threat to public safety.

16

The Rule not only enables law enforcement to better trace firearms used in crimes but also helps ensure that those firearms do not end up in the hands of individuals prohibited from possessing firearms—such as felons—in the first place. Dealers are required to conduct a background check before selling a firearm to an unlicensed person. The Rule clarifies that products like certain weapon parts kits and partially complete frames or receivers must be sold in compliance with that requirement, preventing (for example) violent felons from purchasing firearms over the Internet. The Rule therefore, as ATF recognized, "increase[s] public safety by, among other things, preventing prohibited persons from acquiring firearms." 87 Fed. Reg. at 24,654.

The injuries to the government and the public from the district court's vacatur are heightened by the court's vacatur of the entire Rule, rather than only the challenged provisions. Perhaps most significantly, the Rule updates an outdated regulatory definition, under a strict reading of which up to 90% of available firearms have no single frame or receiver subject to regulation. The "practical result of that strict reading" would be that "every individual part of almost all firearms in circulation in the United States may be sold separately without compliance with the statutory" requirements for firearm sales, such that "a felon or other prohibited person could easily purchase" (for example) the upper and lower parts of an AR-variant firearm online "and assemble a fully functional AR-variant firearm within a minute" with no serial number. Add.51-52. The Rule also includes provisions specific to ensuring the

17

consistent and proper marking of silencers and modular multipiece receivers. *See* Add.46-47, Add.54.

In addition, the Rule contains other provisions related to effective implementation of the statutory recordkeeping requirements. For example, the Rule requires licensees to mark unserialized firearms when they are taken into the licensee's inventory, so that the statutorily required acquisition and disposition records can be effectively used "as a means of tracing or locating" the firearm. Add.53-54. And the Rule requires licensees to maintain records through the end of the licensee's business, rather than (as the previous regulations permitted) allowing a licensee to destroy records after 20 years. That updated requirement is critical to public safety; "numerous older firearms" recovered at crime scenes could not be traced "because the records were destroyed after 20 years." Add.54-55. And if that provision is vacated—even only while an appeal is pending—more than 14,000 licensees that have been in business for 20 years or more may be permitted to destroy old records, with no way for ATF to recover the information contained in those records. *Id.*

In addition to harming public safety, vacatur of the Rule will substantially harm the regulated community and ATF. Vacatur "has already created[] significant confusion" among licensees. Add.55-56. For example, "ATF has already received inquiries from members of the firearms industry, a trade association," and others to " seeking clarification whether they must now reverse their newly implemented business practices" that reflect the Rule's requirements. *Id.* And that confusion will "only

increase if the [district court's] ruling, or the scope of relief, is reversed on appeal, which may require licensees to overhaul certain business practices twice in a short period." *Id.* In addition, various provisions of the Rule were "aimed at easing burdens on the regulated community," such that vacatur would harm the community by reimposing those burdens. *See* Add.56-57. Finally, with respect to ATF, the agency has devoted substantial resources to training and implementation related to the Rule. Requiring the agency to adjust course would result in the required outlay of substantial additional resources, and it would, particularly given the possibility of future reversal on appeal, risk engendering significant confusion. *See* Add.58-59.

2. By contrast, the plaintiffs will experience only minimal, if any, injuries from a stay of the vacatur pending appeal. Even with respect to the provisions that plaintiffs challenge, those provisions do not forbid the sale (or purchase) of any firearm, weapon parts kit, or other item; instead, the Rule clarifies that certain items, like ready-to-assemble kits, are "firearms" and so must be sold in accordance with the Gun Control Act's licensing, recordkeeping, and background check requirements. Thus, plaintiffs who wish to purchase or sell regulated products may do so if they comply with the Act.

These requirements are not especially onerous. An entity that already possesses a federal firearms manufacturer's license is permitted to sell the firearms that it manufactures at retail, *see* 27 C.F.R. § 478.41(b), subject to certain restrictions on direct sales to out-of-state customers, 18 U.S.C. § 922(b)(3). Even for such customers,

sales are permitted so long as the firearm is shipped to a licensee in the customer's state of residence, which can then transfer the firearm to the customer after fulfilling background check and recordkeeping requirements. And an individual who wishes to purchase one of the regulated products may continue to do so (assuming he is not prohibited from possessing firearms); he may simply need to purchase the product from an in-state seller or have the item transferred through an in-state licensee.

In short, the Rule does not prohibit any plaintiff from selling or purchasing any product; it simply clarifies that sales of certain products must be conducted in accordance with statutory licensing, background check, serializing, and recordkeeping requirements. Indeed, there are tens of thousands of federally licensed firearms manufacturers and dealers around the country, all of whom manage to bear the costs associated with those requirements when producing and selling firearms. And there are, of course, many more firearms owners who similarly bear the minor costs associated with statutory compliance when they purchase firearms from federal firearms licensees. These kinds of incidental costs do not outweigh the substantial harms to the government, the regulated community, and the public from vacatur of the Rule.

And that balancing is particularly clear with respect to the overbroad aspects of the district court's vacatur. No plaintiff has demonstrated any harm from the provisions of the Rule other than those being challenged in this suit. And no plaintiff could plausibly contend that relief to non-parties (other than customers of the entity

plaintiffs) is necessary to remedy any Article III injury they themselves might allege.

But, as explained, such relief imposes significant harm on the government and the

public; a stay is thus warranted.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay of the judgment

pending appeal. At a minimum, and in the alternative, the Court should stay the

vacatur to the extent that it vacates provisions of the Rule beyond those addressed by

the district court and as applied to non-parties.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
    General*

LEIGHA SIMONTON
  *United States Attorney*

MICHAEL S. RAAB
ABBY C. WRIGHT

*/s/  Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff
  Civil Division, Room 7260
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-3388*

July 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2023, I electronically filed the foregoing

response with the Clerk of the Court for the United States Court of Appeals for the

Fifth Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*/s/ Sean R. Janda*
SEAN R. JANDA

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5186 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface. I further certify that this emergency motion complies with the requirements of 5th Cir. R. 27.3 because it was preceded by a telephone call to the Clerk's Office and contact with opposing counsel on July 18, 2023, advising of the intent to file this emergency motion. I further certify that the facts supporting emergency consideration of this motion are true and complete. I further certify under 5th Cir. R. 27.4 that all appellees who have responded to the government's request for their position oppose this motion.

*/s/ Sean R. Janda*
SEAN R. JANDA

No. 23-10718

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

—————————

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,
Plaintiffs-Appellees,

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms; Defense Distributed; Second Amendment Foundation, Incorporated; Not An L.L.C., doing business as JSD Supply; Polymer80, Incorporated,
Intervenor Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,
Defendants-Appellants.

—————————

On Appeal from the United States District Court
for the Northern District of Texas

—————————

## ADDENDUM TO EMERGENCY
## MOTION FOR STAY PENDING APPEAL

—————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MICHAEL S. RAAB
ABBY C. WRIGHT
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
*202-514-3388*

# TABLE OF CONTENTS

**Page**

District Court Opinion (June 30, 2023) (Dkt. 227)...........................................................Add.1

District Court Judgment (July 5, 2023) (Dkt. 231)....................................................... Add.39

District Court Order Granting Administrative Stay (July 18, 2023) (Dkt. 238) ........Add.41

Declaration of Matthew P. Varisco (July 14, 2023) (Dkt. 236-1)..................................Add.42

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JENNIFER VANDERSTOK, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BLACKHAWK MANUFACTURING** | § | |
| **GROUP INC., et al.,** | § | **Civil Action No. 4:22-cv-00691-O** |
| | § | |
| **Intervenor-Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MERRICK GARLAND, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION & ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT & MOTIONS TO INTERVENE

Before the Court are Plaintiffs Jennifer VanDerStok, Michael G. Andren, Tactical Machining, LLC, and Firearms Policy Coalition, Inc.'s ("Original Plaintiffs") Motion for Summary Judgment (ECF No. 140), Brief (ECF No. 141), and Appendix in support (ECF No. 142), filed December 23, 2022; Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms' Motion for Summary Judgment (ECF No. 144), Brief (ECF No. 145), and Appendix in support (ECF No. 146), filed December 23, 2022; Intervenor-Plaintiffs Defense Distributed and The Second Amendment Foundation, Inc.'s Motion for Summary Judgment (ECF No. 165) and Brief in support (ECF No. 166), filed January 12, 2023; Defendants' Combined Opposition to Original Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment and Cross-Motion for Summary Judgement (ECF No. 180), Brief (ECF No. 181), and Appendix in Support (ECF No. 182), filed February 13, 2023; Original Plaintiffs' Reply Brief in Support of Their Motion for Summary Judgment and Response to Defendants' Cross-Motion for Summary

Judgment (ECF No. 191), filed March 6, 2023; Intervenor-Plaintiff BlackHawk Manufacturing Group Inc.'s Reply Brief and Opposition to Defendants' Cross-Motion for Summary Judgment (ECF No. 192), filed March 6, 2023; Intervenor-Plaintiffs Defense Distributed and The Second Amendment Foundation, Inc.'s Summary Judgment Response/Reply Brief (ECF No. 193), filed March 6, 2023; and Defendants' Reply Brief (ECF No. 204) and Appendix (ECF No. 205) in support of their Motion for Summary Judgment, filed April 19, 2023. Also before the Court is the Amici Curiae Brief of Gun Owners for Safety and Individual Co-Amici in Support of Defendants' Opposition to Original Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment (ECF No. 187), filed February 23, 2023. Also before the Court are Defendants' Supplemental Brief Regarding Rule 65(a)(2) Consolidation and Plaintiffs' Count I (ECF No. 132), filed December 5, 2022; Original Plaintiffs' Brief (ECF No. 133), filed December 5, 2022; and Intervenor-Plaintiff BlackHawk Manufacturing Group Inc.'s Brief (ECF No. 134), filed December 5, 2022.

On January 18, 2023, the Court deferred ruling on putative intervenors' motions to intervene until summary judgment briefing concluded. *See* Order, ECF No. 172. Now ripe for review are Not An LLC d/b/a JSD Supply's Motion to Intervene (ECF No. 149) and Brief in support (ECF No. 150), filed January 5, 2023; Defendants' Opposition (ECF No. 207), filed April 27, 2023; Original Plaintiffs' Opposition (ECF No. 212), filed May 10, 2023; and JSD Supply's Reply (ECF No. 213), filed May 11, 2023. Also before the Court are Polymer80's Motion to Intervene (ECF No. 157), Brief (ECF No. 158), and Appendix (ECF No. 159) in support; filed January 9, 2023; Defendants' Opposition (ECF No. 206), filed April 27, 2023; Original Plaintiffs' Opposition (ECF No. 212), filed May 10, 2023; and Polymer80's Reply (ECF No. 214), filed May 11, 2023.

Also pending are Original Plaintiffs' unopposed Motion for Leave to Provide Supplemental Authority to Their Motion for Summary Judgment and Response to Defendants' Cross-Motion for Summary Judgment (ECF No. 197), filed March 24, 2023, which the Court **GRANTS** for good cause shown; and JSD Supply's proposed Motion for Injunction (ECF No. 151) and Brief in support (ECF No. 152), filed January 5, 2023, and Defendants' Notice Regarding the Same (ECF No. 156), filed January 9, 2023, which the Court **DENIES** as prematurely filed.

Having considered the briefing and applicable law, the Court **GRANTS** JSD Supply's and Polymer80's motions to intervene on permissive grounds. For the reasons that follow, the Court **GRANTS** Plaintiffs' and Intervenors' motions for summary judgment, **DENIES** Defendants' cross-motion for summary judgment, and **VACATES** the Final Rule.

## I.    INTRODUCTION

This case presents the question of whether the federal government may lawfully regulate partially manufactured firearm components, related firearm products, and other tools and materials in keeping with the Gun Control Act of 1968. Because the Court concludes that the government cannot regulate those items without violating federal law, the Court holds that the government's recently enacted Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (codified at 27 C.F.R. pts. 447, 478, and 479), is unlawful agency action taken in excess of the ATF's statutory jurisdiction. On this basis, the Court vacates the Final Rule.

## II.    STATUTORY & REGULATORY BACKGROUND

In 1934, Congress enacted the National Firearms Act ("NFA") to authorize federal taxation and regulation of certain firearms such as machineguns, short-barreled shotguns, and short-barreled rifles. National Firearms Act of 1934, ch. 757, Pub. L. 73-474, 48 Stat. 1236, 1236. A few years later, Congress enacted the Federal Firearms Act ("FFA"), which more broadly defined

"firearm" and thereby authorized federal regulation of "any weapon . . . designed to expel a projectile or projectiles by the action of an explosive. . . or any part of such weapon." Federal Firearms Act of 1938, ch. 850, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968).

Thirty years later, Congress enacted the Gun Control Act of 1968 ("GCA"), which superseded the FFA's regulation of firearms in interstate commerce. The GCA requires manufacturers and dealers of firearms to have a federal firearms license.[1] 18 U.S.C. §§ 921, *et seq.* Dealers must also conduct background checks before transferring firearms to someone without a license, and they must keep records of firearm transfers. *Id.* §§ 922(t), 923(g)(1)(A).

The GCA also redefines "firearm" more narrowly than the earlier statute it superseded, defining the term as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3). But "[s]uch term does not include an antique firearm." *Id.* Notably, the GCA departs from the FFA's prior definition of "firearm" by restricting federal authority over "any part" of a firearm to only the "frame or receiver" of such firearm.

Congress delegated authority to administer and enforce the GCA to the Attorney General by authorizing him to "prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." *Id.* § 926(a). The Attorney General, in turn, delegated that authority to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a). Those who violate the federal firearms laws are subject to potential fines and imprisonment. 18 U.S.C. § 924(a).

---

[1] A manufacturer or dealer authorized to transfer firearms under the Gun Control Act is known as a Federal Firearms Licensee ("FFL").

In 1978, ATF promulgated a rule interpreting the phrase "frame or receiver," which the GCA does not define. The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Title and Definition Changes, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). That definition remained in place until last year.

In April 2022, ATF published the Final Rule changing, among other things, the 1978 definition of "frame or receiver." *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479 (2022)).[2] ATF split the phrase into two parts, assigning the term "frame" to handguns and the term "receiver" to any firearm other than a handgun, such as rifles and shotguns. *See* 27 C.F.R. § 478.12(a)(1), (a)(2). ATF then defined the terms "frame" and "receiver" along the same lines as the 1978 rule, though with updated, more precise technical terminology.[3]

But ATF did not stop there. Rather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers. Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver,

---

[2] The Final Rule took effect on August 24, 2022, in the midst of the parties' initial briefing. *See* 27 C.F.R. pts. 447, 478, and 479 (2022).

[3] Here are the two definitions, in full:

>    (1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.
>
>    (2) The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

27 C.F.R. § 478.12(a).

including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.*

Further, the Final Rule permits the ATF Director to consider extrinsic factors when determining if an object is a frame or receiver. Specifically, "[w]hen issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with [or otherwise made available to the purchaser or recipient of] the item or kit." *Id.* The Final Rule also amends ATF's definition of "firearm" to include weapon parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* § 478.11 (definition of "firearm").

## III.    PARTIES & PROCEDURAL BACKGROUND

Individual Plaintiffs Jennifer VanDerStok and Michael Andren are Texas residents who own firearm components that they intend to manufacture into firearms for personal, lawful use.[4] They claim that the Final Rule prohibits them from directly purchasing products online that they want to use to manufacture their own firearms.[5] Now, to purchase these products in compliance with the Final Rule, Individual Plaintiffs would have to route their purchases of the regulated products through an FFL and incur associated transfer fees ($30 in Individual Plaintiffs' case), plus additional time and expense.

---

[4] VanDerStok Decl. 1, ECF No. 16-2; Andren Decl. 1, ECF No. 16-3.
[5] VanDerStok Decl. 2, ECF No. 16-2; Andren Decl. 2, ECF No. 16-3.

Tactical Machining, LLC manufactures and sells items that are subject to regulation under the Final Rule.[6] Over 90% of Tactical Machining's business consists of selling items that individuals can use to manufacture frames and receivers and to build functioning firearms.[7]

The Firearms Policy Coalition, Inc. ("FPC") is a non-profit organization dedicated to promoting the constitutional rights of American citizens through public education and legislative and legal advocacy.[8] In support of its educational and advocacy efforts, FPC owns and uses several firearm parts and products that are subject to the Final Rule.[9] FPC has hundreds of thousands of members, donors, and supporters nationwide, many of whom are plaintiffs in this lawsuit.[10] Individuals and organizations become FPC members by making a donation via the non-profit corporation's website.[11] FPC seeks to bring this lawsuit on behalf of itself and its members.[12]

Shortly before the Final Rule took effect in August 2022, Original Plaintiffs sued the U.S. Attorney General, the Department of Justice, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and the ATF Director over the legality of the Final Rule.[13] Days later, the Original Plaintiffs sought preliminary injunctive relief, which the Court granted on grounds that they were likely to succeed on their claim that ATF exceeded its statutory authority in issuing the Final Rule.[14]

BlackHawk Manufacturing Group, Inc. is a manufacturer and retailer that sells products newly subject to ATF's Final Rule, with most of its revenue earned through sales of those

---

[6] Peters Decl. 1, ECF No. 16-1.

[7] *Id.* at 2.

[8] *See generally* Combs Decl., ECF No. 62-4.

[9] *Id.* ¶¶ 9–10.

[10] *Id.* ¶¶ 6–7. Individual Plaintiffs, Tactical Machining, LLC, BlackHawk Manufacturing Group, Inc. d/b/a 80 Percent Arms, and Defense Distributed are members of FPC. *Id.*

[11] *Id.* ¶ 8.

[12] Orig. Pls.' Reply 5, ECF No. 191.

[13] *See generally* Compl., ECF No. 1.

[14] Orig. Pls.' Mot. for Prelim. Inj., ECF No. 15; Mem. Opinion, ECF No. 56.

products.[15] Defense Distributed is a private defense contractor that primarily manufactures and deals products now subject to the Final Rule.[16] Defense Distributed is also a member of its co-intervenor, the Second Amendment Foundation ("SAF"), a non-profit organization that promotes and defends constitutional rights through educational and legal efforts.[17] Like FPC, SAF brings this suit on behalf of itself and its members.[18] The Court subsequently allowed these parties to intervene in the suit and granted BlackHawk and Defense Distributed their preliminary injunctions on the same grounds as the Original Plaintiffs.[19]

In the weeks after BlackHawk, Defense Distributed, and SAF were permitted to join the lawsuit, and after summary judgment briefing had begun, movants Not An LLC d/b/a JSD Supply and Polymer80, Inc. filed their pending motions to intervene.[20] JSD Supply is a manufacturer and distributor that earns most of its revenue through sales of products now subject to the Final Rule.[21] Likewise, Polymer80, Inc. is a designer, manufacturer, and distributor of firearms and non-firearm products.[22] Through letters issued by ATF since the Final Rule's enactment, Polymer80 learned that some of its products are considered subject to the Final Rule and, if not afforded relief, that its "corporate existence" is at stake.[23]

Plaintiffs and Intervenor-Plaintiffs claim the Final Rule violates several of the Administrative Procedure Act's ("APA") substantive and procedural requirements and various

---

[15] Lifschitz Decl. 6–8, ECF No. 62-5 ¶¶ 8, 11, 13.

[16] *See generally* Defense Distributed Compl., ECF No. 143.

[17] *Id.* ¶¶ 11–12.

[18] *Id.*

[19] Mem. Opinions, ECF Nos. 118, 188.

[20] JSD Supply Mot. to Intervene, ECF No. 149; Polymer80 Mot. to Intervene, ECF No. 157.

[21] JSD Supply Br. 4–5, ECF No. 150.

[22] Polymer80 Br. 1–3, ECF No. 158.

[23] *See generally id.*; *id.* at 4.

constitutional guarantees.[24] Though some raise unique claims, all contend that the Final Rule was issued in excess of the agency's statutory authority and the Court preliminarily agreed.[25] Earlier in the proceedings, the Court considered consolidating its hearing on the parties' motions for preliminary injunction with a trial on the merits under Federal Rule of Civil Procedure 65(a)(2).[26] After review of the parties' responsive briefing, however, the Court did not consolidate and now considers Plaintiffs' and Intervenor-Plaintiffs' claims at the summary judgment stage.

Thus, based on the Court's prior decisions in this case, Defendants are preliminarily enjoined from enforcing the Final Rule against Individual Plaintiffs VanDerStok and Andren; and, with limited exception, Tactical Machining, BlackHawk, and Defense Distributed and the companies' customers. Now ripe for the Court's review are the parties' cross-motions for summary judgment on all statutory and constitutional claims, as well as JSD Supply's and Polymer80's motions to intervene. In part A below, the Court will resolve the motions to intervene before turning to the parties' cross-motions for summary judgment in part B.

---

[24] Orig. Pls.' Am. Compl., ECF No. 93 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates APA's Notice and Comment Requirement (Count II), Violates APA's Ban on Arbitrary and Capricious Conduct (Count III), Violates Nondelegation Principles (Count IV), Violates Take Care Clause (Count V), Violates Due Process (Count VI), Violates the First Amendment (Count VII)); *see also* BlackHawk's Compl., ECF No. 99 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates Separation of Powers (Count II), is Unconstitutionally Vague (Count III), is Arbitrary and Capricious (Count IV), Violates the APA's Procedural Requirements (Count V), Violates the Nondelegation Doctrine (VI), is Contrary to Constitutional Right, Power, Privilege, or Immunity (VII), Violates the Commerce Clause (VIII), Unlawfully Chills First Amendment Speech (IX), Constitutes an Unconstitutional Taking Without Just Compensation (Count X)); *see also* Defense Distributed, et al.'s Compl., ECF No. 143 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates the APA's Procedural Requirements (Counts II and IV), Violates Delegation Principles (Count III), Violates the Second Amendment (Count V), Violates Due Process (Count VI)); *see also* JSD Supply's Mem. 10, ECF No. 150 (expressing intent to adopt Plaintiffs' claims and legal theories in full); *see also* Polymer80's Mem. 6–7, ECF No. 158 (expressing intent to adopt the current plaintiffs' pending claims in full but to assert several additional claims).
[25] Mem. Opinion, ECF No. 56.
[26] *See* Orders, ECF Nos. 33, 107.

## IV.     DISCUSSION

### A.

### 1.  Legal Standard[27]

Federal Rule of Civil Procedure 24(b) vests a district court with considerable discretion to permit permissive intervention in a lawsuit, provided (1) the movant's intervention is timely, (2) the movant "has a claim or defense that shares with the main action a common question of law or fact," and (3) intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(1)(B), (b)(3); *United States v. City of New Orleans*, 540 F. App'x 380, 380–81 (5th Cir. 2013). With respect to the first element of "timeliness," courts are to consider four distinct factors:

> (1) the length of time between the would-be intervenor's learning of his interest and his petition to intervene;
> (2) the extent of prejudice to existing parties from allowing late intervention;
> (3) the extent of prejudice to the would-be intervenor if the petition is denied; and
> (4) any unusual circumstances [weighing in favor of or against intervention].

*In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247–48 (5th Cir. 2009) (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977)). Like permissive intervention itself, any determination of timeliness is committed to the court's discretion. *Id.* at 248.

Finally, in addition to the three permissive elements above, courts *may* also consider factors such as "whether the intervenors' interests are adequately represented by other parties" and whether the intervenors "will significantly contribute to full development of the underlying factual issues in the suit." *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.* ("*NOPSI*"), 732 F.2d

---

[27] Original Plaintiffs and Defendants (the "opponents" for purposes of the following intervention analysis only) contest the propriety of allowing additional intervenors to join the lawsuit by either intervention as of right or permissive intervention. Because the Court concludes that permissive intervention under Rule 24(b) is appropriate in this case, it does not reach the merits of intervention as of right under Rule 24(a)(2). FED. R. CIV. P. 24.

452, 472 (5th Cir. 1984) (citations omitted).

### 2.  Analysis

The Court begins with timeliness, which requires consideration of four factors. *In re Lease Oil Antitrust Litig.*, 570 F.3d at 247. With respect to the first factor, opponents of intervention argue that JSD Supply and Polymer80's interventions are untimely because they "waited five months after the commencement of this action to seek intervention"[28] and that they were presumably aware of the other "multiple competing lawsuits challenging the Final Rule filed before [it] took effect on August 24, 2022."[29] In other words, they waited too long. But these arguments fail because the relevant inquiry for timeliness is how soon the movant intervened in the instant lawsuit after learning its interest was at risk, which may or may not occur when the complaint is filed. *Id.* at 248. Moreover, a movant's decision to forego intervention in another case is irrelevant to the issue of timeliness in the instant case. *See id.* ("The first timeliness factor is '[t]he length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in *the case* before he petitioned for leave to intervene.") (emphasis added). Thus, "[t]he timeliness clock runs either from the time the applicant knew or reasonably should have known of his interest [in the instant litigation] *or* from the time he became aware that his interest would no longer be protected by the existing parties to the lawsuit." *Edwards v. City of Houston*, 78 F.3d 983, 1000 (5th Cir. 1996) (emphasis added) (citation omitted). Either way, there "are no absolute measures of timeliness," *id.*, and any assessment of this factor is wholly committed to the court's discretion. *In re Lease Oil Antitrust Litig.*, 570 F.3d at 248.

---

[28] Defs.' Opp. to JSD Supply 3, ECF No. 207; Defs.' Opp. to Polymer80 5, ECF No. 206.
[29] Orig. Pls.' Opp. 6–7, ECF No. 212.

Here, the Original Plaintiffs commenced this suit and moved for injunctive relief in early August 2022, shortly before the Final Rule took effect.[30] Among those was Firearms Policy Coalition, a nonprofit organization that sought to protect the interests of its entire member base —of which JSD Supply is a part.[31] On October 1, 2022, the Court concluded that FPC had not demonstrated its associational right to seek injunctive relief on its members' behalf.[32] At that point, JSD Supply recognized its interests would no longer be protected via its membership in FPC and, within three months, it moved to intervene.[33] Days later, on January 9, 2023, Polymer80 similarly moved to intervene.[34] Polymer80 says it sought to intervene only 13 days after ATF issued letters identifying Polymer80's products as violative of the Final Rule.[35] And while the Court will not consider evidence "outside the administrative record" in deciding the *merits* of an APA claim, the Court is not aware of any rule that prohibits it from considering extrinsic evidence for purposes of *timeliness of intervention*.[36] Under these circumstances, the Court is of the view that neither movant waited too long between the time it learned of its interests in the suit and its motion to intervene.

Next, the Court considers "the extent of prejudice to existing parties from allowing late intervention." *In re Lease Oil Antitrust Litig.*, 570 F.3d at 247. The opponents claim permitting intervention will prejudice the existing parties by delaying ultimate resolution of the case.[37] But here the proper inquiry is the extent to which the existing parties were prejudiced by the

---

[30] ECF Nos. 1, 15.
[31] Vinroe Decl. ¶ 3, ECF No. 213-1.
[32] Mem. Opinion 15, ECF No. 89.
[33] JSD Supply's Mot., ECF No. 151.
[34] Polymer80's Mot., ECF No. 157.
[35] *Id.* at 2–6.
[36] Orig. Pls.' Opp. 7, ECF No. 212.
[37] Defs.' Opp. to JSD Supply 3, 7, ECF No. 207; Defs.' Opp. to Polymer80 5–6, 9–10, ECF No. 206 (noting Polymer80 asserts ten causes of action separate from those of the existing plaintiffs); Original Pls.' Opp. 8, ECF No. 212.

intervenors' delay in seeking to intervene, not how the existing parties may be inconvenienced after the intervenors have successfully joined. *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994); *Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 865 (5th Cir. 2019). Delay of proceedings, on its own, is not equivalent to prejudice. And the opponents to intervention have offered no explanation about *how* a purported delay of proceedings would be prejudicial. Instead, the opponents have claimed prejudice due to the resulting inconvenience associated with the intervenors' subsequent participation in the lawsuit. That is not enough. "Any potential prejudice caused by the intervention *itself* is irrelevant, because it would have occurred regardless of whether the intervention was timely." *In re Lease Oil Antitrust Litig.*, 570 F.3d at 248 (emphasis added) (citation omitted). Moreover, as permitted by Rule 54, the Court finds no just reason it should delay entry of summary judgment on the existing parties' pending claims, which the intervenors have expressly agreed to adopt.[38] FED. R. CIV. P. 54(b). Thus, any prejudice that delayed proceedings might cause the parties (though doubtful) is cured by this Court's resolution and entry of judgment now as to those shared claims.

Third, the Court considers the "extent of prejudice to the would-be intervenor if the petition is denied." *In re Lease Oil Antitrust Litig.*, 570 F.3d at 247–48. Denying intervention would prejudice the would-be intervenors by delaying a favorable judgment, without which their declining revenues would be prolonged, potentially forcing their dissolution.[39] Polymer80

---

[38] JSD Supply's Mem. 10, ECF No. 150 (expressing intent to adopt Plaintiffs' claims and legal theories in full); Polymer80's Mem. 6–7, ECF No. 158 (expressing intent to adopt Plaintiffs' summary judgment briefing in full and to assert additional distinct claims). To the extent Polymer80 wishes to seek summary judgment on its alternate claims, it may do so. That Defendants may be required to litigate the additional claims is irrelevant, because they would be required to do so whether Polymer80 brought those claims in this case or a separate case.

[39] Kelley Decl. ¶¶ 13–14, Polymer80 App. 6, ECF No. 159 (noting the "profound economic harm" that Polymer80 has experienced following the Final Rule's effective date); Vinroe Supp. Decl. ¶ 3, ECF No. 213-1 (noting JSD Supply's revenues have dropped by more than 73% since the Final Rule's effective date).

concedes it would not be prejudiced if denied intervention in this case, provided its separate lawsuit and preliminary injunction in that case is not dismissed.[40] This conditional concession undoubtedly minimizes its claims of prejudice in the instant suit. But because the "most important consideration" in determining intervention is the prejudice to the parties *opposing* intervention—and the Court finds that none exists—this concession is of little weight in the Court's decision. *Rotstain v. Mendez*, 986 F.3d 931, 938 (5th Cir. 2021).

Fourth, the Court finds no "unusual circumstances" that weigh heavily for or against intervention. *In re Lease Oil Antitrust Litig.*, 570 F.3d at 248. Defendants contend that permitting Polymer80's intervention in this case while the company's independent and duplicative suit is pending would violate the rule against claim-splitting.[41] That rule permits—but does not require—a court to dismiss a second complaint that "alleg[es] the same cause of action as a prior, pending, related action." *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996) (authorizing courts to dismiss a second complaint whether it is duplicative of a previously filed and still active suit). The claim-splitting rule is permissive, however, and does not require the Court to take any action at all. *Id.* In any event, if the rule were applied here, the appropriate course would be to dismiss Polymer80's independent suit, which it filed *after* attempting its initial intervention here.

Nor are the other permissible timeliness factors—"whether the intervenors' interests are adequately represented by other parties" and whether the intervenors "will significantly contribute to full development of the underlying factual issues in the suit"—particularly compelling. *NOPSI*, 732 F.2d at 472. Defendants argue intervention will not "significantly contribute to the full

---

[40] Polymer80's Reply 6, ECF No. 214. After it sought intervention and learned resolution of that motion would be deferred for several months, Polymer80 filed an independent lawsuit before this Court. *See Polymer80, Inc. v. Garland*, Civil Action No. 4:23-cv-00029-O (N.D. Tex. Jan. 9, 2023).
[41] Defs.' Opp. to Polymer80 3–4, 9, ECF No. 206.

development of the underlying factual issues" because the existing parties have already "fully developed and briefed their claims," and intervenors therefore cannot meaningfully contribute.[42] Elsewhere, however, Defendants point out that Polymer80 raises ten distinct causes of action, all of which presumably require further development.[43] In response, Polymer80 says its status as "the industry leader in the design, manufacture, and distribution of the products that ATF" seeks to regulate will significantly contribute to the factual development of the underlying issues in dispute but offers no more than that bare assertion.[44] For its part, JSD Supply offers no rebuttal to Defendants. Thus, on the briefing before it, the Court finds that this factor is, at best, neutral for purposes of intervention or weighs slightly against intervention. But given that the other factors favor intervenors, the Court does not find this sufficient to bar intervention.

Finally, the opponents also argue that JSD Supply and Polymer80 have other means of asserting their interests.[45] Indeed, Polymer80 has a separate suit currently pending before this Court.[46] But whether an intervenor has other adequate means of protecting its interests is not a dispositive or necessary factor for the Court's decision to grant permissive intervention. Though the Court could require the parties to initiate or maintain their own lawsuits, the purpose of Rule 24 and the principle of judicial efficiency counsel against that course of action. *See United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 412 (5th Cir. 1991) (noting Rule 24's goals of achieving "judicial economies of scale by resolving related issues in a single lawsuit" while preventing the single lawsuit "from becoming fruitlessly complex or unending") (cleaned up). Allowing intervention preserves judicial resources by preventing multiple parallel proceedings

---

[42] Defs.' Opp. to Polymer80 9, ECF No. 206; Defs.' Opp. to JSD Supply 7, ECF No. 207.
[43] Defs.' Opp. to Polymer80 6 n.3, ECF No. 206.
[44] Polymer80's Reply 8, ECF No. 214.
[45] Defs.' Opp. to JSD Supply 6–7, ECF No. 207; Defs.' Opp. to Polymer80 9–10, ECF No. 206; Original Pls.' Opp. 5–6, ECF No. 212.
[46] *Polymer80, Inc. v. Garland*, Civil Action No. 4:23-cv-00029-O (N.D. Tex. Jan. 9, 2023).

from running concurrently in multiple courts or before multiple jurists when this Court is already well-acquainted with the parties' respective claims. Nor is there a need to divide lawsuits where, as here, the would-be intervenors largely agree to adopt the claims and briefing schedule already before the Court, which reduces the complexity of the case.

*     *     *     *

In sum, the Court holds that all requisite elements for permissive intervention—timeliness, shared causes of action, and prejudice—weigh in favor of allowing the intervenors to join the lawsuit. For these reasons, the Court **GRANTS** JSD Supply's and Polymer80's motions to intervene on permissive grounds. Because JSD Supply and Polymer80 have agreed to adopt the current Plaintiffs' summary judgment briefing with respect to their shared claims, and because those express intentions inform the Court's discretionary decision to permit intervention here, the intervenors are barred from separately moving for summary judgment or filing supplemental briefing on any of the existing claims. However, Polymer80 may move for summary judgment on its unique claims to the extent those claims are not mooted by the Court's decision today.

**B.**

**1. Legal Standards**

Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record. *See Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). Summary judgment is proper where the Court finds that there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Upon review of agency action, district courts apply the APA, which requires the reviewing court to "hold unlawful and set aside agency action" that the court finds to be "(A)

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

Among other procedural requirements, the APA requires agencies to provide "legislative" rules (i.e., substantive regulations) for public notice and comment, *id.* § 553(b), and to ensure that the final version of such a rule is a "logical outgrowth" of the agency's initial regulatory proposal. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). The APA's arbitrary and capricious standard requires that agency action be both "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), meaning agencies must not "rel[y] on factors which Congress has not intended it to consider" or "entirely fail[] to consider an important aspect of the problem" when issuing regulations. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Once a court determines the contested agency action falls short of the APA's substantive or procedural requirements, the reviewing court "shall" set aside the unlawful agency action. 5 U.S.C. § 706(2); *Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022).

## 2. Article III Standing

As a preliminary defense, Defendants argue that some of the plaintiffs, the Individual Plaintiffs and the non-profit organizations, are not entitled to entry of summary judgment because they lack standing to challenge the Final Rule. Because "standing is not dispensed in gross," the general rule is that each plaintiff must demonstrate a personal stake in the outcome of the case or controversy at bar. *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017). This means

each plaintiff to a case "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (cleaned up). When there are multiple plaintiffs or intervenors to a lawsuit that request the same form of relief, however, only "*one* plaintiff must have standing to seek each form of relief requested." *Id.* at 1651 (emphasis added).

Here, among other requested forms of relief, all plaintiffs and intervenors—including those litigants whose standing is not in question—ask this Court to declare unlawful and set aside the Final Rule.[47] Accordingly, the Court could address the legality of the Final Rule regardless of whether the Individual Plaintiffs and the non-profit organizations have standing. Nevertheless, because these parties will not be entitled to unique forms of relief (e.g., party-specific injunctive relief or attorneys' fees) without independently demonstrating standing, the Court addresses the individuals' and the organizations' standing before turning the merits of their claims.[48]

To establish Article III standing, a plaintiff must show it has suffered (1) an injury-in-fact (2) that is fairly traceable to the defendants' conduct, and (3) is likely to be redressed by a favorable judicial decision. *Id.* at 1650. As the parties invoking federal jurisdiction, plaintiffs bear the burden of proving each element of standing. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).

### i. Individual Plaintiffs

First, Defendants argue that Individual Plaintiffs VanDerStok and Andren cannot demonstrate standing because "the only purported injury they plausibly invoke—a $30 transfer fee that certain FFLs purportedly would charge them to facilitate a firearm purchase—is not fairly

---

[47] Orig. Pls.' Am. Compl. 57, ECF No. 93 (seeking vacatur, injunctive relief, attorneys' fees and costs, etc.); BlackHawk's Compl. 33, ECF No. 99 (same); Defense Distributed, et al.'s Compl. 27, ECF No. 143 (same); JSD Supply's Proposed Compl. 29–30, ECF No. 149-2 (same); Polymer80's Proposed Compl. 43–44, App. 101–02, ECF No. 159 (same).

[48] To be entitled to attorneys' fees, a plaintiff must independently establish standing and prevail on the merits of an underlying claim. *See, e.g.*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998) ("An interest in attorney's fees is insufficient to create an Article III case or controversy *where none exists on the merits of the underlying claim*.") (cleaned up) (emphasis added).

traceable to the Rule."[49] Defendants contend that an FFL's independent decision to charge Individual Plaintiffs a transfer fee to facilitate purchase of newly regulated products bears no causal relationship to the Final Rule, and is therefore not fairly traceable to Defendants' conduct.[50] But Defendants are wrong on this point.

While the Supreme Court has declined to endorse theories of standing "that rest on *speculation* about the decisions of independent actors," where a plaintiff can make a showing of *de facto* causality, standing's traceability element is satisfied. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (emphasis added). Here, Individual Plaintiffs' theory of standing is not speculative. Instead, it relies "on the predictable effect of Government action on the decisions of third parties." *Id.* Individual Plaintiffs have confirmed that the FFLs they would use to facilitate their purchases will in fact charge a transfer fee.[51] And it is highly predictable that FFLs would charge for this service, particularly when faced with the prospect of an influx of customers who need to make purchases of certain products through an FFL as a result of a recent government mandate. Absent the requirements of the Final Rule, the Individual Plaintiffs would not purchase the regulated products through an FFL and would therefore not incur an associated transfer fee. This is sufficient to show *de facto* causality. Thus, the Court is satisfied that Individual Plaintiffs' purported injury is fairly traceable to Defendants' actions.

Even if the FFLs' independent decision to charge a transfer fee broke the chain of causation, Individual Plaintiffs have an alternative basis for standing that Defendants largely ignore. In a footnote, Defendants dismiss Individual Plaintiffs' other alleged injury—the threat of criminal prosecution should they violate the Rule—as simply "not credible."[52] They say the risk

---

[49] Defs.' Reply 2, ECF No. 204; Defs.' Cross-Mot. 11–12, ECF No. 181.
[50] Defs.' Reply 2–3, ECF No. 204.
[51] VanDerStok Decl. ¶¶ 2–6, ECF No. 62-1; Andren Decl. ¶¶ 2–6, ECF No. 62-2.
[52] Defs.' Reply 2 n.3, ECF No. 204.

of criminal prosecution is not a cognizable injury because the costs Individual Plaintiffs would have to incur to avoid criminal liability "are merely *de minimis*."[53]

Here, however, Defendants conflate the injury analysis required for Article III standing with the irreparable harm analysis required for a preliminary injunction.[54] It is true that, for purposes of injunctive relief, a plaintiff must allege an irreparable injury that is more than merely *de minimis*. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). But Defendants offer no authority for the proposition that a plaintiff's alleged injury must pass a certain threshold to be cognizable for purposes of Article III. Nor is the Court aware of any such requirement.

It is well established that a credible threat of government action, on its own, provides a plaintiff with a sufficient basis for bringing suit. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). This remains true even if a plaintiff takes steps to protect themselves from prosecution. As the Supreme Court has made clear, a "plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Id.* Thus, even if Individual Plaintiffs in this case ameliorated the threat of government enforcement by making their purchases through an FFL and paying the associated fee (action), or by simply refraining from purchasing the regulated products they want to buy

---

[53] *Id.* (""Plaintiffs do not face a 'Hobson's choice' whether to comply with a regulation or risk criminal prosecution when the costs of compliance are merely *de minimis*.").

[54] Plaintiffs respond that "[t]he Agencies provide no argument as to . . . how Individual Plaintiffs could suffer irreparable harm [as the Court previously held] and yet not have standing." Pls.' Reply 3, ECF No. 191. But irreparable harm for purposes of injunctive relief and Article III injury-in-fact are not equivalents. And Plaintiffs offer no authority indicating that a showing of irreparable harm for purposes of injunctive relief automatically satisfies Article III's injury-in-fact requirement. Moreover, many courts address these issues separately, confirming that the analysis is distinct. *See, e.g.*, *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378 (6th Cir. 2020) (analyzing Article III standing and irreparable harm for purposes of injunctive relief separately); *East Bay Sanctuary v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018) (same); *Geer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638 (N.D. Tex. 2021) (same) (O'Connor, J.).

(inaction), they do not lose their right to challenge the Final Rule.[55] Defendants offer no argument regarding the traceability or redressability of this alternative injury. Nor could they. Thus, the Court holds that Individual Plaintiffs' threat of civil or criminal penalties is a cognizable injury under Article III and that, on this basis also, they have demonstrated standing to pursue their claims.

### ii. Non-profit Organizations

Second, Defendants claim the organizations—Firearms Policy Coalition and the Second Amendment Foundation—have failed to demonstrate associational (or organizational) standing. The associational standing doctrine permits a traditional membership organization "to invoke the court's [injunctive or declaratory] remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). To do so, the organization must satisfy a three-prong test showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, No. 20-1199, --- S.Ct. ---, 2023 WL 4239254, at *8 (U.S. June 29, 2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants do not meaningfully contend that FPC and SAF cannot satisfy the three-prong *Hunt* test.[56] Instead, they challenge the non-profits' statuses as "traditional membership

---

[55] For the same reasons, Defendants' argument that FPC cannot establish Article III standing *in its own right* fails. *See* Defs.' Reply 3 n.4. As FPC avers, it owns and uses products now subject to the Final Rule and, though a corporate entity, will suffer the same financial injury as Individual Plaintiffs if required to comply and the same threat of prosecution for non-compliance. Orig. Pls.' Br. 50, ECF No. 141; Combs Decl. ¶¶ 9–11, ECF No 62-4.

[56] Defs.' Br. 13, ECF No. 181; Defs.' Reply 3–4, ECF No. 204. Defendants simply point to the Court's earlier conclusion that, at the preliminary injunction stage, FPC did not carry its burden to demonstrate associational standing. Defs.' Br. 13, ECF No. 181 (citing Mem. Opinion 12–15, ECF No. 89).

organizations" arguing that, because they cannot satisfy this threshold requirement, they cannot establish associational standing. Defendants contend that, under Fifth Circuit precedent, an organization can only prove itself a "traditional membership organization" if it provides evidence that its members both fund and control the organization's activities. By contrast, FPC and SAF contend that they are traditional membership organizations because they have members nationwide who, by donating to their organizations, have "joined voluntarily to support [the non-profits'] mission[s]."[57] *Students for Fair Admissions, Inc. v. University of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022). Under the Supreme Court's recent decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, that is all the evidence that is required. 2023 WL 4239254, at *9. "Where, as here, an organization has identified members and represents them in good faith, [the Supreme Court's decisions] do not require further scrutiny into how the organization operates." *Id.* at 9.

As Defendants concede, the Court has already recognized that SAF satisfies the *Hunt* test.[58] Based on its summary judgment briefing, so does FPC. First, several of FPC's members— Individual Plaintiffs, Tactical Machining, and BlackHawk, who are all parties to this suit—have standing to sue in their own right. Second, FPC's organizational purpose to advocate for their members' individual liberties, separation of powers, and limited government are clearly germane to this suit challenging Defendants' asserted authority to regulate the manufacture of personal firearms.[59] Third, because FPC seeks equitable remedies of declaratory relief and vacatur of the Final Rule, there is no need for FPC's individual members to participate in the lawsuit.

---

[57] Orig. Pls.' Reply 8, ECF No. 191; Combs Decl. ¶ 8, ECF No. 62-4 (describing the voluntary and mission-driven membership base of FPC); Defense Distributed, et al.'s Reply 2, ECF No. 193; Gottlieb Decl. ¶ 2, ECF No. 166-2 (describing SAF's national membership base).
[58] Order 5, ECF No. 137.
[59] *See generally* Combs Decl., ECF No. 62-4; Orig. Pls.' Br. 49, ECF No. 144.

* * * *

In sum, the Court holds that Individual Plaintiffs and FPC—in its own right—have standing to pursue their claims for relief. Furthermore, FPC and SAF have demonstrated associational standing and may pursue relief on their members' behalf. Because Defendants do not contest the standing of Tactical Machining, BlackHawk, or Defense Distributed, these parties are similarly entitled to pursue their respective claims for relief.

### 3. Statutory Claims

The Original Plaintiffs and Intervenors (collectively "Plaintiffs" going forward) attack the Final Rule on a host of statutory and constitutional grounds. However, there exists an ordinary rule "that a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available." *Hagans v. Lavine*, 415 U.S. 528, 547 (1974); *see also New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable. Before deciding the constitutional question, it was incumbent on [the lower] courts to consider whether the statutory grounds might be dispositive.") (cleaned up). Thus, "if a case raises both statutory and constitutional questions, the inquiry should focus initially on the statutory question[s]. . . . If the lower court finds that statutory ground dispositive, resolution of the constitutional issue will be obviated." *Jordan v. City of Greenwood, Miss.*, 711 F.2d 667, 669 (5th Cir. 1983). Because the Court concludes that the ATF has clearly and without question acted in excess of its statutory authority, and that this claim is dispositive, the Court declines to address the constitutional questions presented.

The Court begins with Plaintiffs' shared claim that, in attempting to regulate products that are not yet a "frame or receiver," and therefore not a "firearm" for purposes of the Gun Control Act, the ATF has acted in excess of its statutory jurisdiction. 5 U.S.C. § 706(2)(C). As they argued at the preliminary injunction stage, Plaintiffs maintain that the Final Rule exceeds ATF's statutory authority in two primary ways. First, they argue that the Final Rule expands ATF's authority over parts that may be "readily converted" into frames or receivers, when Congress limited ATF's authority to "frames or receivers" as such. Second, they argue that the Final Rule unlawfully treats component parts of a weapon in the aggregate (i.e., a weapon parts kit) as the equivalent of a firearm.[60] The Court agrees with Plaintiffs.

Basic principles of statutory interpretation decide this case. "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (quoting *Roberts v. Sea-Land Services, Inc.*, 556 U.S. 93, 101 (2012)). If the disputed statutory language is unambiguous, as it is here, "the sole function of the courts is to enforce [the law] according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (cleaned up). The Court

---

[60] Orig. Pls.' Supp. Br. Regarding Count I, ECF No. 133; *see also* Defense Distributed, et al.'s Br. in Support of Mot. for Summ. J., ECF No. 166 (joining and adopting Original Plaintiffs' Counts and summary judgment briefing on behalf of Defense Distributed and Second Amendment Foundation). BlackHawk offers additional arguments in support of its claim that the agency has exceeded its statutory authority, some of which are closely related to the arguments before the Court and other that are novel. *See generally* BlackHawk's Supp. Br. Regarding Count I 7–10, ECF No. 134 (e.g., arguing that the Final Rules requirement that FFLs retain records indefinitely exceeds the agency's statutory authority). But because Plaintiffs' primary arguments in support of their shared Counts I are dispositive, the Court need not consider each of the alternative grounds for reaching the same result.

begins with "the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (quoting *Bouchikhi v. Holder*, 676 F.3d 173, 177 (5th Cir. 2012)). If a statute "includes an explicit definition," however, the Court "must follow that definition, even if it varies from a term's ordinary meaning." *Digit. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (cleaned up).

### i.    Parts that *may become* receivers are not receivers.

Congress carefully defined its terms in the Gun Control Act. The primary definition of "firearm" in the GCA contains three parts: "any weapon (including a starter gun) which [1] will or [2] is designed to or [3] may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Under this primary definition, a firearm is first and foremost a *weapon*. Underscoring that point, Congress explicitly named starter guns in the definition because starter guns are not obviously weapons. Then, because weapon parts also are not "weapons," Congress created a secondary definition covering specific weapon parts: "the frame or receiver of any such weapon." *Id.* § 921(a)(3)(B).[61] Notably, Congress did not cover all weapon parts—only frames and receivers. And *only* the frames and receivers "of any such weapon" that Congress described in its primary definition.

Because Congress did not define "frame or receiver," the words receive their ordinary meaning. *See* 18 U.S.C § 921 (defining other terms); *Kaluza*, 780 F.3d at 659. Contrary to Defendants' assertion, in an interpretive dispute over a statutory term's meaning, the Court does not simply "leav[e] the precise definition of that term to the discretion and expertise of ATF."[62]

---

[61] The Gun Control Act defines "firearm" in full as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3).

[62] Defs.' Supp. Br. Regarding Count I 9, ECF No. 132 (citing no supporting authority for the proposition that agency's definition of an unambiguous statutory term controls).

Nor is the Court bound by the agency's definition of an unambiguous statutory term, even if the ATF has "long provided regulations defining . . . 'frame or receiver.'"[63]

Plaintiffs do not take issue with ATF's 1978 definition of "frame or receiver." This is because, as Defendants themselves acknowledge, ATF's prior regulatory definitions have been "*consistent with common and technical dictionary definitions*."[64] Statutory construction entails "follow[ing] the plain and unambiguous meaning of the statutory language, [and] interpreting undefined terms according to their ordinary and natural meaning and the overall policies and objectives of the statute. In determining the ordinary meaning of terms, dictionaries are often a principal source." *NPR Invs., L.L.C. ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014) (cleaned up). Near the time of the GCA's enactment in 1968, Webster's Dictionary defined "frame" as "the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm" and "receiver" as "the metal frame in which the action of a firearm is fitted and which the breech end of the barrel is attached." *Webster's Third International Dictionary* 902, 1894 (1971).[65] ATF's prior regulatory definition, which defined "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel," tracks that common definition.[66] Title and Definition Changes, 43 Fed. Reg. at 13,537.

---

[63] Defs.' Supp. Br. Regarding Count I 6–7, ECF No. 132. Even if the phrase "frame or receiver" was ambiguous, the Court would not defer to ATF's interpretation under *Chevron* because Defendants have not invoked the doctrine in this case, because the statute in question imposes criminal penalties, and because the Final Rule is a reversal of the ATF's prior interpretive position. *Cargill v. Garland,* 57 F.4th 447, 464–68 (5th Cir. 2023); Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 17–18, ECF No. 41.

[64] Defs.' Supp. Br. Regarding Count I 9, ECF No. 132 (emphasis added).

[65] *See also John Olson, Olson's Encyclopedia of Small Arms* 72 (1985) (defining a receiver as "the part of a gun that takes the charge from the magazine and holds it until it is seated in the breech. Specifically, the metal part of a gun that houses the breech action and firing mechanism").

[66] ATF's 1968 definition of "frame or receiver" was identical. *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968).

But the Final Rule's amended definition of "frame or receiver" does not accord with the ordinary meaning of those terms and is therefore in conflict with the plain statutory language. Departing from the common understanding of "frame or receiver," Defendants now assert ATF's authority to regulate "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]" that are "designed to or may readily be completed, assembled, restored, or otherwise be converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The parts must be "clearly identifiable as an unfinished component part of a weapon." *Id.* In deciding whether something is a partially complete frame or receiver, ATF may consider other materials such as molds, instructions, and marketing materials "that are sold, distributed, or possessed with the item." *Id.*

As this Court has previously discussed, the definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). And that which *may become* or *may be converted to* a functional receiver is not itself a receiver. Congress could have included firearm parts that "may readily be converted" to frames or receivers, as it did with "weapons" that "may readily be converted" to fire a projectile. *Id.* § 921(a)(3)(A), (a)(4)(B). But it omitted that language when talking about frames and receivers. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (citation and internal quotation marks omitted). Likewise, when Congress uses a phrase in one part of a definition and excludes that phrase from another part of the very same definition, courts should give effect to Congress's deliberate exclusion.

Congress excluded other adjectives that ATF adds to its definition. Specifically, the Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c).

Congress's definition does not. Again, compare the language in Congress's primary definition of "firearm" to its secondary definition covering frames and receivers. The primary definition of "firearm" includes any "weapon" that "is designed to" fire a projectile. 18 U.S.C. § 921(a)(3)(A). That language covers disassembled, nonfunctional, and antique firearms because they are "designed" to fire projectiles even if they are practically unable to do so. But Congress wanted to exclude antiques, so it explicitly said the "term does not include an antique firearm," once again demonstrating awareness of the scope of the language it chose. *Id.* § 921(a)(3). In contrast, Congress did not choose to cover firearm parts that are "designed" to be frames or receivers—that is, incomplete, nonfunctional frames or receivers. "That omission is telling," particularly when Congress used the more expansive terminology in the same definition. *Collins*, 141 S. Ct. at 1782. In sum, ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is facially unlawful given its conflict with the ordinary meaning of those terms as read within their immediate statutory context. *Sturgeon*, 577 U.S. at 438 (cleaned up).

The Court's earlier acknowledgement that ATF does indeed have discretion to decide "whether a particular component is a frame or receiver" based upon that component's "degree of completeness" does not alter this analysis.[67] Relying on the Court's acknowledgement, Defendants claim that is all the Final Rule purports to do: "provide[] more specific guidance about the criteria ATF uses in making th[e] determination" whether a component is a frame or receiver.[68] But that is not all the regulation does. Rather, the Final Rule sets outs the criteria ATF will use to determine whether a component "may readily be . . . *converted to function*" as a frame or receiver. 27 C.F.R. § 478.12(c) (emphasis added). As the Court previously explained, the issue in this case is whether ATF may properly regulate a component as a "frame or receiver" even after ATF determines that

---

[67] Mem. Opinion 10, ECF No. 56.
[68] Defs.' Supp. Br. Regarding Count I 10, ECF No. 132.

the component in question is *not* a frame or receiver.[69] It may not. Logic dictates that a part cannot be both *not yet* a receiver and receiver at the same time. Defendants' reliance on that logical contradiction is fatal to their argument.

Predictably, Defendants disagree with the Court's interpretation of how the regulation operates and argue that "the Final Rule's amended definition treats a component as a frame or receiver only when ATF has determined that the component *is* a frame or receiver."[70] Again, a plain reading of the Final Rule's text belies this objection.[71] A part that has yet to be completed or converted to function as frame or receiver is *not* a frame or receiver. ATF's declaration that a component is a "frame or receiver" does not make it so if, at the time of evaluation, the component does not yet accord with the ordinary public meaning of those terms.

Thus, the Court's prior acknowledgment that "[a]n incomplete receiver may still be a receiver *within the meaning of the statute*, depending on the degree of completeness" is not a contradiction.[72] To be a receiver "within the meaning of the statute" requires that the particular component possess all the attributes of a receiver as commonly understood (i.e., the component must "provide[] housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel") at the point of evaluation, not "readily" in the near term.

Nevertheless, Defendants continue to press their case with reference to historical agency action. Defendants offer several classification letters in which ATF previously determined that a particular component was (or was not) a "firearm" for purposes of the GCA based on the item's

---

[69] *Id.*

[70] *Id.*

[71] Nor do Defendants invoke *Auer* deference here.

[72] Mem. Opinion 10, ECF No. 56 (emphasis added).

stage of manufacture.[73] They contend that this historical practice proves that ATF does, in fact, hold statutory authority to regulate firearm components that may "readily" become a frame or receiver.[74] But historical practice does not dictate the interpretation of unambiguous statutory terms. The ordinary public meaning of those terms does. If these administrative records show, as Defendants contend, that ATF has previously regulated components that are not *yet* frames or receivers but could *readily be converted into* such items, then the historical practice does nothing more than confirm that the agency has, perhaps in multiple specific instances over several decades, exceeded the lawful bounds of its statutory jurisdiction.[75] That the agency may have historically acted *ultra vires* does not convince the Court it should be permitted to continue the practice.

Finally, Defendants argue that the Final Rule's redefinition of the "frame or receiver" is appropriate because it better achieves the goals Congress intended to accomplish in enacting the federal firearms laws.[76] They warn that "[u]nder any other approach, persons could easily circumvent the requirements of the GCA and NFA by producing or purchasing almost-complete [purported] frames or receivers that could easily be altered to produce a functional frame or receiver."[77] But "the best evidence of Congress's intent is the statutory text." *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). And the text of 18 U.S.C. § 921(a)(3), read in context, indicates that when Congress sought to regulate *parts* of weapons, it did so meticulously. Vague countervailing assertions about Congress's purpose in enacting the federal firearms laws do not override this analysis.

---

[73] *See* Defs.' Supp. Br. Regarding Count I 7–10, ECF No. 132.
[74] *See id.*
[75] *Id.* at 8 ("Under the previous definition, then, ATF regularly applied the definition of 'frame or receiver' to some unfinished or incomplete frames or receivers if they had reached a sufficiently advanced stage of the manufacturing process that they *could be readily converted to a functional state*.").
[76] *Id.* at 11.
[77] *Id.*

### ii.    A weapon parts kit is not a firearm.

The Gun Control Act defines a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3). The Final Rule amends that definition, adding that the term "firearm" "shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). But that language conflicts with the statute's definition of "firearm."

As this Court previously concluded, ATF has no general authority to regulate weapon parts.[78] When Congress enacted the GCA, it replaced the FFA that authorized regulation of "any part or parts of" a firearm. Federal Firearms Act of 1938, Ch. 850, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968). In proposing the new regulation, Defendants even acknowledged as much.[79] Instead, under the GCA, the only firearm parts that fall under ATF's purview are "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). But the Final Rule goes further by regulating weapon parts kits (that is, "aggregations of weapon parts")[80] that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11.

---

[78] Mem. Opinion, ECF No. 56.
[79] *Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"), 86 Fed. Reg. 27,720, 27,720 (May 21, 2021) ("Congress recognized that regulation of all firearm parts was impractical. Senator Dodd explained that '[t]he present definition of this term includes "any part or parts" of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."'").
[80] Defs.' Resp. to Mot. for Prelim. Inj. 13, ECF No. 41.

The GCA covers "any *weapon*" that is "designed to" or "may readily be converted to" fire a projectile. 18 U.S.C. § 921(a)(3)(A) (emphasis added). And Defendants contend that weapon parts kits satisfy this definition because they are clearly "'designed to' fire a projectile" and are sold to customers "for the sole purpose of assembling the kits into functional weapons capable of firing a projectile."[81] They say "[a] weapon parts kit is nothing more than a disassembled, currently nonfunctional weapon incapable of firing a projectile in its present form, but that is designed and intended to be assembled or completed to do so."[82] But Congress's definition does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile. To read § 921(a)(3)(A) as authorizing ATF to regulate any aggregation of weapon parts that may readily be converted into a weapon would render § 921(a)(3)(B)'s carveout for "frame[s] or receiver[s]" superfluous. Accepting Defendants' interpretation would be to read the statute as authorizing regulation of (A) weapon parts generally, and (B) two specific weapon parts. *SEC v. Hallam*, 42 F.4th 316, 337 (5th Cir. 2022) (noting courts should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law") (citation omitted). This despite Congress's purposeful change in the law between the FFA and the GCA, which limited agency authority to regulation of only frames and receivers. "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Id.* (quoting *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020)).

The statutory context repeatedly confirms that Congress intentionally chose not to regulate "weapon" parts generally. As further evidence, look to § 921(a)(4)(C), which does allow for the regulation of "parts," but only parts of "destructive devices"—one of the four statutory sub-

---

[81] Defs.' Supp. Br. Regarding Count I 13, ECF No. 132.
[82] *Id.* at 14.

definitions of "firearm." *Id.* § 921(a)(3)(D). The term "destructive device" is defined as "any explosive, incendiary, or poison gas," such as a bomb, grenade, mine, or similar device. *Id.* § 921(a)(4)(A). The definition of "destructive device" also includes "any type of weapon" that "may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter." *Id.* § 921(a)(4)(B). For example, suppose a manufacturer tried to sell a parts kit to make a homemade grenade. ATF could regulate that parts kit because it can regulate "any combination of parts either designed or intended for use in converting any device into" a grenade, from which a grenade "may be readily assembled." *Id.* § 921(a)(4)(C). Likewise for bombs, rockets, missiles, and other destructive devices. But commonly sold firearms such as 9mm pistols or .223 rifles do not fall under the specialized definition of "destructive devices," so weapon parts kits for those firearms cannot be properly regulated as components of "destructive devices." *Id.* § 921(a)(4).

In sum, the Gun Control Act's precise wording demands precise application. Congress *could have* described a firearm as "any combination of parts" that would produce a weapon that could fire a projectile. It used that language elsewhere in the definition. *Id.* § 921(a)(4)(C). Congress could have described a firearm as any part "designed" to be part of a weapon. It used that language, too. *Id.* § 921(a)(3)(A), (a)(4)(C). Congress could have described a firearm as a set of parts that "may be readily assembled" into a weapon, as it did for "destructive device." *Id.* § 921(a)(4)(C). Congress could have written all those things, and the very definition of "firearm" demonstrates that Congress knew the words that would accomplish those ends.[83] But Congress did

---

[83] Congress's definition of "machinegun" elsewhere in the U.S. Code is a great example of a definition that would fit the kind of rule ATF has in mind:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by

not regulate firearm parts as such, let alone aggregations of parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11. Accordingly, the Final Rule's attempt to regulate weapon parts kits lacks statutory support.

As the Court has previously discussed, Defendants' arguments that the Final Rule's regulation of weapon parts kits is consistent with existing judicial interpretations of the Gun Control Act are unavailing.[84] Defendants' cited cases demonstrate that courts understand the constraints of the Gun Control Act's definitions. The only Fifth Circuit case Defendants cite held that a disassembled shotgun was still a "firearm" under the Gun Control Act's definition. *See United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993). There, the government argued the shotgun "was only 'disassembled' in that the barrel was removed from the stock and that it could have been assembled in thirty seconds or less." *Id.* But the Fifth Circuit only agreed after surveying other cases in which courts held that inoperable weapons were still firearms "so long as those weapons 'at the time of the offense did not appear clearly inoperable.'" *Id.* No weapon parts kit would pass that test, and Defendants do not claim they would.[85]

---

a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part* designed and intended solely and exclusively, or *combination of parts* designed and intended, for use in converting a weapon into a machinegun, *and any combination of parts from which a machinegun can be assembled* if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphases added); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 n.3 (2006) ("Our more natural reading is confirmed by the use of the word 'contract' elsewhere in the United States Code . . . .").

[84] *See* Defs.' Supp. Br. Regarding Count I 13; Defs.' Resp. to Mot. for Prelim. Inj. 20–21, ECF No. 41.

[85] The best case in support of Defendants is *United States v. Wick*, 697 F. App'x 507 (9th Cir. 2017), in which the Ninth Circuit upheld a conviction for unlicensed firearm dealing based on evidence that the defendant had sold a "complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive,' thus meeting the statute's definition of a firearm." *Id.* at 508 (quoting 18 U.S.C. § 921(a)(3)(A)). But *Wick* is outside this circuit, nonprecedential, and contains no analysis of the statutory text.

In sum, there is a legal distinction between a weapon parts kit, which may be an aggregation of partially manufactured parts not subject to the agency's regulatory authority, and a "weapon" which "may readily be completed [or] assembled . . . to expel a projectile." 18 U.S.C. § 921(a)(3)(A). Defendants contend that drawing such a distinction will produce the absurd result whereby a person lawfully prohibited from possessing a firearm can obtain the necessary components and, given advances in technology, self-manufacture a firearm with relative ease and efficiency.[86] Even if it is true that such an interpretation creates loopholes that as a policy matter should be avoided, it not the role of the judiciary to correct them. That is up to Congress. And until Congress enacts a different statute, the Court is bound to enforce the law as written.

*     *     *     *

Because the Final Rule purports to regulate both firearm components that are not yet a "frame or receiver" and aggregations of weapon parts not otherwise subject to its statutory authority, the Court holds that the ATF has acted in excess of its statutory jurisdiction by promulgating it.

### 4. Remedy

The proper remedy for a finding that an agency has exceeded its statutory jurisdiction is vacatur of the unlawful agency action. While Defendants claim the APA does not allow for such

---

Defendants' remaining cases are even less applicable. *See United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (affirming the district court's denial of an evidentiary hearing on whether probable cause supported a search warrant based on the defendant's possession of weapon parts kits that could "readily be converted" into firearms), *overruled on other grounds by Dist. of Columbia v. Heller*, 554 U.S. 570, 594–95 (2008); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (affirming a sentence enhancement for possession of a firearm because the defendant had a disassembled rifle but "could easily 'make the rifle operational in just a few seconds by putting the bolt in'"); *United States v. Theodoropoulos*, 866 F.2d 587, 595 n.3 (3d Cir. 1989) (affirming a conviction for possession of an unregistered, disassembled machine pistol), *overruled by United States v. Price*, 76 F.3d 526 (3d Cir. 1996).

[86] *See* Defs.' Supp. Br. Regarding Count I 14, ECF No. 132; Defs.' Resp. to Mot. for Prelim. Inj. 1–3, ECF No. 41.

a remedy, the Fifth Circuit says otherwise. *Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (permitting vacatur under 5 U.S.C. § 706(2)).[87] While in some cases the court may remand a rule or decision to the agency to cure procedural defects, the Fifth Circuit considers vacatur the "default rule" for agency action otherwise found to be unlawful. *Id.* at 859–60; *accord Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022) (concluding that "[v]acatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation") (emphasis added). The D.C. Circuit agrees. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action . . . . In rare cases, however, we do not vacate the action but instead remand for the agency to correct its errors."). Whether remand-without-vacatur is the appropriate remedy "turns on two factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Id.* (cleaned up).

Vacatur is appropriate given the Court's conclusion that the ATF has exceeded its statutory authority. An illegitimate agency action is void *ab initio* and therefore cannot be remanded as there is nothing for the agency to justify. Defendants tacitly acknowledge this, noting that "if vacatur is authorized under the APA, it is not warranted here in the event that Plaintiffs succeed on the merits of any *procedural claim*, because the agency can likely correct any such error on remand."[88]

---

[87] Defendants argue that any Fifth Circuit precedent recognizing the permissibility of vacatur is not binding, because those decisions did not squarely address the issue of whether the APA authorizes such a remedy. Defs.' Reply 52–53. As such, Defendants contend this Court may not be bound by a legal "assumption" of a Fifth Circuit panel. *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021). But even if this Court is not bound by the Circuit's view that the APA permits vacatur, Defendants have not offered a compelling justification why this Court should depart from the mass of persuasive authority—developed over decades—that has assumed that vacatur is permissible. *See* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1178 n.270 (2020) (collecting cases from all Circuits).
[88] Defs.' Reply 53, ECF No. 204 (emphasis added).

Moreover, vacating the unlawful assertion of the agency's authority would be minimally disruptive because vacatur simply "establish[es] the status quo" that existed for decades prior to the agency's issuance of the Final Rule last year. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022).

Defendants argue that any vacatur should only be applied to the parties before the Court while citing no binding authority in support.[89] But such a remedy is more akin to an injunction that would prohibit the agencies from enforcing their unlawful Final Rule against only certain individuals. And indeed, "[t]here are meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *Id.* at 219 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)) (assuming the availability of vacatur under the APA)). "[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the . . . statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Id.* at 220. Thus, the Court applies the default remedy and **VACATES** the Final Rule on grounds that the agency acted beyond the scope of its legitimate statutory authority in promulgating it.

Finally, because vacatur provides Plaintiffs full relief, the Court will not address the parties' remaining statutory claims, all of which raise procedural defects that might properly result in remand of the Final Rule that the Court has already deemed vacated.

## V.     CONCLUSION

In sum, the Court **GRANTS** Original Plaintiffs' unopposed Motion for Leave to Provide Supplemental Authority, and the Court **DENIES** JSD Supply's proposed Motion for Injunction as prematurely filed. The Court **GRANTS** Intervenor-Plaintiffs JSD Supply's and Polymer80's Motions to Intervene. Further, for the reasons discussed, the Court **GRANTS** Plaintiffs' and

---

[89] Defs.' Reply 54–55, ECF No. 204.

Intervenor-Plaintiffs' Motions for Summary Judgment, **DENIES** Defendants' Cross-Motion, and **VACATES** the Final Rule. Separate final judgment shall issue as to the appropriate parties and claims. As discussed, Polymer80 may move for summary judgment on its unique claims to the extent those remaining claims are not mooted by this decision.

   **SO ORDERED** this **30th day** of **June, 2023**.

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| JENNIFER VANDERSTOK, et al., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | |
| | § | |
| BLACKHAWK MANUFACTURING | § | |
| GROUP INC., et al., | § | |
| | § | **Civil Action No. 4:22-cv-00691-O** |
| **Intervenor Plaintiffs,** | § | |
| | § | |
| v. | § | |
| | § | |
| MERRICK GARLAND, et al., | § | |
| | § | |
| **Defendants.** | § | |

**FINAL JUDGMENT**

This Judgment is issued pursuant to Fed. R. Civ. P. 58(a).

This action came on for consideration by the Court, and the issues having been duly considered and a decision duly rendered,

It is **ORDERED**, **ADJUDGED**, and **DECREED** that:

1. Plaintiffs' and Intervenor-Plaintiffs' motions for summary judgment on grounds that the Final Rule was issued in excess of ATF's statutory jurisdiction (Counts I and III) are **GRANTED** and Defendants' cross-motion for summary judgment as to those claims are **DENIED**.

2. On these grounds, the Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479 (2022)), is hereby **VACATED**.

**Add.39**

3. The parties' remaining claims are **DENIED** as moot.[1]

4. All other relief not expressly granted herein is denied.

SO ORDERED this **5th day** of **July, 2023**.

---

[1] Orig. Pls.' Am. Compl., ECF No. 93 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates APA's Notice and Comment Requirement (Count II), Violates APA's Ban on Arbitrary and Capricious Conduct (Count III), Violates Nondelegation Principles (Count IV), Violates Take Care Clause (Count V), Violates Due Process (Count VI), Violates the First Amendment (Count VII)).

S*ee also* BlackHawk's Compl., ECF No. 99 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates Separation of Powers (Count II), is Unconstitutionally Vague (Count III), is Arbitrary and Capricious (Count IV), Violates the APA's Procedural Requirements (Count V), Violates the Nondelegation Doctrine (VI), is Contrary to Constitutional Right, Power, Privilege, or Immunity (VII), Violates the Commerce Clause (VIII), Unlawfully Chills First Amendment Speech (IX), Constitutes an Unconstitutional Taking Without Just Compensation (Count X)).

*See also* Defense Distributed, et al.'s Compl., ECF No. 143 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates the APA's Procedural Requirements (Counts II and IV), Violates Delegation Principles (Count III), Violates the Second Amendment (Count V), Violates Due Process (Count VI)).

*See also* Polymer80's Compl., ECF No. 229 (claiming Final Rule: Violates Separation of Powers (Count I), Exceeds Statutory Authority (Count III), Violates Nondelegation Doctrine (Count V), Violates APA's Procedural Requirements (Counts VII and XII), is Arbitrary and Capricious (Count IX), Violates First Amendment (Count XV), Violates Second Amendment (Count XIV), is Unconstitutionally Vague (Count XIII), Exceeds Limits of Commerce Clause (Count XVI), Violates the Takings Clause (Count XVII)).

As discussed in the Court's Memorandum Opinion, Polymer80, Inc. may move for summary judgment on any remaining claims not mooted by the Court's opinion. Mem. Opinion at 16, ECF No. 227. Polymer80 **SHALL** file a notice on the docket **no later than July 12, 2023**, informing the Court whether its remaining claims are moot and, if so, proposing an order of Final Judgment as to those claims.

*See also* JSD Supply's Compl., ECF No. 230 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates Separation of Powers (Count II), is Unconstitutionally Vague (Count III), is Arbitrary and Capricious (Count IV), Violates APA's Procedural Requirements (Count V), Violates the Nondelegation Doctrine (Count VI), is Contrary to Constitutional Right, Power or Privilege (Count VII), Violates the Commerce Clause (Count VIII), Violates First Amendment (Count IX), Violates the Takings Clause (Count X)).

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JENNIFER VANDERSTOK, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BLACKHAWK MANUFACTURING** | § | |
| **GROUP INC., et al.,** | § | |
| | § | **Civil Action No. 4:22-cv-00691-O** |
| **Intervenor Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MERRICK GARLAND, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER GRANTING 7-DAY ADMINISTRATIVE STAY

Before the Court is Defendants' Emergency Motion for Stay Pending Appeal (ECF No. 236), filed July 14, 2023. Defendants seek a stay of this Court's recently entered Memorandum Opinion & Order (ECF No. 227) and Final Judgment (ECF No. 231) pending appeal. Defendants ask this Court to consider their motion on an expedited basis and issue a decision no later than 10:00 a.m. CDT on July 24, 2023. Having considered the motion, the Court summarily **DENIES** the request for a stay pending appeal but **STAYS** the applicability of its Opinion and Final Judgment for **7 days** in order that Defendants may seek emergency appellate relief.

**SO ORDERED** this **18th day** of **July, 2023**.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

|  |  |
|---|---|
| JENNIFER VANDERSTOK, *et al.*,<br><br>      Plaintiffs,<br><br>   v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States, *et al.*,<br><br>      Defendants. | Case No. 4:22-cv-00691-O |

## DECLARATION OF MATTHEW P. VARISCO

I, Matthew P. Varisco, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

### Introduction

1.  I am the Assistant Director for the Office of Enforcement Programs and Services (Regulatory Operations) within the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice (DOJ).  I have been in this position for 9 months, and have also served as an ATF Special Agent for over 22 years, including as the Special Agent in Charge of the Philadelphia Field Division, which encompasses the Commonwealth of Pennsylvania.  Before that, I was an ATF Industry Operations Investigator for over 2 years.  I hold a Master of Science degree in Criminal Justice from Iona University, New Rochelle, New York, and a Master of Science degree in Strategic Studies from the U.S. Army War College, Carlisle,

Pennsylvania.  I have testified in numerous grand jury proceedings as well as criminal

trials and hearings in U.S. District Court.

2.    In my current senior executive position, I direct policy, conduct planning, and oversee

rulemakings for Bureau-wide programmatic offices, including ATF's National Tracing

Center Division, Firearms Ammunition Technology Division, Regulatory Affairs

Division, and National Firearms Act Division.  These divisions support every aspect of

ATF's mission to protect the public and reduce violent crime throughout the United

States.  I supervise around 833 personnel and currently manage an approximately $57

million budget.

3.    I am authorized to provide this Declaration on ATF's behalf and am providing it in

support of the Defendants' Emergency Motion for Stay Pending Appeal in this civil

case.  This declaration is based on my personal knowledge and belief, my training and

experience, as well as information conveyed to me by ATF personnel in the course of

my official duties.  This declaration does not set forth all of the knowledge and

information I have on the topics discussed herein and it does not state all of the harms

to ATF and the public from the judgment in this case.

4.    I am familiar with the definition of "firearm" and the enforcement provisions in the

Gun Control Act of 1968, as amended ("GCA"), and the National Firearms Act of

1934, as amended ("NFA").  I am also familiar with ATF's Final Rule, *"Definition of*

*'Frame or Receiver' and Identification of Firearms"* ("Rule"), 87 FR 24652 (Apr. 26, 2022),

which implemented several of these GCA and NFA provisions.

5.    Congress and the Attorney General delegated the responsibility for administering and

enforcing the GCA and NFA to the Director of ATF, subject to the direction of the

Attorney General and the Deputy Attorney General.  *See* 28 U.S.C. 599A(b)(1)-(2); 28 C.F.R. 0.130(a)(1)–(2).

6.    ATF's top priority is public safety.  ATF recognizes the role that firearms play in violent crimes and, as part of its efforts to administer and enforce the GCA and NFA, ATF pursues an integrated regulatory and enforcement strategy.   ATF uses the GCA and NFA to target, investigate, and recommend prosecution of offenders to reduce the level of violent crime and to enhance public safety.  ATF also takes steps to increase State and local awareness of available federal prosecution under these statutes through, among other things, devoting its limited resources to developing and presenting relevant training and conducting outreach.

7.    ATF uses its regulatory authority to similarly fulfill its public safety mission. In order to curb the illegal use of firearms and enforce the federal firearms laws, ATF issues licenses to firearms manufacturers, importers, dealers, and curio or relic collectors, and conducts federal firearms licensee ("licensee") qualification and compliance inspections.  In addition to aiding the enforcement of federal requirements for firearm purchases, compliance inspections of existing licensees focus on assisting law enforcement to identify and apprehend criminals who illegally purchase and possess firearms.  As part of this effort, ATF also takes steps to increase awareness of the legal obligations among the firearms industry and the public.  To accomplish this, ATF devotes its limited resources to educational campaigns and helping to ensure that those engaged in the business of manufacturing, importing, or dealing in firearms follow the law and have the essential education, training, and support to comply with federal law.

8.    ATF issues rulemakings, rulings, forms, open letters, public safety advisories, Q&As, marking and recordkeeping variances (alternate methods to comply with the

regulations), and a variety of publications to implement, administer, and enforce the GCA and NFA.

9.   Among the critical public safety issues ATF has identified and attempted to address is the impact of the proliferation of unserialized and unregulated firearms on efforts to reduce violent crime, including: (1) the proliferation of "privately made firearms" ("PMFs"), sometimes referred to as "ghost guns;" and (2) limitations of certain regulatory definitions that, as described below, could result in the vast majority of firearms in circulation in the United States having no frame or receiver.

### The Rule

10.   This rule updated the regulatory definitions of "frame or receiver," "firearm," and associated marking and recordkeeping regulations.  This update helped prevent firearms, particularly, easy-to-complete firearm parts kits, from falling into the hands of felons and other prohibited persons[1] who, without the Rule, were able to purchase them without a background check or transaction records.  The Rule also curbs the proliferation of unserialized privately made firearms, typically assembled from those kits, by ensuring that those weapons, or the frames or receivers of those weapons, are subject to the same requirements as commercially produced firearms whenever they are accepted into inventory by licensees.  This, in turn, helps law enforcement solve crime by providing law enforcement officers with the ability to trace those weapons to a potential suspect if they are later found at a crime scene.

---

[1] Among other GCA prohibitions, 18 U.S.C. § 922(g) makes it unlawful for persons who fall into one or more of the following categories of "prohibited persons" to ship, transport, receive, or possess firearms:  felons, fugitives from justice, drug abusers, persons adjudicated as a mental defective or committed to a mental institution, illegal aliens, certain nonimmigrant aliens, persons dishonorably discharged from the military, persons who have renounced their U.S. citizenship, persons subject to a qualifying domestic violence restraining order, and persons who have been convicted of a misdemeanor crime of domestic violence. Additionally, under 18 U.S.C. § 922(b)(1), juveniles under the age of 21 are prohibited from purchasing firearms other than a rifle or shotgun from a licensee, and if under 18, any firearms.

11. ATF issued the Rule to increase public safety with the goal of ensuring proper marking, recordkeeping, and traceability of all firearms manufactured, imported, or otherwise acquired, and sold or otherwise disposed of by licensees.

12. I am aware that in an Opinion and Order dated June 30, 2023, and a Final Judgment dated July 5, 2023, the district court in *VanDerStok v. Garland*, 4:22-cv-00691-O (N.D. Tex.), determined that two provisions of the Rule, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652f (Apr. 26, 2022), exceeded ATF's regulatory authority, and vacated the Rule.

13. The Court's prior preliminary injunction decisions and June 30 Opinion and Order were limited to determining that these two specific provisions in the Rule—namely, 27 CFR 478.12(c) ("frame or receiver"), regulating certain partially complete frames and receivers (*i.e.*, those are designed to or may readily be designed to or may readily be completed, assembled, restored, or otherwise converted to a functional state) as falling within the definition of "frame or receiver," and the portion of 27 CFR 478.11 ("firearm") that addresses certain weapon parts kits (*i.e.*, those that are designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive) as falling within the definition of "firearm."

14. The Rule, which was published with 90 days of public notice and comment, and which evaluated over 290,000 public comments, did considerably more than amend the regulatory definition of "frame or receiver" to include certain partially complete frames or receivers, 27 CFR 478.12(c), and amend the regulatory definition of "firearm" to include certain weapon part kits, 27 CFR 478.11.

15. In addition to these amendments, the Rule also: (a) defines the terms "frame" for handguns, and "receiver" for long guns and other projectiles weapons, to identify the

specific part that provides the housing for one primary fire control component with respect to those weapons, and grandfathers pre-existing designs; (b) addresses how and by when unserialized firearms that are privately made and are voluntarily accepted into the inventory of a licensee must be marked and recorded; (c) provides silencer manufacturers with important clarifications as to which portion of a complete muffler or silencer device must be marked with a serial number and other required identification, and when (often tiny) individual silencer parts must be marked; (d) explains how "multi-piece" frames or receivers that are modular—those that may be disassembled into standardized multiple subparts—are required to be marked; (e) updates the marking requirements for manufacturers to allow them to mark their abbreviated license number as an alternative to "city" and "state," by clarifying what it means to mark "conspicuously," and permits adoption of markings when firearms are being transferred prior to first sale or distribution into commerce and when gunsmithing operations are performed; (f) requires all licensees to consolidate records of manufacture, importation, acquisition, and disposition of firearms; and (g) updates existing regulations to require that all records retained by firearms licensees be maintained until they discontinue business or licensed operations rather than requiring them to be maintained for only 20 years.

**Overview of Harms**

16.  Eliminating the entire Rule—including provisions other than those evaluated by the Court in its opinions and orders—would irreparably harm the public, the regulated community, and ATF.  Such elimination would damage public safety by allowing felons and other prohibited purchasers (including underage persons) and possessors to easily buy and assemble both serialized and unserialized firearms, by permitting the

widespread proliferation of unserialized firearms, and by impairing law enforcement's ability to trace firearms recovered at crime scenes.  In addition, the Rule provides clarity to, and eases certain regulatory burdens on, the regulated community, such that its elimination would cause confusion among, and costs to, that community. ATF has already spent substantial resources to implement the Rule. Thus, eliminating the Rule would—especially if any elimination were later narrowed or reversed—require ATF to spend additional substantial resources and would create confusion both inside and outside the agency.

### Harm to Public Safety

17.  A number of the Rule's provisions are aimed at ensuring that all firearms have a single frame or receiver subject to the statutory serialization, licensing, background check, recordkeeping, and other requirements. The effective implementation of those requirements is critically important to public safety, primarily for two separate reasons.

18.  First, these requirements prevent felons and other prohibited persons throughout the country from acquiring firearms by ensuring that licensees sell firearms only after the purchaser undergoes a background check (or falls within an exception) and completes an ATF Form 4473, Firearms Transaction Record.

19.  Second, as detailed extensively in the Rule and the administrative record, unserialized firearms, which have been increasingly recovered at crime scenes, are nearly impossible to trace and therefore pose a significant challenge to law enforcement.  (87 FR 24655 – 24660; AR 818-819; 825-827; 855-859; 871-901;71,465-71,657).  The number of suspected unserialized firearms recovered by law enforcement agencies and submitted to ATF for tracing increased by 1,083% from 2017 (1,629) to 2021 (19,273). (National Firearms Commerce and Trafficking Assessment Vol. II:  Part III, Page 5). With the

Rule in its infancy, the threat of unserialized firearms continues. Between August 24, 2022, and July 6, 2023, a total of approximately 23,452 suspected privately made firearms were recovered at crime scenes and submitted for tracing. (ATF PMF Trace Data, queried July 14, 2023). These numbers are likely far lower than the actual number of privately made firearms recovered from crime scenes because some law enforcement departments incorrectly trace some privately made firearms as commercially manufactured firearms, or may not see a need to use their resources to attempt to trace firearms with no serial numbers or other markings. (87 FR 24656 n.18).

20. Eliminating all of the Rule's provisions would thus irreparably harm public safety by allowing the continued proliferation of unserialized firearms—generally acquired by individuals who have not undergone a background check and sold with no record of their sale—on a number of different dimensions.

21. At the outset, the two provisions that the Court determined exceeded ATF's regulatory authority in its opinion vacating the Rule are critical to public safety because they prevent easy circumvention of the GCA's entire regulatory scheme. 27 CFR 478.12(c) ("frame or receiver"), which explains when a partially complete, disassembled, or nonfunctional frame or receiver has reached the stage of manufacture to be considered a "frame" or "receiver," ensures that companies that produce and sell frame or receiver parts kits, or standalone partially complete frames or receivers, that allow ready completion and assembly to be *functional* frames or receivers: (a) are properly licensed; (b) place traceable marks of identification on them; (c) conduct background checks when they are sold to prevent felons and other prohibited persons from acquiring them; and (d) maintain records through which the weapons that incorporate

them can traced if later used in crime.  Under the Court's decision, unlike every other firearms manufacturer, a manufacturer of frames or receivers can easily avoid the regulatory requirements of the GCA simply by producing and selling frames or receivers that are missing, for example, a single hole necessary to install the applicable fire control component, or that has a small piece of plastic that can easily be removed to allow installation of that component (*i.e.*, a frame or receiver that is "partially complete").

22.   The same is true of weapon parts kits.  27 CFR 478.11 ("firearm") ensures that companies that produce and sell weapon parts kits, or aggregations of parts that allow a weapon to readily be completed and assembled to expel a lethal projectile, are subject to the same requirements as all other firearms manufacturers.  Again, these requirements help prevent violent crime by requiring manufacturers to conduct background checks to prevent prohibited persons from receiving them, and requiring licensees to mark and keep records that allow those weapons to be traced to a potential suspect if they are later used in a crime.

23.   In recognition of these risks to public safety, the Court had previously limited its preliminary injunctions so that it did not apply to plaintiffs' customers who were prohibited from possessing firearms pursuant to 18 U.S.C. § 922(g).  In vacating the Rule, that important limitation to the Court's prior rulings no longer exists, which will only encourage felons and other prohibited purchasers (including underage persons) and possessors to buy firearms in the configuration of weapon parts kits or partially complete frames or receivers that enable those individuals to easily acquire the parts and readily complete and assemble a functional unserialized firearm for use in violent crime.  (87 FR 24686 & n.107).

**Add.50**

24. For example, in New Orleans, Louisiana, from August 19, 2021, to February 1, 2022, a 20-year-old named Tyrese Harris committed a series of carjackings using a privately made 9mm caliber semiautomatic pistol that had been completed and assembled from a Lone Wolf parts kit that could not be traced.  During one attempted carjacking, Harris fired the weapon at the driver, and in another, the victim was dragged by the car resulting in serious bodily injury.  He was sentenced to 45 years in prison.  *See also, Teens buying ghost guns online, with deadly consequences*, Washington Post (July 12, 2023), available at https://www.washingtonpost.com/dc-md-va/2023/07/12/teens-ghost-guns-deadly-shootings/.

25. In addition, numerous other provisions of the Rule, which were not addressed by the Court, seek to combat the proliferation of unserialized, or otherwise untraceable, firearms in different ways.  Eliminating those provisions would thus further undermine public safety.

26. First, one provision of the Rule updates the regulatory definitions of "frame" and "receiver" to reflect advances in weapons technology.  As noted in the Rule (87 FR 24691, 24655) and administrative record (AR 628-687; 701-709; 719-722; 71,330), the 1968 regulatory definition of "frame or receiver" meant "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism."  But today, 90% of firearms currently available do not have a single part that houses a hammer, bolt or breechblock, and firing mechanism; instead, most firearms have split frames or receivers (*i.e.*, they house those three components in two or more separate parts), or they house a striker rather than a hammer.  As a result, under a strict reading of the previous regulatory definition—which had been adopted by at least three federal

**Add.51**

district courts (87 FR 24691, 24655)[2]—the vast majority of available firearms would have no frame or receiver.

27.    The practical result of that strict reading is that every individual part of almost all firearms in circulation in the United States may be sold separately without compliance with the statutory background check, licensing, serialization, and recordkeeping requirements.  As illustrated below, a felon or other prohibited person could easily purchase online Part A and Part B (*i.e.*, the upper and lower receiver) as "non-firearms" and assemble a fully functional AR-variant firearm within a minute. And that firearm may not have a serial number, and even if it did, there would be no recordkeeping required that would allow ATF to trace it if it were later recovered at a crime scene.



**Part A**

**Part B**

**Complete Weapon**

---

[2] *See United States v. Jimenez,* 191 F. Supp. 3d 1038  (N.D. Cal 2016); *United States v. Roh*, 8:14-cr-00167-JVS, May 16, 2019; *United States v. Rowold*, 429 F. Supp. 3d 469 (N.D. Ohio 2019).

28. Notably, a court in the Northern District of Ohio encouraged ATF to alter the 1968 regulatory definition of "frame or receiver," stating that "[A]TF retains the authority – and has the duty – to fix the regulatory scheme and to regulate AR-15 lower receivers as firearms within the GCA. The result I reach only prevents the agency from using an unreasonable and legally unacceptable application of its current regulation to accomplish that worthwhile objective." *Rowold*, 429 F. Supp. 3d at 476.

29. Second, the Rule requires that firearms licensees mark unserialized firearms whenever they are voluntarily accepted into the licensee's inventory. The GCA requires that licensees record the acquisition and disposition of each firearm, but without unique identifying information to record, those records are ineffective as a means of tracing or locating unserialized firearms. Thus, eliminating that provision of the Rule would undermine the GCA's requirements that ensure every licensee has recorded each firearm's acquisition and disposition for purposes of tracing.

30. As explained above, the lack of proper records makes it nearly impossible to trace firearms that are recovered at crime scenes. But it also harms public safety in other, related ways. For example, it is difficult, if not impossible, for licensees and ATF (during inspections) to match accurately and reliably the unserialized firearms in a licensee's inventory with those in required records, or to determine whether a particular unserialized firearm recorded as disposed on a Form 4473 (which details information of a purchaser) are those recorded as disposed in the records. Such difficulty not only makes it hard for ATF to ensure that licensees are keeping accurate records during inspections, but also means that licensees and ATF will have difficulty accurately determining which unserialized firearms were stolen or lost from inventory if such an incident occurs, or were the same crime guns listed on an ATF Form 4473.

In addition, the lack of such a serialization requirement makes it much more difficult for police to locate stolen unserialized firearms in the business inventories of pawnbrokers, for example, or to return any recovered stolen or lost unserialized firearms to their rightful owners. (87 FR 24659-60)

31.   Third, the Rule imposes a number of requirements related to silencers and mufflers that are important for public safety. The Rule explains how, by when, and where on the device, including one that is modular, the silencer or muffler must be marked so that law enforcement officers can trace them if later found at a crime scene.  The Rule also prohibits manufacturers from marking a removable end cap on the device, which can be damaged during use, thus destroying the information necessary to trace the firearm.  (87 FR 24660, 24727, 24739)

32.   Fourth, the Rule updates existing regulations to require that all records retained by firearms licensees be maintained (including allowing storage of old paper records at a separate warehouse) until they discontinue business or licensed operations, rather than destroying them after a twenty-year period.  As the Rule and administrative record make clear, numerous older firearms could not be traced after having been used in crime because the records were destroyed after 20 years.  (87 FR 24667, 24712; AR 68,595-597; 68,605-606; 68,626-628; 68,640-644; 68,655; 68,659-661). There are currently 81,808 total active federal firearms licensees.  Of those, 14,048 have been in business 20 years or more, and an additional 751 have been in business for 19 years. With the Rule vacated, these thousands of licensees are able to destroy their dated records now and every day the Rule remains vacated without recourse.  Once these firearms transactions records are destroyed, there is no way to recover the information

they contained, which will make any additional traces of the firearms involved

unsuccessful.

33. As explained in the Rule, the National Tracing Center conducted an analysis of all trace

requests submitted between January 1, 2010, and December 31, 2021, that were closed

under a particular code in the tracing system indicating the licensee specifically

informed ATF that it did not have records for that firearm because the records were

more than 20 years old and had been destroyed. A total of approximately 16,324

traces, or 1,360 on average per year, could not be completed during this time period

because ATF was informed the records had been destroyed. Of these total

unsuccessful traces, approximately 182 of the traces were designated as "Urgent,"

1,013 were related to a homicide or attempted homicide (not including suicide), and

4,237 were related to "Violent Crime." (87 FR 24712)

### Harm to the Regulated Community

34. In addition to harming public safety, eliminating the entire Rule would substantially

injure the regulated community, in primarily two different ways. First, it would create

substantial confusion among the regulated community regarding their legal obligations.

Second, it would increase regulatory burdens on the regulated community.

35. First, eliminating the Rule will create, and indeed has already created, significant

confusion among the regulated community—impacting approximately 80,000

licensees. Vacating the entire Rule also has a significant impact on formal ATF

Rulings that were superseded by the Rule because the firearms industry is unclear how

to proceed with their current business practices. ATF has already received inquiries

from members of the firearms industry, a trade association that represents many of

those members, and a software company, seeking clarification whether they must now

reverse their newly implemented business practices (*e.g.*, whether these licensees must now separate their recently consolidated records) and methods of operation.  This confusion will only increase if the Court's ruling, or the scope of relief, is reversed on appeal, which may require licensees to overhaul certain business practices twice in a short period of time.

36.    Second, a number of provisions of the Rule were aimed at easing burdens on the regulated community, and their elimination harms that community by reimposing those requirements.  For example, the Rule authorizes manufacturers to mark the "frame" or "receiver" with their abbreviated license number instead of "city" and "state" of manufacture, and enumerates specific exceptions as to when and how a licensee may adopt existing markings.  Without the Rule, these codified allowances and blanket "marking variances" would not exist, increasing burdens on the firearms industry.  These burdens may be particularly onerous because manufacturers must set up their manufacturing processes to comply with marking requirements, a process that costs substantial time and money to accomplish.

37.    In addition, the Rule provides silencer manufacturers with important clarification as to which portion of a complete muffler or silencer device must be marked with a serial number and other required identification.  Under the GCA, the term "silencer" is defined to include each small individual part designed and intended only to be used to fabricate a silencer.  It is extremely difficult and expensive for silencer manufacturers to mark each tiny individual silencer part.  For this reason, the Rule only requires them to mark what is defined as the "frame or receiver" of the silencer.  (AR 917; 937-938).

38.    Similarly, the Rule also provides an exception for qualified manufacturers to delay or avoid registration of silencer parts if they become part of a complete device, or

gunsmithing operations are being performed on an existing marked and registered

silencer device.  Without the Rule, there is no exception for manufacturers from the

requirement that they mark and register each and every silencer part, and no grace

period in which to mark them after completion of manufacture.

39. The Rule replaced many prior ATF Rulings with updated information that explained

how to conduct business under law.  (87 FR 24664 n.53, 24665-66, 24688, 24702-03,

24729-30).  For example, the Rule superseded ATF Rulings 2009-5 (Firearms

Manufacturing Activities, Identification Markings of Firearms) and 2013-3 (Adopting

Identification of Firearms).  Under the applicable provisions of the Rule,

manufacturers may adopt existing markings on a firearm and a "non-marking variance

request" or notice is no longer required under the new regulations under certain

circumstances.  Without the Rule, manufacturers will either have to mark firearms they

remanufacture, or apply for a variance not to mark firearms they remanufacture even

though they have already been marked by another manufacturer.  These additional

markings are expensive for licensees to place, and confusing to law enforcement when

conducting a trace of a crime gun.

40. In addition, the Rule superseded ATF Ruling 2011–1 (Importers Consolidated

Records) and ATF Ruling 2016–3 (Consolidation of Records Required for

Manufacturers), which allowed licensed manufacturers and importers to consolidate

their records of both production/importation, and disposition, but only under certain

conditions.  The Rule made this consolidation a requirement.  If the Rule is removed,

manufacturers and importers would need to undo this consolidation and keep their

production/importation records separately from their records of sale or distribution

unless they obtain a variance.

**Harm to ATF**

41. In addition, elimination of the Rule will substantially harm ATF, which has devoted significant resources to training and implementing the Rule, and which will need to devote substantial additional resources to comply.

42. For example, after the issuance of the Rule, ATF amended its Form 4473, Firearms Transaction Record, to comport with the updates made by the Rule. This form must be completed every time a licensee transfers a firearm to a non-licensee. ATF will incur substantial monetary costs to publish a revised version of Form 4473. This would include the cost of creating, printing, and shipping approximately 25 million replacement forms to licensees throughout the United States. This cost could double if the Court's decision is overturned or rendered inconsistent with rulings by other courts. In addition to ATF's costs to change the Form 4473, there are also costs to the industry to develop the electronic Form 4473 for their electronic systems; in addition to the costs, these changes can take roughly several months to complete.

43. After publication of the Rule, ATF and the Department of Justice conducted extensive training and outreach to federal, state, and local law enforcement partners, and United States Attorney's Offices nationwide regarding the impact of the Rule. ATF extensively trained its personnel on the scope of the Rule and identified one Industry Operations Investigator and one Special Agent in each ATF field division as the local subject matter expert on the Rule. ATF conducted approximately 18 internal trainings which around 1,978 ATF employees attended. Additionally, ATF presented at least four virtual trainings for over 5,200 regulated industry members and in person trainings to regulated industry members at the Orchid Advisors Conference, SAAMI Conference, National Shooting Sports Foundation conference, and Firearms and

Ammunition Import Roundtable Conference.  ATF's Office of Field Operations also conducted over 150 licensee seminars from June 22, 2022, to the present which included explaining the Rule.

44. Each training covered the Rule's definition of "frame or receiver"; its definition of "privately made firearm"; marking and recordkeeping for licensees; general changes to the marking, recordkeeping, and record retention requirements for licensees; and affected ATF Rulings/Procedures.  In each training, experts from ATF's Firearms and Ammunition Technology Division, Firearms and Explosives Services Division, National Firearms Act Division, Field Operations, and Firearms and Explosives Law Division answered numerous questions.

45. In addition to training, ATF established a robust public facing webpage, (https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver) dedicated to the Rule.  The website includes a summary of the Rule, resource guides explaining the impact of the Rule, and it provides access to the regulation's website with the Rule's text, the detailed PowerPoint training, frequently asked questions, and a recorded training video on the Rule.

46. Removal of the Rule will result in widespread confusion among law enforcement officers and prosecutors, firearms industry members, and the general public.  ATF has already begun to receive these inquiries, and will need to devote the agency's limited time and resources to retraining internal personnel and educating the regulated industry, law enforcement, and the public on implementation of this decision.  The potential of an appeal or contrary decision by the court of appeals or another district court further increases the risk that ATF will need to expend further resources to undertake continual efforts to update the public on the status of the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of July, 2023.


_____

Matthew P. Varisco
Assistant Director, Enforcement Programs and Services (Regulatory Operations)
Bureau of Alcohol, Tobacco, Firearms and Explosives
United States Department of Justice