No. 23-10718

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING, L.L.C.; FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation,

*Plaintiffs-Appellees*,

BLACKHAWK MANUFACTURING GROUP, INCORPORATED, doing business as 80 PERCENT ARMS; DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED; NOT AN L.L.C., doing business as JSD SUPPLY; POLYMER80, INCORPORATED,

*Intervenor Plaintiffs-Appellees*,

v.

MERRICK GARLAND, U.S. Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,

*Defendants-Appellants*.

On Appeal from United States District Court for the Northern District of Texas, Fort Worth Division, Case No. 4:22-CV-00691-O

## BLACKHAWK MANUFACTURING GROUP, INC.'S APPENDIX TO RESPONSE IN OPPOSITION TO EMERGENCY MOTION FOR STAY

BRIAN D. POE
BRIAN D. POE, ATTORNEY AT LAW PLLC
THE BRYCE BUILDING
909 THROCKMORTON STREET
FORT WORTH, TX 76102
(817) 870-2022

MICHAEL J. SULLIVAN
NATHAN P. BRENNAN
ASHCROFT LAW FIRM LLC
200 State St., 7th Floor
Boston, MA 02109
(617) 573-9400

*Counsel for Intervenor Plaintiff-Appellee BlackHawk Manufacturing Group, Inc.*

# TABLE OF CONTENTS

**Page**

District Court Opinion (June 30, 2023) (Dkt. 227) ........................................... APP.001

District Court Judgment (July 5, 2023) (Dkt. 231) .................................................... APP.039

Complaint (August 11, 2022) (Dkt. 1) ....................................................................... APP.041

Intervenor Complaint (October 20, 2022) (Dkt. 99) ................................................. APP.094

Opinion & Order on Preliminary Injunction (September 2, 2022) (Dkt. 56) ........ APP.130

Opinion & Order on BlackHawk Manufacturing Group Inc.
d/b/a 80 Percent Arms' Preliminary Injunction (November 3, 2022)
(Dkt. 118) .................................................................................................................... APP.153

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JENNIFER VANDERSTOK, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BLACKHAWK MANUFACTURING** | § | |
| **GROUP INC., et al.,** | § | **Civil Action No. 4:22-cv-00691-O** |
| | § | |
| **Intervenor-Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MERRICK GARLAND, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**MEMORANDUM OPINION & ORDER ON PARTIES' CROSS-MOTIONS FOR
SUMMARY JUDGMENT & MOTIONS TO INTERVENE**</u>

Before the Court are Plaintiffs Jennifer VanDerStok, Michael G. Andren, Tactical Machining, LLC, and Firearms Policy Coalition, Inc.'s ("Original Plaintiffs") Motion for Summary Judgment (ECF No. 140), Brief (ECF No. 141), and Appendix in support (ECF No. 142), filed December 23, 2022; Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms' Motion for Summary Judgment (ECF No. 144), Brief (ECF No. 145), and Appendix in support (ECF No. 146), filed December 23, 2022; Intervenor-Plaintiffs Defense Distributed and The Second Amendment Foundation, Inc.'s Motion for Summary Judgment (ECF No. 165) and Brief in support (ECF No. 166), filed January 12, 2023; Defendants' Combined Opposition to Original Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment and Cross-Motion for Summary Judgement (ECF No. 180), Brief (ECF No. 181), and Appendix in Support (ECF No. 182), filed February 13, 2023; Original Plaintiffs' Reply Brief in Support of Their Motion for Summary Judgment and Response to Defendants' Cross-Motion for Summary

Judgment (ECF No. 191), filed March 6, 2023; Intervenor-Plaintiff BlackHawk Manufacturing Group Inc.'s Reply Brief and Opposition to Defendants' Cross-Motion for Summary Judgment (ECF No. 192), filed March 6, 2023; Intervenor-Plaintiffs Defense Distributed and The Second Amendment Foundation, Inc.'s Summary Judgment Response/Reply Brief (ECF No. 193), filed March 6, 2023; and Defendants' Reply Brief (ECF No. 204) and Appendix (ECF No. 205) in support of their Motion for Summary Judgment, filed April 19, 2023. Also before the Court is the Amici Curiae Brief of Gun Owners for Safety and Individual Co-Amici in Support of Defendants' Opposition to Original Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment (ECF No. 187), filed February 23, 2023. Also before the Court are Defendants' Supplemental Brief Regarding Rule 65(a)(2) Consolidation and Plaintiffs' Count I (ECF No. 132), filed December 5, 2022; Original Plaintiffs' Brief (ECF No. 133), filed December 5, 2022; and Intervenor-Plaintiff BlackHawk Manufacturing Group Inc.'s Brief (ECF No. 134), filed December 5, 2022.

On January 18, 2023, the Court deferred ruling on putative intervenors' motions to intervene until summary judgment briefing concluded. *See* Order, ECF No. 172. Now ripe for review are Not An LLC d/b/a JSD Supply's Motion to Intervene (ECF No. 149) and Brief in support (ECF No. 150), filed January 5, 2023; Defendants' Opposition (ECF No. 207), filed April 27, 2023; Original Plaintiffs' Opposition (ECF No. 212), filed May 10, 2023; and JSD Supply's Reply (ECF No. 213), filed May 11, 2023. Also before the Court are Polymer80's Motion to Intervene (ECF No. 157), Brief (ECF No. 158), and Appendix (ECF No. 159) in support; filed January 9, 2023; Defendants' Opposition (ECF No. 206), filed April 27, 2023; Original Plaintiffs' Opposition (ECF No. 212), filed May 10, 2023; and Polymer80's Reply (ECF No. 214), filed May 11, 2023.

APP.002

Also pending are Original Plaintiffs' unopposed Motion for Leave to Provide Supplemental Authority to Their Motion for Summary Judgment and Response to Defendants' Cross-Motion for Summary Judgment (ECF No. 197), filed March 24, 2023, which the Court **GRANTS** for good cause shown; and JSD Supply's proposed Motion for Injunction (ECF No. 151) and Brief in support (ECF No. 152), filed January 5, 2023, and Defendants' Notice Regarding the Same (ECF No. 156), filed January 9, 2023, which the Court **DENIES** as prematurely filed.

Having considered the briefing and applicable law, the Court **GRANTS** JSD Supply's and Polymer80's motions to intervene on permissive grounds. For the reasons that follow, the Court **GRANTS** Plaintiffs' and Intervenors' motions for summary judgment, **DENIES** Defendants' cross-motion for summary judgment, and **VACATES** the Final Rule.

## I.    INTRODUCTION

This case presents the question of whether the federal government may lawfully regulate partially manufactured firearm components, related firearm products, and other tools and materials in keeping with the Gun Control Act of 1968. Because the Court concludes that the government cannot regulate those items without violating federal law, the Court holds that the government's recently enacted Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (codified at 27 C.F.R. pts. 447, 478, and 479), is unlawful agency action taken in excess of the ATF's statutory jurisdiction. On this basis, the Court vacates the Final Rule.

## II.    STATUTORY & REGULATORY BACKGROUND

In 1934, Congress enacted the National Firearms Act ("NFA") to authorize federal taxation and regulation of certain firearms such as machineguns, short-barreled shotguns, and short-barreled rifles. National Firearms Act of 1934, ch. 757, Pub. L. 73-474, 48 Stat. 1236, 1236. A few years later, Congress enacted the Federal Firearms Act ("FFA"), which more broadly defined

3

"firearm" and thereby authorized federal regulation of "any weapon . . . designed to expel a projectile or projectiles by the action of an explosive. . . or any part of such weapon." Federal Firearms Act of 1938, ch. 850, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968).

Thirty years later, Congress enacted the Gun Control Act of 1968 ("GCA"), which superseded the FFA's regulation of firearms in interstate commerce. The GCA requires manufacturers and dealers of firearms to have a federal firearms license.[1] 18 U.S.C. §§ 921, *et seq.* Dealers must also conduct background checks before transferring firearms to someone without a license, and they must keep records of firearm transfers. *Id.* §§ 922(t), 923(g)(1)(A).

The GCA also redefines "firearm" more narrowly than the earlier statute it superseded, defining the term as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3). But "[s]uch term does not include an antique firearm." *Id.* Notably, the GCA departs from the FFA's prior definition of "firearm" by restricting federal authority over "any part" of a firearm to only the "frame or receiver" of such firearm.

Congress delegated authority to administer and enforce the GCA to the Attorney General by authorizing him to "prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." *Id.* § 926(a). The Attorney General, in turn, delegated that authority to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a). Those who violate the federal firearms laws are subject to potential fines and imprisonment. 18 U.S.C. § 924(a).

---

[1] A manufacturer or dealer authorized to transfer firearms under the Gun Control Act is known as a Federal Firearms Licensee ("FFL").

APP.004

In 1978, ATF promulgated a rule interpreting the phrase "frame or receiver," which the GCA does not define. The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Title and Definition Changes, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). That definition remained in place until last year.

In April 2022, ATF published the Final Rule changing, among other things, the 1978 definition of "frame or receiver." *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479 (2022)).[2] ATF split the phrase into two parts, assigning the term "frame" to handguns and the term "receiver" to any firearm other than a handgun, such as rifles and shotguns. *See* 27 C.F.R. § 478.12(a)(1), (a)(2). ATF then defined the terms "frame" and "receiver" along the same lines as the 1978 rule, though with updated, more precise technical terminology.[3]

But ATF did not stop there. Rather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers. Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver,

---

[2] The Final Rule took effect on August 24, 2022, in the midst of the parties' initial briefing. *See* 27 C.F.R. pts. 447, 478, and 479 (2022).

[3] Here are the two definitions, in full:

> (1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.
>
> (2) The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

27 C.F.R. § 478.12(a).

APP.005

including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.*

Further, the Final Rule permits the ATF Director to consider extrinsic factors when determining if an object is a frame or receiver. Specifically, "[w]hen issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with [or otherwise made available to the purchaser or recipient of] the item or kit." *Id.* The Final Rule also amends ATF's definition of "firearm" to include weapon parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* § 478.11 (definition of "firearm").

### III.    PARTIES & PROCEDURAL BACKGROUND

Individual Plaintiffs Jennifer VanDerStok and Michael Andren are Texas residents who own firearm components that they intend to manufacture into firearms for personal, lawful use.[4] They claim that the Final Rule prohibits them from directly purchasing products online that they want to use to manufacture their own firearms.[5] Now, to purchase these products in compliance with the Final Rule, Individual Plaintiffs would have to route their purchases of the regulated products through an FFL and incur associated transfer fees ($30 in Individual Plaintiffs' case), plus additional time and expense.

---

[4] VanDerStok Decl. 1, ECF No. 16-2; Andren Decl. 1, ECF No. 16-3.
[5] VanDerStok Decl. 2, ECF No. 16-2; Andren Decl. 2, ECF No. 16-3.

APP.006

Tactical Machining, LLC manufactures and sells items that are subject to regulation under the Final Rule.[6] Over 90% of Tactical Machining's business consists of selling items that individuals can use to manufacture frames and receivers and to build functioning firearms.[7]

The Firearms Policy Coalition, Inc. ("FPC") is a non-profit organization dedicated to promoting the constitutional rights of American citizens through public education and legislative and legal advocacy.[8] In support of its educational and advocacy efforts, FPC owns and uses several firearm parts and products that are subject to the Final Rule.[9] FPC has hundreds of thousands of members, donors, and supporters nationwide, many of whom are plaintiffs in this lawsuit.[10] Individuals and organizations become FPC members by making a donation via the non-profit corporation's website.[11] FPC seeks to bring this lawsuit on behalf of itself and its members.[12]

Shortly before the Final Rule took effect in August 2022, Original Plaintiffs sued the U.S. Attorney General, the Department of Justice, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and the ATF Director over the legality of the Final Rule.[13] Days later, the Original Plaintiffs sought preliminary injunctive relief, which the Court granted on grounds that they were likely to succeed on their claim that ATF exceeded its statutory authority in issuing the Final Rule.[14]

BlackHawk Manufacturing Group, Inc. is a manufacturer and retailer that sells products newly subject to ATF's Final Rule, with most of its revenue earned through sales of those

---

[6] Peters Decl. 1, ECF No. 16-1.
[7] *Id.* at 2.
[8] *See generally* Combs Decl., ECF No. 62-4.
[9] *Id.* ¶¶ 9–10.
[10] *Id.* ¶¶ 6–7. Individual Plaintiffs, Tactical Machining, LLC, BlackHawk Manufacturing Group, Inc. d/b/a 80 Percent Arms, and Defense Distributed are members of FPC. *Id.*
[11] *Id.* ¶ 8.
[12] Orig. Pls.' Reply 5, ECF No. 191.
[13] *See generally* Compl., ECF No. 1.
[14] Orig. Pls.' Mot. for Prelim. Inj., ECF No. 15; Mem. Opinion, ECF No. 56.

products.[15] Defense Distributed is a private defense contractor that primarily manufactures and deals products now subject to the Final Rule.[16] Defense Distributed is also a member of its co-intervenor, the Second Amendment Foundation ("SAF"), a non-profit organization that promotes and defends constitutional rights through educational and legal efforts.[17] Like FPC, SAF brings this suit on behalf of itself and its members.[18] The Court subsequently allowed these parties to intervene in the suit and granted BlackHawk and Defense Distributed their preliminary injunctions on the same grounds as the Original Plaintiffs.[19]

In the weeks after BlackHawk, Defense Distributed, and SAF were permitted to join the lawsuit, and after summary judgment briefing had begun, movants Not An LLC d/b/a JSD Supply and Polymer80, Inc. filed their pending motions to intervene.[20] JSD Supply is a manufacturer and distributor that earns most of its revenue through sales of products now subject to the Final Rule.[21] Likewise, Polymer80, Inc. is a designer, manufacturer, and distributor of firearms and non-firearm products.[22] Through letters issued by ATF since the Final Rule's enactment, Polymer80 learned that some of its products are considered subject to the Final Rule and, if not afforded relief, that its "corporate existence" is at stake.[23]

Plaintiffs and Intervenor-Plaintiffs claim the Final Rule violates several of the Administrative Procedure Act's ("APA") substantive and procedural requirements and various

---

[15] Lifschitz Decl. 6–8, ECF No. 62-5 ¶¶ 8, 11, 13.
[16] *See generally* Defense Distributed Compl., ECF No. 143.
[17] *Id.* ¶¶ 11–12.
[18] *Id.*
[19] Mem. Opinions, ECF Nos. 118, 188.
[20] JSD Supply Mot. to Intervene, ECF No. 149; Polymer80 Mot. to Intervene, ECF No. 157.
[21] JSD Supply Br. 4–5, ECF No. 150.
[22] Polymer80 Br. 1–3, ECF No. 158.
[23] *See generally id.*; *id.* at 4.

constitutional guarantees.[24] Though some raise unique claims, all contend that the Final Rule was issued in excess of the agency's statutory authority and the Court preliminarily agreed.[25] Earlier in the proceedings, the Court considered consolidating its hearing on the parties' motions for preliminary injunction with a trial on the merits under Federal Rule of Civil Procedure 65(a)(2).[26] After review of the parties' responsive briefing, however, the Court did not consolidate and now considers Plaintiffs' and Intervenor-Plaintiffs' claims at the summary judgment stage.

Thus, based on the Court's prior decisions in this case, Defendants are preliminarily enjoined from enforcing the Final Rule against Individual Plaintiffs VanDerStok and Andren; and, with limited exception, Tactical Machining, BlackHawk, and Defense Distributed and the companies' customers. Now ripe for the Court's review are the parties' cross-motions for summary judgment on all statutory and constitutional claims, as well as JSD Supply's and Polymer80's motions to intervene. In part A below, the Court will resolve the motions to intervene before turning to the parties' cross-motions for summary judgment in part B.

---

[24] Orig. Pls.' Am. Compl., ECF No. 93 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates APA's Notice and Comment Requirement (Count II), Violates APA's Ban on Arbitrary and Capricious Conduct (Count III), Violates Nondelegation Principles (Count IV), Violates Take Care Clause (Count V), Violates Due Process (Count VI), Violates the First Amendment (Count VII)); *see also* BlackHawk's Compl., ECF No. 99 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates Separation of Powers (Count II), is Unconstitutionally Vague (Count III), is Arbitrary and Capricious (Count IV), Violates the APA's Procedural Requirements (Count V), Violates the Nondelegation Doctrine (VI), is Contrary to Constitutional Right, Power, Privilege, or Immunity (VII), Violates the Commerce Clause (VIII), Unlawfully Chills First Amendment Speech (IX), Constitutes an Unconstitutional Taking Without Just Compensation (Count X)); *see also* Defense Distributed, et al.'s Compl., ECF No. 143 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates the APA's Procedural Requirements (Counts II and IV), Violates Delegation Principles (Count III), Violates the Second Amendment (Count V), Violates Due Process (Count VI)); *see also* JSD Supply's Mem. 10, ECF No. 150 (expressing intent to adopt Plaintiffs' claims and legal theories in full); *see also* Polymer80's Mem. 6–7, ECF No. 158 (expressing intent to adopt the current plaintiffs' pending claims in full but to assert several additional claims).
[25] Mem. Opinion, ECF No. 56.
[26] *See* Orders, ECF Nos. 33, 107.

APP.009

## IV.     DISCUSSION

## A.

### 1.  Legal Standard[27]

Federal Rule of Civil Procedure 24(b) vests a district court with considerable discretion to permit permissive intervention in a lawsuit, provided (1) the movant's intervention is timely, (2) the movant "has a claim or defense that shares with the main action a common question of law or fact," and (3) intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(1)(B), (b)(3); *United States v. City of New Orleans*, 540 F. App'x 380, 380–81 (5th Cir. 2013). With respect to the first element of "timeliness," courts are to consider four distinct factors:

> (1) the length of time between the would-be intervenor's learning of his interest and his petition to intervene;
> (2) the extent of prejudice to existing parties from allowing late intervention;
> (3) the extent of prejudice to the would-be intervenor if the petition is denied; and
> (4) any unusual circumstances [weighing in favor of or against intervention].

*In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247–48 (5th Cir. 2009) (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977)). Like permissive intervention itself, any determination of timeliness is committed to the court's discretion. *Id.* at 248.

Finally, in addition to the three permissive elements above, courts *may* also consider factors such as "whether the intervenors' interests are adequately represented by other parties" and whether the intervenors "will significantly contribute to full development of the underlying factual issues in the suit." *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.* ("*NOPSI*"), 732 F.2d

---

[27] Original Plaintiffs and Defendants (the "opponents" for purposes of the following intervention analysis only) contest the propriety of allowing additional intervenors to join the lawsuit by either intervention as of right or permissive intervention. Because the Court concludes that permissive intervention under Rule 24(b) is appropriate in this case, it does not reach the merits of intervention as of right under Rule 24(a)(2). FED. R. CIV. P. 24.

APP.010

452, 472 (5th Cir. 1984) (citations omitted).

## 2. Analysis

The Court begins with timeliness, which requires consideration of four factors. *In re Lease Oil Antitrust Litig.*, 570 F.3d at 247. With respect to the first factor, opponents of intervention argue that JSD Supply and Polymer80's interventions are untimely because they "waited five months after the commencement of this action to seek intervention"[28] and that they were presumably aware of the other "multiple competing lawsuits challenging the Final Rule filed before [it] took effect on August 24, 2022."[29] In other words, they waited too long. But these arguments fail because the relevant inquiry for timeliness is how soon the movant intervened in the instant lawsuit after learning its interest was at risk, which may or may not occur when the complaint is filed. *Id.* at 248. Moreover, a movant's decision to forego intervention in another case is irrelevant to the issue of timeliness in the instant case. *See id.* ("The first timeliness factor is '[t]he length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in *the case* before he petitioned for leave to intervene.") (emphasis added). Thus, "[t]he timeliness clock runs either from the time the applicant knew or reasonably should have known of his interest [in the instant litigation] *or* from the time he became aware that his interest would no longer be protected by the existing parties to the lawsuit." *Edwards v. City of Houston*, 78 F.3d 983, 1000 (5th Cir. 1996) (emphasis added) (citation omitted). Either way, there "are no absolute measures of timeliness," *id.*, and any assessment of this factor is wholly committed to the court's discretion. *In re Lease Oil Antitrust Litig.*, 570 F.3d at 248.

---

[28] Defs.' Opp. to JSD Supply 3, ECF No. 207; Defs.' Opp. to Polymer80 5, ECF No. 206.
[29] Orig. Pls.' Opp. 6–7, ECF No. 212.

APP.011

Here, the Original Plaintiffs commenced this suit and moved for injunctive relief in early August 2022, shortly before the Final Rule took effect.[30] Among those was Firearms Policy Coalition, a nonprofit organization that sought to protect the interests of its entire member base —of which JSD Supply is a part.[31] On October 1, 2022, the Court concluded that FPC had not demonstrated its associational right to seek injunctive relief on its members' behalf.[32] At that point, JSD Supply recognized its interests would no longer be protected via its membership in FPC and, within three months, it moved to intervene.[33] Days later, on January 9, 2023, Polymer80 similarly moved to intervene.[34] Polymer80 says it sought to intervene only 13 days after ATF issued letters identifying Polymer80's products as violative of the Final Rule.[35] And while the Court will not consider evidence "outside the administrative record" in deciding the *merits* of an APA claim, the Court is not aware of any rule that prohibits it from considering extrinsic evidence for purposes of *timeliness of intervention*.[36] Under these circumstances, the Court is of the view that neither movant waited too long between the time it learned of its interests in the suit and its motion to intervene.

Next, the Court considers "the extent of prejudice to existing parties from allowing late intervention." *In re Lease Oil Antitrust Litig.*, 570 F.3d at 247. The opponents claim permitting intervention will prejudice the existing parties by delaying ultimate resolution of the case.[37] But here the proper inquiry is the extent to which the existing parties were prejudiced by the

---

[30] ECF Nos. 1, 15.
[31] Vinroe Decl. ¶ 3, ECF No. 213-1.
[32] Mem. Opinion 15, ECF No. 89.
[33] JSD Supply's Mot., ECF No. 151.
[34] Polymer80's Mot., ECF No. 157.
[35] *Id.* at 2–6.
[36] Orig. Pls.' Opp. 7, ECF No. 212.
[37] Defs.' Opp. to JSD Supply 3, 7, ECF No. 207; Defs.' Opp. to Polymer80 5–6, 9–10, ECF No. 206 (noting Polymer80 asserts ten causes of action separate from those of the existing plaintiffs); Original Pls.' Opp. 8, ECF No. 212.

APP.012

intervenors' delay in seeking to intervene, not how the existing parties may be inconvenienced after the intervenors have successfully joined. *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994); *Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 865 (5th Cir. 2019). Delay of proceedings, on its own, is not equivalent to prejudice. And the opponents to intervention have offered no explanation about *how* a purported delay of proceedings would be prejudicial. Instead, the opponents have claimed prejudice due to the resulting inconvenience associated with the intervenors' subsequent participation in the lawsuit. That is not enough. "Any potential prejudice caused by the intervention *itself* is irrelevant, because it would have occurred regardless of whether the intervention was timely." *In re Lease Oil Antitrust Litig.*, 570 F.3d at 248 (emphasis added) (citation omitted). Moreover, as permitted by Rule 54, the Court finds no just reason it should delay entry of summary judgment on the existing parties' pending claims, which the intervenors have expressly agreed to adopt.[38] FED. R. CIV. P. 54(b). Thus, any prejudice that delayed proceedings might cause the parties (though doubtful) is cured by this Court's resolution and entry of judgment now as to those shared claims.

Third, the Court considers the "extent of prejudice to the would-be intervenor if the petition is denied." *In re Lease Oil Antitrust Litig.*, 570 F.3d at 247–48. Denying intervention would prejudice the would-be intervenors by delaying a favorable judgment, without which their declining revenues would be prolonged, potentially forcing their dissolution.[39] Polymer80

---

[38] JSD Supply's Mem. 10, ECF No. 150 (expressing intent to adopt Plaintiffs' claims and legal theories in full); Polymer80's Mem. 6–7, ECF No. 158 (expressing intent to adopt Plaintiffs' summary judgment briefing in full and to assert additional distinct claims). To the extent Polymer80 wishes to seek summary judgment on its alternate claims, it may do so. That Defendants may be required to litigate the additional claims is irrelevant, because they would be required to do so whether Polymer80 brought those claims in this case or a separate case.

[39] Kelley Decl. ¶¶ 13–14, Polymer80 App. 6, ECF No. 159 (noting the "profound economic harm" that Polymer80 has experienced following the Final Rule's effective date); Vinroe Supp. Decl. ¶ 3, ECF No. 213-1 (noting JSD Supply's revenues have dropped by more than 73% since the Final Rule's effective date).

APP.013

concedes it would not be prejudiced if denied intervention in this case, provided its separate lawsuit and preliminary injunction in that case is not dismissed.[40] This conditional concession undoubtedly minimizes its claims of prejudice in the instant suit. But because the "most important consideration" in determining intervention is the prejudice to the parties *opposing* intervention— and the Court finds that none exists—this concession is of little weight in the Court's decision. *Rotstain v. Mendez*, 986 F.3d 931, 938 (5th Cir. 2021).

Fourth, the Court finds no "unusual circumstances" that weigh heavily for or against intervention. *In re Lease Oil Antitrust Litig.*, 570 F.3d at 248. Defendants contend that permitting Polymer80's intervention in this case while the company's independent and duplicative suit is pending would violate the rule against claim-splitting.[41] That rule permits—but does not require— a court to dismiss a second complaint that "alleg[es] the same cause of action as a prior, pending, related action." *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996) (authorizing courts to dismiss a second complaint whether it is duplicative of a previously filed and still active suit). The claim-splitting rule is permissive, however, and does not require the Court to take any action at all. *Id.* In any event, if the rule were applied here, the appropriate course would be to dismiss Polymer80's independent suit, which it filed *after* attempting its initial intervention here.

Nor are the other permissible timeliness factors—"whether the intervenors' interests are adequately represented by other parties" and whether the intervenors "will significantly contribute to full development of the underlying factual issues in the suit"—particularly compelling. *NOPSI*, 732 F.2d at 472. Defendants argue intervention will not "significantly contribute to the full

---

[40] Polymer80's Reply 6, ECF No. 214. After it sought intervention and learned resolution of that motion would be deferred for several months, Polymer80 filed an independent lawsuit before this Court. *See Polymer80, Inc. v. Garland*, Civil Action No. 4:23-cv-00029-O (N.D. Tex. Jan. 9, 2023).
[41] Defs.' Opp. to Polymer80 3–4, 9, ECF No. 206.

APP.014

development of the underlying factual issues" because the existing parties have already "fully developed and briefed their claims," and intervenors therefore cannot meaningfully contribute.[42] Elsewhere, however, Defendants point out that Polymer80 raises ten distinct causes of action, all of which presumably require further development.[43] In response, Polymer80 says its status as "the industry leader in the design, manufacture, and distribution of the products that ATF" seeks to regulate will significantly contribute to the factual development of the underlying issues in dispute but offers no more than that bare assertion.[44] For its part, JSD Supply offers no rebuttal to Defendants. Thus, on the briefing before it, the Court finds that this factor is, at best, neutral for purposes of intervention or weighs slightly against intervention. But given that the other factors favor intervenors, the Court does not find this sufficient to bar intervention.

Finally, the opponents also argue that JSD Supply and Polymer80 have other means of asserting their interests.[45] Indeed, Polymer80 has a separate suit currently pending before this Court.[46] But whether an intervenor has other adequate means of protecting its interests is not a dispositive or necessary factor for the Court's decision to grant permissive intervention. Though the Court could require the parties to initiate or maintain their own lawsuits, the purpose of Rule 24 and the principle of judicial efficiency counsel against that course of action. *See United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 412 (5th Cir. 1991) (noting Rule 24's goals of achieving "judicial economies of scale by resolving related issues in a single lawsuit" while preventing the single lawsuit "from becoming fruitlessly complex or unending") (cleaned up). Allowing intervention preserves judicial resources by preventing multiple parallel proceedings

---

[42] Defs.' Opp. to Polymer80 9, ECF No. 206; Defs.' Opp. to JSD Supply 7, ECF No. 207.
[43] Defs.' Opp. to Polymer80 6 n.3, ECF No. 206.
[44] Polymer80's Reply 8, ECF No. 214.
[45] Defs.' Opp. to JSD Supply 6–7, ECF No. 207; Defs.' Opp. to Polymer80 9–10, ECF No. 206; Original Pls.' Opp. 5–6, ECF No. 212.
[46] *Polymer80, Inc. v. Garland*, Civil Action No. 4:23-cv-00029-O (N.D. Tex. Jan. 9, 2023).

APP.015

from running concurrently in multiple courts or before multiple jurists when this Court is already well-acquainted with the parties' respective claims. Nor is there a need to divide lawsuits where, as here, the would-be intervenors largely agree to adopt the claims and briefing schedule already before the Court, which reduces the complexity of the case.

*     *     *     *

In sum, the Court holds that all requisite elements for permissive intervention—timeliness, shared causes of action, and prejudice—weigh in favor of allowing the intervenors to join the lawsuit. For these reasons, the Court **GRANTS** JSD Supply's and Polymer80's motions to intervene on permissive grounds. Because JSD Supply and Polymer80 have agreed to adopt the current Plaintiffs' summary judgment briefing with respect to their shared claims, and because those express intentions inform the Court's discretionary decision to permit intervention here, the intervenors are barred from separately moving for summary judgment or filing supplemental briefing on any of the existing claims. However, Polymer80 may move for summary judgment on its unique claims to the extent those claims are not mooted by the Court's decision today.

## B.

### 1. Legal Standards

Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record. *See Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). Summary judgment is proper where the Court finds that there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Upon review of agency action, district courts apply the APA, which requires the reviewing court to "hold unlawful and set aside agency action" that the court finds to be "(A)

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

Among other procedural requirements, the APA requires agencies to provide "legislative" rules (i.e., substantive regulations) for public notice and comment, *id.* § 553(b), and to ensure that the final version of such a rule is a "logical outgrowth" of the agency's initial regulatory proposal. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). The APA's arbitrary and capricious standard requires that agency action be both "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), meaning agencies must not "rel[y] on factors which Congress has not intended it to consider" or "entirely fail[] to consider an important aspect of the problem" when issuing regulations. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Once a court determines the contested agency action falls short of the APA's substantive or procedural requirements, the reviewing court "shall" set aside the unlawful agency action. 5 U.S.C. § 706(2); *Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022).

### 2. Article III Standing

As a preliminary defense, Defendants argue that some of the plaintiffs, the Individual Plaintiffs and the non-profit organizations, are not entitled to entry of summary judgment because they lack standing to challenge the Final Rule. Because "standing is not dispensed in gross," the general rule is that each plaintiff must demonstrate a personal stake in the outcome of the case or controversy at bar. *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017). This means

APP.017

each plaintiff to a case "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (cleaned up). When there are multiple plaintiffs or intervenors to a lawsuit that request the same form of relief, however, only "*one* plaintiff must have standing to seek each form of relief requested." *Id.* at 1651 (emphasis added).

Here, among other requested forms of relief, all plaintiffs and intervenors—including those litigants whose standing is not in question—ask this Court to declare unlawful and set aside the Final Rule.[47] Accordingly, the Court could address the legality of the Final Rule regardless of whether the Individual Plaintiffs and the non-profit organizations have standing. Nevertheless, because these parties will not be entitled to unique forms of relief (e.g., party-specific injunctive relief or attorneys' fees) without independently demonstrating standing, the Court addresses the individuals' and the organizations' standing before turning the merits of their claims.[48]

To establish Article III standing, a plaintiff must show it has suffered (1) an injury-in-fact (2) that is fairly traceable to the defendants' conduct, and (3) is likely to be redressed by a favorable judicial decision. *Id.* at 1650. As the parties invoking federal jurisdiction, plaintiffs bear the burden of proving each element of standing. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).

###    i.  Individual Plaintiffs

First, Defendants argue that Individual Plaintiffs VanDerStok and Andren cannot demonstrate standing because "the only purported injury they plausibly invoke—a $30 transfer fee that certain FFLs purportedly would charge them to facilitate a firearm purchase—is not fairly

---

[47] Orig. Pls.' Am. Compl. 57, ECF No. 93 (seeking vacatur, injunctive relief, attorneys' fees and costs, etc.); BlackHawk's Compl. 33, ECF No. 99 (same); Defense Distributed, et al.'s Compl. 27, ECF No. 143 (same); JSD Supply's Proposed Compl. 29–30, ECF No. 149-2 (same); Polymer80's Proposed Compl. 43–44, App. 101–02, ECF No. 159 (same).

[48] To be entitled to attorneys' fees, a plaintiff must independently establish standing and prevail on the merits of an underlying claim. *See, e.g.*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998) ("An interest in attorney's fees is insufficient to create an Article III case or controversy *where none exists on the merits of the underlying claim*.") (cleaned up) (emphasis added).

traceable to the Rule."[49] Defendants contend that an FFL's independent decision to charge Individual Plaintiffs a transfer fee to facilitate purchase of newly regulated products bears no causal relationship to the Final Rule, and is therefore not fairly traceable to Defendants' conduct.[50] But Defendants are wrong on this point.

While the Supreme Court has declined to endorse theories of standing "that rest on *speculation* about the decisions of independent actors," where a plaintiff can make a showing of *de facto* causality, standing's traceability element is satisfied. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (emphasis added). Here, Individual Plaintiffs' theory of standing is not speculative. Instead, it relies "on the predictable effect of Government action on the decisions of third parties." *Id.* Individual Plaintiffs have confirmed that the FFLs they would use to facilitate their purchases will in fact charge a transfer fee.[51] And it is highly predictable that FFLs would charge for this service, particularly when faced with the prospect of an influx of customers who need to make purchases of certain products through an FFL as a result of a recent government mandate. Absent the requirements of the Final Rule, the Individual Plaintiffs would not purchase the regulated products through an FFL and would therefore not incur an associated transfer fee. This is sufficient to show *de facto* causality. Thus, the Court is satisfied that Individual Plaintiffs' purported injury is fairly traceable to Defendants' actions.

Even if the FFLs' independent decision to charge a transfer fee broke the chain of causation, Individual Plaintiffs have an alternative basis for standing that Defendants largely ignore. In a footnote, Defendants dismiss Individual Plaintiffs' other alleged injury—the threat of criminal prosecution should they violate the Rule—as simply "not credible."[52] They say the risk

---

[49] Defs.' Reply 2, ECF No. 204; Defs.' Cross-Mot. 11–12, ECF No. 181.
[50] Defs.' Reply 2–3, ECF No. 204.
[51] VanDerStok Decl. ¶¶ 2–6, ECF No. 62-1; Andren Decl. ¶¶ 2–6, ECF No. 62-2.
[52] Defs.' Reply 2 n.3, ECF No. 204.

APP.019

of criminal prosecution is not a cognizable injury because the costs Individual Plaintiffs would have to incur to avoid criminal liability "are merely *de minimis*."[53]

Here, however, Defendants conflate the injury analysis required for Article III standing with the irreparable harm analysis required for a preliminary injunction.[54] It is true that, for purposes of injunctive relief, a plaintiff must allege an irreparable injury that is more than merely *de minimis*. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). But Defendants offer no authority for the proposition that a plaintiff's alleged injury must pass a certain threshold to be cognizable for purposes of Article III. Nor is the Court aware of any such requirement.

It is well established that a credible threat of government action, on its own, provides a plaintiff with a sufficient basis for bringing suit. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). This remains true even if a plaintiff takes steps to protect themselves from prosecution. As the Supreme Court has made clear, a "plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Id.* Thus, even if Individual Plaintiffs in this case ameliorated the threat of government enforcement by making their purchases through an FFL and paying the associated fee (action), or by simply refraining from purchasing the regulated products they want to buy

---

[53] *Id.* (""Plaintiffs do not face a 'Hobson's choice' whether to comply with a regulation or risk criminal prosecution when the costs of compliance are merely *de minimis*.").

[54] Plaintiffs respond that "[t]he Agencies provide no argument as to . . . how Individual Plaintiffs could suffer irreparable harm [as the Court previously held] and yet not have standing." Pls.' Reply 3, ECF No. 191. But irreparable harm for purposes of injunctive relief and Article III injury-in-fact are not equivalents. And Plaintiffs offer no authority indicating that a showing of irreparable harm for purposes of injunctive relief automatically satisfies Article III's injury-in-fact requirement. Moreover, many courts address these issues separately, confirming that the analysis is distinct. *See, e.g.*, *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378 (6th Cir. 2020) (analyzing Article III standing and irreparable harm for purposes of injunctive relief separately); *East Bay Sanctuary v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018) (same); *Geer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638 (N.D. Tex. 2021) (same) (O'Connor, J.).

(inaction), they do not lose their right to challenge the Final Rule.[55] Defendants offer no argument regarding the traceability or redressability of this alternative injury. Nor could they. Thus, the Court holds that Individual Plaintiffs' threat of civil or criminal penalties is a cognizable injury under Article III and that, on this basis also, they have demonstrated standing to pursue their claims.

### ii. Non-profit Organizations

Second, Defendants claim the organizations—Firearms Policy Coalition and the Second Amendment Foundation—have failed to demonstrate associational (or organizational) standing. The associational standing doctrine permits a traditional membership organization "to invoke the court's [injunctive or declaratory] remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). To do so, the organization must satisfy a three-prong test showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, No. 20-1199, --- S.Ct. ---, 2023 WL 4239254, at *8 (U.S. June 29, 2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants do not meaningfully contend that FPC and SAF cannot satisfy the three-prong *Hunt* test.[56] Instead, they challenge the non-profits' statuses as "traditional membership

---

[55] For the same reasons, Defendants' argument that FPC cannot establish Article III standing *in its own right* fails. *See* Defs.' Reply 3 n.4. As FPC avers, it owns and uses products now subject to the Final Rule and, though a corporate entity, will suffer the same financial injury as Individual Plaintiffs if required to comply and the same threat of prosecution for non-compliance. Orig. Pls.' Br. 50, ECF No. 141; Combs Decl. ¶¶ 9–11, ECF No 62-4.

[56] Defs.' Br. 13, ECF No. 181; Defs.' Reply 3–4, ECF No. 204. Defendants simply point to the Court's earlier conclusion that, at the preliminary injunction stage, FPC did not carry its burden to demonstrate associational standing. Defs.' Br. 13, ECF No. 181 (citing Mem. Opinion 12–15, ECF No. 89).

organizations" arguing that, because they cannot satisfy this threshold requirement, they cannot establish associational standing. Defendants contend that, under Fifth Circuit precedent, an organization can only prove itself a "traditional membership organization" if it provides evidence that its members both fund and control the organization's activities. By contrast, FPC and SAF contend that they are traditional membership organizations because they have members nationwide who, by donating to their organizations, have "joined voluntarily to support [the non-profits'] mission[s]."[57] *Students for Fair Admissions, Inc. v. University of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022). Under the Supreme Court's recent decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, that is all the evidence that is required. 2023 WL 4239254, at *9. "Where, as here, an organization has identified members and represents them in good faith, [the Supreme Court's decisions] do not require further scrutiny into how the organization operates." *Id.* at 9.

As Defendants concede, the Court has already recognized that SAF satisfies the *Hunt* test.[58] Based on its summary judgment briefing, so does FPC. First, several of FPC's members— Individual Plaintiffs, Tactical Machining, and BlackHawk, who are all parties to this suit—have standing to sue in their own right. Second, FPC's organizational purpose to advocate for their members' individual liberties, separation of powers, and limited government are clearly germane to this suit challenging Defendants' asserted authority to regulate the manufacture of personal firearms.[59] Third, because FPC seeks equitable remedies of declaratory relief and vacatur of the Final Rule, there is no need for FPC's individual members to participate in the lawsuit.

---

[57] Orig. Pls.' Reply 8, ECF No. 191; Combs Decl. ¶ 8, ECF No. 62-4 (describing the voluntary and mission-driven membership base of FPC); Defense Distributed, et al.'s Reply 2, ECF No. 193; Gottlieb Decl. ¶ 2, ECF No. 166-2 (describing SAF's national membership base).
[58] Order 5, ECF No. 137.
[59] *See generally* Combs Decl., ECF No. 62-4; Orig. Pls.' Br. 49, ECF No. 144.

APP.022

\*     \*     \*     \*

In sum, the Court holds that Individual Plaintiffs and FPC—in its own right—have standing to pursue their claims for relief. Furthermore, FPC and SAF have demonstrated associational standing and may pursue relief on their members' behalf. Because Defendants do not contest the standing of Tactical Machining, BlackHawk, or Defense Distributed, these parties are similarly entitled to pursue their respective claims for relief.

### 3. Statutory Claims

The Original Plaintiffs and Intervenors (collectively "Plaintiffs" going forward) attack the Final Rule on a host of statutory and constitutional grounds. However, there exists an ordinary rule "that a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available." *Hagans v. Lavine*, 415 U.S. 528, 547 (1974); *see also New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable. Before deciding the constitutional question, it was incumbent on [the lower] courts to consider whether the statutory grounds might be dispositive.") (cleaned up). Thus, "if a case raises both statutory and constitutional questions, the inquiry should focus initially on the statutory question[s]. . . . If the lower court finds that statutory ground dispositive, resolution of the constitutional issue will be obviated." *Jordan v. City of Greenwood, Miss.*, 711 F.2d 667, 669 (5th Cir. 1983). Because the Court concludes that the ATF has clearly and without question acted in excess of its statutory authority, and that this claim is dispositive, the Court declines to address the constitutional questions presented.

APP.023

The Court begins with Plaintiffs' shared claim that, in attempting to regulate products that are not yet a "frame or receiver," and therefore not a "firearm" for purposes of the Gun Control Act, the ATF has acted in excess of its statutory jurisdiction. 5 U.S.C. § 706(2)(C). As they argued at the preliminary injunction stage, Plaintiffs maintain that the Final Rule exceeds ATF's statutory authority in two primary ways. First, they argue that the Final Rule expands ATF's authority over parts that may be "readily converted" into frames or receivers, when Congress limited ATF's authority to "frames or receivers" as such. Second, they argue that the Final Rule unlawfully treats component parts of a weapon in the aggregate (i.e., a weapon parts kit) as the equivalent of a firearm.[60] The Court agrees with Plaintiffs.

Basic principles of statutory interpretation decide this case. "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (quoting *Roberts v. Sea-Land Services, Inc.*, 556 U.S. 93, 101 (2012)). If the disputed statutory language is unambiguous, as it is here, "the sole function of the courts is to enforce [the law] according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (cleaned up). The Court

---

[60] Orig. Pls.' Supp. Br. Regarding Count I, ECF No. 133; *see also* Defense Distributed, et al.'s Br. in Support of Mot. for Summ. J., ECF No. 166 (joining and adopting Original Plaintiffs' Counts and summary judgment briefing on behalf of Defense Distributed and Second Amendment Foundation). BlackHawk offers additional arguments in support of its claim that the agency has exceeded its statutory authority, some of which are closely related to the arguments before the Court and other that are novel. *See generally* BlackHawk's Supp. Br. Regarding Count I 7–10, ECF No. 134 (e.g., arguing that the Final Rules requirement that FFLs retain records indefinitely exceeds the agency's statutory authority). But because Plaintiffs' primary arguments in support of their shared Counts I are dispositive, the Court need not consider each of the alternative grounds for reaching the same result.

APP.024

begins with "the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (quoting *Bouchikhi v. Holder*, 676 F.3d 173, 177 (5th Cir. 2012)). If a statute "includes an explicit definition," however, the Court "must follow that definition, even if it varies from a term's ordinary meaning." *Digit. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (cleaned up).

### i.   Parts that *may become* receivers are not receivers.

Congress carefully defined its terms in the Gun Control Act. The primary definition of "firearm" in the GCA contains three parts: "any weapon (including a starter gun) which [1] will or [2] is designed to or [3] may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Under this primary definition, a firearm is first and foremost a *weapon*. Underscoring that point, Congress explicitly named starter guns in the definition because starter guns are not obviously weapons. Then, because weapon parts also are not "weapons," Congress created a secondary definition covering specific weapon parts: "the frame or receiver of any such weapon." *Id.* § 921(a)(3)(B).[61] Notably, Congress did not cover all weapon parts—only frames and receivers. And *only* the frames and receivers "of any such weapon" that Congress described in its primary definition.

Because Congress did not define "frame or receiver," the words receive their ordinary meaning. *See* 18 U.S.C § 921 (defining other terms); *Kaluza*, 780 F.3d at 659. Contrary to Defendants' assertion, in an interpretive dispute over a statutory term's meaning, the Court does not simply "leav[e] the precise definition of that term to the discretion and expertise of ATF."[62]

---

[61] The Gun Control Act defines "firearm" in full as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3).

[62] Defs.' Supp. Br. Regarding Count I 9, ECF No. 132 (citing no supporting authority for the proposition that agency's definition of an unambiguous statutory term controls).

APP.025

Nor is the Court bound by the agency's definition of an unambiguous statutory term, even if the ATF has "long provided regulations defining . . . 'frame or receiver.'"[63]

Plaintiffs do not take issue with ATF's 1978 definition of "frame or receiver." This is because, as Defendants themselves acknowledge, ATF's prior regulatory definitions have been "*consistent with common and technical dictionary definitions*."[64] Statutory construction entails "follow[ing] the plain and unambiguous meaning of the statutory language, [and] interpreting undefined terms according to their ordinary and natural meaning and the overall policies and objectives of the statute. In determining the ordinary meaning of terms, dictionaries are often a principal source." *NPR Invs., L.L.C. ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014) (cleaned up). Near the time of the GCA's enactment in 1968, Webster's Dictionary defined "frame" as "the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm" and "receiver" as "the metal frame in which the action of a firearm is fitted and which the breech end of the barrel is attached." *Webster's Third International Dictionary* 902, 1894 (1971).[65] ATF's prior regulatory definition, which defined "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel," tracks that common definition.[66] Title and Definition Changes, 43 Fed. Reg. at 13,537.

---

[63] Defs.' Supp. Br. Regarding Count I 6–7, ECF No. 132. Even if the phrase "frame or receiver" was ambiguous, the Court would not defer to ATF's interpretation under *Chevron* because Defendants have not invoked the doctrine in this case, because the statute in question imposes criminal penalties, and because the Final Rule is a reversal of the ATF's prior interpretive position. *Cargill v. Garland*, 57 F.4th 447, 464–68 (5th Cir. 2023); Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 17–18, ECF No. 41.

[64] Defs.' Supp. Br. Regarding Count I 9, ECF No. 132 (emphasis added).

[65] *See also John Olson, Olson's Encyclopedia of Small Arms* 72 (1985) (defining a receiver as "the part of a gun that takes the charge from the magazine and holds it until it is seated in the breech. Specifically, the metal part of a gun that houses the breech action and firing mechanism").

[66] ATF's 1968 definition of "frame or receiver" was identical. *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968).

APP.026

But the Final Rule's amended definition of "frame or receiver" does not accord with the ordinary meaning of those terms and is therefore in conflict with the plain statutory language. Departing from the common understanding of "frame or receiver," Defendants now assert ATF's authority to regulate "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]" that are "designed to or may readily be completed, assembled, restored, or otherwise be converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The parts must be "clearly identifiable as an unfinished component part of a weapon." *Id.* In deciding whether something is a partially complete frame or receiver, ATF may consider other materials such as molds, instructions, and marketing materials "that are sold, distributed, or possessed with the item." *Id.*

As this Court has previously discussed, the definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). And that which *may become* or *may be converted to* a functional receiver is not itself a receiver. Congress could have included firearm parts that "may readily be converted" to frames or receivers, as it did with "weapons" that "may readily be converted" to fire a projectile. *Id.* § 921(a)(3)(A), (a)(4)(B). But it omitted that language when talking about frames and receivers. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (citation and internal quotation marks omitted). Likewise, when Congress uses a phrase in one part of a definition and excludes that phrase from another part of the very same definition, courts should give effect to Congress's deliberate exclusion.

Congress excluded other adjectives that ATF adds to its definition. Specifically, the Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c).

APP.027

Congress's definition does not. Again, compare the language in Congress's primary definition of "firearm" to its secondary definition covering frames and receivers. The primary definition of "firearm" includes any "weapon" that "is designed to" fire a projectile. 18 U.S.C. § 921(a)(3)(A). That language covers disassembled, nonfunctional, and antique firearms because they are "designed" to fire projectiles even if they are practically unable to do so. But Congress wanted to exclude antiques, so it explicitly said the "term does not include an antique firearm," once again demonstrating awareness of the scope of the language it chose. *Id.* § 921(a)(3). In contrast, Congress did not choose to cover firearm parts that are "designed" to be frames or receivers—that is, incomplete, nonfunctional frames or receivers. "That omission is telling," particularly when Congress used the more expansive terminology in the same definition. *Collins*, 141 S. Ct. at 1782. In sum, ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is facially unlawful given its conflict with the ordinary meaning of those terms as read within their immediate statutory context. *Sturgeon*, 577 U.S. at 438 (cleaned up).

The Court's earlier acknowledgement that ATF does indeed have discretion to decide "whether a particular component is a frame or receiver" based upon that component's "degree of completeness" does not alter this analysis.[67] Relying on the Court's acknowledgement, Defendants claim that is all the Final Rule purports to do: "provide[] more specific guidance about the criteria ATF uses in making th[e] determination" whether a component is a frame or receiver.[68] But that is not all the regulation does. Rather, the Final Rule sets outs the criteria ATF will use to determine whether a component "may readily be . . . *converted to function*" as a frame or receiver. 27 C.F.R. § 478.12(c) (emphasis added). As the Court previously explained, the issue in this case is whether ATF may properly regulate a component as a "frame or receiver" even after ATF determines that

---

[67] Mem. Opinion 10, ECF No. 56.
[68] Defs.' Supp. Br. Regarding Count I 10, ECF No. 132.

APP.028

the component in question is *not* a frame or receiver.[69] It may not. Logic dictates that a part cannot be both *not yet* a receiver and receiver at the same time. Defendants' reliance on that logical contradiction is fatal to their argument.

Predictably, Defendants disagree with the Court's interpretation of how the regulation operates and argue that "the Final Rule's amended definition treats a component as a frame or receiver only when ATF has determined that the component *is* a frame or receiver."[70] Again, a plain reading of the Final Rule's text belies this objection.[71] A part that has yet to be completed or converted to function as frame or receiver is *not* a frame or receiver. ATF's declaration that a component is a "frame or receiver" does not make it so if, at the time of evaluation, the component does not yet accord with the ordinary public meaning of those terms.

Thus, the Court's prior acknowledgment that "[a]n incomplete receiver may still be a receiver *within the meaning of the statute*, depending on the degree of completeness" is not a contradiction.[72] To be a receiver "within the meaning of the statute" requires that the particular component possess all the attributes of a receiver as commonly understood (i.e., the component must "provide[] housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel") at the point of evaluation, not "readily" in the near term.

Nevertheless, Defendants continue to press their case with reference to historical agency action. Defendants offer several classification letters in which ATF previously determined that a particular component was (or was not) a "firearm" for purposes of the GCA based on the item's

---

[69] *Id.*

[70] *Id.*

[71] Nor do Defendants invoke *Auer* deference here.

[72] Mem. Opinion 10, ECF No. 56 (emphasis added).

APP.029

stage of manufacture.[73] They contend that this historical practice proves that ATF does, in fact, hold statutory authority to regulate firearm components that may "readily" become a frame or receiver.[74] But historical practice does not dictate the interpretation of unambiguous statutory terms. The ordinary public meaning of those terms does. If these administrative records show, as Defendants contend, that ATF has previously regulated components that are not *yet* frames or receivers but could *readily be converted into* such items, then the historical practice does nothing more than confirm that the agency has, perhaps in multiple specific instances over several decades, exceeded the lawful bounds of its statutory jurisdiction.[75] That the agency may have historically acted *ultra vires* does not convince the Court it should be permitted to continue the practice.

Finally, Defendants argue that the Final Rule's redefinition of the "frame or receiver" is appropriate because it better achieves the goals Congress intended to accomplish in enacting the federal firearms laws.[76] They warn that "[u]nder any other approach, persons could easily circumvent the requirements of the GCA and NFA by producing or purchasing almost-complete [purported] frames or receivers that could easily be altered to produce a functional frame or receiver."[77] But "the best evidence of Congress's intent is the statutory text." *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). And the text of 18 U.S.C. § 921(a)(3), read in context, indicates that when Congress sought to regulate *parts* of weapons, it did so meticulously. Vague countervailing assertions about Congress's purpose in enacting the federal firearms laws do not override this analysis.

---

[73] *See* Defs.' Supp. Br. Regarding Count I 7–10, ECF No. 132.

[74] *See id.*

[75] *Id.* at 8 ("Under the previous definition, then, ATF regularly applied the definition of 'frame or receiver' to some unfinished or incomplete frames or receivers if they had reached a sufficiently advanced stage of the manufacturing process that they *could be readily converted to a functional state*.").

[76] *Id.* at 11.

[77] *Id.*

APP.030

### ii.     A weapon parts kit is not a firearm.

The Gun Control Act defines a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3). The Final Rule amends that definition, adding that the term "firearm" "shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). But that language conflicts with the statute's definition of "firearm."

As this Court previously concluded, ATF has no general authority to regulate weapon parts.[78] When Congress enacted the GCA, it replaced the FFA that authorized regulation of "any part or parts of" a firearm. Federal Firearms Act of 1938, Ch. 850, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968). In proposing the new regulation, Defendants even acknowledged as much.[79] Instead, under the GCA, the only firearm parts that fall under ATF's purview are "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). But the Final Rule goes further by regulating weapon parts kits (that is, "aggregations of weapon parts")[80] that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11.

---

[78] Mem. Opinion, ECF No. 56.
[79] *Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"), 86 Fed. Reg. 27,720, 27,720 (May 21, 2021) ("Congress recognized that regulation of all firearm parts was impractical. Senator Dodd explained that '[t]he present definition of this term includes "any part or parts" of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."'").
[80] Defs.' Resp. to Mot. for Prelim. Inj. 13, ECF No. 41.

APP.031

The GCA covers "any *weapon*" that is "designed to" or "may readily be converted to" fire a projectile. 18 U.S.C. § 921(a)(3)(A) (emphasis added). And Defendants contend that weapon parts kits satisfy this definition because they are clearly "'designed to' fire a projectile" and are sold to customers "for the sole purpose of assembling the kits into functional weapons capable of firing a projectile."[81] They say "[a] weapon parts kit is nothing more than a disassembled, currently nonfunctional weapon incapable of firing a projectile in its present form, but that is designed and intended to be assembled or completed to do so."[82] But Congress's definition does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile. To read § 921(a)(3)(A) as authorizing ATF to regulate any aggregation of weapon parts that may readily be converted into a weapon would render § 921(a)(3)(B)'s carveout for "frame[s] or receiver[s]" superfluous. Accepting Defendants' interpretation would be to read the statute as authorizing regulation of (A) weapon parts generally, and (B) two specific weapon parts. *SEC v. Hallam*, 42 F.4th 316, 337 (5th Cir. 2022) (noting courts should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law") (citation omitted). This despite Congress's purposeful change in the law between the FFA and the GCA, which limited agency authority to regulation of only frames and receivers. "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Id.* (quoting *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020)).

The statutory context repeatedly confirms that Congress intentionally chose not to regulate "weapon" parts generally. As further evidence, look to § 921(a)(4)(C), which does allow for the regulation of "parts," but only parts of "destructive devices"—one of the four statutory sub-

---

[81] Defs.' Supp. Br. Regarding Count I 13, ECF No. 132.
[82] *Id.* at 14.

definitions of "firearm." *Id.* § 921(a)(3)(D). The term "destructive device" is defined as "any explosive, incendiary, or poison gas," such as a bomb, grenade, mine, or similar device. *Id.* § 921(a)(4)(A). The definition of "destructive device" also includes "any type of weapon" that "may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter." *Id.* § 921(a)(4)(B). For example, suppose a manufacturer tried to sell a parts kit to make a homemade grenade. ATF could regulate that parts kit because it can regulate "any combination of parts either designed or intended for use in converting any device into" a grenade, from which a grenade "may be readily assembled." *Id.* § 921(a)(4)(C). Likewise for bombs, rockets, missiles, and other destructive devices. But commonly sold firearms such as 9mm pistols or .223 rifles do not fall under the specialized definition of "destructive devices," so weapon parts kits for those firearms cannot be properly regulated as components of "destructive devices." *Id.* § 921(a)(4).

In sum, the Gun Control Act's precise wording demands precise application. Congress *could have* described a firearm as "any combination of parts" that would produce a weapon that could fire a projectile. It used that language elsewhere in the definition. *Id.* § 921(a)(4)(C). Congress could have described a firearm as any part "designed" to be part of a weapon. It used that language, too. *Id.* § 921(a)(3)(A), (a)(4)(C). Congress could have described a firearm as a set of parts that "may be readily assembled" into a weapon, as it did for "destructive device." *Id.* § 921(a)(4)(C). Congress could have written all those things, and the very definition of "firearm" demonstrates that Congress knew the words that would accomplish those ends.[83] But Congress did

---

[83] Congress's definition of "machinegun" elsewhere in the U.S. Code is a great example of a definition that would fit the kind of rule ATF has in mind:

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by

APP.033

not regulate firearm parts as such, let alone aggregations of parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11. Accordingly, the Final Rule's attempt to regulate weapon parts kits lacks statutory support.

As the Court has previously discussed, Defendants' arguments that the Final Rule's regulation of weapon parts kits is consistent with existing judicial interpretations of the Gun Control Act are unavailing.[84] Defendants' cited cases demonstrate that courts understand the constraints of the Gun Control Act's definitions. The only Fifth Circuit case Defendants cite held that a disassembled shotgun was still a "firearm" under the Gun Control Act's definition. *See United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993). There, the government argued the shotgun "was only 'disassembled' in that the barrel was removed from the stock and that it could have been assembled in thirty seconds or less." *Id.* But the Fifth Circuit only agreed after surveying other cases in which courts held that inoperable weapons were still firearms "so long as those weapons 'at the time of the offense did not appear clearly inoperable.'" *Id.* No weapon parts kit would pass that test, and Defendants do not claim they would.[85]

---

a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part* designed and intended solely and exclusively, or *combination of parts* designed and intended, for use in converting a weapon into a machinegun, *and any combination of parts from which a machinegun can be assembled* if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphases added); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 n.3 (2006) ("Our more natural reading is confirmed by the use of the word 'contract' elsewhere in the United States Code . . . .").

[84] *See* Defs.' Supp. Br. Regarding Count I 13; Defs.' Resp. to Mot. for Prelim. Inj. 20–21, ECF No. 41.

[85] The best case in support of Defendants is *United States v. Wick*, 697 F. App'x 507 (9th Cir. 2017), in which the Ninth Circuit upheld a conviction for unlicensed firearm dealing based on evidence that the defendant had sold a "complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive,' thus meeting the statute's definition of a firearm." *Id.* at 508 (quoting 18 U.S.C. § 921(a)(3)(A)). But *Wick* is outside this circuit, nonprecedential, and contains no analysis of the statutory text.

APP.034

In sum, there is a legal distinction between a weapon parts kit, which may be an aggregation of partially manufactured parts not subject to the agency's regulatory authority, and a "weapon" which "may readily be completed [or] assembled . . . to expel a projectile." 18 U.S.C. § 921(a)(3)(A). Defendants contend that drawing such a distinction will produce the absurd result whereby a person lawfully prohibited from possessing a firearm can obtain the necessary components and, given advances in technology, self-manufacture a firearm with relative ease and efficiency.[86] Even if it is true that such an interpretation creates loopholes that as a policy matter should be avoided, it not the role of the judiciary to correct them. That is up to Congress. And until Congress enacts a different statute, the Court is bound to enforce the law as written.

*     *     *     *

Because the Final Rule purports to regulate both firearm components that are not yet a "frame or receiver" and aggregations of weapon parts not otherwise subject to its statutory authority, the Court holds that the ATF has acted in excess of its statutory jurisdiction by promulgating it.

### 4. Remedy

The proper remedy for a finding that an agency has exceeded its statutory jurisdiction is vacatur of the unlawful agency action. While Defendants claim the APA does not allow for such

---

Defendants' remaining cases are even less applicable. *See United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (affirming the district court's denial of an evidentiary hearing on whether probable cause supported a search warrant based on the defendant's possession of weapon parts kits that could "readily be converted" into firearms), *overruled on other grounds by Dist. of Columbia v. Heller*, 554 U.S. 570, 594–95 (2008); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (affirming a sentence enhancement for possession of a firearm because the defendant had a disassembled rifle but "could easily 'make the rifle operational in just a few seconds by putting the bolt in'"); *United States v. Theodoropoulos*, 866 F.2d 587, 595 n.3 (3d Cir. 1989) (affirming a conviction for possession of an unregistered, disassembled machine pistol), *overruled by United States v. Price*, 76 F.3d 526 (3d Cir. 1996).

[86] *See* Defs.' Supp. Br. Regarding Count I 14, ECF No. 132; Defs.' Resp. to Mot. for Prelim. Inj. 1–3, ECF No. 41.

APP.035

a remedy, the Fifth Circuit says otherwise. *Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (permitting vacatur under 5 U.S.C. § 706(2)).[87] While in some cases the court may remand a rule or decision to the agency to cure procedural defects, the Fifth Circuit considers vacatur the "default rule" for agency action otherwise found to be unlawful. *Id.* at 859–60; *accord Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022) (concluding that "[v]acatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation") (emphasis added). The D.C. Circuit agrees. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action . . . . In rare cases, however, we do not vacate the action but instead remand for the agency to correct its errors."). Whether remand-without-vacatur is the appropriate remedy "turns on two factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Id.* (cleaned up).

Vacatur is appropriate given the Court's conclusion that the ATF has exceeded its statutory authority. An illegitimate agency action is void *ab initio* and therefore cannot be remanded as there is nothing for the agency to justify. Defendants tacitly acknowledge this, noting that "if vacatur is authorized under the APA, it is not warranted here in the event that Plaintiffs succeed on the merits of any *procedural claim*, because the agency can likely correct any such error on remand."[88]

---

[87] Defendants argue that any Fifth Circuit precedent recognizing the permissibility of vacatur is not binding, because those decisions did not squarely address the issue of whether the APA authorizes such a remedy. Defs.' Reply 52–53. As such, Defendants contend this Court may not be bound by a legal "assumption" of a Fifth Circuit panel. *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021). But even if this Court is not bound by the Circuit's view that the APA permits vacatur, Defendants have not offered a compelling justification why this Court should depart from the mass of persuasive authority—developed over decades—that has assumed that vacatur is permissible. *See* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1178 n.270 (2020) (collecting cases from all Circuits).
[88] Defs.' Reply 53, ECF No. 204 (emphasis added).

APP.036

Moreover, vacating the unlawful assertion of the agency's authority would be minimally disruptive because vacatur simply "establish[es] the status quo" that existed for decades prior to the agency's issuance of the Final Rule last year. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022).

Defendants argue that any vacatur should only be applied to the parties before the Court while citing no binding authority in support.[89] But such a remedy is more akin to an injunction that would prohibit the agencies from enforcing their unlawful Final Rule against only certain individuals. And indeed, "[t]here are meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *Id.* at 219 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)) (assuming the availability of vacatur under the APA)). "[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the . . . statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Id.* at 220. Thus, the Court applies the default remedy and **VACATES** the Final Rule on grounds that the agency acted beyond the scope of its legitimate statutory authority in promulgating it.

Finally, because vacatur provides Plaintiffs full relief, the Court will not address the parties' remaining statutory claims, all of which raise procedural defects that might properly result in remand of the Final Rule that the Court has already deemed vacated.

## V.    CONCLUSION

In sum, the Court **GRANTS** Original Plaintiffs' unopposed Motion for Leave to Provide Supplemental Authority, and the Court **DENIES** JSD Supply's proposed Motion for Injunction as prematurely filed. The Court **GRANTS** Intervenor-Plaintiffs JSD Supply's and Polymer80's Motions to Intervene. Further, for the reasons discussed, the Court **GRANTS** Plaintiffs' and

---

[89] Defs.' Reply 54–55, ECF No. 204.

APP.037

Intervenor-Plaintiffs' Motions for Summary Judgment, **DENIES** Defendants' Cross-Motion, and **VACATES** the Final Rule. Separate final judgment shall issue as to the appropriate parties and claims. As discussed, Polymer80 may move for summary judgment on its unique claims to the extent those remaining claims are not mooted by this decision.

      **SO ORDERED** this **30th day** of **June, 2023**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

APP.038

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JENNIFER VANDERSTOK, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BLACKHAWK MANUFACTURING** | § | |
| **GROUP INC., et al.,** | § | |
| | § | **Civil Action No. 4:22-cv-00691-O** |
| **Intervenor Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MERRICK GARLAND, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>FINAL JUDGMENT</u>

This Judgment is issued pursuant to Fed. R. Civ. P. 58(a).

This action came on for consideration by the Court, and the issues having been duly considered and a decision duly rendered,

It is **ORDERED**, **ADJUDGED**, and **DECREED** that:

1. Plaintiffs' and Intervenor-Plaintiffs' motions for summary judgment on grounds that the Final Rule was issued in excess of ATF's statutory jurisdiction (Counts I and III) are **GRANTED** and Defendants' cross-motion for summary judgment as to those claims are **DENIED**.

2. On these grounds, the Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479 (2022)), is hereby **VACATED**.

3. The parties' remaining claims are **DENIED** as moot.[1]

4. All other relief not expressly granted herein is denied.

**SO ORDERED** this **5th day** of **July, 2023**.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**


---

[1] Orig. Pls.' Am. Compl., ECF No. 93 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates APA's Notice and Comment Requirement (Count II), Violates APA's Ban on Arbitrary and Capricious Conduct (Count III), Violates Nondelegation Principles (Count IV), Violates Take Care Clause (Count V), Violates Due Process (Count VI), Violates the First Amendment (Count VII)).

*See also* BlackHawk's Compl., ECF No. 99 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates Separation of Powers (Count II), is Unconstitutionally Vague (Count III), is Arbitrary and Capricious (Count IV), Violates the APA's Procedural Requirements (Count V), Violates the Nondelegation Doctrine (VI), is Contrary to Constitutional Right, Power, Privilege, or Immunity (VII), Violates the Commerce Clause (VIII), Unlawfully Chills First Amendment Speech (IX), Constitutes an Unconstitutional Taking Without Just Compensation (Count X)).

*See also* Defense Distributed, et al.'s Compl., ECF No. 143 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates the APA's Procedural Requirements (Counts II and IV), Violates Delegation Principles (Count III), Violates the Second Amendment (Count V), Violates Due Process (Count VI)).

*See also* Polymer80's Compl., ECF No. 229 (claiming Final Rule: Violates Separation of Powers (Count I), Exceeds Statutory Authority (Count III), Violates Nondelegation Doctrine (Count V), Violates APA's Procedural Requirements (Counts VII and XII), is Arbitrary and Capricious (Count IX), Violates First Amendment (Count XV), Violates Second Amendment (Count XIV), is Unconstitutionally Vague (Count XIII), Exceeds Limits of Commerce Clause (Count XVI), Violates the Takings Clause (Count XVII)).

As discussed in the Court's Memorandum Opinion, Polymer80, Inc. may move for summary judgment on any remaining claims not mooted by the Court's opinion. Mem. Opinion at 16, ECF No. 227. Polymer80 **SHALL** file a notice on the docket **no later than July 12, 2023**, informing the Court whether its remaining claims are moot and, if so, proposing an order of Final Judgment as to those claims.

*See also* JSD Supply's Compl., ECF No. 230 (claiming Final Rule: Exceeds Statutory Authority (Count I), Violates Separation of Powers (Count II), is Unconstitutionally Vague (Count III), is Arbitrary and Capricious (Count IV), Violates APA's Procedural Requirements (Count V), Violates the Nondelegation Doctrine (Count VI), is Contrary to Constitutional Right, Power or Privilege (Count VII), Violates the Commerce Clause (Count VIII), Violates First Amendment (Count IX), Violates the Takings Clause (Count X)).

APP.040

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING, LLC, a limited liability company; FIREARMS POLICY COALITION, INC., a nonprofit corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>*Defendants*. | Civil Action No. 4:22-cv-691 |

## PETITION FOR JUDICIAL REVIEW OF AGENCY ACTION AND REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs Jennifer VanDerStok; Michael G. Andren; Tactical Machining, LLC; and Firearms Policy Coalition, Inc., file this Petition for Judicial Review of Agency Action and Request for Declaratory and Injunctive Relief against Defendants Merrick Garland, Attorney General of the United States, in his official capacity; the United States Department of Justice; Steven Dettelbach, Director of

APP.041

the Bureau of Alcohol, Tobacco, Firearms and Explosives, in his official capacity;

and the Bureau of Alcohol, Tobacco, Firearms and Explosives and state the

following:

## **INTRODUCTION**

1.     The Executive Branch is not Congress. Congress maintains "All

legislative Powers," U.S. CONST. ART. I, § 1, and the president and his subordinate

agencies may neither enact nor legislatively "interpret" statutes to advance desired

outcomes not provided for in a law as passed by Congress.

2.     Despite this fundamental tenet of separation of powers, President

Biden has both expressed and advanced his intentions to expand federal firearm

regulations regardless of whether Congress concurs, in contravention of the

constitutional limits on Executive authority.[1]

3.     This lawsuit challenges, *inter alia*, the authority of the Department of

Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives

("ATF," collectively "Agencies") to regulate items that are not firearms as if they

were, and the Agencies' failure to follow the rulemaking requirements of the

Administrative Procedure Act ("APA").

---

[1]     THE WHITE HOUSE, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/ (last visited Aug. 10, 2022) ("I asked the Attorney General and his team to identify for me immediate, concrete actions I could [] take now without having to go through the Congress.").

APP.042

4.    The Final Rule not only greatly departs from the Proposed Rule, but misconstrues the Gun Control Act ("GCA"), 18 U.S.C. § 921 *et seq.*; ignores the congressional intent conveyed by the text of the GCA; and defies long-standing agency interpretation by redefining what constitutes a "firearm" and, in particular, what constitutes the "frame or receiver" of a "weapon."

5.    The GCA defines "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

6.    The central dispute in this case is whether the coverage of "any weapon" that may be "readily converted to expel a projectile by the action of an explosive" and the separate coverage of "the frame or receiver of any such weapon" allows the expansion of coverage for anything that is not already a "weapon" but could be "readily converted" into a frame or receiver of an eventual weapon to qualify as a "firearm." The Agencies claim that it is a natural extension of congressional intent to apply the readily converted language of subsection (A) to subsection (B), even though such language is notably lacking in subsection (B). *Definition of "Frame or Receiver" and Identification of Firearms* ("Final Rule"),

APP.043

87 Fed. Reg. 24,652, 24,667 (Apr. 26, 2022).[2] And yet Congress is presumed to include and exclude language knowingly and intentionally, and by omitting the "readily converted" from subsection (B) regarding frames and receivers, it must be presumed that Congress did not confer such expanded authority on the Agencies. And, more importantly, that is how such language would have more naturally been understood by legislators and the public when it was adopted. In the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm."

7.    The Final Rule defies the plain language of the GCA and longstanding agency interpretation suggesting that the items at issue here, sometimes colloquially referred to as receiver blanks, unfinished frames or receivers, or 80% frames or receivers, are not firearms.[3]

---

[2]    The Final Rule is available at: https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms

[3]    *See Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (last visited Aug. 10, 2022) ("ATF has long held that items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the GCA.").

APP.044

8.    "Frame or receiver" is not independently defined in the GCA but refers to the "frame or receiver" of a weapon as defined in 18 U.S.C. § 921(a)(3)(A). Through this rulemaking, however, the Agencies are attempting to create a broad, sweeping definition by including items that are not yet the "frames or receivers" of such weapons and by including "frame or receiver kits."

9.    Additionally, by treating non-frames and non-receivers as if they were actual frames and receivers of a weapon, the Agencies have expanded the reach of a criminal statute to cover "weapon parts kits" within the definition of a "firearm" under 18 U.S.C. § 921(a)(3)(A), even though such kits do not meet the congressionally defined term and do not actually contain a frame or receiver of a weapon.

10.    Congress never understood itself to be adopting language permitting every actual or potential *part* of a firearm be regulated as a firearm itself through the GCA.[4] Congress also did not give the Agencies the authority to regulate the broad array of materials that may, at some point in the future, be manufactured into firearms by private individuals. Individuals that are not otherwise prohibited from

---

[4]    "Under the present definition of 'firearm,' any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'" Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98, at 34 (S.D.N.Y. Jan. 29, 2021) (internal quotations omitted) (quoting S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200).

possessing firearms in the United States are free to personally manufacture firearms—there is no federal law that allows the Executive Branch to regulate or prohibit that practice.

11.     The Agencies' Final Rule defies the APA, other federal statutes, and the United States Constitution. Accordingly, the declaratory, injunctive, and other relief Plaintiffs request is necessary to prevent the implementation and enforcement of this unconstitutional, illegal regulation that will directly impact the current and longstanding personal and business practices of Plaintiffs and many other similarly situated individuals and businesses.

## PARTIES

12.     Plaintiff Jennifer VanDerStok is a United States citizen who lives in Mineral Wells, Texas. Ms. VanDerStok owns at least one firearm—used for lawful purposes, including but not limited to self-defense—that she purchased from Federal Firearms Licensee ("FFL") in accordance with federal law. Ms. VanDerStok does not currently own a firearm that she has manufactured herself using materials that Defendants do not currently classify as firearms, but Ms. VanDerStok wishes to manufacture a firearm using these products in the future and would do so but for the Agencies' new attempt to treat those items as firearms in and of themselves. Ms. VanDerStok is a member of Plaintiff Firearms Policy Coalition, Inc. ("FPC").

APP.046

13.     Plaintiff Michael G. Andren is a United States citizen who lives in Springtown, Texas. Mr. Andren owns at least one firearm that he purchased from an FFL in accordance with federal law. Mr. Andren also owns a firearm—used for lawful purposes, including but not limited to self-defense—that he manufactured himself using materials that Defendants do not currently classify as firearms. Mr. Andren wishes to and would continue to manufacture firearms using these products but for the Agencies' new attempt to treat those items as firearms in and of themselves. Mr. Andren is a member of Plaintiff FPC.

14.     Plaintiff Tactical Machining, LLC is a producer and retailer of the items the Agencies seek to regulate under the Final Rule. Tactical Machining is a corporation in good standing registered and located in Deland, Florida. Tactical Machining has had several sales direct to customers in this district. Tactical Machining currently sells items that Defendants do not currently treat as firearms under the GCA—items that Tactical Machining submitted to the ATF for classification and that the ATF did not classify as firearms. Should Defendants succeed in amending the GCA via the Final Rule, Tactical Machining would be prohibited from continuing the direct sale of those items to consumers and would be required to serialize all newly regulated items and kits, including already existing products. These new requirements will negatively impact Tactical Machining and will likely put Tactical Machining out of business, a point that the

APP.047

ATF anticipates and acknowledges in the Final Rule. Final Rule, at 24,723. At minimum, these new requirements will cost Tactical Machining a significant amount of monetary expenditure, including changes in business model, changes in product offerings, and a loss of customers. The ATF specifically notes that "there are 41 FFL and 43 non-FFL manufacturers that will be affected by the rule[,]" which includes Tactical Machining.[5] Further, the "ATF estimates the majority of affected entities are small entities that would experience a range of costs, the largest cost being the dissolution of the entire business[,]"[6] which again includes Tactical Machining. Tactical Machining is a member of Plaintiff FPC.

15.     Plaintiff Firearms Policy Coalition, Inc. is a nonprofit organization incorporated under the laws of Delaware with its principal place of business in Las Vegas, Nevada. FPC's purposes include defending and promoting the People's rights—especially but not limited to First and Second Amendment rights—and advancing individual liberty and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC represents its members and supporters—who include gun owners, individuals who wish to acquire firearms and ammunition, individuals who wish to manufacture their own

---

[5]     ATF, REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS 32 (2022), https://www.atf.gov/file/165811/download.
[6]     *Id.* at 124.

APP.048

personal use firearms, licensed firearm retailers, shooting ranges, trainers and educators, and others—and brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. Plaintiff FPC submitted comments on the Proposed Rule.[7]

16.     Defendant Merrick Garland is the United States Attorney General. As the Attorney General, Defendant Garland leads the Department of Justice. The Department of Justice oversees the Bureau of Alcohol, Tobacco, Firearms and Explosives—the agency that Congress has charged with enforcing the Gun Control Act, the National Firearms Act, and other federal laws. Attorney General Garland is sued in his official capacity.

17.     Defendant United States Department of Justice is a federal agency located at 950 Pennsylvania Avenue, NW, Washington, D.C., 20530.

18.     Defendant Steven Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives. The Bureau of Alcohol, Tobacco, Firearms and Explosives is charged by Congress with enforcing the Gun Control Act, the National Firearms Act, and other federal laws. Director Dettelbach is sued in his official capacity.

---

[7]     FPC, COMMENT ON ATF'S PROPOSED RULE (Aug. 19, 2021), https://bit.ly/3zxj9RR.

19.    Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a federal agency located at 99 New York Avenue, NE, Washington, D.C., 20226.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under federal law.

21.    This Court has jurisdiction pursuant to 5 U.S.C. § 701, *et seq.*, because Plaintiffs' claims arise under the Administrative Procedure Act.

22.    This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. § 2202.

23.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C) because Plaintiffs Andren and VanDerStok reside in this district; Plaintiff Tactical Machining has engaged in several business transactions in this district; and Plaintiff FPC has members that reside in this district, which include Plaintiffs Andren, VanDerStok, and Tactical Machining.

## STATEMENT OF FACTS

**I.    Historical Background**

24.    When reviewing a regulation of "Arms," whatever the context, it is important to start by recognizing that the "People" have a right to keep and bear arms, and that any regulation burdening that right must be measured against

APP.050

historical practices and understandings. "[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022) (internal quotation and citation omitted). As relevant to this case, that pre-existing right and historical practice long encompassed the practice of gunsmithing—the production of firearms by private individuals. The rulemaking challenged here would make such historical practice nearly impossible for those individuals. Congress certainly did not legislate an express ban on such a practice, and basic principles of constitutional avoidance counsel against allowing an agency to imply such a likely unconstitutional ban from far more limited statutory language.

25.     That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop. "Just as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (*per curiam*)).

26.     Importantly, "[t]he Second Amendment's text makes no distinction between the different methods of acquiring the firearms that Americans have a right to keep and bear. The text shows no preference for purchasing a firearm built by another individual over building one's own firearm. After all, it would not be much of a right if one unnecessarily had to pay others to exercise it[.]"[8]

27.     The concept of manufacturing a firearm at home is not novel—personal manufacturing of firearms has occurred since long before the Founding of our Nation. In fact, "[p]rivately made firearms have been in existence since the first ignition system was developed close to 500 years ago, in the 1400s."[9] During colonial times, American citizens manufactured and repaired arms—a valued skill that signified America's independence and self-reliance.[10] "Despite the emergence of armories, mass production, and the innovation of prominent manufacturers, the role of the individual never went away and still exists today."[11] Accordingly, The relevant history of arms in this country reflects a long and celebrated tradition of

---

[8]     Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J., at 9 (Apr. 11, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566.

[9]     *Stop Gun Violence: Ghost Guns*, *Hearing before the Subcomm. on the Constitution, Comm. on the Judiciary* ("Stop Gun Violence"), 117th Cong. 4 (2021) (statement of Ashley Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, President, The Gun Code, LLC), https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf.

[10]     *The American Tradition of Self-Made Arms*, at 2.

[11]     *Stop Gun Violence*, at 6.

APP.052

gunsmithing by private individuals, for their own benefit as well as for the benefit of their fellow citizens and the government.

28.    In light of the historically favorable view of gunsmithing, "[r]egulations on self-built arms are *not* longstanding. In fact, there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. All such restrictions have been enacted within the last decade."[12] Efforts to restrict that practice thus run headlong into the Second Amendment, and efforts to do so through Executive Branch expansion of a more limited congressional enactment are particularly suspect.

## II.    Legal Background

### A.    National Firearms Act and Gun Control Act

29.    In 1934, Congress enacted the National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq.*, and "imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational) tax on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms."[13] "Firearms subject to the 1934 Act included [short barreled] shotguns

---

[12]    *The American Tradition of Self-Made Arms*, at 40 (emphasis added).
[13]    *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Aug. 10, 2022).

APP.053

and rifles . . ., certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers."[14]

30.    Congress then passed the GCA in 1968, which "amended the NFA definitions of 'firearm' by adding 'destructive devices' and expanding the definition of 'machine gun.'"[15]

31.    As Congress defined it in the GCA, and as it has stood since 1968, "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3). Congress did not independently define the terms "frame or receiver" contained in subsection (B) of that overall definition.

32.    Under federal law, it is "unlawful . . . for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce[.]" 18 U.S.C. § 922(a)(1)(A). "The term 'engaged in the business' means . . . as applied to a manufacturer of firearms, a person who devotes time,

---

[14]    *Id.*
[15]    *Id.*

attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured." 18 U.S.C. § 921(a)(21). "The term 'to predominately earn a profit' means that the intent underlying the sale or disposition of firearms is predominately one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22).

33.    Violations of the NFA and GCA can carry criminal penalties, including fines and up to five year's imprisonment. 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both.").

### B.    Congress's Delegation to the ATF

34.    The Attorney General has the authority to *enforce* the GCA and NFA, but lacks the authority to fill gaps or legislate. *See* 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General[.]"); 26 U.S.C. § 7805(a) ("[T]he Secretary shall prescribe all needful rules and regulations for the enforcement of this title[.]").

35.    "Congress also authorized the Attorney General to prescribe 'rules and regulations as are necessary to carry out the provisions' of Chapter 44 of Title

APP.055

18 of the Gun Control Act." *Gun Owners of Am. v. Garland*, 19 F.4th 890, 897 (6th Cir. 2021) (quoting 18 U.S.C. § 926(a)).

36.    "The Attorney General has directed the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to administer, enforce, and exercise the functions and powers of the Attorney General with respect to" both the GCA and NFA. *Id*.; *see Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514, 66,527 (Dec. 26, 2018) ("The Department agrees that regulatory agencies may not promulgate rules that conflict with statutes.").[16]

37.    According to the ATF, "[a]mong ATF's responsibilities is the classification of firearms[.]" Fed. Defs.' Mot. to Dismiss, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685, ECF No. 29, at 12 (N.D. Cal. Nov. 30, 2020).[17]

## C.    The ATF's Prior Classifications

38.    The ATF maintains guides and images to convey and illustrate its treatment and classification of certain firearms and non-firearms.

39.    The ATF has had the same answer to this question for decades. "Are '80%' or 'unfinished' receivers illegal?":

> Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings," or "machined

---

[16]    The       Bump-Stock-Type       Devices       rule       is       available       at: https://www.federalregister.gov/documents/2018/12/26/2018-27763/bump-stock-type-devices
[17]    All court filings refer to the ECF pagination.

APP.056

bodies" in which the fire-control cavity is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.[18]

This response was available on the ATF's website at the time of filing this Petition. "Classification letters from the late 1970s through the 1990s repeatedly sought to determine whether the 'manufacturing process' was sufficiently complete in order to be deemed a firearm." Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98, at 16 (S.D.N.Y. Jan. 29, 2021). The ATF supplemented this answer with photos[19] for clarification:

---

[18] *Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (last visited Aug. 10, 2022).
[19] *Id.* (retrieved on Aug. 10, 2022).



40.     ATF also answered the question of whether there are "restrictions on who can purchase receiver blanks[,]" stating, "[t]he Gun Control Act (GCA) does not impose restrictions on receiver blanks that do not meet the definition of a 'firearm.'"[20] This response was available on the ATF's website at the time of filing this Petition.

**D.     Campaign Statements, Announcement, and Rulemaking Process**

41.     Before President Biden took office, one of his campaign pillars was an amorphous plan to combat "gun violence." This plan included "stop[ping] the

---

[20]     *Are there restrictions on who can purchase receiver blanks?*, ATF, https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks     (last visited Aug. 10, 2022).

APP.058

proliferation of these so-called 'ghost guns' by passing legislation requiring that purchasers of gun kits or [a] 3D printing code pass a federal background check."[21]

42.    Once elected, President Biden "urged Congress to swiftly pass gun control laws[.]"[22] When Congress did not act to the Biden Administration's liking, President Biden instead called upon the Agencies to dramatically expand their interpretation of the congressionally defined term "firearm" in order to accomplish the legislative agenda Congress itself declined to adopt.

43.    On April 11, 2022, President Biden declared that he had "instructed the Attorney General to write a regulation that would rein in the proliferation of 'ghost guns' because [he] was having trouble getting it passed in the Congress[.]"[23]

44.    On May 21, 2021, the Department of Justice published a Proposed Rule directly in line with the Administration's public stance and statements. *Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"), 86 Fed. Reg. 27,720 (proposed May 21, 2021).[24]

---

[21]    *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ (last visited Aug. 10, 2022).

[22]    *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.

[23]    *Biden announces new rules for 'ghost guns,' introduces ATF director nominee*, CBS NEWS, at 2:51 (Apr. 11, 2022), https://www.cbsnews.com/video/biden-ghost-guns-atf-director-nominee/#x.

[24]    The    Proposed    Rule    is    available    at: https://www.federalregister.gov/documents/2021/05/21/2021-10058/definition-of-frame-or-receiver-and-identification-of-firearms

45.     The Biden Administration has sought to end run Congress and place restrictions on the ability of peaceable Americans to acquire materials to self-manufacture firearms. The Final Rule requires rigorous compliance with a labyrinth of rules should a privately manufactured firearm ever come into the hands of a licensed dealer. This will naturally cause licensed dealers to turn away privately manufactured guns for repairs to avoid tangling with the complicated regulatory scheme, thus disincentivizing Americans to take part in the pastime of self-manufacturing guns. And this Administration will put numerous companies that produce these newly-regulated items and kits out of business—despite those companies' specific reliance on the Agencies' longstanding application of federal law.

46.     The   newly   proposed   regulation,   inspired   by   the   Biden Administration's promises, takes stances that defy statutory construction and long-standing agency interpretation.

## III.   The Agencies' Unlawful Redefinition of "Firearm"

### A.     Unlawful Definition of Frames or Receivers

47.     Statutorily, as it has stood since Congress enacted the GCA in 1968, "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler

APP.060

or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

48.    The Agencies' prior regulation defines a "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. This definition was established by an agency rulemaking in 1978. *Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978).

49.    Just nine days after President Biden was sworn into office, the ATF recognized in a court filing that "pursuant to the . . . statutory definition, a device is a firearm if it is either: (1) a frame or receiver or (2) a device that is designed to or can readily be converted into a device that expels a projectile. Importantly, the 'designed to' and 'readily be converted' language are only present in the *first clause* of the statutory definition." Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 14 (quoting 18 U.S.C. § 921(a)(3)(A)) (emphasis added).

50.    The ATF not only acknowledged, but affirmatively argued that even a *nearly complete* frame or receiver that can be "readily converted" into a frame or receiver was not a firearm under the GCA, nor was it an accurate statutory reading of the GCA to take express language from 18 U.S.C. § 921(a)(3)(A) and add it to 18 U.S.C. § 921(a)(3)(B) when Congress had not done so. *Id.*

APP.061

51.     Despite the clear distinction in the statute that "readily converted" is sequestered to one section of the statutory definition, the Final Rule did precisely what the ATF claimed was inaccurate—it imported "readily converted" into 18 U.S.C. § 921(a)(3)(B). Final Rule, at 24,739 ("The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver[.]").

52.     The Agencies newly define "readily" itself as: "A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." *Id.* at 24,735. Trailing behind the term "readily" in the Final Rule are eight amorphous factors that the ATF will "balance" to determine whether an object that is itself neither a weapon nor a frame or receiver of a weapon can nonetheless be "readily converted" into a firearm. *Id.* These factors include time, ease, expertise, equipment required, parts availability, expense, scope, and feasibility. *Id.* The Final Rule does not give any indication as to the weight assigned to each factor, giving the ATF near complete discretion on all classifications moving forward.

53.     The Agencies' new interpretation of the GCA defies canons of statutory interpretation. Congress has the power to insert "readily converted"

within the subsection addressing "the frame or receiver of any such weapon" in the GCA and chose not to. Importing such an extension where Congress has not itself done so violates any number of statutory construction canons, not the least of which is the clear statement rule. *See Clear-Statement Rule*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[A] doctrine requiring the legal drafter to use clarity of expression before some effect will follow[.]"); Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 34 (quoting *Allison Engine Co., Inc. v. U.S. ex rel. Saunders*, 553 U.S. 662, 671 (2008) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in disparate inclusion or exclusion.") (internal quotation marks and alteration omitted)).

54.     The Agencies' newly proposed definition also defies long-standing agency precedent. In litigation documents filed just a few days after President Biden was sworn in, the ATF declared it "applies a standard under which unfinished frames or receivers that have not yet reached a critical stage of manufacturing—devices that are not designed to expel a projectile and still require many steps, tools, and expertise to be converted into such a device—are *not firearms* within the meaning of the GCA." Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 11 (emphasis added).

APP.063

55.    "An unmachined frame or receiver is not 'designed' to expel a projectile, because its purpose is not to expel a projectile. Rather, its purpose is to be incorporated into something else that is designed to expel a projectile. Holding otherwise would mean that every part of a gun is designed to expel a projectile and, therefore, would be deemed a firearm under the GCA." *Id.* at 31. Notably, the ATF recognized this would contravene the purpose of the GCA. *Id.* at 34 ("Under the present definition of 'firearm,' any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'") (internal quotations omitted) (quoting S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200).

56.    "The object that is designed to expel a projectile is a gun—not its trigger, its hammer, the grip, front sight, or the frame. It is the combination of all these things into one that results in an object that is designed to expel a projectile. [The party's] argument that unmachined frames and receivers are firearms because they are 'designed to' expel a projectile should therefore be rejected." *Id.* at 32.

57.    The ATF referenced some its own classification letters, including one letter that states: "[T]he devices at issue still required both machining to become finished frames/receivers and assembly with other parts to become operable

APP.064

firearms. . . . [T]his process is not one whereby an unmachined frame can 'readily' be converted into a device that expels a projectile." *Id.* at 36.

58.    "Congress knew how to regulate devices based upon what was 'intended' to be done with them. . . . The absence of analogous language in Section 921's definition of 'firearm,' forecloses any argument that unfinished frames or receivers are firearms simply because they are parts that will later be assembled into firearms, or because they are intended to be incorporated into firearms." *Id.* at 34.

59.    Under the Final Rule, the items in the photograph below[25] labeled "not a firearm" are now firearms because "the terms 'frame' and 'receiver' include a partially complete frame or receiver 'that is designed to, or may readily be completed, assembled, restored, or otherwise converted' to accept the parts it is intended to house or hold." Final Rule, at 24,685.

---

[25]    *Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (last visited Aug. 10, 2022).

APP.065



60.     Additionally, the Agencies can exert broad discretion in determining what exactly constitutes a "frame or receiver." The Final Rule declares, under the definition of "frame," "receiver," and "variant," that "[t]he following are *nonexclusive* examples that illustrate the above definitions." Final Rule, at 24,735 (emphasis added); *see id.* at 24,739 ("[T]his section, the terms 'frame' and 'receiver' shall include the specific part of a complete weapon, including variants thereof, *determined (classified) by the Director* to be defined as a firearm frame or receiver prior to April 26, 2022.") (emphasis added).

61.     The Final Rule also provides near complete discretion to the ATF's Director to consider not just the item being classified, but also to consider outside information, whether provided with the item or not, to "determine" if it is a frame or receiver. *Id.* at 24,739 ("When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit."). In this way, the Final Rule also seeks to regulate a "frame or receiver parts kit" as a frame or receiver itself. In other words, under the Final Rule, a link to a YouTube video on a retailer or producer's website may have the effect of converting an unregulated item into a regulated frame or receiver.

62.     The Final Rule goes so far as to "[e]xpressly exclude[] from the definition of 'frame or receiver' unformed blocks of metal, liquid polymers, and other raw materials" because the ATF's new classification is so expansive and departs so markedly from its previous classifications that they are not obviously excluded without explicit mention. *Id.* at 24,700. But such exclusions are entirely arbitrary, cannot be supported by the definitions the ATF otherwise seeks to apply, and thus illustrate why such regulatory redefinitions are overbroad and incorrect.

APP.067

63.    The Final Rule's redefinition of "firearm," specifically as to frames and receivers is not consistent with the statutory definition because the Final Rule includes items that do not meet the statutory definition of frame or receiver under the regulatory definition, thus broadening the ATF's reach without congressional mandate or approval. *See* 18 U.S.C. § 921(a)(3).

### B.    Unlawfully Designating Weapons Parts Kits as "Firearms"

64.    In addition to improperly expanding the terms "frame" and "receiver", the Final Rule unlawfully treats parts kits as "firearms." Initially, the Proposed Rule sought to add "a sentence at the end of the definition of 'firearm' in [27 C.F.R. § 478.11] providing that '[t]he *term shall include a weapon parts kit* that is designed to or may readily be assembled, completed, converted, or restored to expel a projectile by the action of an explosive.'" Proposed Rule*, at 27,726 (emphasis added).

65.    In the Final Rule, the Agencies contravened their prior position and stated, "the language of section 921(a)(3)(A) should be read to include weapon parts kits and aggregations of weapon parts that . . . may or may not be designed to expel a projectile by the action of an explosive in their present form or configuration, *but may readily be converted to do so*." Final Rule, at 24,684 (emphasis added).

66.    The Final Rule included in the definition of firearm "a weapon parts kit that is designed to or may be readily completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* at 24,735.

67.    The Agencies' newly crafted regulatory definition that includes a collection of parts within the definition of a firearm defies long-standing agency precedent—explicitly argued in litigation in *California v. ATF*.

68.    In *California v. ATF*, the ATF declared in its motion to dismiss a contrary message to what it purports now, that it is required to regulate weapon parts kits:

> As a statutory matter, Congress has legislatively defined a "firearm" to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, but has explicitly excluded "firearms parts" from that definition. Congress has determined that "firearms" are subject to regulation under the GCA, and that anything that is not a firearm is largely excluded from federal regulation. This leaves a State like California free to enact its own regulations of firearm parts (as it has done), but does not permit ATF to extend federal regulation beyond the limits imposed by Congress.

Fed. Defs.' Mot. to Dismiss, *California*, at 10–11. In other words, Congress chose to regulate complete weapons, or a single component of an incomplete weapon.

69.    The ATF goes on, stating, "Congress has chosen to exclude firearm parts from the scope of the GCA, including parts that could be assembled with a

APP.069

homemade receiver and frame to make a firearm. Congress has also chosen to permit the home manufacture of unserialized firearms for personal use." *Id.* at 20.

70.    Congress granted the ATF the limited authority to regulate complete weapons (including those that may be readily converted into complete weapons) and the actual complete or functional receiver of a such weapon, but not items that may someday become a frame or receiver or even the individual parts of a weapon.

71.    In fact, "[t]here is nothing novel about the use of unregulated firearm parts to manufacture firearms for personal use; that possibility (whether by lawful makers or by prohibited persons) has been evident since Congress's 1968 decision to exclude firearms parts from the GCA." *Id.* at 21 n.10.

72.    The Agencies now regulate weapon parts kits in contradiction with clear statutory language and the Agencies' own long-standing precedent and understanding of the original public meaning of such language. Furthermore, Plaintiffs, and millions of other individuals, have relied on the original public meaning of such language, as confirmed by the ATF's long-standing precedent, to establish and pursue their personal and business practices. Such a shift would detrimentally impact Plaintiffs and the population writ large.

## IV. The Agencies' Further APA Violations

73.    "Between May 21 and August 19, 2021, ATF received over 290,000 comments on the proposed rule, Definition of 'Frame or Receiver' and

APP.070

Identification of Firearms."[26] DOJ published the Final Rule in the Federal Register on April 26, 2022. The Final Rule violates numerous provisions of the APA beyond just the Agencies' redefinition of congressionally established terms.

### A.   The Definition of "Complete Weapon" is in Excess of the Agencies' Authority

74.   The Agencies newly define a complete weapon as "[a] firearm other than a muffler or silencer that contains all component parts necessary to function, *whether or not assembled or operable*." Final Rule, at 24,747 (emphasis added). By including unassembled weapons in the definition of "complete weapon" the ATF has created tremendous enforcement uncertainty.

75.   This definition is problematic considering the interchangeability of certain gun parts. For example, "law-abiding gun owners who legally own both AR rifles and pistols could be charged with a felony if they store their firearms unassembled." *Id.* at 24,700. This is because an AR rifle and an AR pistol could theoretically create a new combination—an AR rifle lower and a pistol upper (with a barrel of less than 16 inches), when combined, create a short-barrel rifle. This matters because that individual would possess a "complete weapon" that is an NFA regulated item and cannot be lawfully owned without a federally issued tax stamp. Mere possession of the unregulated AR pistol upper in conjunction with an AR

---

[26]   *Comments on Proposed Rule 2021R-05*, ATF, https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver/submit-comment (last visited Aug. 10, 2022).

APP.071

rifle lower could now qualify as a felony under the Agencies' definition of "complete weapon."

76.     The Final Rule does not sufficiently respond to this dramatic expansion of federal regulation, intentional or not—violation of which bears potential felony charges, prison time, and the forfeiture of an individual's right to possess a firearm under federal law.

77.     The Agencies fail to adequately address this concern and merely state the definition is needed for other purposes. *See id.* at 24,700 ("Firearms manufacturing is a continuum from raw material to a functional item, and the term 'complete weapon' is needed to explain *when* the frame or receiver of a weapon in the process of being manufactured must be identified and recorded as required by the regulations."). The ATF does not explain how the current regulatory system is insufficient in this regard, nor does the ATF have the authority to regulate the various firearm parts that will be caught up in this definition.

**B.     The Final Rule is Not a Logical Outgrowth of the Proposed Rule**

78.     The Proposed Rule sought to combine frame or receiver into a less technical single definition, defined as "[a] part of a firearm that, when the complete weapon is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components, even if

32

APP.072

pins or other attachments are required to connect those components to the housing or structure." Proposed Rule, at 27,741.

79.    The Final Rule significantly departed from the Proposed Rule and defines "frame" and "receiver" as distinct terms accompanied by nearly six pages of diagrams and examples. Final Rule, at 24,735–41. The Final Rule omitted four diagrams from the Proposed Rule and added five new diagrams. *Compare* Proposed Rule, at 27,742–46 *with* Final Rule, at 24,735–41.

80.    The new, sweeping definition and diagrams associate a "frame" with handguns, a "receiver" with rifles or shotguns, and adds the term "variant," which means "a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments." Final Rule, at 24,735.[27]

---

[27]    "(1) The term 'frame' means the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence (i.e., sear or equivalent), even if pins or other attachments are required to connect such component to the housing or structure. (2) The term 'receiver' means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure. (3) The terms 'variant' and 'variants thereof' mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments. For example, an AK-type firearm with a short stock and a pistol grip is a pistol variant of an AK-type rifle, an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle, and a revolving cylinder shotgun is a shotgun variant of a revolver." Final Rule, at 24,735.

81.    The definitions are followed by "nonexclusive examples that illustrate the above definitions[,]" and sub-definitions of what constitutes a "frame or receiver." *Id.* at 24,735, 24,739–41.

82.    Another significant change is that the Proposed rule sought to require a "manufacturer, importer, or maker of a firearm" identify "a complete weapon or complete muffler or silencer device no later than seven days following the date of completion of the active manufacturing process . . . or prior to disposition, whichever is sooner," Proposed Rule, at 27,752, but the Final Rule replaces seven days with "no later than close of the next business day," Final Rule, at 24,748. The Agencies did not provide any opportunity for comment on this significant change.

83.    Additional definitions were added to the Final Rule without being proposed in the Proposed Rule. For example, the definition of multi-piece frame or receiver was added to the Final Rule under sections 478.92(a)(iii) and 479.102(a)(3) without being proposed in the Proposed Rule. *See* Final Rule, at 24,741, 24,747.

84.    Additionally, under section 478.92(a)(4)(iii)(D), the requirements for privately made firearms marked by non-licensees was added without being proposed. *See id.* at 24,743.

85.    Although mentioned in the Proposed Rule, the Final Rule, for the first time, defines the term "primordial." *See* Proposed Rule, at 27,729 ("Although this

APP.074

addition is intended to capture when an item becomes a frame or receiver that is regulated irrespective of the type of technology used to complete the assembly, frame or receiver molds that can accept metal or polymer, unformed blocks of metal, and other articles only in a primordial state would not—without more—be considered a 'partially complete' frame or receiver.").

86.    The Final Rule states, "[a]s used in this rule, the term 'primordial' refers to an item, such as an unmachined block of metal, liquid polymer, or other raw material that is in its original natural form or at an early stage of development without substantial processing." Final Rule, at 24,663 n.49 (citing Primordial, Oxford                    English                    Dictionary, https://www.oed.com/view/Entry/151373?redirectedFrom=primordial#eid ("[T]hat [which] constitutes the origin or starting point from which something else is derived or developed.")).

87.    In addition to definitional issues, the Proposed Rule and Final Rule omit sources that the agency presumably relied on for preparing both rules. The public did not have the opportunity to review those sources or provide comment. For example, regarding personally manufactured firearms, while the ATF claims that they are involved in crimes and difficult to trace, the assertion was unsupported by any cited evidence in the Proposed Rule and the ATF declined to

make available the evidence on which it purportedly relied for review, notice, and comment.

88.    The Final Rule included a significant amount of new and additional sources that were not provided to the public for review and comment. *See*, *e.g.*, Final Rule, at 24,657–58 (citing nearly two pages of DOJ Office of Public Affairs "OPA" sources not mentioned in the Proposed Rule; 57 new DOJ/OPA sources are cited throughout the entire Final Rule for the first time).

89.    No opportunity for additional comment was made available here on these new, critical elements of the Final Rule.

### C.    The Agencies' Failure to Adequately Explain and Failure to Consider

90.    The Final Rule fails to adequately explain why the ATF will now treat inoperable frames or receivers or inoperable frame or receiver kits as firearms, when they were previously not treated as such. *Id.* at 24,727–28. The Final Rule (and indeed the Proposed Rule) includes "inoperable" without any explanation or justification.

91.    Despite suggesting that the ruling is "not intended to alter any prior determinations" on what is a "frame or receiver," *id.* at 24,662, the ATF appears to be changing its mind on at least one firearm right on the face of the Final Rule— the Beretta AR-70.

92.    The Final Rule makes factually incorrect claims about split frame firearms. "[T]he concept of a 'split receiver' was nowhere near new. In fact, self-loading firearms invited, or even required, 'split' components as early as their introduction. These firearms were incredibly common, undisputedly in common lawful use, and thus very unlikely to have gone unnoticed by the ATF and its predecessor."[28]

93.    The ATF has long held that the upper receiver was the "firearm" and that the lower receiver and other parts were not themselves firearms. Yet now, the ATF is amending the regulation to declare that, for some firearms, such as AR-style rifles, the lower receiver is the "frame or receiver."

94.    The "ATF and its precursors were patently aware of striker-fired, selfloading firearms that were so tremendously popular they, in large part, led to the adoption of the very law the ATF purports to be interpreting. Many of the popular imported firearms targeted by the [GCA], which the ATF enforced, meet the exact factors the ATF here claims it could not have known about."[29]

95.    "In addition to this, hundreds of thousands of American made striker-fired pistols were flooding the market by 1968. To suggest that these firearms were so rare in what the ATF terms 'civilian use' compared to revolvers and break-open

---

[28]    FPC, COMMENT ON ATF'S PROPOSED RULE 12–13 (Aug. 19, 2021), https://bit.ly/3zxj9RR.
[29]    Id.

APP.077

shotguns, despite their popularity literally preceding the very law the ATF is presently interpreting, is implausible, to say the least."[30]

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE APA
### 5 U.S.C. § 706
### (Exceeds the ATF's Statutory Jurisdiction and Authority)

96.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

97.    Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

98.    If the agency's regulation is not consistent with a statutory definition established by Congress, the agency has gone outside the bounds of its authority since it derives its authority from Congress. *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation."). And

---

[30]    *Id.*

even were there some ambiguity in the legislative language, such ambiguity would be resolved in a manner that narrowed, rather than expanded, the relevant statutes, consistent with clear statement principles, the constitutional avoidance doctrine, and the rule of lenity. The agency would not have discretion to expand any such terms to criminalize further behavior and would not receive deference of any such interpretive efforts.

99.    "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quotations and citation omitted).

100.   The Final Rule purports to establish a regulation to "guide" the ATF's administration of the NFA and GCA, but instead regulates new items Congress explicitly left out of the definition of "firearm," and would grant the Agencies new, additional authority in excess of that proposed, considered, debated, or passed by Congress.

101.   The Agencies are attempting to regulate weapon parts Congress explicitly left out of the statute and impose felony charges for violations thereof. *See* 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both.").

102. The Final Rule exceeds the ATF's congressionally mandated jurisdiction and authority.


# COUNT II
## VIOLATION OF THE APA
## 5 U.S.C. § 706
## (Fails to Observe Procedures Required by Law)

103. Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

104. Under 5 U.S.C. § 706(2)(D), "[t]he reviewing court shall . . . hold unlawful and set aside any action, findings, and conclusions found to be . . . without observance of procedure required by law[.]"

105. The APA's rulemaking requirements include a mandate for federal agencies to provide the public with a meaningful opportunity to comment on the elements of a rule and the materials that form the basis for the rule. *See*, *e.g.*, 5 U.S.C. § 553(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) ("The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process.").

### *Final Rule Not a Logical Outgrowth of Proposed Rule*

106. As part of the rulemaking process, the Agencies made significant changes to the Final Rule that do not logically grow out of the Proposed Rule.

APP.080

107.   An agency is prohibited by the APA from adopting a final rule that contains significant changes unless supplemental notice and opportunity to comment is provided. *See* 5 U.S.C. § 706; *see also Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) (applying "logical outgrowth" doctrine to vacate final rule that significantly deviated from proposed rule without notice).

108.   The Final Rule provides separate and distinct definitions for "frame," "receiver," and "variant" that were not proposed in the Proposed Rule and were not provided for comment.

109.   The Proposed Rule defined a frame or receiver as "[a] part of a firearm that, when the complete weapon is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components, even if pins or other attachments are required to connect those components to the housing or structure." Proposed Rule, at 27,741. Following the definition is just over a dozen illustrations. *Id.* at 27,742–46.

110.   The Final Rule omitted four diagrams from the Proposed Rule and added five new diagrams. *Compare* Proposed Rule, at 27,742–46, *with* Final Rule, at 24,735–41.

APP.081

111.  The Final Rule significantly altered the time allowed for the identification of a firearm, down from 7 days to the next business day. *Compare* Proposed Rule, at 27,752, *with* Final Rule, at 24,748.

### *Lack Notice and Comment on Critical Elements of the Final Rule*

112.  As part of the rulemaking process, the agencies relied on new information and made significant changes to the Final Rule that were not available for public comment. *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 251 (2d Cir. 1977) ("If the failure to notify interested persons of the scientific research upon which the agency was relying actually prevented the presentation of relevant comment, the agency may be held not to have considered all 'the relevant factors.'"); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment.").

113.  For example, the Final Rule added 57 DOJ Office of Public Affairs sources, among others, that were not present in the Proposed Rule or offered for comment.

114.  The Final Rule added definitions and/or regulations for several terms, including but not limited to a multi-piece frame or receiver, privately made

APP.082

firearms marked by licensees, and primordial, all without being proposed in the Proposed Rule or offered for comment. These definitions also cannot be said to have logically outgrown from the Proposed Rule.

115.    The Agencies included voluminous new sources in the Final Rule that were not provided for public review nor comment in the Proposed Rule.

**COUNT III**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**(Arbitrary, Capricious, and Not in Accordance with Law)**

116.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

117.    Under 5 U.S.C. § 706(2)(A), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"

***Failure to Adequately Explain Change in Position***

118.    "It is established administrative law that if the agency fails to acknowledge a change [in its position] and adequately explain it, the changed position will be afforded no deference in litigation under either *Chevron* . . . or *Auer*[.]" *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 6 (D.D.C. 2017) (internal quotation marks and citations omitted).

119.   The Final Rule drastically departs from the Agencies' longstanding treatment of firearms and non-firearms.

120.   The Final Rule abandons the Agencies' treatment of non-firearm objects that was stated on the ATF's official website, applied in numerous classification letters, and that the ATF argued in support of in active litigation—a position that individuals and corporations have relied on to structure their personal and business practices.

121.   The Agencies have failed to adequately reconcile their statements in *California v. ATF* and *Syracuse v. ATF* with their Final Rule, including, but not limited to, the Agencies' treatment of "readily convertible."

122.   The Agencies include new regulation of certain firearms, including but not limited to AR-style firearms and striker-fired handguns, in the Final Rule without adequate explanation, given the Agencies knew of both split receivers and striker-fired handguns at the time of their prior rulemaking defining firearms, which were already popular and widely used.

123.   The Agencies fail to adequately explain why the ATF will now treat inoperable frames or receivers or inoperable frame or receiver kits as firearms.

### *Failure to Consider Important Aspects of the Problem and Relevant Comments and/or Sources*

124.   The APA requires federal agencies, including Defendants, to (a) give general notice of proposed rulemaking in the Federal Register and thereafter (b)

"give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

125.   The House and Senate reports regarding this provision state that "the agency must analyze and consider all relevant matter presented." S. Rep. No. 752, 796 Cong., 1st Sess. 15 (Nov. 19, 1945); H. Rep. No. 1980, 79th Cong., 1st Sess. 25 (May 3,1946).

126.   "[Public] participation . . . in the rule-making process is essential in order to permit administrative agencies to inform themselves[.]" Report submitted by Pat McCarran, Chairman, U.S. Senate Committee on the Judiciary, *Administrative Procedure Act, Legislative History 1944-46*, 79th Cong. (July 26, 1946).

127.   "[I]t is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." *Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972).

128.   Courts have recognized the importance of the public comment process, which is designed to prevent a person from being required to resort to, or be adversely affected by, significant rulemaking without having the opportunity to participate in that rulemaking. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001); *Ober v. EPA*, 84 F.3d 304, 312–15 (9th Cir. 1996); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401–06 (9th Cir. 1995).

APP.085

129.   The Final Rule fails to adequately address a number of comments the Agencies received on the Proposed Rule within the Final Rule. For example, the Final Rule fails to adequately consider the implications of its "complete weapon" definition. *See* Final Rule, at 24,700 ("[T]he Department disagrees . . . that the application of the definition of 'firearm' to unassembled weapons creates enforcement uncertainty."). Most importantly, fails to consider the fact that both split receivers and striker-fired pistols were in existence in 1968, thus Congress could not have intended for the ATF to regulate what it chose to ignore.

130.   There are a variety of other examples of such failure, including, but not limited to these instances of the Agencies' failure to consider relevant comments and sources.

**COUNT IV**
**VIOLATION OF THE U.S. CONSTITUTION**
**U.S. CONST. ART. I**
**(Separation of Powers & The Delegation Doctrine)**

131.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

132.   Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

133.   Article I, Section 3 of the U.S. Constitution directs that the President "shall take Care that the Laws be faithfully executed[.]"

46

134.   A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. CONST. ART. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

135.   "Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* at 756–57.

136.   When the ATF redefined the definition of "firearm," it did so without congressional authority, thus violating the separation of powers.

137.   "[B]oth separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). "A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a *clear delegation* from that representative body." *Id.* at 2616 (emphasis added).

138.   Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

139.   Neither the president nor his subordinates, therefore, may exercise, Congress' legislative power to declare entirely "what circumstances . . . should be forbidden" by law. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418–19 (1935).

140.   A violation of the Constitution is always a violation of the APA. *See* 5 U.S.C. § 706(2)(B).

141.   The Final Rule is not merely a regulatory change that allows the Agencies to enforce the NFA and GCA. The Final Rule would give the Agencies new power over new items that are not contemplated nor regulated under federal law. This rulemaking constitutes an executive branch agency making new law, bearing potential criminal penalties, in violation of the Delegation Doctrine as established by the structure of the U.S. Constitution and elucidated by the U.S. Supreme Court.

**COUNT V**
**VIOLATION OF THE U.S. CONSTITUTION**
**U.S. CONST. ART. II**
**(The Take Care Clause)**

142.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

143.   Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

APP.088

144.   Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution require that "Every Bill" shall be passed by both the House of Representatives and the Senate and signed by the President "before it [may] become a Law."

145.   Article II, Section 3 of the U.S. Constitution directs that the President "shall take Care that the Laws be faithfully executed[.]"

146.   A violation of the Constitution is always a violation of the APA. *See* 5 U.S.C. § 706(2)(B).

147.   "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

148.   The Executive Branch cannot create new policies to be enforced with the force of federal law in the guise of enforcing a congressional enactment. *Id.* at 587–88 ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."); s*ee Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting the notion that "the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution").

149.   "The Supreme Court has also invoked the Take Care Clause as the textual source of the President's duty to abide by and enforce the laws enacted by

APP.089

Congress—that is, as the instantiation of the President's duty to respect legislative supremacy and not to act c*ontra legem*." Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. PA. L. REV. 1835, 1848 (2016).

150.   "Separate opinions by members of the *Youngstown* majority expressed a like sentiment about the Take Care Clause—that it obliges the President to respect the means and ends of statutory policy power specified by Congress. In his famous concurrence, Justice Jackson wrote that the clause confers on the President 'a governmental authority that reaches so far as there is law,' thereby 'signify[ing] . . . that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules.'" *Id.* at 1849–50.

151.   "To similar effect, Justice Frankfurter quoted Justice Holmes for the proposition that '[t]he duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.' Likewise, in Justice Douglas's words, any authority conferred by the clause 'starts and ends with the laws Congress has enacted.'" *Id.* at 1850.

152.   The Final Rule is not a faithful execution of congressionally enacted law. Instead, it is an executive created law offered under the guise of enforcing the NFA and GCA. The Final Rule violates the prohibition on the Executive of making law and violates the president's duty to ensure the laws are faithfully executed.

APP.090

## COUNT VI
## VIOLATION OF THE U.S. CONSTITUTION
### U.S. CONST. AMEND. V
### (Void for Vagueness)

153.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

154.   A person of ordinary intelligence could not determine from the statute or the rule itself whether various objects were regulated. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").

155.   The indeterminacy of the various tests gives the Agencies virtually unlimited and unpredictable discretion. *See, e.g.*, Final Rule at 24,735 (listing eight un-ranked factors to determine what "readily" means); *id.* at 24,735–41 (listing six pages of non-exclusive illustrations of what constitutes a "frame," "receiver," or "variants thereof"); *id.* at 24,739 (empower the Director to consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit," when classifying items).

APP.091

156.    Even long-standing agency classification letters are subject to change,
thus adding to the obscurity. *See* Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 40
("The Record contains classification letters dating back to the 1970s. These
classification letters make plain that the ATF has consistently adopted a standard
whereby the degree of machining to the frame or receiver determined whether that
device constituted a firearm.").

157.    The Final Rule is unduly vague and violates the void for vagueness
doctrine.

## **PRAYER FOR RELIEF**

Plaintiffs request the following relief from this Honorable Court:

1.    Holding unlawful and setting aside the Final Rule;

2.    Issuing preliminary and permanent injunctive relief enjoining
Defendants from enforcing or implementing the Final Rule;

3.    Postponing the effective date of the Final Rule;

4.    Awarding Plaintiffs the costs of this action and reasonable attorney's
fees; and

5.    Awarding Plaintiffs such other relief as is just and appropriate.


Respectfully submitted,

*/s/ R. Brent Cooper*
R. Brent Cooper (TX Bar No. 04783250)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas  75202

APP.092

Telephone: (214) 712-9500
Telecopy: (214) 712-9540
brent.cooper@cooperscully.com


Cody J. Wisniewski* (CO Bar No. 50415)
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org


Kaitlyn D. Schiraldi* (TN Bar No. 039737)
Erin M. Erhardt* (CO Bar No. 49360)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO  80227
Telephone: (303) 292-2021
Telecopy: (877) 349-7074
kschiraldi@mslegal.org
eerhardt@mslegal.org

*Pro hac vice applications forthcoming

*Attorneys for Plaintiffs*

APP.093

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited<br>liability company; and<br>FIREARMS POLICY COALITION, INC., a<br>nonprofit corporation,<br><br>          *Plaintiffs*,<br><br>and<br><br>BLACKHAWK MANUFACTURING GROUP<br>INC. d/b/a 80 PERCENT ARMS,<br><br>          *Intervenor-Plaintiff*,<br><br>    v.<br><br>MERRICK GARLAND, in his official capacity<br>as Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF<br>JUSTICE; STEVEN DETTELBACH, in his<br>official capacity as Director of the Bureau of<br>Alcohol, Tobacco, Firearms and Explosives; and<br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES,<br><br>          *Defendants*. | Civil Action No. 4:22-cv-691-O |

## BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## *Introduction*

1.      This lawsuit challenges the Biden Administration's unlawful attempt to unilaterally rewrite federal law, create new criminal and civil liability, and destroy the ability of Americans to exercise their Second Amendment rights by privately making firearms.

2.      Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms ("BlackHawk") is a business that produces and distributes receiver blanks—unfinished firearm parts from which individuals can make their own firearms—jigs, tools, and instructions, to customers across the United States.

3.      ATF's longstanding legal position has been that receiver blanks, jigs, tools, and related instructions do not fall within ATF's regulatory jurisdiction. ATF has stated this position on its website, in classification determinations issued to manufacturers after reviewing product samples, and in litigation.

4.      Receiver blanks did not fall under the purview of the Gun Control Act of 1968 ("Gun Control Act" or "Act"), an Act with definitions carefully defined by Congress. Nor did the Act apply to receiver blanks combined with tools, jigs, instructions, and/or kits.

5.      President Biden campaigned on a promise to prompt legislative action imposing new regulations on receiver blanks but was unable to persuade Congress to pass such legislation.

6.      Having failed to convince Congress, President Biden politically pressured Defendants to take unilateral executive action to accomplish his failed policy agenda.

7.    In response to the Biden Administration's political pressure, Defendants adopted a Final Rule. In doing so, Defendants (a) ignored administrative procedures; (b) flouted longstanding principles of congressional intent; and (c) illicitly redefined, *inter alia*, the Gun Control Act.

8.    First, the Final Rule unlawfully rewrites federal law by (1) expanding the definitions of "frame" and "receiver" so that ATF may regulate *partial* frames or receivers; and (2) broadening Congress' definition of "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted" into a "firearm."[1] These expansions are in direct defiance of congressionally defined laws and regulations. At no point has Congress shown that it intended to regulate *partial* frames or receivers or weapon parts kits that could be readily made into a firearm, and there is no evidence to suggest otherwise.

9.    Second, the practical application of such broad sweeping definitions not only unlawfully increases Defendants' regulatory powers, but also confers to Defendants the power to hold criminally liable businesses and citizens who simply wish to exercise their Second Amendment rights.

10.    Third, the Final Rule repudiates ATF's longstanding legal position on receiver blanks, expressly stating that prior classification determinations "shall not continue to be valid or authoritative," 87 Fed. Reg. at 24,741, and claiming that receiver blanks now fall within ATF's regulatory jurisdiction.

---

[1] The Final Rule is available at https://www.federalregister.gov/d/2022-08026.

11.     Fourth, beyond Defendants' facially unlawful expansion of congressionally defined terms, the Final Rule has implicated the First Amendment. For example, ATF's position that two identical pieces of metal could be treated differently depending on whether they are associated with, *inter alia*, instructions, jigs, tools, or some unknown combination, chills First Amendment speech used to guide lawful activity recognized by the Final Rule itself. Furthermore, the Final Rule's requirement that submissions to ATF for classification determination must include the submitting party's marketing materials unlawfully regulates speech protected by the First Amendment.

12.     The Final Rule is an unconstitutional regulation that spells death for BlackHawk and similarly situated businesses. BlackHawk therefore asks this Court to issue a preliminary injunction preventing Defendants from enforcing the Final Rule against BlackHawk, and to declare that the Final Rule is unlawful.

## PARTIES

13.     BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms (collectively, "BlackHawk") is a corporation organized under California law and located in Tarrant County in Fort Worth, Texas. BlackHawk's core business is manufacturing and distributing the very items Defendants seek to regulate under the Final Rule. BlackHawk distributes its products to businesses and consumers throughout the United States, including within this district.

14.     Defendant Merrick Garland is the Attorney General of the United States and the head of the United States Department of Justice, which oversees the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

3

15.     Defendant United States Department of Justice ("DOJ") is an agency of the United States that administers and enforces the principal federal gun control statutes, including the National Firearms Act of 1934 and the Gun Control Act of 1968. DOJ is located at 950 Pennsylvania Ave., NW, Washington, D.C. 20530.

16.     Defendant Steven Dettelbach is the Chief Law Enforcement Officer and Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

17.     Defendant Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") is an agency of the United States that administers and enforces the principal federal gun control statutes, including the National Firearms Act of 1934 and Gun Control Act of 1968. ATF is located at 99 New York Ave., NE, Washington, D.C. 20226.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. § 1331.

19.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(e)(1)(B) and (C). A substantial part of the events giving rise to these claims occurred in this district; a substantial part of the property that is the subject of the action is situated in this district; and BlackHawk has engaged in business transactions in this district.

20.     BlackHawk has standing to assert the interests of both itself and its customers. *See*, *e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976).

## HISTORICAL BACKGROUND

21.     The Gun Control Act established the definition of a "firearm" for purposes of federal firearms regulations.

4

22.    The Act states that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" for appropriate purposes. Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213–14.

23.    The Act goes on to state that "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title." § 101, 82 Stat. at 1214.

24.    18 U.S.C. § 921 defined "firearm" as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

25.    There is no statutory definition of a "frame or receiver."

26.    27 C.F.R. § 478.11 provided a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

27.    A strict licensing regime governs the importation, manufacture, and dealing of products that constitute firearms. 18 U.S.C. § 923(i) requires licensed importers and licensed manufacturers to "identify by means of a serial number engraved or cast on the

receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."

28.     Failure to follow these requirements can result in criminal liability. Under 18 U.S.C. § 924(a)(1), it is a crime to violate "any other provision of this chapter," referring to Title 18, Chapter 44, of the United States Code, which contains sections 921–931. It is therefore of paramount importance for law-abiding businesses in the firearms industry to have clarity and predictability about what products meet the definitions of a "firearm" and "frame or receiver."

29.     It is equally important for law-abiding customers and for those who may not possess firearms (prohibited possessors) to have clarity on what products constitute a "firearm" and "frame or receiver." 18 U.S.C. § 922(g) makes it a crime for various categories of individuals "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

**FACTUAL BACKGROUND**

**I.     The United States of America Has a Long Tradition of Individuals Privately Making Their Own Firearms**

30.     Civilian gunmaking is a practice that dates back to the American colonies.

31.     Despite the emergence of armories, mass production, and the innovation of prominent manufacturers, the role of the individual in making guns never went away.

32.     Today, many law-abiding Americans make their own firearms using gun parts and receiver blanks, which are also commonly known as "incomplete receivers," "unfinished receivers," or "80% receivers."

33.     A receiver blank is a piece of raw material that has undergone some of the stages of manufacture necessary to create a firearm receiver, but which still requires additional machining to produce a functioning firearm receiver. The phrase "80% receiver" is not a legal term but refers to the colloquial understanding that receiver blanks have undergone 80% or less of the stages of manufacture necessary to produce a functioning receiver. The remaining stages of manufacture must be performed by the individual owner using appropriate machinery to produce a functioning receiver.

34.     Receiver blanks are popular among do-it-yourself hobbyists, who appreciate the challenge of using machinery to build a firearm from raw materials and unfinished components. These law-abiding citizens cherish the right of Americans to build their own firearms.

35.     Customers for receiver blanks include women and men, veterans, blue and white collar workers, retirees, and government employees all across the country.

## II.    Politicians Malign the Receiver-Blank Industry Despite Laws That Already Prohibit the Targeted Misconduct

36.     The receiver-blank industry has been unfairly maligned by politicians and the media, who point to misconduct that is already prohibited by federal law as a justification for shutting down or criminalizing lawful businesses and preventing law-abiding Americans from privately making firearms.

APP.101

37.    For example, it is already illegal for a prohibited possessor to own a firearm under 18 U.S.C. § 922(g), and it is already illegal to engage in the business of selling or distributing firearms without a license under 18 U.S.C. § 923(a).

38.    Even though a lawfully acquired firearm can be used in an illegal manner, that does not justify a complete destruction of businesses' ability to sell firearms and individuals' ability to purchase them.

39.    Similarly, even though lawfully, privately made firearms can be used in an illegal manner, that does not justify a complete destruction of businesses' ability to sell receiver blanks jigs, tools and instructions, and individuals' ability to purchase them and privately make firearms in a lawful manner.

## III.    ATF Previously Classified Receiver Blanks as Unregulated Materials

40.    ATF has long held, and told the public, that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver." Its website states:

**Are "80%" or "unfinished" receivers illegal?**

Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.[2]

---

[2] ATF, *Are "80%" or "unfinished" receivers illegal?*,
https://www.atf.gov/firearms/qa/are-"80"-or-"unfinished"-receivers-illegal.

APP.102

**Are there restrictions on who can purchase receiver blanks?**

The Gun Control Act (GCA) does not impose restrictions on receiver blanks that do not meet the definition of a "firearm." . . . .[3]

**What is ATF doing in regards to people making their own firearms?**

An individual may generally make a firearm for personal use. . . . .[4]

**Does an individual need a license to make a firearm for personal use?**

No, a license is not required to make a firearm solely for personal use. . . . .[5]

41.    ATF's website also includes photographs of receiver blanks that ATF has determined are not regulated firearm receivers:[6]

---

[3] ATF, *Are there restrictions on who can purchase receiver blanks?*,
https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks.
[4] ATF, *What is ATF doing in regards to people making their own firearms?*,
https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms.
[5] ATF, *Does an individual need a license to make a firearm for personal use?*,
https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use.
[6] *See* https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks

APP.103



42.     For the last several decades, ATF has permitted industry to request written determinations from ATF as to the classification of sample products.

43.     ATF's Firearms and Ammunition Technology Division conducts a thorough technological analysis of the sample and provides industry with a classification determination as to whether the sample is a firearm regulated under the Gun Control Act or National Firearms Act.

10

APP.104

44.    For example, in a recent lawsuit that dealt with whether a particular product was a "firearm," the government submitted a certified administrative record containing numerous classification determinations sent to manufacturers stating that their receiver-blank products were not firearms. *See* ATF's Certified Set of Documents Comprising the Record at 64–70, *California Rifle & Pistol Ass'n, Inc. v. ATF*, No. 1:14-CV-1211 (E.D. Cal. Jan. 9, 2015), ECF No. 19-3 (containing the images that follow).

**Submitted forging**





Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch.   Any changes to its characteristics would require re-evaluation.

**Submitted forging, first view**



11

APP.105

**Submitted forging, second view**



Based on our examination, FTB finds that the submitted item is *not* a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

**Submitted forging**



45.    Prior to the Biden Administration, ATF defended these classification

determinations in litigation brought by gun-control activists:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the
> process under which, for decades, ATF has reviewed numerous items to
> determine if they should be classified as "firearms" under the GCA, bringing
> to bear the agency's technical, scientific, mechanical, and legal expertise.
> Receivers for the AR-15, the most common rifle in America, have a space
> within them called the fire-control cavity, which accommodates the firing
> components. The longstanding position of ATF is that, where a block of
> metal (or other material) that may someday be manufactured into a receiver
> bears no markings that delineate where the fire-control cavity is to be formed
> and has not yet been even partially formed, that item is not yet a receiver . . . .

APP.106

Fed. Defs.' Mot. Dismiss at 2, *California v. ATF*, No. 3:20-CV-06761

(N.D. Cal. Nov. 30, 2020), ECF No. 29, 2020 WL 9849685.

> The Record contains classification letters dating back to the 1970s. These
> classification letters make plain that ATF has consistently adopted a standard
> whereby the degree of machining to the frame or receiver determined
> whether the device constituted a firearm. . . .
>
>     . . . . Not one of the above-noted classification letters made reference
> to the amount of time that would be required to transform the given device
> into a fully functional frame or receiver. Further, these letters are only a few
> of the examples contained in the Record of ATF making determinations
> based on the degree of machining performed on the unfinished frame or
> receiver with no reference whatsoever to the time required to transform the
> device into a fully functional frame or receiver.

Fed. Defs.' Mot. for Summ. J. at 30–32, *City of Syracuse v. ATF*, 1:20-CV-06885

(S.D.N.Y. Jan. 29, 2021), ECF No. 98.

46.    Manufacturers, distributors, and retailers invested capital, created American

jobs, and sold lawful products to customers based on their good-faith reliance on ATF's

written classification determinations.

## IV.    The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control

47.    President Biden campaigned on a promise to "[s]top 'ghost guns,'" referring

to firearms "assembl[ed] . . . on [one's] own . . . by buying a kit of disassembled gun

parts."[7] Specifically, he promised to "pass[] legislation" to "stop the proliferation of these

so-called 'ghost guns.'"

---

[7] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS,
https://joebiden.com/gunsafety/.

48.     After President Biden took office, members of Congress proposed bills changing the way ATF classifies receiver blanks not currently defined as firearms. *See*, *e.g.*, S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021); H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act). None of those bills have become law.

49.     Because the Biden Administration could not accomplish its legislative goal through the constitutional process of bicameralism and presentment, it unlawfully sought to implement its policies through unilateral executive action.

50.     On April 7, 2021, the Biden Administration announced that President Biden was "reiterating his call for Congress to pass legislation" on firearms regulations.[8] The announcement stated that "this Administration will not wait for Congress to act to take its own steps" on gun control. The announcement instructed the United States Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns."

51.     On April 8, 2021, President Biden, Vice President Harris, and Defendant Garland held a press conference on gun policy at the White House Rose Garden. President Biden stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress."[9]

---

[8] *Fact Sheet: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[9] *Remarks by President Biden on Gun Violence Prevention*, THE WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/.

52.    Defendant Garland stated in his remarks that "the proliferation of the so-called ghost guns" was caused by a "regulatory loophole" or "gap,"[10] even though the proliferation of such products was actually the direct result of ATF's carefully considered and legally correct decision to issue classification determinations approving the unregulated sale of such products.

53.    On May 7, 2021, Defendant Garland signed ATF proposed rule 2021R-05, titled: "Definition of 'Frame or Receiver' and Identification of Firearms."

54.    On April 11, 2022, President Biden and Vice President Harris announced at the White House Rose Garden that the Final Rule had been completed. President Biden stated that a "year ago this week . . . I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress."[11] President Biden explained that the purpose of the Final Rule was to make it "illegal to manufacture" weapon parts kits and "[i]llegal for a licensed dealer to sell them" without complying with the same regulatory requirements governing the manufacture and sale of complete firearms.

55.    The Final Rule was published in the Federal Register on April 26, 2022.[12]

---

[10] *Defendant Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence-prevention-white-house-rose-garden.

[11] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, THE WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.

[12] https://www.federalregister.gov/d/2022-08026

## V.    ATF's Unlawful and Unconstitutional Final Rule

### A.    Definition of a "Frame or Receiver" as Including "Partially Complete, Disassembled, or Nonfunctional" Frames and Receivers

56.    18 U.S.C. § 921(a)(3) defined a "firearm" as including "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon," but it does not define what constitutes a "frame or receiver."

57.    27 C.F.R. § 478.11 provided a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

58.    The Final Rule deletes that definition of a "firearm frame or receiver" and replaces it with a convoluted multi-page definitions of "frame" and "receiver" that are unconstitutionally vague and subjective.

59.    Part of the new definitions states:

*Partially complete, disassembled, or nonfunctional frame or receiver.* The terms "frame" or "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.*, to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projective weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools,

16

APP.110

instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

87 Fed. Reg. at 24,739.

60.    If item *A* can readily be made into item *B*, it is by definition not yet item *B*. The Final Rule abuses the English language in order to expand ATF's regulatory jurisdiction to cover materials that can "readily" be made into regulated products.

61.    This attempt to drastically expand ATF's regulatory jurisdiction is in excess of ATF's statutory authority.

### B.    The Final Rule Repudiates Prior Classification Determinations and, in Turn, Presents Issues Contrary to the Constitution

62.    In classification determinations issued to manufacturers, ATF has stated that receiver blanks do not meet the definition of a regulated "firearm" under federal law.

63.    ATF has defended these classification determinations in litigation brought by gun-control activists.

64.    The Final Rule expressly repudiates ATF's prior classification determinations:

> Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to April 26, 2022, shall not continue to be valid or authoritative after that date. Such determinations shall include those in which the Director determined that the item or parts kit had not yet reached a stage of manufacture to be, or include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to [April 26, 2022].

87 Fed. Reg. at 24,741.

65.     ATF's complete reversal of its legal position is arbitrary, capricious, and an abuse of discretion.

66.     The phrases "partially complete," "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," and "stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon" are so vague as to make it impossible for manufacturers, distributors, and customers to understand which product designs are regulated by the Final Rule and which are not.

67.     These vague phrases, when combined with the Final Rule's authorization of the ATF Director to "consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials," effectively delegate to the ATF Director unbounded, unconstitutional discretion to determine by diktat which products fall within ATF's jurisdiction.

68.     There is no reason why the existence of "instructions" or "tools" would have any bearing on whether an item meets the legal definition of a firearm "frame or receiver."

69.     Nevertheless, ATF has recently stated that a "frame or receiver" piece may be treated differently depending on whether the piece is accompanied by tools, jigs, and instructions or some combination thereof.

70.     If a "frame or receiver" piece is combined with tools, jigs, and instructions, ATF's position is that this piece is a firearm.

71.     Because the definition of a firearm "frame or receiver" has consequences for criminal liability, vagueness in that definition violates due process of law. *See Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Additionally, the rule of lenity applies, and *Chevron*

deference is inappropriate. *See Leocal v. Ashcroft*, 543 U.S. 1 (2004); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992).

### C.    The Final Rule Violates the First Amendment

72.    The Final Rule (unconstitutionally) expands ATF's regulatory authority so that it may now make determinations on *speech*, not just equipment submitted for classification determination.

73.    For example, the Final Rule stipulates that requests to ATF for classification determination must be submitted under penalty of perjury and include "any instructions, guides, templates, jigs, equipment, tools, or marketing materials that are made available to the purchaser or recipient of the item." 87 Fed. Reg. at 24,666, 24,739, 24,743, 24,749.

74.    The Final Rule specifically aims to police the content of the "instructions, guides, templates, . . . [and] marketing materials". *Id.*

75.    Speech restriction is content-based where such restriction requires "enforcement authorities" to "examine the content of the message that is conveyed to determine whether" the speech should be restricted. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984); *See also, e.g., Boos v. Barry*, 485 U.S. 312, 315–18 (1988) (content-based prohibition of signage outside of foreign embassy that brings the foreign government into "public odium" or "public disrepute"); *Carey v. Brown*, 447 U.S. 455, 465 (1980) (content-based prohibition of all residential picketing except "peaceful labor picketing").

76.    BlackHawk's "instructions, guides, templates, . . . [and] marketing materials" are protected speech.

77.     ATF has suggested that a product such as a receiver blank, which BlackHawk sells, on its own—particularly without instructions—would *not* constitute a firearm.

78.     It logically flows that ATF's determination of whether a product such as a receiver blank is considered a "firearm" is predominantly dependent upon ATF's review of the content of the "instructions, guides, templates, . . . [and] marketing materials" either submitted along with the product or on a company's website.

79.     The Final Rule and ATF's admitted inconsistent determinations concerning the same metal piece (*e.g.*, receiver blank) depending on whether it is associated with instructions have forced Blackhawk to delete instructions from its company website in order to avoid potential criminal liability and to survive as a business.

80.     Thus, the possibility that two identical pieces of metal sold by Blackhawk could be treated differently depending on whether the pieces are associated with instructions chills First Amendment speech that guides lawful activity recognized by the Final Rule itself.

81.     Such regulation of speech is in direct violation of the First Amendment, and the suppression of free discourse and the self-censorship by U.S. citizens caused by the profound uncertainty regarding enforcement of the Final Rule constitutes a loss of civil liberties.

### D.     Definition of "Readily" by Reference to Eight Unranked, Unweighted Factors

82.     The Final Rule creates a new definition of "readily": a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the

APP.114

most efficient, speediest, or easiest process, action, or physical state." 87 Fed. Reg. at 24,735; *see also id.* at 24,747.

83.     The Final Rule then provides a *non-exclusive* list of eight unranked, unweighted factors, none of which is dispositive.

- The first factor is "(a) Time, *i.e.*, how long it takes to finish the process."

- The second factor is "(b) Ease, *i.e.*, how difficult it is to do so."

- The third factor is "(c) Expertise, *i.e.*, what knowledge and skills are required."

- The fourth factor is "(d) Equipment, *i.e.*, what tools are required."

- The fifth factor is "(e) Parts availability, *i.e.*, whether additional parts are required, and how easily they can be obtained."

- The sixth factor is "(f) Expense, *i.e.*, how much it costs."

- The seventh factor is "(g) Scope, *i.e.*, the extent to which the subject of the process must be changed to finish it."

- The eighth factor is "(h) Feasibility, *i.e.*, whether the process would damage or destroy the subject of the process, or cause it to malfunction."

84.     By making the definition of a "frame or receiver" turn on whether the product "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" and then defining the word "readily" in such a vague manner, the Final Rule creates an unconstitutionally vague standard and effectuates an unconstitutional delegation of legislative authority to the ATF Director.

**E.     Definition of a "Firearm" as Including Weapon Parts Kits**

85.     18 U.S.C. § 921(a)(3) defined the term "firearm" as including four categories of items: "(A) any weapon (including a starter gun) which will or is designed to or may

APP.115

readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

86.    27 C.F.R. § 478.11 defined a "firearm" as including the four categories of items contained in 18 U.S.C. § 921(a)(3), tracking the statutory text almost verbatim: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics."

87.    The Final Rule amended 27 C.F.R. § 478.11 by adding the following fifth category to the definition of a "firearm," which has no basis in the statutory text of 18 U.S.C. § 921(a)(3):

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition "frame or receiver."

87 Fed. Reg. at 24,735.

88.    Under this new provision, a collection of parts, none of which independently has ever constituted a firearm, are now characterized by the government as a firearm based on an arbitrary determination that the items, when grouped together, can "readily" be assembled into a firearm.

22

APP.116

89.    By adding weapon parts kits to the definition of a "firearm," the Final Rule takes an existing rule that closely tracks the four statutory categories of "firearms" set forth by Congress and adds a brand new fifth category that Congress did not include.

90.    This violates the plain, unambiguous text of the statute, which evinces Congress's intent to create only four categories of "firearms," not five.

91.    By adding a fifth category with no basis in the statutory text, the Final Rule goes beyond merely interpreting or clarifying the statute adopted by Congress and instead rewrites it.

**F.    New Regulations on "Privately Made Firearms" That Are Sweeping in Scope**

92.    The Final Rule created a new term, "privately made firearm," which it defines as a "firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced." 87 Fed. Reg. at 24,735.

93.    The Final Rule states that "licensees must legibly and conspicuously identify each privately made firearm or 'PMF' received or otherwise acquired (including from a personal collection) not later than the seventh day following the date of receipt or other acquisition, or before the date of disposition (including to a personal collection), whichever is sooner." 87 Fed. Reg. at 24,742. It further states that "PMFs must be identified by placing, or causing to be placed under the licensee's direct supervision, an individual serial

number on the frame or receiver, which must not duplicate any serial number placed by the licensee on any other firearm." *Id.*

94.    The Final Rule also requires licensees to retain records indefinitely until the "business or licensed activity is discontinued." 87 Fed. Reg. at 24,746. This requirement is tantamount to creating an unlawful national gun registry for privately made firearms.

95.    The Final Rule's regulations on privately made firearms are so onerous that many licensees will cease to work with privately made firearms to avoid the Final Rule's excessive regulatory burdens. The lack of availability of basic services for owners of privately made firearms will deter individuals from exercising their historically recognized right to make their own firearms.

96.    The coercive effect of these regulations effectively wipes out the secondary resale market for receiver blanks and firearms produced by individuals from receiver blanks, and more broadly, eliminates the consumer market for receiver blanks entirely.

97.    The Final Rule's excessive regulations on "privately made firearms" cumulatively violate the constitutional rights of BlackHawk and its customers.

98.    To the extent the Final Rule's regulations on "privately made firearms" apply to purely intrastate activities, they exceed Congress's authority under the Commerce Clause.

99.    The Final Rule's excessive regulations on "privately made firearms" cumulatively effectuate unconstitutional takings in violation of the Fifth Amendment.

APP.118

## VI.     The Final Rule Will Destroy BlackHawk's Business

100.    BlackHawk's business is the distribution of receiver blanks, jigs, tools, and instructions to individual customers and businesses that lawfully market the products to customers who wish to exercise their Second Amendment rights by making their own firearms.

101.    BlackHawk fulfills orders by shipping receiver blanks, jigs, tools, and instructions to customers and businesses across the country that place orders for products. The bulk of its customers are out of state.

102.    By unlawfully enacting legislative changes through its redefinitions of "firearm" and "frame or receiver," the Final Rule reversed ATF's longstanding legal position and subjected currently unregulated receiver blanks to the same regulatory requirements as fully functional firearms.

103.    By delegating to the ATF Director unbounded discretion to apply vague and capacious standards for what constitutes a "firearm" and "frame or receiver," the Final Rule makes it impossible for manufacturers to determine with any reasonable certainty which regulatory requirements apply to a product design.

104.    By imposing unlawful and excessive requirements on licensees who take "privately made firearms" into their custody, the Final Rule will eliminate consumer demand for receiver blanks.

105.    In summation, the Final Rule will wipe out BlackHawk's business or cause BlackHawk and its owners and employees to face criminal and civil liability.

APP.119

**CLAIMS FOR RELIEF**

### COUNT I
### The Final Rule Exceeds Defendants' Statutory Authority

106.   All preceding paragraphs of this complaint are hereby incorporated by reference.

107.   The Final Rule, including its definitions of "frame or receiver," "readily," and "firearm," and its regulations on "privately made firearms," constitutes an unlawful expansion of Defendants' statutory authority.

108.   The Final Rule's provisions relating to and purporting to define "frame or receiver" are facially unlawful.

109.   The Final Rule presupposes a general authority to regulate weapon parts which Defendants do not possess.

110.   The Final Rule is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

### COUNT II
### The Adoption of the Final Rule Violates the Separation of Powers

111.   All preceding paragraphs of this complaint are hereby incorporated by reference.

112.   Article I, § 1 of the Constitution states: "All legislative Powers herein granted shall be vested in a Congress of the United States."

113.   Article I, § 7, Clause 2 of the Constitution requires that "Every Bill" be passed by both the House of Representatives and the Senate and presented to the President "before it [may] become a Law."

APP.120

114.    The Final Rule is not a valid interpretation of federal law. It is an unconstitutional attempt by Defendants to exercise legislative powers that belong to Congress. And it is an unconstitutional attempt to rewrite statutes without satisfying the requirements of bicameralism and presentment.

## COUNT III
## The Final Rule is Unconstitutionally Vague

115.    All preceding paragraphs of this complaint are hereby incorporated by reference.

116.    The Supreme Court has recognized that criminal laws must provide fair notice to the public of what conduct is proscribed. *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).

117.    Numerous aspects of the Final Rule are unconstitutionally vague, including its definitions of a "frame or receiver," "readily," and "firearm."

118.    These definitions are so vague that even an experienced lawyer specializing in firearms law cannot possibly say for certain which products fall within those definitions. The ordinary business and citizen therefore could not possibly understand how to properly comply with the statutes without risking criminal sanction and loss of liberty.

## COUNT IV
## The Final Rule is Arbitrary, Capricious, and an Abuse of Discretion

119.    All preceding paragraphs of this complaint are hereby incorporated by reference.

120.    ATF previously stated on its website that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver."

APP.121

121.   ATF previously reviewed product samples from industry and issued written classification determinations stating that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver."

122.   Prior to the Biden Administration, ATF routinely defended the lawfulness of those classification determinations in litigation.

123.   The Final Rule reverses ATF's longstanding correct legal interpretation, which has generated significant reliance interests, without a reasonable explanation.

124.   The Final Rule contains internally self-contradictory provisions.

125.   ATF's stated explanation for the Final Rule is a pretext for its true goal of unlawfully expanding its jurisdiction.

126.   ATF did not adequately consider alternative regulatory approaches that could have avoided the destruction of businesses such as BlackHawk.

127.   The Final Rule is therefore "arbitrary," "capricious," and "an abuse of discretion." 5 U.S.C. § 706(2)(A).

## COUNT V
### The Final Rule Was Adopted Without
### Observance of Procedure Required by Law

128.   All preceding paragraphs of this complaint are hereby incorporated by reference.

129.   The process of notice-and-comment rulemaking requires an agency to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and to give "consideration of the relevant matter presented." 5 U.S.C. § 553(c).

APP.122

130.    Approximately 290,000 members of the public submitted comments to the proposed rule. Defendants did not adequately consider all relevant arguments raised in those comments and provide appropriately reasoned responses to them.

131.    When agencies adopt rules, they must publish a "concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

132.    The Final Rule does not provide an accurate and adequate "concise general statement" of its basis and purpose.

133.    The Final Rule was therefore adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT VI
### The Final Rule Violates the Nondelegation Doctrine

134.    All preceding paragraphs of this complaint are hereby incorporated by reference.

135.    If this Court concludes that the Final Rule is authorized by statute, then the statutory scheme unconstitutionally delegates legislative power with no intelligible principle, violating the nondelegation doctrine. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

136.    Various provisions of the Final Rule effectuate a double delegation by interpreting Congress's delegation of authority to ATF as allowing for the promulgation of a rule that in turn delegates to the ATF Director unbounded discretion to create and unilaterally revise legislative standards.

APP.123

## COUNT VII
## The Final Rule is Contrary to Constitutional Right, Power, Privilege, or Immunity

137.    All preceding paragraphs of this complaint are hereby incorporated by reference.

138.    The Second Amendment protects "the right of the people to keep and bear Arms."

139.    The Ninth Amendment recognizes that the people have inalienable rights not expressly enumerated in the Constitution.

140.    The Final Rule violates the rights of BlackHawk and its customers to keep and bear arms, to engage in lawful self-defense, to make their own firearms, to possess property lawfully acquired, and to earn a living by manufacturing and selling lawful goods in commerce. *See Craig v. Boren*, 429 U.S. 190 (1976) (allowing a business to vindicate the constitutional rights of customers).

141.    The Final Rule is therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## COUNT VIII
## The Final Rule's Regulations on "Privately Made Firearms"
## Exceed the Limits of the Commerce Clause

142.    All preceding paragraphs of this complaint are hereby incorporated by reference.

143.    To the extent the Final Rule imposes regulations on intrastate activities with no interstate nexus, those requirements exceed Congress's authority under the Commerce Clause. U.S. CONST. art. I, § 8, cl. 3.

## COUNT IX
## The Final Rule Chills First Amendment Rights

144.   All preceding paragraphs of this complaint are hereby incorporated by reference.

145.   The First Amendment to the United States Constitution forbids any lawmaking that abridges freedom of speech. U.S. CONST. amend. I.

146.   The Final Rule mandates that requests to ATF for classification determination must be submitted under penalty of perjury and include "any instructions, guides, templates, jigs, equipment, tools, or marketing materials that are made available to the purchaser or recipient of the item." 87 Fed. Reg. at 24,666, 24,739.

147.   The purpose of this mandate is so ATF can regulate the content of the "instructions, guides, templates, . . . [and] marketing materials" that BlackHawk and other similarly situated companies provide to customers.

148.   Instructions, guides, and marketing materials are considered speech protected by the First Amendment.

149.   In accordance with the Final Rule, ATF has taken inconsistent positions which have implicated the First Amendment. In one instance, a piece of metal *would not* be considered a firearm if the piece is not accompanied by, *e.g.*, instructions. But on the flip side of the same coin, that same piece of metal *would* be classified as a firearm if accompanied by instructions.

150.   Such inconsistency has forced BlackHawk to regulate its protected speech by deleting instructions from its website in order to survive as a business.

31

APP.125

151.    The Final Rule impermissibly regulates speech in direct violation of the First Amendment.

## COUNT X
### The Final Rule Effectuates a Regulatory Taking of "Privately Made Firearms" Without Just Compensation

152.    All preceding paragraphs of this complaint are hereby incorporated by reference.

153.    The Supreme Court has recognized that the appropriation of personal property by the government without just compensation can violate the Fifth Amendment's Takings Clause. *See Horne v. Dep't of Agriculture*, 576 U.S. 351, 357 (2015).

154.    The Supreme Court has also recognized that onerous government regulations can effectuate a regulatory taking. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (noting that the Court looks at the "economic impact of the regulation" and "the extent to which the regulation has interfered with distinct investment-backed expectations"); *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("[I]f regulation goes too far it will be recognized as a taking.").

155.    The Final Rule requires licensees with "privately made firearms" in their inventories to either mark them according to the Final Rule's specifications, destroy them, or "voluntarily" turn them over to a law enforcement agency. The Final Rule places no restrictions on what the government may choose to do with "privately made firearms" that are "voluntarily" surrendered to the government.

156.    The Final Rule's regulations on "privately made firearms" effectuate a regulatory taking of personal property without just compensation.

## PRAYER

WHEREFORE, BlackHawk asks this Court to enter an order and judgment:

    a.    Declaring that the Final Rule is unlawful;

    b.    Issuing injunctive relief enjoining Defendants from enforcing the Final Rule against BlackHawk;

    c.    Awarding BlackHawk the costs of this action and reasonable attorney's fees; and

    d.    Awarding such other relief as the Court deems equitable and just.

Respectfully Submitted,

*/s/ Brian D. Poe*
BRIAN D. POE
TX Bar No. 24056908
BRIAN D. POE, ATTORNEY AT LAW PLLC
The Bryce Building
909 Throckmorton Street
Fort Worth, Texas 76102
Phone: (817) 870-2022
Fax: (817) 977-6501
bpoe@bpoelaw.com

Michael J. Sullivan
MA Bar No. 487210
*Pro Hac Vice*
J. Christopher Amrhein, Jr.
MA Bar No. 703170
*Pro Hac Vice*
Nathan P. Brennan
MN Bar No. 389954
*Pro Hac Vice*
ASHCROFT LAW FIRM LLC

33

200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (617) 933-7607
msullivan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com

*Counsel for Intervenor-Plaintiff BlackHawk
Manufacturing Group Inc. d/b/a 80 Percent
Arms*

APP.128

## **CERTIFICATE OF SERVICE**

I certify that on October 20, 2022, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the registered CM/ECF users in this action.

/s/ *Brian D. Poe*
Brian D. Poe

APP.129

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| JENNIFER VANDERSTOK; MICHAEL | § | |
| G. ANDREN; TACTICAL MACHINING | § | |
| LLC, a limited liability company; | § | |
| FIREARMS POLICY COALITION, | § | |
| INC., a nonprofit corporation, | § | |
| | § | |
|     **Plaintiffs,** | § | |
| | § | |
| v. | § | **Civil Action No. 4:22-cv-00691-O** |
| | § | |
| MERRICK GARLAND, in his Official | § | |
| capacity as Attorney General of the | § | |
| United States; UNITED STATES | § | |
| DEPARTMENT OF JUSTICE; STEVEN | § | |
| DETTELBACH, in his official capacity | § | |
| as Director of the Bureau of Alcohol, | § | |
| Tobacco, Firearms and Explosives; and | § | |
| BUREAU OF ALCOHOL, TOBACCO, | § | |
| FIREARMS, AND EXPLOSIVES, | § | |
| | § | |
|     **Defendants.** | § | |

**OPINION & ORDER ON PRELIMINARY INJUNCTION**

Before the Court are Plaintiffs' Motion for Injunction (ECF Nos. 15–16), filed August 17,

2022; Defendants' Response (ECF No. 41), filed August 29, 2022; and Plaintiffs' Reply (ECF No.

55), filed August 31, 2022. Plaintiffs withdrew their request for a hearing. *See* Pls.' Resp. to Court

Order 1 n.2, ECF No. 54. Having considered the briefing, arguments, and evidence, the Court

**ORDERS** that the motion for Preliminary Injunction (ECF No. 15) is **GRANTED in part**.

    **I.**      **BACKGROUND**

       **A. Statutory and Regulatory Background**

The Gun Control Act of 1968 regulates firearms in interstate commerce. Among other

things, the Act requires manufacturers and dealers of firearms to have a federal firearms license.

18 U.S.C. § 923(a). Dealers must also conduct background checks before transferring firearms to

someone without a license, and they must keep records of firearm transfers. *Id.* §§ 922(t), 923(g)(1)(A).

The Gun Control Act defines the term "firearm" four different ways: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3). But "[s]uch term does not include an antique firearm." *Id.* Congress delegated authority to administer and enforce the Act to the Attorney General. *Id.* § 926(a). The Attorney General, in turn, delegated that authority to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a).

In 1978, ATF promulgated a rule interpreting the phrase "frame or receiver." The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). That definition remained in place until this year.

In April 2022, ATF published a Final Rule changing, among other things, the 1978 definition of "frame or receiver." *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479 (2022)).[1] ATF split the phrase into two parts, assigning the term "frame" to handguns and the term "receiver" to any firearm other than a handgun, such as rifles and shotguns. *See* 27 C.F.R. § 478.12(a)(1), (a)(2). ATF then defined the terms "frame" and "receiver" along the same lines as

---

[1] The final rule took effect on August 24, 2022, in the midst of the parties' briefing. *See* 27 C.F.R. pts. 447, 478, and 479 (2022).

APP.131

the 1978 rule, though with updated, more precise technical terminology.[2] But ATF did not stop there.

Rather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers. Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.* When determining whether an object is a frame or receiver, the ATF Director is not limited to looking only at the object. "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit . . . ." *Id.*

The Final Rule also amends ATF's definition of "firearm" to include weapon parts kits. The ATF's new definition of "firearm," "shall include a weapon parts kit that is designed to or

---

[2] Here are the two definitions, in full:

> (1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.

> (2) The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

27 C.F.R. § 478.12(a).

APP.132

may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* § 478.11 (definition of "firearm").

### B. The Parties

Jennifer VanDerStok and Michael Andren are Texas residents who own firearms.[3] VanDerStok is a high school teacher and former police officer.[4] Andren is a licensed firearms instructor and retired aerospace administrator.[5] Both VanDerStok and Andren own firearm components that they intend to manufacture into firearms for personal, lawful use.[6] They claim that the Final Rule prohibits them from purchasing products that they want to use to manufacture their own firearms.[7]

Tactical Machining, LLC manufactures and sells items that are subject to regulation under the Final Rule.[8] Over 90% of Tactical Machining's business consists of selling items that individuals can use to manufacture frames and receivers and to build functioning firearms.[9] The owner and CEO of Tactical Machining says the company had to cease sales of those items after the Final Rule took effect.[10] Tactical Machining estimates that cessation of over 90% of its sales will put it out of business.[11] In addition, Tactical Machining's freight company now refuses to ship most of Tactical Machining's products because the company fears the parts may be considered firearms under the Final Rule.[12] Tactical Machining's credit card processing company has likewise

---

[3] Decl. of Jennifer VanDerStok 1, ECF No. 16-2; Decl. of Michael G. Andren 1, ECF No. 16-3.
[4] Decl. of Jennifer VanDerStok 1, ECF No. 16-2.
[5] Decl. of Michael G. Andren 2, ECF No. 16-3.
[6] Decl. of Jennifer VanDerStok 2, ECF No. 16-2; Decl. of Michael G. Andren 2, ECF No. 16-3.
[7] Decl. of Jennifer VanDerStok 2, ECF No. 16-2; Decl. of Michael G. Andren 2, ECF No. 16-3.
[8] Decl. of Darren Peters, Sr. 1, ECF No. 16-1.
[9] *Id.* at 2.
[10] *Id.* at 3–4; Supp. Decl. of Darren Peters, Sr. 1–2, ECF No. 55-1.
[11] Decl. of Darren Peters, Sr. 3–4, ECF No. 16-1.
[12] *Id.* at 4.

4

threatened to stop providing services to Tactical Machining, which does 95% of its sales through credit card.[13]

The Firearms Policy Coalition, Inc. is a nonprofit organization dedicated to promoting the Second Amendment rights of American citizens through legislative and legal advocacy.[14]

Plaintiffs VanDerStok, Andren, Tactical Machining, and the Firearms Policy Coalition sued the Attorney General, Department of Justice, ATF, and the ATF Director over the Final Rule.[15] Plaintiffs now move for a nationwide preliminary injunction to prevent Defendants from enforcing the rule.[16] Plaintiffs argue that the Final Rule is unlawful because it (1) exceeds ATF's statutory authority under the plain language of the Gun Control Act, (2) is a "major question" that Congress did not delegate to ATF, (3) is not a logical outgrowth of the proposed rule, and (4) represents a drastic, unexplained change in ATF's position.[17] Plaintiffs say enforcement of the Final Rule will likely put Tactical Machining out of business.[18] The parties briefed the issues, and the motion is ripe for review.

## II.     LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and will be granted only if the movants carry their burden on all four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *see also* Fed. R. Civ. P. 65. The Court should issue a preliminary injunction only if the movants establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in their favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs.,*

---

[13] *Id.* at 4.
[14] Compl. 8, ECF No. 1.
[15] *See generally id.*
[16] *See* Pls.' Mot. for Prelim. Inj., ECF No. 15.
[17] *See* Pls.' Br., ECF No. 16.
[18] *See id.* at 42–46.

APP.134

*L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). The movant must make a clear showing that the injunction is warranted, and the issuance of a preliminary injunction "is to be treated as the exception rather than the rule." *Id.*

### III.    ANALYSIS

#### A.  Likelihood of Success on the Merits

Plaintiffs must first show a substantial likelihood that they will succeed on the merits of their claims. *Daniels Health Servs.*, 710 F.3d at 582. "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Id.* Plaintiffs have shown a strong likelihood that they will succeed on the merits of their claims that ATF's new definitions are inconsistent with the Gun Control Act.

#### 1.  The Final Rule exceeds ATF's statutory authority under the plain language of the Gun Control Act.

The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Plaintiffs argue the Final Rule exceeds ATF's statutory authority under the Gun Control Act in two ways. First, Plaintiffs argue that the Final Rule expands ATF's authority over parts that may be "readily converted" into frames or receivers, when Congress limited ATF's authority to "frames or receivers" as such. Second, Plaintiffs argue that the Final Rule unlawfully treats weapon parts kits as firearms. Plaintiffs are likely to succeed on both claims.

APP.135

### a. Parts that *may become* receivers are not receivers.

The text of the Gun Control Act resolves this motion. When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation omitted). The Court "begin[s] with the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (citation and internal quotation marks omitted). But when a statute "includes an explicit definition," the Court "'must follow that definition,' even if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (citation omitted). "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citation omitted).

Congress carefully defined its terms in the Gun Control Act. The primary definition of "firearm" in the Act contains three parts: "any weapon (including a starter gun) which [1] will or [2] is designed to or [3] may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Under this primary definition, a firearm is first and foremost a *weapon*. Underscoring that point, Congress explicitly named starter guns in the definition because starter guns are not obviously weapons. Then, because weapon parts also are not "weapons," Congress created a secondary definition covering specific weapon parts: "the frame or receiver of any such weapon." *Id.* § 921(a)(3)(B). Congress did not cover all weapon parts—only frames and receivers. And *only* the frames and receivers "of any such weapon" that Congress described in the primary definition.

Congress did not define the phrase "frame or receiver," so the words receive their ordinary meaning. *See Kaluza*, 780 F.3d at 659. In the Final Rule, ATF interprets the phrase as two separate

APP.136

parts. ATF says the "term 'frame' means the part of a handgun . . . that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence." 27 C.F.R. § 478.12(a)(1). ATF defines "receiver" similarly, though it says the term refers to a "rifle, shotgun, or projectile weapon other than a handgun." *Id.* § 478.12(a)(2). Plaintiffs do not take issue with those definitions, which appear to be updated, more precise versions of ATF's 1978 interpretation.

But the Final Rule did not merely update ATF's terminology. ATF added an entirely new section expanding its jurisdiction to include "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]." *Id.* § 478.12(c). ATF now claims authority to regulate parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* The parts must be "clearly identifiable as an unfinished component part of a weapon." *Id.* In deciding whether something is a partially complete frame or receiver, ATF may consider other materials such as molds, instructions, and marketing materials "that are sold, distributed, or possessed with the item or kit." *Id.*

The Final Rule's redefinition of "frame or receiver" conflicts with the statute's plain meaning. The definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). That which *may become* a receiver is not itself a receiver. Congress could have included firearm parts that "may readily be converted" to frames or receivers, as it did with "weapons" that "may readily be converted" to fire a projectile. But it omitted that language when talking about frames and receivers. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v.*

APP.137

*Yellen*, 141 S. Ct. 1761, 1782 (2021) (citation and internal quotation marks omitted). Likewise, when Congress uses a phrase in one part of a definition and excludes that phrase from another part of the very same definition, courts should give effect to Congress's deliberate exclusion.

Congress excluded other adjectives that ATF adds to its definition. The Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c). Congress's definition does not. Again, compare the language in Congress's primary definition of "firearm" to its secondary definition covering frames and receivers. The primary definition of "firearm" includes any "weapon" that "is designed to" fire a projectile. 18 U.S.C. § 921(a)(3)(A). That language covers disassembled, nonfunctional, and antique firearms because they are "designed" to fire projectiles even if they are practically unable to do so. But Congress wanted to exclude antiques, so it explicitly said the "term does not include an antique firearm," once again demonstrating awareness of the scope of the language it chose. *Id.* § 921(a)(3). In contrast, Congress did not choose to cover firearm parts that are "designed" to be frames or receivers—that is, incomplete, nonfunctional frames or receivers. "That omission is telling," particularly when Congress used that more expansive terminology in the same definition. *Collins*, 141 S. Ct. at 1782.

ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is facially unlawful. By comparison, the Final Rule includes definitions of "frame" and "receiver" in § 478.12(a) that appear to be consistent with the statute. This further highlights that the Final Rule's expansion of authority in § 478.12(c) to firearm parts that are *not yet* frames or receivers goes beyond Congress's definition. In other words, § 478.12(a) describes the full scope of frames and receivers that are consistent with the statutory scheme. ATF's expansion in § 478.12(c), on the other hand, covers *additional* parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But Congress

9

APP.138

intentionally omitted that language from the definition. Section 478.12(c) is thus facially unlawful because it describes only parts that Congress intentionally excluded from its definition of "firearm." It is purely an expansion of authority beyond the statutory language.

To be sure, ATF is entitled to deference on its expertise in determining whether a particular component is a frame or receiver. There are no doubt close calls, as illustrated by the samples Tactical Machining has sent to ATF over the years.[19] But this case does not require the Court to determine how much machining is necessary to transform a component into a frame or receiver—that determination lies with ATF. Rather, the issue here is whether ATF may still regulate a component as a "frame or receiver" even after ATF determines that the component in question is *not* a frame or receiver at the time of evaluation. Congress has not extended ATF's authority so far. That the firearm part is "designed" to be or may one day become a frame or receiver does not change the fact that, in that moment, it is not "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3)(B).

Defendants' counterarguments are unpersuasive. Defendants first fault Plaintiffs for adding words to the statute.[20] Defendants argue that Plaintiffs read the phrase "frame or receiver" to mean "*complete* frame or receiver," or "*functional* frame or receiver." That argument poses two problems. First, as the prior paragraph discusses, the issue here is one of kind, not of degree. An incomplete receiver may still be a receiver within the meaning of the statute, depending on the degree of completeness (hence the industry term "80% lowers"). But the Final Rule treats incomplete receivers that are *not yet receivers* as if they were receivers under the statutory definition, which is clearly a step too far.[21] Second, Defendants' argument proves too much. If

---

[19] *See* Decl. of Darren Peters, Sr. Ex. 1, ECF No. 16-1.
[20] *See* Defs.' Resp. 17–18, ECF No. 41.
[21] Recall that the definition covers "the frame or receiver *of any such weapon*." 18 U.S.C. § 921(a)(3) (emphasis added). The statutory definition covers only the frames and receivers of "such weapon[s]" that

APP.139

adding language to Congress's definition is inappropriate (and it certainly is), then the Final Rule is unlawful on that ground alone. Section 478.12(c) explicitly adds the terms "partially complete, disassembled, [and] nonfunctional," even though the statute's definition omits them. 27 C.F.R. § 478.12(c).

Defendants next argue that Plaintiffs' interpretation thwarts congressional intent. According to Defendants, "[t]he clear Congressional intent, as indicated by the plain language and the statutory scheme of the GCA, was to regulate—as a 'firearm'—the frame or receiver of a weapon."[22] That much is evident. But Defendants jump from that premise to a boundless congressional intent to "define[] 'firearms' more broadly than a fully operational weapon."[23] And a broad statute justifies broad regulation, Defendants say. But "[t]hat's not the level of rigor that usually accompanies statutory interpretation . . . ." *In re Harris*, 988 F.3d 239, 241 (5th Cir. 2021) (Oldham, J., concurring). Contrary to Defendants' broad framing, "the regulatory goals of the Gun Control Act were narrower: the Act ensured that '*weapons* [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular *firearms*.'" *New York v. Burger*, 482 U.S. 691, 713 (1987) (emphases added) (alterations in original) (citing *United States v. Biswell*, 406 U.S. 311, 315–16 (1972)). When Congress sought to regulate *parts* of weapons, it did so meticulously.

---

Congress has said are firearms. That language implies some degree of finality or functionality because a nonfunctional receiver is arguably not a receiver of "such weapon" that Congress has said is a firearm. The determination of degree likely rests with ATF.

[22] Defs.' Resp. 18, ECF No. 41 (citing *New York v. Burger*, 482 U.S. 691, 713 (1987)).

[23] *Id.* (internal quotation marks omitted) (quoting *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-cv-116, 2022 WL 3597299, at *6 (D.N.D. Aug. 23, 2022)).

APP.140

### b. A weapon parts kit is not a firearm.

Plaintiffs are also likely to succeed on their claim that the Final Rule unlawfully treats weapon parts kits as firearms. The Final Rule contains its own definition of "firearm," notwithstanding that the Gun Control Act already defines the term. Under the Final Rule, "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). That language conflicts with the statute's definition of "firearm."

ATF has no general authority to regulate weapon parts. But the Final Rule grants ATF that general authority by copying language used throughout the statutory definition. It takes phrases like "designed to" and "may readily be converted" and "assembled" from various places in the statute, cobbling them together to form ATF's own definition of "firearm." Those terms may add a patina of credibility to the drafting, but they tarnish Congress's carefully crafted definition. More importantly, they unlawfully expand ATF's authority beyond the boundaries set by the Gun Control Act.

Under § 921(a)(3)(B), the only firearm parts that fall under ATF's purview are "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). But the Final Rule regulates weapon parts kits (that is, "aggregations of weapon parts")[24] that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11. The statute covers "any *weapon*" that is "designed to" or "may readily be converted to" fire a projectile. 18 U.S.C. § 921(a)(3)(A) (emphasis added). Congress's definition does not cover weapon *parts*, or aggregations of weapon

---

[24] Defs.' Resp. 13, ECF No. 41.

parts, regardless of whether the parts may be readily assembled into something that may fire a projectile.

The statutory context repeatedly confirms that Congress intentionally chose not to regulate "weapon" parts generally. As further evidence, look to § 921(a)(4)(C), which does allow for the regulation of "parts." But it allows for the regulation only of parts of "destructive devices"—one of the four statutory sub-definitions of "firearm." *Id.* § 921(a)(3)(D). The term "destructive device" is defined as "any explosive, incendiary, or poison gas," such as a bomb, grenade, mine, or similar device. *Id.* § 921(a)(4)(A). The definition of "destructive device" also includes "any type of weapon" that "may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter." *Id.* § 921(a)(4)(B). For example, suppose a manufacturer tried to sell a parts kit to make a homemade grenade. ATF could regulate that parts kit because it can regulate "any combination of parts either designed or intended for use in converting any device into" a grenade, from which a grenade "may be readily assembled." *Id.* § 921(a)(4)(C). Likewise for bombs, rockets, missiles, and other destructive devices. But commonly sold firearms such as 9mm pistols or .223 rifles do not fall under the specialized definition of "destructive devices," so weapon parts kits for those firearms cannot be properly regulated as components of "destructive devices." *Id.* § 921(a)(4).

In sum, the Gun Control Act's precise wording demands precise application. Congress *could have* described a firearm as "any combination of parts" that would produce a weapon that could fire a projectile. It used that language elsewhere in the definition. *Id.* § 921(a)(4)(C). Congress could have described a firearm as any part "designed" to be part of a weapon. It used that language, too. *Id.* § 921(a)(3)(A), (a)(4)(C). Congress could have described a firearm as a set of parts that "may be readily assembled" into a weapon, as it did for "destructive device." *Id.*

§ 921(a)(4)(C). Congress could have written all those things, and the very definition of "firearm" demonstrates that Congress knew the words that would accomplish those ends.[25] But Congress did not regulate firearm parts as such, let alone parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11.

Defendants' counterarguments are once again unavailing. Defendants argue the Final Rule's regulation of weapon parts kits is consistent with existing judicial interpretations of the Gun Control Act.[26] To the contrary, the cases demonstrate that courts understand the constraints of the Gun Control Act's definitions. The only Fifth Circuit case Defendants cite held that a disassembled shotgun was still a "firearm" under the Gun Control Act's definition. *See United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993). The government argued the shotgun "was only 'disassembled' in that the barrel was removed from the stock and that it could have been assembled in thirty seconds or less." *Id.* The Fifth Circuit agreed after surveying other cases in which courts held that inoperable weapons were still firearms "so long as those weapons 'at the time of the offense did

---

[25] Congress's definition of "machine gun" elsewhere in the U.S. Code is a great example of a definition that would fit the kind of rule ATF has in mind:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part* designed and intended solely and exclusively, or *combination of parts* designed and intended, for use in converting a weapon into a machinegun, *and any combination of parts from which a machinegun can be assembled* if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphases added); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006) ("Our more natural reading is confirmed by the use of the word 'contract' elsewhere in the United States Code . . . .").

[26] *See* Defs.' Resp. 20–21, ECF No. 41.

APP.143

not appear clearly inoperable.'" *Id.* No weapon parts kit would pass that test, and Defendants do not claim they would.[27]

\*     \*     \*

Plaintiffs have demonstrated a strong likelihood of success on their claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under the Gun Control Act. Given Plaintiffs' strong likelihood of success on those claims, the Court need not address the merits of Plaintiffs' remaining claims. Before moving on to the remaining factors, a brief note on the *Chevron* doctrine is warranted. Plaintiffs argue that the Rule is not entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[28] Defendants respond that the Court need not reach any *Chevron* issues because the Final Rule "reflects the best statutory interpretation."[29] Defendants argue in the alternative that "the Court should 'consider the agency's interpretation to the extent it is persuasive.'"[30] Defendants do not argue that *Chevron* deference applies. Even assuming *Chevron* applies, the Court finds the statute unambiguous and ATF's interpretation unreasonable for the reasons contained in this

---

[27] The best case in support of Defendants is *United States v. Wick*, 697 F. App'x 507 (9th Cir. 2017), in which the Ninth Circuit upheld a conviction for unlicensed firearm dealing based on evidence that the defendant had sold "complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive,' thus meeting the statute's definition of a firearm." *Id.* at 508 (quoting 18 U.S.C. § 921(a)(3)(A)). But *Wick* is outside this circuit, nonprecedential, and more importantly contains no analysis of the statutory text.

   Defendants' remaining cases are even less applicable. *See United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (affirming the district court's denial of an evidentiary hearing on whether probable cause supported a search warrant based on the defendant's possession of weapon parts kits that could "readily be converted" into firearms), *overruled on other grounds by Dist. of Columbia v. Heller*, 554 U.S. 570, 594–95 (2008); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (affirming a sentence enhancement for possession of a firearm because the defendant had a disassembled rifle but "could easily 'make the rifle operational in just a few seconds by putting the bolt in'"); *United States v. Theodoropoulos*, 866 F.2d 587, 595 n.3 (3d Cir. 1989) (affirming a conviction for possession of an unregistered, disassembled machine pistol), *overruled by United States v. Price*, 76 F.3d 526 (3d Cir. 1996).
[28] *See* Pls.' Br. 33–36, ECF No. 16.
[29] Defs.' Resp. 26–27, ECF No. 41 (citing *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002)).
[30] *Id.* at 27 (quoting *United States v. Garcia*, 707 F. App'x 231, 234 n.5 (5th Cir. 2017)).

APP.144

Section. And to the extent the Court should consider ATF's interpretation, the Court finds it unpersuasive, again for the reasons already discussed in this Section.

### B. Irreparable Harm

Plaintiffs must also show a substantial threat of irreparable harm. *Daniels Health Servs.*, 710 F.3d at 582. "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The harm must be more than "speculative," that is, "there must be more than an unfounded fear on the part of the applicant." *Daniels Health Scis.*, 710 F.3d at 585 (citation and internal quotation marks omitted).

Tactical Machining has shown a substantial threat of irreparable harm. Tactical Machining's owner says that he will likely be put out of business by the Final Rule.[31] That claim is not far-fetched. Over 90% of Tactical Machining's business consists of producing and selling items that customers can use to self-manufacture frames or receivers and to build firearms. *Id.* The Final Rule, as Defendants admit, "requires Tactical Machining to become a federal firearms licensee and comply with regulatory requirements such as keeping transaction records and marking firearms with serial numbers."[32] In the final regulatory analysis, ATF estimated "that the final rule could potentially affect 132,023 entities, including all FFLs[33] and non-FFL manufacturers and retailers of firearm parts kits with partially complete frames or receivers." ATF, *Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* 124 (Apr. 2022), https://www.atf.gov/firearms/docs/rulemaking/ria-final-rule-2021r-05f-definition-frame-or-receiver-and-identification/download. Indeed, ATF estimated that "the majority of affected

---

[31] *See* Decl. of Darren Peters, Sr. 1–2, ECF No. 16-1.
[32] Defs.' Resp. 40, ECF No. 41.
[33] Federal Firearm Licensees

entities are small entities that would experience a range of costs, the largest cost being the dissolution of the entire business." *Id.* Defendants' predictions, it seems, have now materialized.

Tactical Machining's fears have also proven well-founded. On August 24, when the Final Rule took effect, Tactical Machining ceased sales of various parts.[34] Because ATF now classifies those parts as "firearms," Tactical Machining may not sell them direct to consumers out of state. *See* 18 U.S.C. § 922(a)(2). As a result, just last week Tactical Machining lost nearly $50,000 in revenue.[35] This trend risks ending Tactical Machining's business.[36]

Generally, economic loss is not an irreparable harm because it can be recovered as damages at the end of the litigation. *See Janvey*, 647 F.3d at 600. "[B]ut an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). Tactical Machining's evidence establishes as much here, and Defendants do not contest otherwise.

Instead, Defendants argue that Tactical Machining can avoid loss of its business by simply complying with the rule.[37] They say compliance is easy and cheap: Tactical Machining need only purchase and maintain a federal firearms license.[38] That argument has two problems. First, it misunderstands Tactical Machining's business. Tactical Machining already has a federal firearms license.[39] But even as a federally licensed manufacturer, Tactical Machining is unable to continue its direct-to-consumer sales of most of its products because those products are now "firearms." *See* 18 U.S.C. § 922(a)(2) (prohibiting interstate transfers of firearms to any person who does not have a license). Second, even if it were factually sound, Defendants' argument relies on the incorrect

---

[34] Supp. Decl. of Darren Peters, Sr. 1–2, ECF No. 55-1.
[35] *Id.* at 2.
[36] *Id.* at 2–4.
[37] *See* Defs.' Resp. 40, ECF No. 41.
[38] *Id.*
[39] Pls.' Reply 13, ECF No. 55.

legal premise that compliance costs are not an irreparable harm. To the extent the Final Rule would impose additional compliance costs,[40] Defendants admit that such costs are nonrecoverable. And nonrecoverable means irreparable.

"Indeed 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). Defendants say *Texas v. EPA* dealt with "extraordinary compliance costs" that were nonrecoverable.[41] But Defendants overlook the very next sentence in the opinion: "When determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts . . . .'" *Id.* (alteration in original) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). "Federal courts have long recognized that, when 'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l*, 762 F.2d at 472 (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974)). Defendants argue the compliance costs are "modest," but not de minimis.[42]

The Fifth Circuit has settled these principles. An economic injury may be irreparable for "two independent reasons." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). "First," the circuit has "explained that 'substantial financial injury' may be 'sufficient to show irreparable injury.'" *Id.* (quoting *Texas v. EPA*, 829 F.3d at 433). Tactical Machining has shown that form of irreparable injury. "Second," compliance costs are "likely unrecoverable,"

---

[40] Because Tactical Machining already holds a federal firearms license, it is not clear that the Final Rule subjects it to compliance costs it would not otherwise incur.

[41] Defs.' Resp. 41, ECF No. 41.

[42] *Id.*

usually "because federal agencies generally enjoy sovereign immunity for any monetary damages." *Id.* Tactical Machining has also shown that form of irreparable injury.

Tactical Machining will likely suffer irreparable harm, either by shutting down its operations forever or paying the unrecoverable costs of compliance. Defendants do not contest Plaintiffs' evidence. Rather, they suggest that Tactical Machining should trade one form of irreparable harm for another.[43] That argument overlooks clear Fifth Circuit precedent. Tactical Machining faces substantial threat of irreparable harm, and it is no answer to say that it may avoid the harm by complying with an unlawful agency rule.

Finally, Defendants argue that Plaintiffs delayed in seeking relief, which shows a lack of irreparable harm. This Court has recognized that "delay in seeking relief is a consideration when analyzing the threat of imminent and irreparable harm." *Anyadike v. Vernon Coll.*, No. 7:15-cv-00157, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015). "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*, No. 3:05-cv-0094, 2006 WL 1540587, at *4 (N.D. Tex. June 6, 2006) (cleaned up). ATF announced the Final Rule on April 11, 2022, and published it in the Federal Register on April 26. Plaintiffs filed their complaint on August 11 and moved for a preliminary injunction six days later. The Rule became effective on August 24.

Plaintiffs offer good explanations for their delay. On April 12—the day after ATF announced the Final Rule—Tactical Machining requested a classification letter from ATF.[44] It sent ATF a sample receiver that ATF had previously said was not a firearm. Tactical Machining asked

---

[43] *See id.* (citing *Div. 80, LLC v. Garland*, No. 3:22-cv-148, 2022 WL 3648454, at *4 (S.D. Tex. Aug. 23, 2022)).
[44] Decl. of Darren Peters, Sr. 3, ECF No. 16-1.

APP.148

whether ATF would continue to classify the receiver as a non-firearm, hoping for clarification in light of the Final Rule. ATF still has not responded.[45] Regardless, any delay is insubstantial. Plaintiffs filed the lawsuit and moved for a preliminary injunction barely three months after the final rule was announced, and importantly, two weeks *before* the effective date. Considering the circumstances, Plaintiffs' delay does not undercut their showing of irreparable harm.

Though Tactical Machining has presented sufficient evidence of irreparable harm, the other Plaintiffs have not. "[A] plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (second alteration in original) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Plaintiffs barely substantiate the injuries of VanDerStok, Andren, and the Firearms Policy Coalition, let alone establish that they will suffer irreparable harm. Plaintiffs state that "VanDerStok and Andren will be prohibited from continuing their existing and planned personal practices in purchasing items the Final Rule newly considers 'firearms' direct from retailers."[46] But they can still purchase those items—they just need to buy them from licensed dealers after passing a background check. Plaintiffs do not explain why purchasing parts from licensed dealers constitutes an injury, particularly when both VanDerStok and Andren have done so in the past.[47] As for the Firearms Policy Coalition, the Court is left guessing at what injuries it or its members will suffer. Plaintiffs' only mention of the Coalition in their briefing is the argument that any relief "should extend to all members of Plaintiff Firearms Policy Coalition."[48] They do not explain why. In contrast to Tactical Machining's existential injury, Plaintiffs have not provided sufficient evidence that VanDerStok, Andren, or the Firearms Policy Coalition will suffer irreparable harm absent injunctive relief.

---

[45] *Id.* at 3; Supp. Decl. of Darren Peters, Sr., ECF No. 55-1.
[46] Pls.' Br. 42, ECF No. 16.
[47] Decl. of Jennifer VanDerStok 1, ECF No. 16-2; Decl. of Michael G. Andren 1, ECF No. 16-3.
[48] Pls.' Reply 19, ECF No. 55.

## C. Balance of the Equities and the Public Interest

The Court must next weigh the equities and the public interest, which "merge" when the Government is a party. *Nken*, 556 U.S. at 435. Both sides claim valid public interests.

Defendants assert a public interest in preventing dangerous individuals from possessing firearms.[49] Defendants say ATF promulgated the Final Rule to further that public interest. And to the extent ATF is prevented from enforcing the rule, Defendants say they suffer irreparable injury.[50] *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Defendants also say the Final Rule will increase public safety.[51]

Meanwhile, Plaintiffs fear substantial economic harm and loss of previously enjoyed freedoms.[52] Those interests are public, not merely personal, as ATF predicts the Final Rule could affect tens of thousands of businesses, even resulting in the dissolution of some. *See Regulatory Impact Analysis*, *supra*, at 124–25. In ATF's words, "[T]he rule will have a significant impact on small entities." *Id.* at 125. Plaintiffs also claim "an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). "The public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

On balance, the equities and public interest weigh in favor of Plaintiffs. Defendants do not dispute that Plaintiffs are law-abiding citizens who wish to engage in lawful conduct covered by the Final Rule. But Defendants' enforcement of the rule strips Plaintiffs of freedoms they lawfully

---

[49] *See* Defs.' Resp. 43, ECF No. 41.
[50] *See id.* (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation and internal quotation marks omitted))).
[51] *See id.* (citing 87 Fed. Reg. at 24,654).
[52] *See* Pls.' Br. 46–47, ECF No. 16.

APP.150

enjoyed until just last week. Moreover, any injury to Defendants is further outweighed by Plaintiffs' strong likelihood of success on the merits of their statutory interpretation claims. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021). Finally, the Court has tailored the scope of the preliminary injunction with careful attention to avoid further upsetting the balance of these competing public interests.

*   *   *

Tactical Machining has shown it is entitled to preliminary injunctive relief. Having considered the arguments, evidence, and law, the Court determines that the relevant factors weigh in favor of a preliminary injunction. The remaining Plaintiffs have not carried that burden. Plaintiffs have also not shown that nationwide injunctive relief is appropriate at this stage. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation and internal quotation marks omitted). Covered by the injunction, Tactical Machining can operate its business as it has, free from the threat of enforcement of the Final Rule's unlawful redefinitions. Presumably, Tactical Machining's *customers* are still subject to felony charges for buying its products. *See* 18 U.S.C. § 922(a)(3). And it may be the case that Tactical Machining's business will fail unless the injunction is subsequently amended to cover a substantial portion of Tactical Machining's customer base. But for now Plaintiffs offer neither evidence nor argument on that point.[53]

---

[53] Plaintiffs also do not explain why a class-wide injunction would be improper.

## IV.        CONCLUSION

Tactical Machining has shown it is entitled to a preliminary injunction against Defendants' enforcement of the Final Rule. Accordingly, the Court **GRANTS** the motion in part, **DENIES** the motion in part, and **ORDERS** that Defendants and their officers, agents, servants, and employees are enjoined from implementing and enforcing against Tactical Machining, LLC the provisions in 27 C.F.R. §§ 478.11 and 478.12 that this Order has determined are unlawful. The Court waives the security requirement of Federal Rule of Civil Procedure 65(c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). If Plaintiffs wish to submit further briefing and evidence on the scope of the injunction, they must do so no later than **September 8, 2022**. Any responses are due within seven days of Plaintiffs' filing.

**SO ORDERED** on this **2nd day** of **September, 2022.**


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

APP.152

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING LLC, a limited liability company; FIREARMS POLICY COALITION, INC., a nonprofit corporation, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 4:22-cv-00691-O |
| BLACKHAWK MANUFACTURING GROUP INC., doing business as 80 PERCENT ARMS, | § § § § | |
| Intervenor Plaintiff, | § § § | |
| v. | § § | |
| MERRICK GARLAND, in his Official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, | § § § § § § § § § § § | |
| Defendants. | § | |

## OPINION & ORDER ON BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS' PRELIMINARY INJUNCTION

Before the Court are Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80

Percent Arms' Motion for Preliminary Injunction (Pl.'s Mot., ECF No. 102) and Brief in Support

(Pl.'s Br. in Supp., ECF No. 103), both filed October 20, 2022; Defendants' Brief in Opposition

to BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms' Motion for Preliminary

Injunction (Defs.' Resp., ECF No. 109), filed October 28, 2022; and BlackHawk Manufacturing

Group Inc. d/b/a 80 Percent Arms' Reply in Support of Motion for Preliminary Injunction (Pl.'s Reply, ECF No. 112), filed October 31, 2022. Having considered the parties' briefing, the Court **GRANTS** Intervenor-Plaintiff's motion.

## I.    BACKGROUND

The United States Congress has delegated the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") authority to regulate firearms in interstate commerce under the Gun Control Act of 1986. On April 26, 2022, ATF promulgated a Final Rule that purports to regulate partially manufactured firearm parts and weapon parts kits.[1] The Rule took effect on August 24, 2022.[2] Prior to its taking effect, on August 11, 2022, Plaintiffs brought this suit to challenge the legality of the Final Rule and claim, among other things, that the regulation exceeds the statutory authority that Congress vested in ATF.[3] Original Plaintiffs include Texas residents and firearm owners Jennifer VanDerStok and Michael G. Andren ("Individual Plaintiffs"); Firearms Policy Coalition, Inc. ("FPC"), a nonprofit organization, comprised of individuals and entities nationwide, that exists to promote Second Amendment rights through legislative and legal advocacy;[4] and Tactical Machining, LLC ("Tactical" or "Tactical Machining"), which manufactures and sells the products subject to the regulations at issue in this dispute.[5] Within a week of filing their complaint, on October 17, 2022, Plaintiffs moved for a preliminary injunction seeking to broadly enjoin the Government from enforcing its Final Rule.[6]

---

[1] *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, 479).
[2] *Id.*
[3] Compl. 1, ECF No. 1.
[4] Compl. 8, ECF No. 1.
[5] Decl. of Darren Peters, Sr. 1–5, ECF No. 16-1, ¶¶ 4–11 (identifying partially manufactured frames or receivers as Tactical Machining's primary product offering, along with other parts potentially subject to the Rule).
[6] Pls.' Mot. for Prelim. Inj., ECF No. 15.

APP.154

On September 2, 2022, the Court issued its First Opinion in which it found that provisions of ATF's Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—likely exceed the scope of ATF's authority under the Gun Control Act ("GCA").[7] Having made this preliminary finding, the Court enjoined Defendants, including the Attorney General, Department of Justice, ATF, and the ATF Director, along with their officers, agents, servants, and employees, from implementing or enforcing the rule against only Tactical Machining but otherwise denying injunctive relief to the remaining Plaintiffs.[8] In its Second Opinion on the proper scope of the preliminary injunction, issued October 1, 2022, the Court extended the injunction to the Individual Plaintiffs and—for the purpose of providing Tactical Machining complete relief—to Tactical's customers.[9]

Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms ("BlackHawk")—a manufacturer and retailer who sells products subject to ATF's Final Rule— was permitted to intervene in the suit under the Court's Order, issued October 18, 2022,[10] and now seeks its own protective preliminary injunction.[11] BlackHawk initially participated in the lawsuit peripherally by filing a declaration in support of Plaintiffs' original motion for preliminary injunction and moved to intervene a week before this Court, in its Second Opinion, again denied injunctive relief to Plaintiff-FPC's association members—of which BlackHawk is one.[12]

BlackHawk seeks a preliminary injunction that mirrors the relief currently afforded to Tactical Machining.[13] BlackHawk's request for injunctive relief rests on its claims that the Final Rule was issued in excess of ATF's statutory authority, is facially unlawful, and unlawfully

---

[7] First Opinion 15, 22–23, ECF No. 56.
[8] *Id.*
[9] Second Opinion 20–22, ECF No. 89.
[10] Oct. 18 Order, ECF No. 98.
[11] Pl.'s Mot. 1, 3, ECF No. 102.
[12] Pl.'s Reply 4, ECF No. 112.
[13] Pl.'s Br. in Supp. 3, 16–17, ECF No. 103.

purports to regulate weapon parts kits as firearms contrary to the strictures of the GCA.[14]
In response, the Government primarily contends that BlackHawk has not substantiated
the irreparable harm it will suffer absent injunctive relief, particularly in light of its "months-
long delay" in seeking preliminary relief.[15] The parties have briefed the issue and the motion is
ripe for review.

## II.    LEGAL STANDARD

The decision to extend interlocutory relief is committed to the district court's sound
discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.
1985). To establish entitlement to a preliminary injunction, BlackHawk must demonstrate: (1) a
substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that
the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction
will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing
party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Once it has determined that a party is entitled to injunctive relief, a court must make a
separate determination regarding the appropriate scope of that prospective injunction. "[T]he scope
of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*,
442 U.S. 682, 702 (1979). In other words, because it is an extraordinary remedy, an injunction
"should be no more burdensome to the defendant than necessary to provide complete relief to the
plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). Thus, an
injunction must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 138 S. Ct.
1916, 1934 (2018) (citation omitted). As movant, the party seeking relief bears the burden of

---

[14] Pl.'s Br. in Supp. 14, ECF No. 103; Intervenor Compl. ¶¶ 61, 90–91, 106–10, ECF No. 99.
[15] Defs.' Response 4–8, ECF No. 109.

APP.156

proving all four elements of the preliminary injunction. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

## III.  ANALYSIS

### A.  Plaintiff is Likely to Succeed on the Merits

BlackHawk must first show a substantial likelihood that it will succeed on the merits of its claims. *Daniels Health Servs.*, 710 F.3d at 582. "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Id.* As BlackHawk correctly points out, this Court has already preliminarily determined that the original Plaintiffs' statutory interpretation claims are likely to prevail on the merits.[16] BlackHawk raises nearly identical interpretive claims (that the Final Rule was issued in excess of ATF's statutory authority under the APA; is facially unlawful; and contravenes the GCA's clear statutory prescriptions) in its complaint.[17]

Rather than recite its previous analysis with respect to the interpretive claims verbatim, the Court incorporates by reference the reasoning in its First Opinion.[18] To summarize: the Final Rule purports to regulate firearm parts—including incomplete, non-functional receivers and weapon parts kits—contrary to the plain language of the GCA, which confined ATF's authority to regulation of "firearms," a term clearly defined by the statute.[19] Moreover, the Final Rule's expanded definition of "frame or receiver" to include partially manufactured, non-functional receivers within the meaning of "firearms"—contrary to the GCA's clear statutory definition—is facially unlawful.[20] Because BlackHawk challenges the Final Rule on these grounds, the Court

---

[16] Pl.'s Br. in Supp. 14, ECF No. 103 (citing the Court's First Opinion, ECF No. 56).
[17] Intervenor Compl. ¶¶ 61, 90–91, 106–10, ECF No. 99.
[18] First Opinion 6–16, ECF No. 56.
[19] *Id.*
[20] *Id.*

APP.157

similarly finds that BlackHawk has shown a substantial likelihood of success on the merits of its claims.

### B. Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief

In the Fifth Circuit, a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). A showing of economic loss is usually insufficient to establish irreparable harm because damages may be recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). However, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). And where costs are nonrecoverable because the government-defendant enjoys sovereign immunity from monetary damages, as is the case here, irreparable harm is generally satisfied. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Irreparable harm must also be concrete and not merely de minimis. *Daniels Health Servs., L.L.C.*, 710 F.3d at 585; *Dennis Melancon, Inc.*, 703 F.3d at 279 (cleaned up).

The Court has already decided this issue with respect to BlackHawk. When analyzing associational standing in its Second Opinion on the proper scope of the preliminary injunction, the Court found that:

> Plaintiffs have indeed shown that at least one of FPC's members, BlackHawk Manufacturing Group, Inc., d/b/a 80 Percent Arms, faces a substantial threat of irreparable harm . . . . Plaintiffs discuss BlackHawk's alleged injuries at length, describing the manufacturer-retailer's substantial decrease in sales following enactment of the Final Rule due to widespread customer concern about purchasing its products [].[21]

---

[21] Second Opinion 14–15, ECF No. 89 (citing Pls.' Mot. to Expand Prelim. Inj. 16–18, ECF No. 63; Decl. of Daniel Lifschitz 6–8, ECF No. 62-5 ¶¶ 13, 16, 17); *see also* BlackHawk's Br. in Supp. of Mot. to Intervene 5, ECF No. 77; Ex. A, Decl. of Daniel Lifschitz ¶¶ 15, 20, ECF No. 77-3 (noting BlackHawk's "average daily revenue since the rule took effect has dropped by more than 90%" and that it has "enough

In response, the Government claims BlackHawk could avert this injury by simply complying with the Rule.[22] But "it is no answer to say that [Plaintiff] may avoid the harm by complying with an [] agency rule" that is likely unlawful. [23] And as this Court has previously held, "Defendants' argument relies on the incorrect legal premise that compliance costs are not an irreparable harm."[24] To this, the Government counters that any nonrecoverable compliance costs are de minimis, and therefore not cognizable.[25] The Government suggests this Court agrees by claiming it "has since found that FFLs can make sales to out-of-state purchasers through a local FFL with costs that are, at most, *de minimis*."[26] But that misreads the Court's prior Opinion, wherein the Court found that *Individual Plaintiffs'* compliance costs—incurred in the form of a one-time $30 FFL transfer fee—were de minimis.[27] The Court said nothing regarding the manufacturer's (there, Tactical Machining's) compliance costs being de minimis. Indeed, BlackHawk's burden of complying with the Final Rule's requirements would entail an overhaul of its entire online, direct-to-customer business model, in addition to the costs incurred through administrative compliance and other FFL-related fees.[28]

The Government also focuses on BlackHawk's "unexcused delay" in seeking preliminary injunctive relief—a fact it claims "weighs heavily against [BlackHawk's] assertion that it would suffer irreparable harm without such relief."[29] The Government calculates this purported delay from the date the Final Rule was announced to the date that BlackHawk moved for its preliminary

---

cash on hand to continue paying [its] expenses for 2 to 3 months while [it] operate[s] at a loss . . . [before being] forced to shut down . . . and cease operations").
[22] Defs.' Resp. 8, ECF No. 109.
[23] First Opinion 19, ECF No. 56.
[24] *Id.* at 17–18.
[25] Defs.' Resp. 8, ECF No. 109.
[26] *Id.* (citing the Court's Second Opinion at 7–8, ECF No. 89).
[27] Second Opinion 8, ECF No. 89.
[28] Pl.'s Reply 2–3, ECF No. 112.
[29] Defs.' Resp. 4, ECF No. 109.

APP.159

injunction: a period of five months and eleven days.[30] But the Government's timeline by which it measures the supposed delay is exaggerated. Though not as a named-Plaintiff, BlackHawk initially participated in this lawsuit when it filed a declaration in support of the Plaintiffs' motion for preliminary injunction on September 8, 2022, only fifteen days after the Final Rule took effect and within a month of Plaintiffs' initial complaint. Moreover, BlackHawk's interests were quasi-represented in the case via its membership status in FPC, who was seeking injunctive relief on behalf of all its association members. Within two weeks of its initial involvement in the ongoing proceedings, BlackHawk moved to intervene and simultaneously filed a proposed motion for preliminary injunction. In the Court's view, these efforts to vindicate its interests are far from an undue delay sufficient to overcome BlackHawk's clear demonstration of irreparable harm and bar injunctive relief.

Even if BlackHawk had effectively "[sat] on its rights"[31] for five months, that length of time alone is not dispositive given that any determination of a movant's timeliness seems to turn on the facts of the particular case. *See, e.g.*, *ADT, LLC v. Cap. Connect, Inc.,* 145 F. Supp. 3d 671, 699 (N.D. Tex. 2015) (finding an eight-month delay reasonable); *Wireless Agents, L.L.C. v. T-Movile USA, Inc.* 2006 WL 1540587, 3 (N.D. Tex. June 6, 2006) (finding a year's delay unreasonable). For these reasons, the Court finds that BlackHawk has adequately demonstrated it will suffer irreparable harm absent injunctive relief.

### C.  The Balance of Equities and Public Interest Weigh in Plaintiff's Favor

The final two elements necessary to support a grant of injunctive relief—the balance of equities (the difference in harm to the respective parties) and the public interest—"merge" when the government is a party. *Nken*, 556 U.S. at 435. In this assessment, the Court weighs "the

---

[30] *See id.* at 5.
[31] *Id.* at 7.

APP.160

competing claims of injury and [] consider[s] the effect on each party of the granting or withholding of the requested relief," while also considering the public consequences of granting injunctive relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted).

BlackHawk argues that its threatened injury (complete elimination of its business) and the public's interest in lawful government action far outweighs any potential harm the government would incur in being temporarily prevented from enforcing its unlawful Rule.[32] On the other hand, Defendants assert injuries to their interests in law enforcement and public safety, which they argue cannot be vindicated if BlackHawk is given interim injunctive relief.[33] This will result, they say, because without compliance with the Final Rule, "no safeguard at the point of purchase would prevent the sale to prohibited persons of products that can readily be converted into functional firearms," and BlackHawk's sale of noncompliant products "would render it far less likely that law enforcement would be able to trace the firearms in the event they were used to commit a crime."[34] In other words, once those injuries occur, they cannot be remediated.

As with its analysis of likely success on the merits, the Court's prior reasoning with respect to the balance of equities and competing public interests applies to BlackHawk's motion for injunctive relief. In its First Opinion, this Court found that any injury to the Government's general interest in law enforcement and public safety is appreciably undermined by this Court's preliminary determination that the Final Rule is likely unlawful.[35] Moreover, it found that Plaintiffs' liberty interest—as law-abiding citizens who wish to engage in historically lawful conduct (the purchase and sale of now-regulated parts)—outweighs the

---

[32] Pl.'s Br. in Supp. 17–18, ECF No. 103; Pl.'s Reply 8–9, ECF No. 112.
[33] Defs.' Resp. 9–11, ECF No. 109.
[34] *Id.* at 10 (citing 87 Fed. Reg. at 25,643).
[35] First Opinion 21–22, ECF No. 56.

APP.161

Government's remaining interest in preventing prohibited persons from unlawfully possessing firearms.[36] That reasoning applies with equal force here and is strengthened by the fact that the Government's likely *ultra vires* enforcement efforts upset more than fifty years of ATF regulatory precedent against a public that has relied on that historic posture.[37]

And even if it is true that, during the interim litigation, the non-enforcement of point-of-sale safeguards and record-keeping requirements against BlackHawk may undermine the public interest in law enforcement and public safety—a status quo that has persisted for decades—that purported injury does not outweigh the existential harm threatening BlackHawk's continued operation. Nor does it outweigh the harm to the public's interest in a government that abides by its own statutory and constitutional obligations. Indeed, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up). Just as the Government has an interest in the law's enforcement, so too does the public have an equally compelling interest in enforcement of the laws that govern its governing authorities.

Finally, while the Government argues that "BlackHawk *affirmatively seeks to protect* the ability of potentially dangerous individuals such as felons, unlawful drug users, and domestic abusers to obtain items and kits that can readily be converted into functional firearms," BlackHawk makes no such request.[38] Indeed, no less than three times, BlackHawk reiterates that it seeks

---

[36] *Id.* at 22.
[37] *See* Pl.'s Br. in Supp. 18, ECF No. 103 (noting creation and maintenance of the industry under ATF's 54-year status quo regarding what constitutes a lawful "firearm" under the Gun Control Act).
[38] Defs.' Resp. 12, ECF No. 109 (emphasis added).

APP.162

"injunctive relief that matches the relief currently provided to Tactical."[39] When BlackHawk moved for an injunction, the Court's protective relief included Tactical and its customers but explicitly *excepted* any customers prohibited from possessing firearms under 18 U.S.C. § 922(g).[40] Thus, the Government's alleged harm to the public interest in preventing prohibited persons from obtaining firearms (by purchasing parts) is mitigated by the injunction's narrow tailoring. The Court therefore finds that the balance of hardships and the public interest weigh in favor of granting BlackHawk's request for injunctive relief.

\* \* \* \*

Having considered the arguments, evidence, and law, the Court determines that the relevant factors weigh in favor of granting a preliminary injunction. As BlackHawk requests and the Government concedes,[41] the proper scope of relief is that which mirrors the relief currently afforded to Tactical Machining, LLC.[42] Thus, any protective relief provided to BlackHawk must be sufficient to redress its injuries, without being overly inclusive. As this Court has previously found, BlackHawk's injuries cannot be remedied if its only source of revenue—customer willingness to transact business—has been severely curtailed. Thus, the Court finds that the proper remedy is an injunction that applies to the company itself and to its customers.

## IV.    CONCLUSION

BlackHawk has shown it is entitled to a preliminary injunction against Defendants' enforcement of the Final Rule. Accordingly, the Court **GRANTS** the motion and **ORDERS** that Defendants and their officers, agents, servants, and employees are enjoined from implementing

---

[39] Pl.'s Br. in Supp. 16, 17, 19, ECF No. 103.
[40] *See generally* First Opinion and Clarification of Opinion (ECF Nos. 89, 91).
[41] The Government agrees that if injunctive relief is granted, it should cover only BlackHawk and its customers not prohibited from possessing firearms under 18 U.S.C. § 922(g). Defs.' Resp. 12, ECF no. 109.
[42] Pl.'s Br. in Supp. 16, 17, 19, ECF No. 103; Defs.' Resp. 14, ECF No. 109.

APP.163

and enforcing against BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms the provisions in 27 C.F.R. §§ 478.11 and 478.12 that the Court has preliminarily determined are unlawful. Reflecting the scope of relief currently afforded to Tactical Machining, LLC, the injunction also covers BlackHawk's customers (except for those individuals prohibited from possessing firearms under 18 U.S.C. § 922(g)). The Court waives the security requirement of Federal Rule of Civil Procedure 65(c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

      **SO ORDERED** this **3rd day** of **November, 2022**.


Reed O'Connor

**UNITED STATES DISTRICT JUDGE**

APP.164