No. 23-10718

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,
Plaintiffs-Appellees,

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms; Defense Distributed; Second Amendment Foundation, Incorporated; Not an L.L.C., doing business as JSD Supply; Polymer80, Incorporated,
Intervenor Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,
Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

_____

## BRIEF FOR APPELLANTS

_____

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument in this appeal for September 7, 2023.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ........................................................3

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE..................................................................4

     A.    Legal Background ....................................................................4

     B.    Procedural Background............................................................10

SUMMARY OF ARGUMENT.................................................................13

STANDARD OF REVIEW .....................................................................18

ARGUMENT .........................................................................................18

I.    The Rule Comports with the Gun Control Act.................................18

     A.    A Nonfunctional Frame or Receiver May Constitute a "Frame" or "Receiver" Under the Gun Control Act ......................................18

     B.    Certain Weapon Parts Kits Constitute Firearms Under the Gun Control Act ..........................................................................26

II.    At a Minimum, This Court Should Reverse the District Court's Overbroad Relief ...........................................................................32

     A.    The District Court Erred in Vacating the Entire Rule.............32

     B.    The District Court Erred in Providing Relief to Non-Plaintiffs, Including Unidentified Members of Plaintiff Organizations .................35

          1.    The District Court Improperly Failed to Consider Whether the Balance of Equities and the Public Interest Justified Its Universal Remedies...........................................................35

2.      Constitutional and Equitable Principles Precluded the District Court's Universal Vacatur in This Case ............................38

CONCLUSION ........................................................................................................... 46

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Abramski v. United States,*
 573 U.S. 169 (2014) ........................................................... 5, 25, 31

*Arizona v. Biden,*
 40 F.4th 375 (6th Cir. 2022) ................................................ 37, 42

*Califano v. Yamasaki,*
 442 U.S. 682 (1979) ................................................................ 39

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,*
 566 U.S. 399 (2012) ................................................................ 30

*Cargill v. Garland,*
 57 F.4th 447 (5th Cir. 2023) (en banc)................................ 36, 37

*Central & S.W. Servs., Inc. v. EPA,*
 220 F.3d 683 (5th Cir. 2000) .................................................. 37

*County of Maui v. Hawaii Wildlife Fund,*
 140 S. Ct. 1462 (2020) ........................................................... 26

*Franciscan All., Inc. v. Becerra,*
 47 F.4th 368 (5th Cir. 2022) .................................................. 36

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
 129 F.3d 826 (5th Cir. 1997) .................................................. 40

*Gill v. Whitford,*
 138 S. Ct. 1916 (2018) ....................................................... 37, 38

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
 527 U.S. 308 (1999) ................................................................ 38

*K Mart Corp. v. Cartier, Inc.,*
 486 U.S. 281 (1988) ........................................................... 16, 34

*Morehouse Enters., LLC v. ATF,*
 No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022),
 *appeal pending,* Nos. 22-2812, 22-2854 (8th Cir.) ...................... 43

*National Fed'n of the Blind of Tex., Inc. v. Abbott,*
 647 F.3d 202 (5th Cir. 2011) .................................................. 18

*Pugin v. Garland,*
143 S. Ct. 1833 (2023) ................................................................................ 32

*Southwestern Elec. Power Co. v. EPA,*
920 F.3d 999 (5th Cir. 2019) ...................................................................... 34

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
143 S. Ct. 2141 (2023) ................................................................................ 41

*Taylor, In re,*
655 F.3d 274 (3d Cir. 2011) ....................................................................... 39

*Tompkins v. Cyr,*
202 F.3d 770 (5th Cir. 2000) ...................................................................... 40

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) ................................................................................ 39

*United States v. Annis,*
446 F.3d 852 (8th Cir. 2006) ...................................................................... 28

*United States v. Lumbermens Mut. Cas. Co.,*
917 F.2d 654 (1st Cir. 1992) ....................................................................... 40

*United States v. Ryles,*
988 F.2d 13 (5th Cir. 1993) ........................................................... 15, 27, 28

*United States v. Stewart,*
451 F.3d 1071 (9th Cir. 2006) .................................................................... 28

*United States v. Texas,*
143 S. Ct. 1964 (2023) ..................................................................... 36, 37, 38

*United States v. Wick,*
697 F. App'x 507 (9th Cir. 2017) ............................................................... 28

**Statutes:**

Administrative Procedure Act (APA):
5 U.S.C. § 702(1) ........................................................................................ 37
5 U.S.C. § 703 .............................................................................................. 36
5 U.S.C. § 706(2) ......................................................................................... 36

Gun Control Act of 1968, *codified as amended*,
    18 U.S.C. § 921 *et seq.* ..................................................................................4
        18 U.S.C. § 921(a)(3) .......................................................................... 1, 5
        18 U.S.C. § 921(a)(3)(A) ................................ 7, 11, 20, 24, 26, 27, 30, 31
        18 U.S.C. § 921(a)(3)(B) ..................................................................... 11, 23
        18 U.S.C. § 921(a)(4)(C) ............................................................................ 12
        18 U.S.C. §§ 922-923 ................................................................................... 4
        18 U.S.C. § 922(a)(2)-(3) ............................................................................. 4
        18 U.S.C. § 922(b)(3) ............................................................................. 4, 45
        18 U.S.C. § 922(t) ........................................................................................ 4
        18 U.S.C. § 923(a) ....................................................................................... 4
        18 U.S.C. § 923(g)(1)(A) ............................................................................. 4
        18 U.S.C. § 923(i) ........................................................................................ 4
        18 U.S.C. § 926(a) ...................................................................................... 5

26 U.S.C. § 5845(b) ........................................................................................ 20

26 U.S.C. § 5845(b)-(d) .................................................................................. 24

26 U.S.C. § 5845(c)-(d) .................................................................................. 20

28 U.S.C. § 1291 .............................................................................................. 3

28 U.S.C. § 1331 .............................................................................................. 3

**Regulations:**

27 C.F.R. § 478.11 ...................................................................................... 8, 26

27 C.F.R. § 478.12(c) ................................................................................... 7, 18

27 C.F.R. § 478.41(b) ....................................................................................... 45

28 C.F.R. § 0.130 .............................................................................................. 5

**Other Authorities:**

ATF, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16
    Type Receivers* (Sept. 27, 2022), https://perma.cc/7457-VZ94 ....................25

ATF, *Open Letter to All Federal Firearms Licensees, Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames* (Dec. 27, 2022), https://perma.cc/VP62-S26P .......................................................................... 20

*Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022) ............................... 2, 5, 6, 7, 8, 9, 10, 16, 18, 19, 21, 22, 26, 27, 29, 34, 43, 44

33 Fed. Reg. 18,555 (Dec. 14, 1968) ................................................................... 5

87 Fed. Reg. 51,249 (Aug. 22, 2022) ................................................................... 2

Second Amendment Found., *Join SAF or Renew Your Membership*, https://www.saf.org/join-saf/ (last visited Aug. 9, 2023) ............................................41

*Webster's Third New International Dictionary of the English Language* (1968) ................... 26, 27

Wright & Miller, *Special Limits on Jurisdiction—Separate Appeal Requirements*, 15A Fed. Prac. & Proc. (3d ed.) ................................................................40

## INTRODUCTION

Congress enacted licensing, background check, and recordkeeping requirements to ensure that law enforcement officers may trace firearms used in crimes and that firearms are not sold to those, such as felons, who cannot lawfully possess them. In delineating these requirements, Congress defined "firearm" to include, as relevant here, "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive," as well as the "frame or receiver" (that is, the major structural component) "of any such weapon." 18 U.S.C. § 921(a)(3). This definition reflects Congress's understanding that limiting the statute only to operational weapons—that is, those that are currently capable of expelling a projectile—would allow persons to circumvent the statute by selling firearms that are designed to or may readily be converted into operational weapons without obtaining a license, marking such weapons with traceable serial numbers, keeping records, or running background checks.

In recent years, there has been an exponential rise in the number of untraceable firearms commonly known as "ghost guns." Ghost guns can be made from kits and parts that are available online and allow anyone with basic tools and rudimentary skills (or access to Internet video tutorials) to assemble a fully functional firearm in as little as 20 minutes. Some manufacturers of those kits and parts assert that they are not selling "firearms" regulated by federal law and thus the kits and parts can be sold without serial numbers, background checks, or transaction records. Those features of

ghost guns make them uniquely attractive to criminals and those who are legally

prohibited from buying firearms, including felons and minors.

Responding to that problem and to other technological advances in firearm

design, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) promulgated

the rule at issue in this case. *See Definition of "Frame or Receiver" and Identification of

Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022); *see also* 87 Fed. Reg. 51,249 (Aug. 22,

2022) (technical corrections). At a high level, the Rule updates the definition of

"frame or receiver" to reflect modern firearms and clarifies that kits or aggregations of

parts that enable a purchaser to readily assemble an operational weapon, or readily

construct a functional frame or receiver, fall within the statutory definition of

"firearm." The Rule also includes additional provisions similarly directed at effectively

implementing the statutory serialization and other requirements, including a directive

regarding which part of a firearm silencer or muffler must be marked with a serial

number, a provision extending the time that licensees are required to maintain

transaction records, and a requirement that licensees mark unserialized firearms that

they take into inventory.

The Rule does not prohibit the purchase, sale, or possession of any firearm, nor

does the Rule prohibit any individual from making a firearm. Rather, the Rule

reinforces compliance with Congress's gun-safety regime. It ensures that background

checks are conducted before individuals purchase firearms from federal firearms

licensees and that licensees mark firearms with serial numbers and keep records to enable law enforcement to trace firearms used in crimes.

The district court granted summary judgment to plaintiffs on their claims that two portions of the Rule are contrary to law. It then purported to "vacate" the entire Rule—rather than only the provisions it found unlawful. And it applied that vacatur across the board to everyone, not just the parties in the case.

Because the challenged provisions of the law comport fully with the statute, and the district court identified no basis that could support its overbroad remedy, this Court should reverse the district court's judgment. Even were the Court to agree with the district court's legal conclusions regarding the challenged provisions, at a minimum, it should reverse the overbroad portions of the judgment.

## STATEMENT OF JURISDICTION

The district court granted in relevant part plaintiffs' motions for summary judgment on June 30, 2023, and entered final judgment on July 5, 2023. *See* ROA.4780, 4857-58. The federal government filed a timely notice of appeal from the judgment on July 13, 2023. *See* ROA.4868. The district court had jurisdiction over the case under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Plaintiffs challenge an ATF rule that implements provisions of the Gun Control Act requiring that firearms be serialized and be sold by licensed dealers that conduct background checks on purchasers and maintain records of transactions. The

district court granted plaintiffs' motions for summary judgment, concluding that two provisions of the Rule are contrary to the statute. As a remedy, the district court vacated the entire Rule, including many provisions it did not find unlawful. The questions presented are the following:

1. Whether the two challenged provisions of the Rule comport with the Gun Control Act; and

2. Whether the district court erred in universally vacating the whole Rule.

## STATEMENT OF THE CASE

### A.    Legal Background

**1.** Through the Gun Control Act of 1968, *codified as amended*, 18 U.S.C. § 921 *et seq.*, Congress has enacted requirements for persons who import, manufacture, or deal in "firearms," *id.* §§ 922-923. Such persons must obtain a federal firearms license, *id.* § 923(a), maintain records of firearm acquisition and disposition, *id.* § 923(g)(1)(A), and conduct a background check before transferring firearms to a non-licensee, *id.* § 922(t). Congress has also required importers and manufacturers to identify each firearm they import or manufacture with a serial number on the frame or receiver. *Id.* § 923(i). In addition, Congress generally prohibits a licensee from selling a firearm directly to a non-licensee in a different state; instead, such sales generally must be routed through a federal licensee in the purchaser's home state. *See id.* § 922(a)(2)-(3), (b)(3). That "comprehensive scheme" has "twin goals": "keep[ing] guns out of the hands of criminals and others who should not have them" and "assist[ing] law

4

enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014).

The statutory scheme hinges on the definition of "firearm." Congress defined that term as follows:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

Congress did not define "frame" or "receiver" in the statute, instead leaving it to ATF to do so. *Cf.* 18 U.S.C. § 926(a) (providing the Attorney General with authority to issue "rules and regulations as are necessary to carry out the provisions of this chapter"); 28 C.F.R. § 0.130 (delegating this authority to the Director of ATF). Thus, in 1968, ATF defined "[f]irearm frame or receiver" by regulation as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968). That regulation provided direction as to which portion of a weapon constituted the frame or receiver for licensing, serialization, and recordkeeping purposes and ensured that a component necessary for the weapon's functioning could be traced if the weapon were used in a crime. *See* 87 Fed. Reg. at 24,652.

**2.** In the last half-century, changes in weapon design have rendered ATF's regulatory definition obsolete. Today, most commonly available weapons have a split or multi-piece receiver, or they incorporate a striker rather than a hammer to fire the weapon. *See* 87 Fed. Reg. at 24,652. As a result, as many as 90% of firearms do not have a single component that houses a hammer, a bolt or breechblock, and a firing mechanism; under a restrictive application of the 1968 regulation, those firearms would arguably have no frame or receiver subject to regulation. *Id.*

In addition, technological advances have made it easier to create and sell firearm parts kits and easy-to-complete frames or receivers. Although these items meet the statutory definition of "firearm," some entities have been engaged in the business of selling them to individual purchasers without complying with the Gun Control Act. 87 Fed. Reg. at 24,652. Such sales permit purchasers who have not completed a background check to assemble firearms easily. And because these firearms usually lack serial numbers, they have become known as "ghost guns," guns which are nearly impossible for law enforcement to trace when they are used in crimes. For example, out of 45,240 unserialized firearms recovered from crime scenes between 2016 and 2021 that were submitted for federal tracing, ATF was able to successfully connect only 445 (less than 1%) of those firearms to individual purchasers. *Id.* at 24,652, 24,656, 24,659.

**3.** Responding to this threat to the continued effective implementation of Congress's gun-safety scheme, ATF promulgated the Rule. This case concerns in

6

particular two provisions of the Rule, both of which are aimed at ensuring that the regulatory definitions and requirements related to serializing, recordkeeping, and licensing reflect the modern realities of firearm design.

First, the Rule provides updated regulatory definitions of "frame" and "receiver." As the Rule explains, partially complete frames or receivers "are often sold in kits where the frame or receiver can readily be completed or assembled"— sometimes in under 30 minutes—to a functional state. 87 Fed. Reg. at 24,663, 24,686. And manufacturers may produce and distribute frames or receivers that are missing, for example, only "a single hole necessary to install the applicable fire control component" or that have "a small piece of plastic that can easily be removed to allow installation of that component." ROA.4895. The Rule therefore provides that frames and receivers that are partially complete, disassembled, or nonfunctional (such as a frame or receiver parts kit) constitute frames or receivers under the statute if they are "clearly identifiable as an unfinished component part of a weapon" and if they are designed to function as a frame or receiver or may readily be converted to a functional state. 87 Fed. Reg. at 24,663, 24,727-28, 24,739; *see* 27 C.F.R. § 478.12(c).

Second, the Rule updates the regulatory definition of "firearm." As explained, the statutory definition includes inoperable weapons that are "designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Weapon parts kits—which may contain all components necessary to easily assemble a functional weapon and even the templates and tools to allow that

assembly—have increasingly been sold without complying with the Gun Control Act's licensing, recordkeeping, and background check requirements. 87 Fed. Reg. at 24,662. The Rule thus updates the regulatory definition of "firearm" to specify that the term includes "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* at 24,662, 24,727, 24,735; *see* 27 C.F.R. § 478.11.

In addition, the Rule contains a host of other provisions, the legality of which is not challenged by the claims at issue in this appeal. Those provisions are similarly aimed at ensuring the continued effective implementation of the statutory serialization, recordkeeping, and licensing requirements, particularly given the modern realities of firearm design.

For example, to address the fact that many modern firearms arguably have no frame or receiver within the meaning of the 1968 regulatory definition, the Rule makes additional updates to that definition that are not challenged in this case. The Rule defines the "frame" of a handgun (*e.g.*, a pistol) as the housing or structure for the component designed to hold back the hammer, striker, bolt, or similar primary energized component before initiating the firing sequence. The Rule defines the "receiver" of a long gun (*e.g.*, a rifle) or other projectile weapon as the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence. *See* 87 Fed. Reg. at 24,727, 24,735. These updated

8

definitions are intended to identify one component for each weapon as the "frame" or "receiver" to which serialization and other statutory requirements attach.

The Rule also clarifies regulations related to silencers and mufflers. The Rule identifies a particular part of a muffler or silencer—generally the part "that provides housing or a structure for the primary internal component designed to reduce the sound of a projectile"—as the muffler's or silencer's "frame or receiver" for licensing, background check, and marking requirements. 87 Fed. Reg. at 24,739. And the Rule explains how and when certain obligations attach to silencers, providing for example that a frame or receiver part or subpart that is not sold as part of a complete muffler or silencer device must be individually serialized and that a manufacturer must serialize a complete muffler or silencer device by the next business day after the manufacturing process has ended. *See id.* at 24,747-48.

The Rule also makes clear that the statutory definition of "firearm" includes a "[p]rivately made firearm"—that is, one made by a person other than a licensed manufacturer that does not contain a serial number placed by a licensed manufacturer at the time of production. 87 Fed. Reg. at 24,735. Consistent with the Gun Control Act's focus on importers, manufacturers, and dealers, the Rule does not affect the private making of firearms by individuals for personal use; however, the Rule requires that licensed dealers imprint a serial number on such firearms if they are taken into inventory. *Id.* at 24,653, 24,742, 24,744.

9

In addition, the Rule extends the time for which licensees are required to maintain records of firearm production, acquisition, and disposition. Previously, licensees were required to maintain those records for 20 years; under the Rule, licensees must maintain them for the duration of the licensee's business or licensed activity. *See* 87 Fed. Reg. at 24,690, 24,746-47.

Finally, the Rule provides: "[I]n the event any provision of this rule," or "the application of such provision" to "any person or circumstance," is determined to be invalid, "the remainder" of the Rule, and "the application of the provisions of [the Rule] to any person or circumstance[,] shall not be affected and shall be construed so as to give them the maximum effect permitted by law." 87 Fed. Reg. at 24,730.

### B.    Procedural Background

**1.** Plaintiffs—two individual firearm owners, two advocacy organizations, and five entities that manufacture or distribute products regulated by the Rule—filed or intervened in this suit. As relevant here, they challenged the portions of the Rule defining "frame" and "receiver" to include certain partially complete or nonfunctional frames and receivers and defining "firearm" to include certain weapon parts kits, alleging that those provisions are inconsistent with the Gun Control Act.

In a series of previous opinions, the district court granted preliminary injunctions limited to the individual plaintiffs and some of the manufacturer plaintiffs and their customers. In so doing, the court declined plaintiffs' "invitation to issue a nationwide injunction." ROA.1214. The court explained that nationwide relief was

unwarranted because "a broad injunction would far exceed the particular tailoring necessary to redress [plaintiffs'] injuries and afford them complete relief." ROA.1214 (quotation omitted). The government appealed from each of those preliminary injunction orders; those appeals remaining pending. *See* Nos. 22-11071, 22-11086, 23-10463, 23-10718 (5th Cir.).

**2.** The district court has now granted plaintiffs' motions for summary judgment on their claims that the two challenged provisions of the Rule are contrary to the statute. ROA.4743-80.

First, the district court held that the Rule's definitions of "frame" and "receiver" to include partially complete, disassembled, or nonfunctional frames and receivers that may readily be converted to a functional state conflict with the Gun Control Act. *See* ROA.4767-72. The court "acknowledge[d] that ATF does indeed have discretion to decide whether a particular component is a frame or receiver based upon that component's degree of completeness." ROA.4770 (quotations omitted). But the court believed that the Rule treats an item as a frame or receiver "even after ATF determines that the component in question is *not* a frame or receiver." ROA.4770-71. And the court emphasized that Congress did not expressly include such "disassembled" or "nonfunctional" language in the provision of the Gun Control Act establishing that frames and receivers are "firearms," ROA.4769; *see also* 18 U.S.C. § 921(a)(3)(B), even though it did include such language in the primary definition of "firearm," *see* 18 U.S.C. § 921(a)(3)(A). The court therefore held that a

"part that has yet to be completed or converted to function as a frame or receiver is *not* a frame or receiver." ROA.4771.

Second, the court held that the Rule's definition of a "firearm" to include a weapon parts kit that is designed to, or may readily be assembled to, function as a firearm could not be squared with the Gun Control Act. ROA.4773-77. That conclusion was based primarily on the court's belief that the definition of "firearm" in the Gun Control Act "does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled" into a weapon that expels a projectile. ROA.4774. The court believed that the Rule's contrary interpretation "would render" the statute's frame-and-receiver provision "superfluous." ROA.4774. And the court noted that the statute's destructive-device provision includes language referring to "any combination of parts" and parts that "may be readily assembled," *see* 18 U.S.C. § 921(a)(4)(C), which the court interpreted as suggesting that "Congress intentionally chose not to regulate 'weapon' parts generally." ROA.4774-75.

Finally, the district court vacated the Rule—in its entirety and universally, including as to non-parties. In entering that relief, the court did not address the Rule's discussion of severability or the possibility of vacating only the challenged provisions. Nor did the court conclude that a universal vacatur was justified by equitable balancing or necessary to redress plaintiffs' asserted injuries. Instead, the court stated only that vacatur is the "default remedy" whenever a district court finds an agency action unlawful. ROA.4777-79.

**3.** The district court entered final judgment vacating the Rule, and this appeal followed. The government moved in this Court for a stay of the district court's vacatur pending appeal, and that motion was granted in part. *See* Unpublished Order (July 24, 2023), Dkt. No. 45-1. First, the motions panel concluded that the government had "not demonstrated a strong likelihood of success on the merits, nor irreparable harm in the absence of a stay," with respect to the two challenged provisions. *Id.* at 3. Second, the motions panel concluded that the government was "likely correct" that "the vacatur of the several non-challenged parts of the Rule was overbroad." *Id.* Thus, the motions panel stayed pending appeal the vacatur as to the portions of the Rule that the district court had not held unlawful.

The government then filed an application with the Supreme Court for a stay of the vacatur pending appeal. The Supreme Court has now granted that application and has stayed the district court's judgment vacating the Rule pending the disposition of this appeal. *See Garland v. VanDerStok*, No. 23A82 (Aug. 8, 2023).

## SUMMARY OF ARGUMENT

Congress has required that those who wish to manufacture, import, or deal in firearms must obtain a license; conduct a background check before transferring a firearm; and maintain records of firearms transactions. And Congress has required that firearms be marked with a serial number when they are imported or manufactured. These requirements are critical components of Congress's gun-safety scheme because they prevent firearms from being sold to individuals, like felons, who

may not lawfully possess them and because they enable law enforcement to trace firearms used in crimes. ATF promulgated the Rule challenged here to ensure the continued effective implementation of these statutory requirements in the face of technological advances that have led to the proliferation of untraceable ghost guns.

Despite the Rule's clear consonance with the statute, the district court concluded that two provisions of the Rule are contrary to law. And the court compounded its error by vacating the entire Rule—including numerous provisions it did not hold unlawful—as applied to everybody. The court thereby sanctioned the continued sale of products over the Internet that enable individuals to readily assemble untraceable firearms like AR-15 rifles and to do so without background checks. This Court should reverse.

**I.** The district court erred in concluding that two provisions of the Rule are contrary to the Gun Control Act.

First, the Rule's clarification that a "frame" or "receiver" includes a partially complete, disassembled, or nonfunctional frame or receiver that may "readily" be converted into a functional frame or receiver accords with the Gun Control Act's text and structure. The statute does not itself define the terms "frame" or "receiver." In interpreting those terms to include a nonfunctional frame or receiver that may "readily" be converted to a functional one, ATF acted consistently with the text of the provision, Congress's approach to other terms in similar statutes, and the reality underlying the statutory scheme that any contrary approach would permit individuals

14

to circumvent important federal gun laws. And ATF's approach is further supported by the agency's longstanding practice of treating certain partially complete frames or receivers as frames or receivers for purposes of the Gun Control Act. In nevertheless concluding that ATF's approach was precluded by the statute, the district court incorrectly suggested that Congress intentionally defined "frame" and "receiver" not to include partially complete frames and receivers. In reality, however, Congress never defined those terms in the statute, and it is implausible to believe that Congress intended to preclude ATF's approach, which accords with the statutory text and context.

Second, the Rule's clarification that a "firearm" also includes certain weapon parts kits that are designed to be, or may readily be converted into, an operational firearm similarly comports with the Gun Control Act. The Act's definition of "firearm" makes clear Congress's intent to include certain partially complete, or nonoperational, weapons within its scope, and consistent with that intent, courts have long recognized that such weapons can constitute "firearms." *See, e.g.*, *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993). A weapon parts kit that can readily be assembled into an operational firearm plainly satisfies the statute's definition, and any other approach would impermissibly result in easy circumvention of the statute, enabling felons and others who cannot lawfully possess firearms to easily obtain untraceable firearms over the Internet. In nevertheless concluding that such a kit falls outside the statutory definition, the district court suggested that ATF was attempting

to improperly regulate "weapon parts generally," which are not covered by the statute. *See* ROA.4774. But that suggestion misunderstands the Rule, which implicates not weapon parts writ large but instead—and consistent with the statute—only those aggregations of parts that may be readily converted to a functional weapon.

**II.** Even if the district court were correct that the two challenged provisions of the Rule are unlawful, its universal vacatur of the entire Rule would be overbroad in multiple ways.

**A.** The district court erred in vacating the entire Rule. As explained, in addition to the two challenged provisions, the Rule contains numerous other provisions generally directed at ensuring the continued effective implementation of Congress's statutory gun-control regime. These provisions include, for example, unchallenged updates to the regulatory definitions of "frame" and "receiver" to reflect advances in firearm technology, new regulatory provisions to ensure the consistent marking of silencers, and an extension of recordkeeping requirements. As ATF has explained, these provisions independently advance important public-safety interests, even in the absence of the challenged provisions, and the Rule thus makes clear ATF's intent that as much of the Rule as possible go into effect. *See* 87 Fed. Reg. at 24,730 (severability discussion). Against that backdrop, the district court should have applied established severability principles to limit any vacatur to the provisions held unlawful. *Cf. K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). Instead, the district court vacated the entire Rule without any explanation of why that was appropriate.

16

**B.** In addition, the district court's universal vacatur of the challenged provisions is unwarranted and unnecessary to remedy the injuries alleged by plaintiffs. The court made no judgment that such sweeping relief was appropriate as a matter of equity—instead, it believed that such relief was the default remedy for a successful contrary-to-law claim. But this Court's precedents make clear that universal vacatur is not automatic or compelled but is instead a discretionary equitable remedy.

Constitutional and equitable principles require limiting any relief to the named plaintiffs, which do not include unidentified members of the organizational plaintiffs. As an initial matter, both Article III and principles of equity counsel that a court's remedial authority is generally limited to redressing the plaintiff's specific injuries. Here, such redress may—and thus must—be provided by party-specific relief. In addition, although the organizational plaintiffs claim to represent hundreds of thousands (or more) unidentified members, those organizations have failed to demonstrate the requisite indicia of membership—such as a membership structure and some ability for members to direct and control the organization—to litigate on their behalf. And even if they could demonstrate Article III standing, equitable principles on restricting asymmetric suits would compel forgoing relief to any member that has not identified themselves in district court and agreed to be bound by the judgment.

Finally, the need to strictly limit any vacatur is underscored by the substantial equities weighing in favor of implementation of the challenged provisions of the Rule,

which serve critical law-enforcement and public-safety interests. In recent years, there has been a substantial increase in the availability of products, many not sold in compliance with statutory requirements, that enable purchasers to easily construct operational firearms outside Congress's regulatory regime. As a result, prohibited persons have been able to easily acquire firearms, there has been a proliferation of unserialized firearms in circulation, and law enforcement has faced difficulty tracing firearms recovered from crime scenes. *See, e.g.*, 87 Fed. Reg. at 24,655-60.

## STANDARD OF REVIEW

The district court's judgment rests on errors of law that are subject to de novo review. *See National Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).

## ARGUMENT

### I.     The Rule Comports with the Gun Control Act

#### A.     A Nonfunctional Frame or Receiver May Constitute a "Frame" or "Receiver" Under the Gun Control Act

In defining the statutory terms "frame" and "receiver," the Rule clarifies that those terms include a "partially complete, disassembled, or nonfunctional frame or receiver" that "is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The district court's conclusion that this definition is unlawful misunderstands both the statute and the Rule.

18

**1.** In defining the statutory terms "frame" and "receiver" to include a partially complete, disassembled, or nonfunctional frame or receiver that may "readily" be converted into a functional one, ATF acted in accordance with the statutory text and structure. As the Rule explains, the text of the statute does not "define the term 'frame or receiver,'" instead leaving it to the agency to define "at what point an unregulated piece of metal, plastic, or other material becomes a 'frame or receiver' that is a regulated item under Federal law." 87 Fed. Reg. at 24,685. And nothing in the statute precludes ATF from exercising that authority to determine that the relevant point comes before the frame or receiver is fully complete and is instead when the frame or receiver reaches a stage where it can be readily converted to a functional frame or receiver. There is not, for example, any statutory language specifying that to be subject to regulation, a "frame" or "receiver" must be "fully complete" or "functional" or "operable."

Nor does ordinary usage support the district court's decision to read those missing adjectives into the statute. A bicycle is still a bicycle even if it lacks pedals, a chain, or some other component needed to render it complete or allow it to function. So too if the bicycle is shipped with plastic guards attached to the gears or brakes that must be removed before it is used, or with a seat tube that the user must cut to length before installing. No one could deny that a company selling products in those conditions was engaged in selling "bicycles."

19

There is no reason in language or logic to treat firearm frames and receivers any differently. Illustrating the point is the partially complete frame sold by plaintiff Polymer80 discussed in a recent ATF open letter implementing the Rule. *See* ATF, *Open Letter to All Federal Firearms Licensees, Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames* (Dec. 27, 2022), https://perma.cc/VP62-S26P. As the letter explains, the difference between Polymer80's product and a complete frame for a Glock-style handgun that all parties agree is covered by the statute is that Polymer80's product contains "temporary rails or blocking tabs" that "are easily removable by a person with novice skill, using common tools, such as a Dremel-type rotary tool, within minutes." *Id.* at 6. Once those tabs are removed, Polymer80's frame is fully functional and is "immediately capable of accepting" the remaining parts of a firearm. *Id.* It is entirely natural to refer to that product as a "frame."

The statutory context and structure confirm that Congress permitted ATF to adopt an interpretation like the one in the Rule. When defining weapons throughout the firearms laws, Congress has repeatedly made clear that non-operational weapons that are either "designed to" or may "readily" be converted to operational weapons are included. *See, e.g.*, 18 U.S.C. § 921(a)(3)(A); 26 U.S.C. § 5845(b) (defining "machinegun" to include a weapon that "can be readily restored to shoot[] automatically more than one shot, without manual reloading, by a single function of the trigger"); *see also id.* § 5845(c)-(d) (similar for "rifle" and "shotgun"). These

20

provisions reflect the reality—borne out by experience—that any other approach would permit persons to easily circumvent statutory requirements by producing or purchasing nearly complete weapons readily converted into operational ones. In including a similar provision in the regulatory definitions of "frame" and "receiver," ATF acted in conformity with those congressional determinations and with the statutory scheme.

The correctness of ATF's interpretation is likewise confirmed by its consistency with previous regulatory practice. As the Rule explains, "ATF has long held that a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a critical stage of manufacture," which is "when it is brought to a stage of completeness that will allow it to accept the firearm components to which it is designed for [sic], using basic tools in a reasonable amount of time." 87 Fed. Reg. at 24,685 (alteration in original) (quotation omitted). For example, in a 1978 classification letter, ATF found that a partially machined frame "ha[d] reached a stage of manufacture such that it may be readily converted to functional condition" and therefore "[wa]s a firearm." Administrative Record 10[1]; *see also* Administrative Record 12. Additional examples abound. *See, e.g.,* Administrative Record 25 (1980 letter

---

[1] The Administrative Record was manually filed with the district court on a USB drive, and it is the government's understanding that the USB drive was transmitted to the Clerk of this Court as part of the Record on Appeal in a previous appeal arising from the same district court case. *See* ROA.52-53 (May 30, 2023 docket note). For the Court's convenience, the government has also included the cited portions of the Administrative Record in its Excerpts of Record. *See* ER Tab 5.

explaining that "if an unfinished receiver could be converted to functional condition within a few hours['] time using common hand tools, or simple grinding, cutting, drilling, or welding operations, it would likely qualify as a firearm"); Administrative Record 29 (1983 letter finding that a "basically complete" receiver where "[a]pproximately 75 minutes . . . was required to make the receiver functional" was a firearm). The Rule's clarification that partially complete frames or receivers constitute frames or receivers when they are designed to, or may be readily converted to, house the applicable fire control component generally accords with this previous approach while also providing additional clarity to regulated entities by incorporating, and substantially elaborating on the application of, language that has long been used in similar statutory and regulatory contexts. *Cf.* 87 Fed. Reg. at 24,663, 24,668, 24,685.

Indeed, consistent with that longstanding regulatory practice, the district court correctly recognized that "ATF does indeed have discretion to decide whether a particular component is a frame or receiver based upon that component's degree of completeness." ROA.4770 (quotation omitted). That correct recognition accords with the Rule, which does no more than explain what "degree of completeness" is required for a partially complete frame or receiver to be a frame or receiver within the meaning of the statute.

**2.** In nevertheless concluding that the Gun Control Act precludes ATF from defining "frame" and "receiver" to include certain partially complete, disassembled, or nonfunctional frames and receivers, the district court focused on two perceived

22

problems with ATF's approach. First, the court observed that Congress defined

"firearm" to include the "frame" or "receiver" of a weapon but did not specifically

include a provision in the statute covering parts that may readily be converted to a

frame or receiver. ROA.4771; *see* 18 U.S.C. § 921(a)(3)(B). Second, the court suggested

that the Rule impermissibly permits ATF to "regulate a component as a 'frame or

receiver' even after ATF determines that the component in question is not a frame or

receiver." ROA.4770-71. Neither of those concerns is persuasive.

As to the first concern, the district court's conclusion proceeds from the

incorrect premise that § 921(a)(3)(B) itself defines "frame or receiver" and so some

inference may be drawn from the nonexistence of "readily" language in that

provision. In fact, that provision states only that the term "firearm" includes "the

frame or receiver of any such weapon." *See* 18 U.S.C. § 921(a)(3)(B). It does not then

go on to provide any definition of "frame" or "receiver," leaving it to ATF to do so in

interpreting the statutory terms, which it has done according to their plain meaning.

And it is implausible to think that Congress precluded ATF from following the

statute's lead and determining that a "frame" and "receiver" includes disassembled or

nonfunctional frames or receivers that may "readily" be converted to functional ones.

Any such limit on ATF's authority would not only fail to reflect the statutory scheme,

but it would also allow (for example) violent felons to purchase online ready-to-

assemble, untraceable firearms just because the frame or receiver is not fully

functional. That result cannot be reconciled with the fact that Congress plainly

contemplated that the definition of "firearm" in the statute would encompass nonfunctional firearms. Nor can it be squared with the district court's own recognition that ATF may "decide whether a particular component is a frame or receiver based upon that component's degree of completeness." ROA.4770.

The district court's second concern similarly rests on an incorrect understanding of the relevant provisions. In the court's view, the Rule permits ATF to simultaneously "determine[]" that a partially complete or nonfunctional frame or receiver "is not a frame or receiver" and also "regulate [it] as a frame or receiver." ROA.4770-71 (emphasis and quotation omitted). That is not correct. To the contrary, the Rule explains when a partially complete frame or receiver is a frame or receiver within the meaning of the statute: when it is "readily" convertible to functional status. Thus, under the Rule, a partially complete, disassembled, or nonfunctional frame or receiver that may readily be converted to a functional one has reached a state of manufacture where it *is* the frame or receiver of a weapon—and where it is thus covered by the statute. And that result mirrors Congress's approach in related contexts. As with ATF's definitions of "frame" and "receiver," Congress has defined items that may readily be converted into operational firearms—or machineguns, rifles, or shotguns—as "firearms" or "machineguns" or "rifles" or "shotguns" themselves. *See* 18 U.S.C. § 921(a)(3)(A); 26 U.S.C. § 5845(b)-(d).

To the extent that the district court's conclusion that the Rule conflicts with the Gun Control Act reduces to the concern that there might be some products on the

24

market that cannot be assembled readily enough for ATF to regulate them as frames or receivers, the district court failed to identify any such product that ATF has attempted to regulate. To the contrary, ATF has explained that certain partially complete receivers will generally not constitute receivers when sold without accompanying tools, jigs, or other materials to enable their ready completion. ATF, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), https://perma.cc/7457-VZ94. And assuming someone were to object to the classification of any particular product, the proper avenue to raise the concern would be in connection with ATF's actions as to that particular product. Any hypothetical concern on that score cannot support a facial attack on the Rule, nor does it justify the district court's vacatur.

The practical realities of the district court's holding further confirm its error. The district court's reading of the provision thwarts the statute's manifest design and invites circumvention through trivialities. It entirely excuses from the Act's coverage products that, but for a single hole or piece of plastic, are fully functional frames and receivers. In doing so, it frustrates two of the statute's principal goals: ensuring that firearms transfers are adequately vetted and recorded so that weapons do not fall into the hands of prohibited persons and ensuring that firearms contain a serialized frame or receiver that may be effectively traced if the firearm is used in a crime. *Abramski v. United States*, 573 U.S. 169, 179-80 (2014). The statute should not be read to create

such "a large and obvious loophole" in its core provisions. *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1473 (2020).

**B.    Certain Weapon Parts Kits Constitute Firearms Under the Gun Control Act**

The Rule further clarifies that a "firearm" subject to regulation under the Gun Control Act encompasses "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 87 Fed. Reg. at 24,727, 24,735; *see* 27 C.F.R. § 478.11. That provision of the Rule is also consistent with the statute, and the district court's contrary conclusion suffers from several flaws.

**1.** The text and structure of the Gun Control Act, as well as all relevant precedent, make clear that ATF's determination that certain weapon parts kits constitute "firearms" under that statute is correct. With respect to the text, Congress defined a "firearm" to include any weapon that "is designed to" or "may readily be converted to expel a projectile." 18 U.S.C. § 921(a)(3)(A). The plain meaning of "convert" is "to change or turn from one state to another: alter in form, substance, or quality: transform, transmute." *Webster's Third New International Dictionary of the English Language* 499 (1968) (*Webster's*) (formatting altered). The statute thus captures items that may readily be "transform[ed]" into a working firearm—or, put differently, items that may readily be "change[d]" into a functional firearm from a different "state" or "form." *Id.*

26

The Rule's inclusion of certain weapon parts kits flows naturally from that plain-text understanding of the statute. The Rule defines "firearm" to "include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 87 Fed. Reg. at 24,735. The terms "complete[]," "assemble[]," and "restore[]" fit comfortably within the plain meaning of "convert": all are a type of transformation or change from one state or form to another. *Cf. Webster's* 131, 465, 1936. A "weapon parts kit that is designed to or may readily be completed, assembled, [or] restored" into an operational firearm, 87 Fed. Reg. at 24,735, is thus a "weapon . . . which will or is designed to or may readily be converted" into an operational firearm, 18 U.S.C. 921(a)(3)(A). Indeed, neither plaintiffs nor the district court have ever offered any explanation for what other purpose such a kit could possibly be designed, nor have they explained how the terms used by the Rule—like "complete" and "assemble"—are relevantly different from the statute's synonymous "convert."

Precedent confirms the correctness of the Rule's interpretation. In essence, a weapon parts kit is a disassembled firearm, and courts have long recognized that even disassembled, or nonoperational, weapons constitute "firearms" for Gun Control Act purposes. For example, in *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993), this Court held that a "disassembled" shotgun, which had the barrel removed from the stock, constituted a "firearm" under a provision of the Sentencing Guidelines mirroring the Act's definition. This Court explained that "[b]ecause Ryles'

disassembled shotgun could have been 'readily converted' to an operable firearm," it was a "firearm" for purposes of the Guidelines enhancement. *Id.* Similarly, in *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006), the court held that a rifle with the clip and bolt removed constituted a "firearm" for the same purposes. As the court explained, although the rifle was "partially disassembled" and not operational, the defendant "could easily make the rifle operational" by reinserting the bolt and clip. *Id.* (quotation omitted). Thus, because the "definition turns on what the weapon is designed to do, not on whether it is capable of doing its job at" any "particular moment," the court concluded that the nonoperational rifle constituted a firearm. *Id.* (quotation omitted); *see also, e.g.*, *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (both similar).

And as with nonfunctional frames and receivers, interpreting the statutory definition of "firearm" to encompass aggregations of parts that are readily converted to a functional firearm is necessary to comport with the design of the Gun Control Act. Any contrary interpretation would permit the sale of weapon parts kits that enable the purchaser to quickly and easily assemble an operational firearm without compliance with the background check, licensing, and recordkeeping requirements of the Gun Control Act. That result would allow easy circumvention of the statute, enabling felons and other prohibited persons to obtain firearms and thwarting law enforcement's ability to trace firearms that are used in crimes.

**2.** Despite the statutory text and context, and all applicable precedent, confirming the correctness of ATF's interpretation, the district court concluded that the statute does not permit ATF to regard weapon parts kits as "firearms," primarily because the court concluded that the Rule's interpretation "would render" the statutory frame-and-receiver provision "superfluous" and that the statutory definition "does not cover weapon *parts*, or aggregations of weapon parts." ROA.4774. Neither of those conclusions is sound.

First, the district court suggested that including weapon parts kits within § 921(a)(3)(A) would make § 921(a)(3)(B)'s specific inclusion of frames and receivers superfluous because it would "read the statute as authorizing regulation of (A) weapon parts generally, and (B) two specific weapon parts." ROA.4774. But the Rule does not interpret § 921(a)(3)(A) to include "weapon parts generally." That provision does not extend to weapon parts writ large, such as standalone triggers, barrels, clips, frames, or receivers, because those parts cannot, on their own, "readily be completed, assembled, restored, or otherwise converted" into an operational weapon. 87 Fed. Reg. at 24,735. Instead, the relevant part of the Rule reaches only weapon parts kits that "readily"—that is, "with "fair[] or reasonabl[e] efficien[cy], quick[ness], and eas[e]"—may "be completed, assembled, restored, or otherwise converted to" a functional weapon. *Id.* Those kits are covered by § 921(a)(3)(A) because they can "readily be converted" into operational firearms. *Id.* Section 921(a)(3)(B), in contrast,

covers standalone frames or receivers even if they are not part of a kit and cannot otherwise be readily converted into a functional weapon. There is no superfluity.

Second, the district court's attempt to leverage Congress's specific inclusion of language regulating certain "parts" in other provisions to carve aggregations of weapon "parts" out of the definition of "firearm" fails in light of the statutory text. The Gun Control Act makes clear that weapons that are "designed to" or "may readily be converted to expel a projectile" are firearms, regardless of whether the weapons are currently operable or assembled. 18 U.S.C. § 921(a)(3)(A). A weapon parts kit that both is designed to allow a purchaser to assemble his own firearm and includes the parts necessary to allow such ready assembly plainly meets that definition. *Cf.* ROA.4770 (recognizing that the definition of "firearm" includes "disassembled, nonfunctional, and antique firearms because they are 'designed' to fire projectiles even if they are practically unable to do so"). It was thus unnecessary (and would have been superfluous) for Congress to also separately regulate parts or aggregations of parts as such. "Congress's use of more detailed language in another provision" provides no reason to depart from the statute's "most natural reading." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012).

The district court's plucking of other language from other statutory provisions that it believed "Congress could have" used underscores its error. ROA.4775-76 (emphasis omitted). For example, the court stated that Congress could have used language making clear that parts "that 'may be readily assembled' into a weapon" are

30

"firearms" or that parts "'designed' to be part of a weapon" are "firearms."
ROA.4775. But Congress used nearly identical language, defining firearms to include
both weapons "designed to" and weapons that "may readily be converted to" expel a
projectile, 18 U.S.C. § 921(a)(3)(A). And the district court's attempted distinction
between, for example, "readily assembled into a weapon" and "readily be converted to
a weapon" cannot possibly bear the weight the court put on it; those two phrases are
synonymous.

Finally, the erroneous nature of the district court's conclusion is further
highlighted by the absurd consequences it engenders. It is difficult to discern any
persuasive distinction between a "disassembled" or "nonfunctional" firearm—which
no party contends evades the statute's coverage—and a weapon parts kit. A weapon
parts kit is, in essence, nothing more than a disassembled, currently nonfunctional
weapon that is designed and intended to be easily assembled into a functional weapon.
There is no indication in the text or statutory scheme that Congress intended to allow
such a kit to evade the licensure, background check, marking, or recordkeeping
requirements enumerated in the Gun Control Act. Such a result would create a
substantial loophole allowing anybody, including individuals like convicted felons who
are prohibited from lawfully possessing a firearm, to purchase a disassembled weapon
that may be assembled in short order. This Court should reject such an interpretation
that would so gravely "undermine—indeed, for all practical purposes, would virtually
repeal—the gun law's core provisions." *Abramski*, 573 U.S. at 179-80. Courts "should

not lightly conclude that Congress enacted a self-defeating statute." *Pugin v. Garland*,

143 S. Ct. 1833, 1841 (2023) (quotation omitted).

## II.    At a Minimum, This Court Should Reverse the District Court's Overbroad Relief

Even setting aside the merits, the district court's universal vacatur of the entire

Rule was without legal basis and overbroad. At the outset, the court should have

limited any vacatur to the provisions of the Rule it held invalid. In addition,

constitutional and equitable principles compelled the court to limit its relief to the

specific named plaintiffs, not including unidentified members of the plaintiff

organizations.

### A.    The District Court Erred in Vacating the Entire Rule

**1.** As explained, in addition to the two provisions that the district court

addressed, the Rule contains a host of other provisions, generally aimed at ensuring

the continued effective implementation of the statutory licensing, background check,

serialization, and recordkeeping requirements. These include, for example, additional

unchallenged updates to the definition of "frame" and "receiver" to reflect modern

firearms, amended regulations governing the marking of mufflers and silencers, and

an extension of preexisting recordkeeping requirements. *See supra* pp. 8-10.

These provisions of the Rule operate independently of the challenged

provisions to advance substantial public-safety interests. Perhaps most significantly,

the Rule updates an outdated regulatory definition, under a strict reading of which up

to 90% of available firearms have no single frame or receiver subject to regulation. The "practical result of that strict reading" would be that "every individual part of almost all firearms in circulation in the United States may be sold separately without compliance with the statutory" requirements for firearm sales, such that "a felon or other prohibited person could easily purchase" (for example) the upper and lower parts of an AR-variant firearm online "and assemble a fully functional AR-variant firearm within a minute" with no serial number. ROA.4896-97. If that provision of the Rule is vacated, as the district court's order contemplated, courts may thus conclude that nearly all firearms in the United States have no frame or receiver subject to regulation.

The Rule also includes provisions specific to ensuring the consistent and proper marking of silencers and modular multipiece receivers. For example, the statute defines "silencer" to "include each small individual part designed and intended only to be used to fabricate a silencer," but it "is extremely difficult and expensive for silencer manufacturers to mark each tiny individual silencer part." ROA.4901. To alleviate this burden while still ensuring that each silencer is marked, the Rule identifies a particular component as the silencer's frame or receiver and permits manufacturers in certain circumstances to mark only that component. ROA.4899, 4901-02. In addition, the Rule "prohibits manufacturers from marking a removable end cap" on a silencer because such a cap "can be damaged during use, thus destroying the information necessary to trace" the silencer. ROA.4899.

Moreover, the Rule contains other provisions related to effective implementation of the statutory recordkeeping requirements. For example, the Rule requires licensees to mark unserialized firearms when they are taken into the licensee's inventory, so that the statutorily required acquisition and disposition records can be effectively used "as a means of tracing or locating" the firearm. ROA.4898-99. And the Rule requires licensees to maintain records through the end of the licensee's business, rather than (as the previous regulations permitted) allowing a licensee to destroy records after 20 years. That updated requirement is critical to public safety; "numerous older firearms" recovered at crime scenes—approximately 1,360 on average each year between 2010 and 2021—could not be traced "because the records were destroyed after 20 years." ROA.4899-900.

**2.** The district court erred in vacating these and other provisions of the Rule on the grounds that two separate provisions are unlawful. Where a court holds specific portions of a rule unlawful, those portions should be severed from the remainder when doing so "will not impair the function of the [rule] as a whole, and there is no indication that the regulation would not have been passed but for [their] inclusion." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988); *see also, e.g.*, *Southwestern Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (concluding that two "portions of the final rule" are "unlawful" and thus "vacat[ing] those portions of the rule").

Here, ATF clearly intended that as much of the Rule as possible go into effect. *See* 87 Fed. Reg. at 24,730 (severability discussion). And as explained above, even

34

without the two challenged provisions of the Rule, the remaining provisions operate

independently to advance important public-safety interests and ensure the continued

effective implementation of statutory requirements. In nevertheless vacating the entire

Rule, the district court did not conclude that those remaining provisions were

unlawful or were inseparably intertwined with the two challenged provisions. Indeed,

the court did not address the Rule's severability clause or this aspect of the scope of

relief at all. In those circumstances, vacatur of the entire Rule was impermissible. *Cf.*

Stay Order 3.

### B.    The District Court Erred in Providing Relief to Non-Plaintiffs, Including Unidentified Members of Plaintiff Organizations

This Court should also reverse the district court's universal vacatur of the

challenged provisions of the Rule. In imposing that universal remedy, the district

court failed to consider either the balance of equities or the public interest. Instead,

the court treated such universal relief as flowing automatically from its finding that the

provisions are contrary to law. That reasoning was erroneous, and constitutional and

equitable principles do not support extending any vacatur beyond the named

plaintiffs.

### 1.    The District Court Improperly Failed to Consider Whether the Balance of Equities and the Public Interest Justified Its Universal Remedies

Even were the district court's merits decision correct, the court erred in

ordering universal vacatur of the challenged provisions of the Rule without any

consideration of equitable principles. In explaining that decision, the court did not suggest that such relief was necessary to remedy any injuries to plaintiffs or was consonant with equitable principles. Instead, the court appeared to believe that party-specific vacatur would be "more akin to an injunction" than to "vacatur" and that universal vacatur is thus "the default remedy" for APA violations. ROA.4779.

That is incorrect. Although this Court's precedents identify vacatur as an available remedy for a successful APA challenge to a regulation, *see, e.g.*, *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022), the APA itself does not reference vacatur, instead remitting plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. § 703, and there is little indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions," *id.* § 706(2). *See United States v. Texas*, 143 S. Ct. 1964, 1980-85 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

In any event, this Court has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality op.) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur of the final rule, and instructing the district court to "determine what

36

remedy—injunctive, declarative, or otherwise—is appropriate to effectuate" the judgment); *see also id.* (recognizing that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018))); *Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand). That makes sense; the APA makes explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). Here, it would have been entirely appropriate for the district court to decline to enter a vacatur at all where other remedies would have fully redressed plaintiffs' injuries.

The error in the district court's remedial analysis is underscored by its comparison of vacatur to injunctions. The problems caused by universal injunctions are well catalogued; they include that such injunctions conflict with principles of Article III and equity, circumvent Rule 23's class-action requirements, "incentivize forum shopping," "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law," and overburden courts' "emergency dockets." *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring); *cf. Morehouse Enters., LLC v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. argued Mar. 14, 2023) (challenge to Rule). And those concerns apply equally to universal vacatur. *Texas*, 143 S. Ct. at 1985-86 (Gorsuch, J., concurring in the judgment). For those reasons, universal vacatur should, at a minimum, be reserved for "truly

extraordinary circumstances." *Id.* No such circumstances exist here. The district court's remedial order should be reversed.

### 2.    Constitutional and Equitable Principles Precluded the District Court's Universal Vacatur in This Case

As discussed above, the district court entered a universal vacatur of the challenged provisions of the Rule without identifying any extraordinary circumstances supporting universal, rather than party-specific, relief—and without even considering the balance of equities or the public interest. But if the district court had considered the relevant equitable principles, it would have been a clear abuse of discretion to conclude that the universal vacatur was justified. Instead, constitutional and equitable principles required the district court to limit any vacatur to the named parties to this case, which do not include the many unidentified members of the two plaintiff organizations.

*First*, Article III and fundamental equitable principles should have counseled the district court to limit any relief to the named plaintiffs in this case. Under Article III, "a plaintiff's remedy must be limited to the inadequacy that produced his injury." *Gill*, 138 S. Ct. at 1930 (alteration and quotation omitted). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must "be no more burdensome to the defendant than necessary to provide

complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring).

To the extent that vacatur—rather than specific declaratory or injunctive relief—was required to redress plaintiffs' injuries, those principles at least required limiting any vacatur to plaintiffs. As explained, in entering relief that went beyond plaintiffs, the district court did not conclude that such a universal vacatur was necessary to redress plaintiffs' asserted injuries. *See* ROA.4777-79. To the contrary, in its earlier decisions entering plaintiff-specific preliminary injunctions, the district court concluded that nationwide relief was unwarranted because "a broad injunction would far exceed the particular tailoring necessary to redress [plaintiffs'] injuries and afford them complete relief." ROA.1214 (quotation omitted). The district court should have followed the same course at final judgment.

Moreover, to the extent that the district court believed that vacatur is a remedy that inherently operates universally, that belief was incorrect. Indeed, in other circumstances, courts recognize that the scope of a vacatur is subject to equitable considerations. For example, the general practice is to vacate a district court judgment only as to the party or parties that appeal, not as to non-appealing parties, though that rule is subject to relaxation based on equitable considerations. *See, e.g.*, *In re Taylor*, 655 F.3d 274, 287 (3d Cir. 2011) ("Ordinarily, of course, a party which does not appeal a

decision by a district court cannot receive relief with respect to that decision."); *Tompkins v. Cyr*, 202 F.3d 770, 786-87 (5th Cir. 2000) (vacating erroneous damages calculation only as to "the losing defendants who have appealed" and declining to "vacate the damage award against the non-appealing defendants"); *United States v. Lumbermens Mut. Cas. Co.*, 917 F.2d 654, 662 (1st Cir. 1992) (declining to modify judgment in favor of a non-appealing party where "the interests of justice in this particular case" did not support reversal); Wright & Miller, *Special Limits on Jurisdiction—Separate Appeal Requirements*, 15A Fed. Prac. & Proc. 3904 (3d ed.) (describing the question as whether "exceptional circumstances" justify relaxing the ordinary rule).

*Second*, the district court should not have extended relief to the hundreds of thousands, or more, unidentified members of the plaintiff organizations, Firearms Policy Coalition and Second Amendment Foundation. As an initial matter, those associations have failed to demonstrate that they have standing to litigate on behalf of their members, because they have not shown that they are bona fide membership organizations. They have not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor have they explained how their members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotation omitted). To the contrary, the Coalition's explanation that it has "hundreds of thousands of members, donors, and supporters across the

country" and that any individual may join through its website, ROA.935, suggests the lack of any such structure or member control. Similarly, any individual may apparently join the Foundation by making a $15 donation through its website, *see* Second Amendment Found., *Join SAF or Renew Your Membership*, https://www.saf.org/join-saf/ (last visited Aug. 9, 2023), and the Foundation has not provided any evidence to suggest that its members in fact direct or control the organization.

In nevertheless holding that both the Coalition and the Foundation possessed associational standing to litigate on behalf of their members, the district court did not conclude that those organizations are in fact bona fide membership organizations that possess any of the indicia of membership discussed in *Friends of the Earth*. Instead, the court concluded that, notwithstanding this Court's binding precedent, the Supreme Court's recent decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141 (2023), obviates the need for an associational plaintiff to demonstrate any such indicia of membership. *See* ROA.4764. But that conclusion improperly overreads the Supreme Court's decision, which related to a plaintiff association that alleged that it had 47 members and was proceeding, in one of the consolidated cases, on behalf of "four members in particular" who "filed declarations" stating their support for the lawsuit. *Students for Fair Admissions*, 143 S. Ct. at 2158. As the Court explained, where "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Id.*

Here, by contrast, the plaintiff organizations are purporting to litigate not on behalf of specific "identified members" but instead on behalf of hundreds of thousands or more unidentified members—who do not control the organization or this litigation and many of whom may not even know about the litigation. Nothing about the Supreme Court's decision undermines this Court's commonsense rule that, in these circumstances, an organizational plaintiff may not purport to litigate on behalf of such unidentified members, including presumably binding those members to any final judgment, without additional evidence establishing that those members in fact direct or control the organization.

Regardless, even if it were correct that the plaintiff organizations could satisfy Article III's requirements to sue on behalf of their hundreds of thousands of members, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. Such a restriction on relief would promote longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf. Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits). Those concerns are heightened in this context, where different large membership organizations have brought suits challenging the Rule in different venues. For example, the Gun Owners of America, which itself claims more than 2 million members, unsuccessfully moved for a preliminary injunction against the Rule in a different suit in the District of North

42

Dakota. *See Morehouse Enters., LLC v. ATF*, No. 3:22-cv-116, 2022 WL 3597299

(D.N.D. Aug. 23, 2022), *appeal pending*, Nos. 22-2812, 22-2854 (8th Cir.); Amended

Complaint at 6-7, *Morehouse Enters.* (D.N.D. July 27, 2022), Dkt. No. 22. To the extent

that there is overlap between the Gun Owners of America's purported millions of

members and the hundreds of thousands (or more) claimed members of the

organizations here, permitting both sets of membership organizations to litigate on

behalf of their members would allow improper duplication of individual members'

claims, in addition to giving individual members multiple bites at the apple and

eviscerating Rule 23's class action requirements.

  *Third*, the need to carefully limit any vacatur of the challenged provisions is

underscored by the substantial public-safety and law-enforcement interests that the

Rule promotes—and by the minimal costs that it imposes on regulated entities.

  As the Rule explains, unserialized firearms have proliferated in recent years; in

2021, nearly 20,000 such firearms were reported to ATF as having been recovered

from potential crime scenes, and the United States has recently brought many criminal

cases "to counter the illegal trafficking of unserialized privately completed and

assembled weapons, the possession of such weapons by prohibited persons, and other

related Federal crimes." 87 Fed. Reg. at 24,656-57. This "proliferation of untraceable

firearms severely undermines" law enforcement's ability to engage in the "integral"

process of "determin[ing] where, by whom, or when" a firearm used in a crime was

manufactured and "to whom [it was] sold or otherwise disposed," *id.* at 24,656,

24,659, thereby impairing law enforcement's ability to apprehend violent individuals who may pose an ongoing threat to public safety.

The Rule not only enables law enforcement to better trace firearms used in crimes but also helps ensure that those firearms do not end up in the hands of individuals prohibited from possessing firearms—such as felons—in the first place. Dealers are required to conduct a background check before selling a firearm to an unlicensed person. The Rule clarifies that products like certain weapon parts kits and partially complete frames or receivers must be sold in compliance with that requirement, preventing (for example) violent felons from purchasing firearms over the Internet. The Rule therefore, as ATF recognized, "increase[s] public safety by, among other things, preventing prohibited persons from acquiring firearms." 87 Fed. Reg. at 24,654.

By contrast, the challenged provisions impose only minimal costs on regulated entities. Indeed, those provisions do not forbid the sale (or purchase) of any firearm, weapon parts kit, or other item; instead, they clarify that certain items, like ready-to-assemble kits, are "firearms" and so must be sold in accordance with the Gun Control Act's licensing, recordkeeping, and background check requirements. Thus, parties who wish to purchase or sell regulated products may do so if they comply with the Act.

These requirements are not especially onerous. An entity that already possesses a federal firearms manufacturer's license is permitted to sell the firearms that it

manufactures at retail, *see* 27 C.F.R. § 478.41(b), subject to certain restrictions on direct sales to out-of-state customers, 18 U.S.C. § 922(b)(3). Even for such customers, sales are permitted so long as the firearm is shipped to a licensee in the customer's state of residence, which can then transfer the firearm to the customer after fulfilling background check and recordkeeping requirements. And an individual who wishes to purchase one of the regulated products may continue to do so (assuming he is not prohibited from possessing firearms); he may simply need to purchase the product from an in-state seller or have the item transferred through an in-state licensee, as he would have to do when purchasing any other firearm. There are tens of thousands of federal licensees and many more firearms owners who routinely bear the minor costs associated with statutory compliance when they sell or purchase firearms. These kinds of incidental costs do not outweigh the substantial harms to the government and the public from the district court's overbroad vacatur of the challenged provisions.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed. In the alternative, this Court should reverse that judgment as it applies to the non-challenged provisions of the Rule and to non-parties, including unidentified members of the plaintiff organizations.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

*s/ Sean R. Janda*
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

August 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system except for counsel listed below, who will be served by US Mail:

Dennis Daniels
Bradley Arant Boult Cummings, L.L.P.
1445 Ross Avenue, Suite 3600
Fountain Place
Dallas, TX 75202

*s/ Sean R. Janda*
Sean R. Janda

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,291 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

## TABLE OF CONTENTS

18 U.S.C. § 921(a)(3) .............................................................................................................A1

**18 U.S.C. § 921**

**§ 921. Definitions**

(a) As used in this chapter—

. . .

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.