No. 23-10718

# United States Court of Appeals for the Fifth Circuit

JENNIFER VANDERSTOK, et al.,

*Plaintiffs-Appellees,*

BLACKHAWK MANUFACTURING GROUP, INCORPORATED, doing business as 80 PERCENT ARMS, et al.,

*Intervenor Plaintiffs-Appellees,*

v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Northern District of Texas, Case No. 4:22-cv-00691-O

## MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF OF GUN OWNERS FOR SAFETY

Jennifer L. Swize
Megan E. Ball
Joseph J. Kiessling
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
202.879.5417

Dustin M. Lorenzo
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
216.586.7383

*Counsel for Amicus Curiae
Gun Owners For Safety*

## CERTIFICATE OF INTERESTED PERSONS

1. *VanDerStok et al. v. Garland et al.*, No. 23-10718

2. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

**<u>Plaintiffs-Appellees</u>**

- Jennifer VanDerStok
- Michael G. Andren
- Tactical Machining, LLC.
- Firearms Policy Coalition, Inc.

**<u>Intervenor Plaintiffs-Appellees</u>**

- BlackHawk Manufacturing Group Inc., b/b/a 80 Percent Arms
- Defense Distributed
- Second Amendment Foundation, Inc.
- Not An L.L.C.
- Polymer80, Imc.

**<u>Attorneys for Plaintiffs-Appellees and Intervenor Plaintiffs-Appellees</u>**

- Cooper & Kirk, PLLC
- David H. Thompson
- William V. Bergstrom
- Peter A. Patterson

- Cooper & Scully, PC
- Richard Brent Cooper
- Ashcroft Law Firm, LLC
- Michael J. Sullivan
- Brian Daniel Poe
- Flores Law, PLLC
- Chad Flores
- J. Mark Brewer
- Matthew Joseph Smid
- Bradley Arant Boult Cummings, LLP
- Dennis Daniels

## Amici Curiae

- Gun Owners for Safety. Gun Owners for Safety is a voluntary coalition of gun owners that does not have any corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock. Gun Owners for Safety is supported by Giffords—the gun safety organization co-founded and led by former Congresswoman Gabrielle Giffords—and the employees of Giffords. Giffords also has no corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock.
- Firearms Regulator Accountability Coalition, Inc.

## Attorney for Amicus Firearms Accountability Coalition, Inc.

- Stephen Obermeier
- Wiley Rein, LLP

s/ *Jennifer L. Swize*

Jennifer L. Swize
*Counsel of Record for*
Amicus Curiae

## MOTION FOR LEAVE TO FILE
## *AMICUS CURIAE* BRIEF

Gun Owners for Safety ("Amicus") respectfully moves for leave to file an amicus curiae brief in support of Defendants-Appellants' opening brief. The proposed amicus brief brings to the Court's attention unique and important perspectives that complement, but do not merely repeat, Defendants-Appellants' brief, and which are directly relevant to this appeal. In particular, the proposed amicus brief addresses the district court's erroneous interpretation of the scope of ATF Final Rule 2021R-05F, Definition of "Frame or Receiver" and Identification of Firearms (the "Rule"), and offers the Court reliable information on the real-world impacts of the issues before it.  As the proposed brief explains, the Rule is consistent with the text and purpose of the Gun Control Act, and is a narrowly tailored commercial regulation designed to prevent criminal activity.

Pursuant to Fifth Circuit Rule 27.4, counsel for Amicus informed counsel for all Plaintiffs-Appellees, Intervenor Plaintiffs-Appellees, and Defendants-Appellants on July 31, 2023, of Amicus's intent to seek leave to file an amicus brief in this appeal.  In response, Defendants-Appellants consented to the filing of the brief; Plaintiffs-Appellees Jennifer VanDerStok,

1

Michael G. Andren, Tactical Machining, and Firearms Policy Coalition also consented; and Intervenor Plaintiffs-Appellees Not An L.L.C. and Polymer80 also consented.  Having received no response from Intervenor Plaintiffs-Appellees Blackhawk Manufacturing Group, Defense Distributed, and Second Amendment Foundation, counsel for Amicus contacted counsel for these parties a second time on August 7, 2023, and as of this filing counsel for these parties has not responded.  Finally, no party indicated an intent to file an opposition or any other response to Amicus's motion for leave to file.

Amicus Gun Owners for Safety respectfully requests that the Court grant this motion and accept the proposed amicus curiae brief.

## LEGAL STANDARD

"[C]ourts should welcome amicus briefs for one simple reason: '[I]t is for the honour of a court of justice to avoid error in their judgments.'" *Lefebure v. D'Aquilla*, 15 F.4th 670, 675 (5th Cir. 2021) (quoting *The Protector v. Geering*, 145 Eng. Rep. 394 (K.B. 1686)).  "Then-Judge Alito put it this way: '[A]n amicus who makes a strong but responsible presentation in support of a party can truly serve as the court's friend.'"  *Id.* (quoting *Neonatology Assocs. v. Comm'r of Internal Revenue*, 293 F.3d 128, 131 (3d Cir. 2002)).  "Even when

2

a party is very well represented, an amicus may provide important assistance to the court," with contributions ranging from "'collect[ing] background or factual references that merit judicial notice,'" providing "'particular expertise not possessed by any party to the case,'" and "'explain[ing] the impact a potential holding might have on an industry or other group.'" *Id.* (quoting Luther T. Munford, *When Does the Curiae Need An Amicus?*, 1 J. App. Prac. & Process 279 (1999)). This Court has likewise observed that "courts should welcome amicus briefs for one simple reason: '[I]t is for the honour of a court of justice to avoid error in their judgments.'" *Lefebure v. D'Aquilla*, 15 F.4th 670, 675 (5th Cir. 2021) (citation omitted).

Consistent with these authorities, this Court has previously granted leave for the filing of an amicus brief in this appeal. *See* ECF No. 30. Likewise, the district court granted Amicus's requests in this case for leave to submit amicus briefs, including at the summary judgment stage. *See* ROA.4744.

## MOVANT'S INTEREST AND ARGUMENT

Amicus respectfully submit that the attached proposed brief provides relevant perspectives and arguments, and leave for filing should be granted.

3

Proposed amicus curiae **Gun Owners for Safety** is a united coalition of gun owners from varied backgrounds and political affiliations who believe lives can be saved through commonsense gun laws that do not infringe upon the civil rights of law-abiding gun owners. With chapters in Texas and across the country, Gun Owners for Safety works to prevent gun violence while supporting and protecting Second Amendment rights. Gun Owners for Safety is comprised of over 20,000 experienced gun owners of all trades and hobbies, including law enforcement, military, hunting, sport shooting, collecting, and building guns. In Texas alone, Gun Owners for Safety has 1,200 gun owner members, including 60 volunteer ambassadors who have educated the public and lawmakers through such activities as hosting seminars and testifying before the State Legislature. Affiliated with Giffords, the gun safety organization co-founded and led by Congresswoman Gabrielle Giffords, a gun owner herself, we fully respect the Second Amendment and simultaneously are devoted to encouraging safe and responsible gun ownership practices. Gun Owners for Safety promotes a shift in culture to inform Americans about ways to improve safe gun ownership, including commonsense gun laws.

4

As law-abiding gun owners, the members of Gun Owners for Safety have a direct and substantial interest in the subject matter of this case and in Plaintiffs-Appellees' challenges to the Rule. Gun Owners for Safety and its membership provide a unique perspective on the questions at the heart of the parties' dispute.

Specifically, the proposed brief offers a different perspective on the Rule and its scope within the ATF's rule-making authority of the Gun Control Act. Through firsthand knowledge and informed awareness of firearms and the various technologies to make firearms, the proposed brief offers an overview of kit-built "ghost guns," the problem the ATF sought to address. An accurate understanding of ghost guns and their use by criminal actors, not law-abiding gun owners, is necessary to appreciate the scope of the Rule under review. Members of Gun Owners for Safety have built guns from scratch, and have also built guns from fully or partially manufactured components, knowing firsthand the relative ease with which guns can be assembled from a kit of fully or partially finished parts. Amicus can therefore offer invaluable context for the true impact of the Rule on those who build guns at home.

Gun Owners for Safety's proposed brief is thus directly relevant to the Court's review of Defendants-Appellants' appeal.  It addresses whether the Rule is narrowly tailored to avoid infringing on the rights of law-abiding citizens to build their own firearms, whether the Rule's narrow tailoring prevents criminal activity, and whether the Rule exceeds the authority granted by the Gun Control Act.  By providing a unique and relevant perspective as an organization and individuals whose activities are directly affected by ATF regulations, who can explain precisely which activities are affected by the Rule, and who can offer a viewpoint as gun owners who do not oppose commonsense firearm regulation, the proposed amicus brief serves as a friend of the Court in its evaluation of the parties' motions.

## CONCLUSION

Gun Owners for Safety respectfully seeks leave to file the proposed amicus curiae brief.

Respectfully submitted, on August 16, 2023.

s/ *Jennifer L. Swize*

Jennifer L. Swize
    D.C. Bar No. 490988
Megan E. Ball
    D.C. Bar No. 1708286

Joseph J. Kiessling
     D.C. Bar No. 1630477
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: 202.879.3939
Facsimile: 202.626.1700

Dustin M. Lorenzo
     Ohio Bar No. 100034
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: 216.586.7383
Facsimile: 216.579.0212

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I, Jennifer L. Swize, hereby certify that on August 16, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: August 16, 2023             *s/ Jennifer L. Swize*
                                   Jennifer L. Swize

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(1)(E) and 27(d)(2) because it contains 1,094 words, excluding the parts of the motion specified by Fed. R. App. P. 32(f), and has been prepared using Microsoft Word for Windows in Book Antiqua 14-point font, a proportionally spaced typeface.

The attached brief complies with the requirements of Fed. R. App. P. 29(a)(5), 32(a)(5), and 32(a)(6) because it contains 5,172 words, excluding the parts of the brief specified by Fed. R. App. P. 32(f), and has been prepared using Microsoft Word for Windows in Book Antiqua 14-point font, a proportionally spaced typeface.

Dated: August 16, 2023         *s/ Jennifer L. Swize*
                               Jennifer L. Swize

No. 23-10718

# United States Court of Appeals
# for the Fifth Circuit

JENNIFER VANDERSTOK, et al.,

*Plaintiffs-Appellees,*

BLACKHAWK MANUFACTURING GROUP, INCORPORATED, doing
business as 80 PERCENT ARMS, et al.,

*Intervenor Plaintiffs-Appellees,*

v.

MERRICK GARLAND, in his official capacity
as Attorney General of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the
Northern District of Texas, Case No. 4:22-cv-00691-O

---

## BRIEF FOR *AMICUS CURIAE*
## GUN OWNERS FOR SAFETY

---

Jennifer L. Swize             Dustin M. Lorenzo
Megan E. Ball                 JONES DAY
Joseph J. Kiessling           901 Lakeside Ave.
JONES DAY                     Cleveland, OH 44114
51 Louisiana Avenue, N.W.     216.586.7383
Washington, D.C. 20001
202.879.5417                  *Counsel for Amicus Curiae*
                              *Gun Owners For Safety*

## CERTIFICATE OF INTERESTED PERSONS

1. *VanDerStok et al. v. Garland et al.*, No. 23-10718

2. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

### <u>Plaintiffs-Appellees</u>

- Jennifer VanDerStok
- Michael G. Andren
- Tactical Machining, LLC.
- Firearms Policy Coalition, Inc.

### <u>Intervenor Plaintiffs-Appellees</u>

- BlackHawk Manufacturing Group Inc., b/b/a 80 Percent Arms
- Defense Distributed
- Second Amendment Foundation, Inc.
- Not An L.L.C.
- Polymer80, Imc.

### <u>Attorneys for Plaintiffs-Appellees and Intervenor Plaintiffs-Appellees</u>

- Cooper & Kirk, PLLC
- David H. Thompson
- William V. Bergstrom
- Peter A. Patterson
- Cooper & Scully, PC

- Richard Brent Cooper
- Ashcroft Law Firm, LLC
- Michael J. Sullivan
- Brian Daniel Poe
- Flores Law, PLLC
- Chad Flores
- J. Mark Brewer
- Matthew Joseph Smid
- Bradley Arant Boult Cummings, LLP
- Dennis Daniels

## Amici Curiae

- Gun Owners for Safety. Gun Owners for Safety is a voluntary coalition of gun owners that does not have any corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock. Gun Owners for Safety is supported by Giffords—the gun safety organization co-founded and led by former Congresswoman Gabrielle Giffords—and the employees of Giffords. Giffords also has no corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock.
- Firearms Regulator Accountability Coalition, Inc.

## Attorney for Amicus Firearms Accountability Coalition, Inc.

- Stephen Obermeier
- Wiley Rein, LLP

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .................................................... i

TABLE OF AUTHORITIES................................................................ iii

INTEREST OF THE *AMICUS CURIAE* ............................................1

INTRODUCTION ........................................................................2

ARGUMENT ..............................................................................5

I.  THE RULE IS A NARROWLY TAILORED COMMERCIAL
REGULATION CONSISTENT WITH THE STATUTE ...................................5

    A.  Guns Assembled from Kits Have Long Been Regulated by the
       Gun Control Act ........................................................8

    B.  Ghost Gun Kits are Designed to Evade the Act's Serialization
       and Background Check Requirements While Being Virtually
       the Same as Kits with Finished Parts ....................................10

    C.  The Rule's Prohibition of Ghost Guns Is Consistent with the
       Text and Purpose of the Gun Control Act.................................17

II.  THE RULE'S NARROW TAILORING DOES NOT AFFECT
SCRATCH BUILDS.......................................................................23

CONCLUSION ..........................................................................27

CERTIFICATE OF SERVICE ...........................................................

CERTIFICATE OF COMPLIANCE ......................................................

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abramski v. United States*,
   573 U.S. 169 (2014)................................................5, 18, 21

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)...................................................18

*New York v. Burger*,
   482 U.S. 691 (1987)...................................................22

*United States v. Hosford*,
   843 F.3d 161 (4th Cir. 2016).......................................22

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir. 2023).......................................18

## STATUTES

18 U.S.C. § 921..............................................................*passim*

18 U.S.C. § 926...................................................................21

Gun Control Act of 1968, Pub. L. No. 90-618
   § 101, 82 Stat. 1213................................................20

## OTHER AUTHORITIES

27 C.F.R. § 478.11...............................................................18

33 Fed. Reg. 18,555 (Dec. 14, 1968)......................................6

*80 Lower Jig*, 80% LOWERS ...........................................9, 14

87 Fed. Reg. 24,652 (Apr. 26, 2022) ............................*passim*

Dakin Andone, *The Gunman In The Saugus High School Shooting
   Used A 'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019)...............16

ATF Firearms Tracing Guide, ATF Publication 3312.13, BUREAU
   OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES.......................9

*A Better-Than-Basic Glock 17 Compatible Build List for Under $500*,
3CR TACTICAL..................................................................................14

Carter Evans, *Santa Monica Shooter Built His Own Weapon*,
CBS NEWS (June 14, 2023).................................................................16

Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS'
INSTITUTE, INC..................................................................................5

*Gunsmithing a Custom Rifle Stock from Scratch: the Step by Step
Guide*, RICHARD'S MICROFIT STOCKS (Feb. 8, 2021) ......................25

How to Build an AR-15 Rifle, MIDWAYUSA ......................................14

*Making Guns*, SPRINGFIELD ARMORY, NATIONAL PARKS SERVICE......................26

David Pucino, *Ghost Guns: How Untraceable Firearms Threaten
Public Safety*, GIFFORDS LAW CENTER (May 2020)............................10, 11, 15

*Understanding Headspace in an AR-15*, AT3 TACTICAL ....................26

*Untraceable: The Rising Spector of Ghost Guns*, EVERYTOWN FOR
GUN SAFETY (May 14, 2020)................................................................12, 13, 15

*What Are Ghost Guns*, BRADY UNITED...........................................15, 16

*Why Outlawing Ghost Guns Didn't Stop America's Largest Maker of
Ghost Gun Parts*, PROPUBLICA (August 24, 2022) ...........................17

*Cody Rutledge Wilson*, SOUTHERN POVERTY LAW CENTER.................17

# INTEREST OF THE *AMICUS CURIAE*[1]

Amicus curiae Gun Owners for Safety ("Amicus") is a united coalition of gun owners from varied backgrounds and political affiliations who believe lives can be saved through commonsense gun laws that do not infringe upon the civil rights of law-abiding gun owners.  With chapters in Texas and across the country, Gun Owners for Safety works to prevent gun violence while supporting and protecting Second Amendment rights.  Gun Owners for Safety is comprised of over 20,000 experienced gun owners of all trades and hobbies, including law enforcement, military, hunting, sport shooting, collecting, and building guns at home.  In Texas alone, Gun Owners for Safety has 1,200 gun owner members, including 60 volunteer ambassadors who have educated the public and lawmakers through such activities as hosting seminars and testifying before the State Legislature. Affiliated with Giffords, the gun safety organization co-founded and led by Congresswoman Gabrielle Giffords, a gun owner herself, we fully respect

---

[1] No counsel for a party authored any part of this brief.  No one other than Amicus, its members, or its counsel financed the preparation or submission of this brief.

1

the Second Amendment and simultaneously are devoted to encouraging safe and responsible gun ownership practices.

Gun Owners for Safety promotes a shift in culture to inform Americans about ways to improve safe gun ownership, including commonsense gun laws. The members of Gun Owners for Safety hail from all different walks of life, different regions of the country, and different personal beliefs, but they are united in their dedication to promoting safe and responsible gun ownership practices consistent with their Second Amendment rights. The purpose of this amicus brief is to provide to this Court credible information about the impact of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Final Rule 2021R-05F. Amicus provides this information from the perspective of individuals and an organization with members who fully support the protection of Second Amendment rights. The organization is equally concerned with enacting commonsense gun laws that promote safe and legal use of firearms, aid law enforcement in fighting crime, and reduce gun violence.

## INTRODUCTION

Amicus seeks to provide real-world context regarding the limited scope and clear lawfulness of the ATF Final Rule 2021R-05F, Definition of

"Frame or Receiver" and Identification of Firearms (the "Rule").  In vacating the Rule, the district court held that ATF "acted in excess of its statutory jurisdiction[.]"  ROA.4766.  But the Rule falls plainly within the text of the Gun Control Act of 1968 and the scope of ATF's rulemaking authority.  The district court's interpretation eschewed common sense and ordinary meaning in favor of unrealistic technical distinctions between two functionally equivalent devices:  gun parts kits with *finished* parts, and kits with *nearly finished* parts that *can be readily assembled* into a functioning firearm.  Without clear regulations requiring serialization of these newer technology firearms, these firearms have been able to escape tracing by law enforcement, and thus are commonly referred to as "ghost guns."  Given this serious concern, and the lack of any meaningful difference between already regulated gun parts kits with finished parts and gun parts kits with nearly finished parts, the Rule merely extends to "ghost gun" kits the same serialization and *de minimis* commercial restrictions that have long applied to gun parts kits.

As an organization of gun owners who respect the Second Amendment and oppose the proliferation of unserialized firearms, it is critical for us to explain why the Rule strikes an appropriate balance in

3

discouraging criminal actors from obtaining dangerous, unserialized ghost guns while having no effect on our rights to craft guns in our own homes within the bounds of preexisting law.

The district court relied on a purported "ordinary meaning" of the statute that does not comport with the facts. According to the district court, a weapon parts kit of nearly finished parts is not equivalent to ATF's previous regulation—unchallenged by Plaintiffs-Appellees and Intervenor Plaintiffs-Appellees (collectively, "Plaintiffs")—that covered weapons parts kits of finished parts. When the Rule is considered through a grounded, practical lens—i.e., how the ordinary language would be read—the answer is clear: the Rule is a reasonable commercial firearm regulation consistent with the text of the Gun Control Act. The Rule's requirements for kits with partially finished parts are critical, commonsense requirements that reduce gun violence by keeping guns out of the hands of people who legally should not have them.

The Court should reverse the district court's judgment.

## ARGUMENT

## I.   THE RULE IS A NARROWLY TAILORED COMMERCIAL REGULATION CONSISTENT WITH THE STATUTE

The Rule is narrowly tailored to carry forward the Gun Control Act's plainly constitutional goal of "curb[ing] crime by keeping firearms out of the hands of those not legally entitled to possess them."  *Abramski v. United States*, 573 U.S. 169, 181 (2014) (internal quotations omitted).

To understand how the Rule fits into the Gun Control Act ("the Act") and its preexisting regulations, it first bears understanding how the statute defines the term "firearm."  The Act defines a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device."  18 U.S.C. § 921(a)(3).  Under the Act, then, a "frame" or "receiver" is the only component of a gun (in addition to the gun itself) that qualifies as a "firearm."[2]  The Act does not define "frame" or

---

[2]  The "basic unit" of a contemporary firearm is generally called the "frame" in handguns, or the "receiver" in long guns."  Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC., https://saami.org/saami-glossary/?search=reciever (last visited Aug. 2, 2023).

"receiver"—leaving to the executive branch the question of when "an unregulated piece of metal, plastic, or other material becomes a 'frame or receiver' that is a regulated item under federal law." Gov't Br. 19.

In 1968 (and again in 1978), ATF promulgated regulations regarding the Act—regulations that are not challenged in this case. As relevant here, the 1968 regulation defined a "firearm" as: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. . . ." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968). And it defined a "frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Id.*; *see also* ROA.4747.

The regulation at issue in this case, referenced herein as the Rule, was adopted on April 26, 2022, became effective on August 24, 2022, and added the following language to the 1968 regulatory definition of a "firearm":

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of

> an explosive.  The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition of "frame or receiver."

87 Fed. Reg. 24,652, 24,735 (Apr. 26, 2022).  Further, the Rule updated the definition for "frame or receiver," — terms that Congress left entirely for the executive branch to define.  In relevant part, the Rule provides that a "frame or receiver":

> shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be.

*Id.* at 24,739.  To clarify what is meant by "readily," the Rule includes eight factors that will help ATF to determine whether something is "readily" converted or assembled:  time, ease, expertise, equipment, availability of parts, expense, scope of the project, and feasibility of the process.  *Id.* at 24,663.

The Rule also adds and defines a new term:  "privately made firearm" ("PMF").  A PMF is "a firearm, including a frame or receiver, assembled by

a person other than a licensed manufacturer, and not containing a serial number or other identifying marking placed by a licensed manufacturer at the time the firearm was produced." *Id.* at 24,664. If a PMF maker seeks to have the PMF enter the marketplace, it must meet the Act's other licensing and serial number requirements. *Id.*

As discussed below, the Rule does not expand ATF's reach beyond the Gun Control Act's text. The Rule has a sensible, but minimal, effect on firearms. It simply closes a loophole—one exploited by gun traffickers and unlawful possessors—by bringing within its scope gun parts kits that are not meaningfully different than gun parts kits already long regulated by ATF. The district court's impractical interpretation to the contrary misses the mark.

### A.     Guns Assembled from Kits Have Long Been Regulated by the Gun Control Act.

Under the law before the Rule went into effect, "kit builds" were already long subject to regulation. As a brief overview, "kit builds" refer to the process of building guns from manufactured or partially manufactured components, as opposed to raw materials. The components can be sold together as part of a kit, or the components can be sold individually. "No

experience [is] necessary" to perform a kit build, and "easy step-by-step instructions" are often provided. *80 Lower Jig*, 80% Lowers, https://www.80-lower.com/80-lower-jig/ (last visited Aug. 7, 2023).

Thus, long before the Rule came into effect, the purchase of a fully machined frame or receiver (with or without a kit) was subject to the same requirements as the purchase of a fully operational firearm: the frame or receiver had to be serialized by the manufacturer and purchased through an FFL. *See* 18 U.S.C. § 921(a)(3). Using this information, ATF and its law enforcement partners can easily track firearms from the manufacturer or importer through the distribution chain to the first retail purchaser. *See generally* ATF Firearms Tracing Guide, ATF Publication 3312.13, Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/ firearms/docs/guide/atf-firearms-tracing-guide-atf-p-331213 (last visited Aug. 2, 2023). Tracing, as the Rule at issue here recognizes, is an "integral tool for Federal, State, local, and international law enforcement agencies to utilize in their criminal investigations" and has allowed law enforcement to ultimately bring justice and closure for countless families affected by gun violence. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. at 24,659. Furthermore, the purchaser of a fully machined frame

or receiver (with or without a kit) had to complete a Form 4473 (ATF Firearm Transaction Record) and undergo a background check. *See id.*

**B.    Ghost Gun Kits are Designed to Evade the Act's Serialization and Background Check Requirements While Being Virtually the Same as Kits with Finished Parts.**

Ghost guns are the result of advances in technology. These guns are assembled from kits with partially manufactured—as opposed to fully manufactured—frames or receivers. Rather than having to complete the parts to assemble a usable product, a manufacturer can nearly finish the parts and—before the Rule went into effect—avoid the longstanding serialization and other requirements associated with the purchase of a firearm or firearm parts kit. David Pucino, *Ghost Guns: How Untraceable Firearms Threaten Public Safety*, GIFFORDS LAW CENTER (May 2020), https://files.giffords.org/wp-content/uploads/2020/08/Giffords-Law-Center-Ghost-Guns-Report.pdf%20. Yet, given these advances in technology, a partially manufactured frame or receiver, known as "receiver blank," "unfinished receiver," or "80%" frame or receiver, typically requires only a minimal amount of additional machining by the customer in order to be a fully functional frame or receiver. *Id.* Often referred to as "80% kits" because the frame or receiver is approximately 80% complete, these kits

require limited additional machining—usually a minimal amount of drilling and milling that can be completed with everyday home tools—to create a functional frame or receiver. *Id.* While the district court emphasized the "partial" nature of these products (ROA.4747), the Rule makes clear that these parts are *nearly* finished. Indeed, just like *finished* frames and receivers, the sole function of *partially finished* frames and receivers is to assemble a weapon designed and capable of expelling a projectile. *Id.* Contrary to the district court's conclusion (ROA.4766), partially finished parts kits and kits with finished parts are lawfully treated as equivalent, because they are.

When constructed, these ghost guns are functionally indistinguishable from traditional firearms. Yet ghost guns were ordinarily not subject to the full panoply of federal firearms regulations like background checks, serialization, and transfer restrictions. *Id.* The practical effect, therefore, of selling a frame or receiver in a partially finished form was to circumvent federal and state gun regulations that apply to the industry that manufactures and sells these products and the buyers who purchase them. *Id.* In short, ghost gun kits allowed any individual, regardless of their ability to pass a background check, to build an unserialized and untraceable firearm with widely available tools and a few hours of work.

11

Over the past decade, the market for such ghost gun kits has exploded, allowing untrained amateurs to assemble their own firearms quickly and easily from unregulated parts.  But rather than comply with the Act's regulations that facilitate this critical law enforcement tool, the ghost gun industry—various Plaintiffs here are representative—has claimed that gaps in those regulations allowed it to make an end-run around the Act.  *Id.* Plaintiffs have never seriously denied the reality that their kits are intended to be made into firearms, nor did they (or could they) offer any compelling alternative interest in selling or purchasing these kits, nor did the district court.  Indeed, ghost gun manufacturers make the assembly process foolproof—often providing a kit with the tools and step-by-step instructions included to make the frame fully functional with an insignificant amount of time and effort.  *Id.*

A visual example makes plain the similarity between finished parts kits (long subject to regulation) and "80%" parts kits (now put on the same footing, pursuant to the Rule).  The diagram below shows the parts of a traditional, ready-to-use Glock 17 handgun, with emphasis on the highlighted light grey component of the "frame."  *Untraceable: The Rising*

*Spector of Ghost Guns*, E<small>VERYTOWN FOR</small> G<small>UN</small> S<small>AFETY</small> (May 14, 2020), https://everytownresearch.org/report/the-rising-specter-of-ghost-guns/.



Compare this traditional firearm to the diagram below, which shows the fully functional frame of the Glock 17 (on the left), next to the "unfinished" frame sold in the typical 80% ghost gun kit (on the right). *Id.*



As is evident, the difference between the two frames is minimal. The functional frame contains three drilled holes (the locking block pin hole, the

13

trigger pin hole, and the trigger housing pin hole), and the rails filed off.  By adding these simple features to the unfinished frame with common household tools, any individual can make the unfinished frame functional in hours or less.  *See, e.g.*, How to Build an AR-15 Rifle, MIDWAYUSA, https://www.midwayusa.com/how-to-guides/how-to-build-ar-15-rifle (last visited Aug. 2, 2023).

Indeed, manufacturers of 80% kits make clear that their target consumer is *not* the artisan gunsmith, but rather *anyone* who wishes to buy and build a gun.  These entities advertise that "[n]o experience [is] necessary" to perform a kit build, and "easy step-by-step instructions" are often provided.  *80 Lower Jig*, 80% LOWERS, *supra*.  It is thus unsurprising that the ghost gun Glock 17 is considered a "clone" of the traditional Glock 17 and is advertised as such on gun kit websites.  *See, e.g.*, *A Better-Than-Basic Glock 17 Compatible Build List for Under $500*, 3CR TACTICAL, https://3crtactical.com/a-better-than-basic-glock-17-clone-build-list-for-under-500/ (last visited Aug. 2, 2023).

The ability of ghost guns to evade federal firearms regulation is the defining feature, not a bug, of this commercial product.  The resultant completed frame will offer the user the same functionality as a traditional

firearm.  There is only one main difference between the ghost gun Glock 17 and the Glock 17 handgun manufactured by a licensed manufacturer or importer:  the lack of a serial number on the ghost gun.  *Ghost Guns*, GIFFORDS, *supra.*  For law-abiding gun owners, there is no discernable advantage.  But this difference, along with the lack of a background check requirement, makes ghost guns the weapon of choice for gun traffickers and persons legally prohibited from possessing firearms, including those bent on violence.  *Id.*; *see also* 87 Fed. Reg. at 24,659.

Perhaps unsurprisingly, ghost guns have been used frequently in violent crimes.  One review of a limited sample of federal prosecutions from 2010 to April 2020 revealed that over 2,500 ghost guns were connected to criminal activity.  *Untraceable*, EVERYTOWN, *supra*.  In nearly half of these prosecutions, the defendants had been prohibited from possessing a firearm and would not have passed background check.  *Id.*  And other studies have confirmed that the increasing popularity of ghost gun kits has led to a corresponding increase in the use of ghost guns in crimes.  *What Are Ghost Guns*, BRADY UNITED, https://www.bradyunited.org/fact-sheets/what-are-ghost-guns (last visited Aug. 2, 2023) (recording testimony from one ATF agent that "almost half our cases we're coming across are these ghost guns").

15

Tragically, ghost guns have also been used in multiple mass shootings. In one case, a shooter had already failed a background check but was nonetheless able to build an assault rifle from a ghost gun kit to kill five people on a college campus in Southern California. *Id.*; *see also* Carter Evans, *Santa Monica Shooter Built His Own Weapon*, CBS NEWS (June 14, 2023), https://www.cbsnews.com/news/santa-monica-shooter-built-his-own-weapon/. In another, a sixteen-year-old California high school student killed two students and injured three others with a unserialized gun assembled from a kit. Dakin Andone, *The Gunman In The Saugus High School Shooting Used A 'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html.

Despite the well-documented criminal consequences of ghost guns, many ghost gun manufacturers make no secret of their contempt for firearm regulations or the fact that their product is designed for those whose intended purpose is to subvert those regulations. For example, Cody Wilson, the CEO of Intervenor Plaintiff-Appellee Defense Distributed, was unapologetic when pressed with allegations that he "wants children to have guns," responding only that his ghost gun technology intends to be

16

"disruptive."   *Cody Rutledge Wilson*, SOUTHERN POVERTY LAW CENTER,

https://www.splcenter.org/fighting-hate/extremist-files/individual/

cody-rutledge-wilson (last visited Aug. 2, 2023).  The owner of Intervenor

Plaintiff-Appellee Polymer80, one of the nation's largest ghost gun

manufacturers, made his contempt for a Nevada bill banning ghost guns

clear, telling legislators:  "[W]e, as Americans, just will not comply with [the

bill] no matter what you do."  *Why Outlawing Ghost Guns Didn't Stop

America's Largest Maker of Ghost Gun Parts*, PROPUBLICA (Aug. 24, 2022),

https://www.propublica.org/article/nevada-ghost-guns-polymer80-

firearms-laws.

　　Put simply, the entire point of a ghost gun kit is to allow the user to

"readily [ ] convert[ ]" the nearly finished parts "expel a projectile" while

evading federal regulation.  18 U.S.C. § 921(a)(3)(A).

## C.    The Rule's Prohibition of Ghost Guns Is Consistent with the Text and Purpose of the Gun Control Act.

　　The ATF promulgated the Rule at issue in this case to stop the

neglectful and reckless behavior described above.  This is consistent with the

text of the Gun Control Act and its purpose.

　　This nation's "Founders firmly believed in both the fundamental right

17

to keep and bear arms and the fundamental role of government in combating violent crime." *United States v. Rahimi*, 61 F.4th 443, 462 (5th Cir. 2023) (Ho, J., concurring), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023). As *Heller* noted, certain classes of firearm regulations would be "presumptively lawful," such as "prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). The Rule falls plainly within the text of the Act and furthers its principal purpose of "curb[ing] crime by keeping 'firearms out of the hands of those not legally entitled to possess them.'" *Abramski*, 573 U.S. at 181 (citation omitted).

As the Government explains, this Rule comports with the text of the Act's definition of "firearm." A kit with an 80% frame or receiver with all parts "necessary to 'readily . . . complete[ ], assemble . . . or otherwise convert[ ]'" the parts into a functioning firearm, 27 C.F.R. § 478.11, fits logically within the statutory definition because it can "readily be converted" into a functioning firearm, 18 U.S.C. § 921(a)(3)(A). The district court did not account for the reality that ghost gun kits with 80% frames or receivers are designed precisely so that the parts can "readily be converted"

into a functional firearm with almost as little effort as a kit with finished frames or receivers.  18 U.S.C. § 921(a)(3)(A); *see* Gov't Br. 31.

An 80% frame or receiver itself also qualifies as a "frame or receiver"—and therefore a "firearm."  18 U.S.C. § 921(a)(3)(B).  As described above, the very purpose of using an 80% frame or receiver kit is to confer all of the convenience of a kit with a finished frame or receiver while evading the Act's licensing and serial number requirements.  To adapt an analogy, these kits are indistinguishable from a box containing parts of a table from IKEA with tools and foolproof instructions on where to drill holes to complete assembly.  Much like any ordinary person would understand that the box received from IKEA contains a "table," any ordinary person would understand that the 80% kit contains a "firearm."  *See* Gov't Br. 19 ("A bicycle is still a bicycle even if it lacks pedals, a chain, or some other component needed to render it complete or allow it to function").  The Rule's definition of the Act's undefined term "frame or receiver" comports with an ordinary understanding of those words.  And the Rule's only effect was to bring these functionally equivalent products all under the same regulations.

These provisions likewise align with the purposes of the Act.  The Rule reflects one primary, fundamental concern:  the criminal misuse of firearms,

19

and in particular the frequent use of kit-made unserialized firearms in violent crime. *See, e.g.*, 87 Fed. Reg. at 24,686 & n.107. These firearms can be easily acquired by persons otherwise prohibited from possessing them, *see id.* at 24,676, and make violent crimes more difficult to trace and solve, *id.* at 24,659. The Rule accounts for these substantial risks and the fact that these firearms offer no advantage to law-abiding gun owners. It merely puts kits with *partially* machined frames or receivers on the same footing, likewise requiring these products to comply with the same federal firearms regulations as kits utilizing fully machined parts, given their plain purpose of being turned into a firearm. *See id.* at 24,652. In other words, the *only* change that resulted from the Rule is that *nearly finished* frames or receivers, along with kits containing such parts, are now treated in the same manner as kits with *fully machined*, *serialized* frames or receivers. *See id*.

At the same time, the text of the Gun Control Act makes clear that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" for appropriate purposes. Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213-14. Meeting these twin goals has often required that ATF engage in line-drawing

exercises to carry out the mandate of the Gun Control Act to meet its regulatory goals, as ATF has done here.  *See* Gov't Br. 25.

The Gun Control Act's carefully calibrated balance is well mirrored in the Rule.  By promulgating the Rule, ATF has merely updated applicable regulations to reflect advances in technology, an approach fully consistent with the Gun Control Act.  *Id.*  Indeed, under these circumstances, *not* regulating partially completed firearms would be directly contrary to the crime-fighting purpose of the Gun Control Act.  *See Abramski*, 573 U.S. at 181.  The Rule itself makes this clear.  *See* 87 Fed. Reg. at 24,656 (noting that ATF had recovered privately-made firearms from 692 homicides or attempted homicides from 2016 to 2021).

As its meticulous responses to the over 290,000 public comments reflect, ATF exercised its careful judgment in promulgating this Rule to close a significant regulatory loophole in existing firearms regulations.  87 Fed. Reg. at 24,652-734.  In doing so, as described below, ATF plainly acted within the statutory authority delegated to it by the Gun Control Act to carry out its provisions and principal purpose of counteracting criminal activity.  18 U.S.C. § 926.

To be clear, the Rule *does not* impact the availability of 80% kits to law-

abiding Americans: any individual who can pass a background check is still permitted to purchase or utilize an 80% kit. ATF's lawful exercise of its rulemaking authority makes explicit that it does "not burden law-abiding, good faith actors"—it merely closes a loophole that made it easier for "traffickers and prohibited persons" to obtain firearms. 87 Fed. Reg. at 24,669-70.

As described above, the Rule's definitions merely expand the existing serialization regime to a previously unserialized class of firearms—ghost guns. In this way, the Rule constitutes a recognized and permissible qualification on commercial firearm sales. *See, e.g.*, *New York v. Burger*, 482 U.S. 691, 713 (1987) ("[T]he regulatory goals of the Gun Control Act . . . ensure[] that weapons [are] distributed through regular channels and in a traceable manner and [make] possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms."); *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) ("[T]he prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of arms and is thus facially constitutional."). Because the Constitution empowers the federal government to impose serialization requirements and other sale controls on traditional firearms, it surely allows

ATF to impose those same controls on products designed to produce functionally indistinguishable firearms.

## II.    THE RULE'S NARROW TAILORING DOES NOT AFFECT SCRATCH BUILDS

As an organization of gun owners who enjoy building firearms and support the Second Amendment, it is crucial for us to emphasize that the Rule does not impose any new or burdensome regulations on traditional at-home gun making.  To the contrary, the Rule is narrowly tailored to avoid infringing on the rights of law-abiding citizens to build their own firearms. As discussed above, the Rule only minimally affects kit builds, and it does not affect firearms built from scratch using raw materials ("scratch builds") at all.

Throughout this case, these distinctions were lost on Plaintiffs' arguments that prevailed before the district court.  Plaintiffs relied heavily on the faulty premise that the Rule sweeps away entirely the rights of law-abiding gun owners to complete at-home builds of firearms.  *See* ROA.1537, Defense Distributed and the Second Amendment Foundation, Inc.'s Complaint.  But an accurate assessment of the Rule's scope makes clear that the Rule simply extends existing federal restrictions to cover partially

finished and easy-to-assemble firearms and does not affect scratch builds.

Scratch builds are fundamentally different from kit builds. Scratch builds for personal use are outside the ambit of the Rule and will continue to be exempt from regulations governing FFLs. The Rule solely (and minimally) affects kit builds—those involving a "partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit." 87 Fed. Reg. at 24,739.

Plaintiffs conflate kit builds with scratch builds, potentially due to a lack of familiarity with the differences between the two processes, or perhaps a desire to overstate the effect of the Rule. *See, e.g.*, ROA.1955, VanDerStok, Andren, Tactical Machining, LLC, and Firearms Policy Coalition, Inc. Br. in Supp. of Mot. for Summ. J. (broadly describing "ghost guns" as "a pejorative for privately manufactured firearms"). But the Rule's revised definition of "frame or receiver" plainly excludes scratch build firearms. It states that its terms "shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, *unformed block of metal, liquid polymer, or other raw material*)." 87 Fed. Reg. at 24,739 (emphasis added); *see also id.* at

24

24,653 ("[T]he final rule makes clear that articles that have not yet reached a stage of manufacture where they are clearly identifiable as an unfinished component of a frame or receiver (*e.g.*, unformed blocks of metal, liquid polymers, or other raw materials) are not frames or receivers.").

There can be no legitimate basis for conflating a scratch build with a kit build that utilizes partially finished components. The scratch build community does not use partially manufactured frames or receivers. Crafting a gun from scratch begins with raw materials that have no pre-shaping, milling, or manufacturing. *Gunsmithing a Custom Rifle Stock from Scratch: the Step by Step Guide*, RICHARD'S MICROFIT STOCKS (Feb. 8, 2021), https://richardsmicrofitgunstocks.com/gunsmithing-a-custom-rifle-stock-from-scratch-the-step-by-step-guide (last visited Aug. 2, 2023)). A scratch build is a "skill-intensive task" that "requires precision carpentry tools and woodworking skills 'that might be a stretch for beginner carpenters[.]'" *Id.* The steps for building a rifle from scratch include selecting raw materials; designing the rifle stock; "inletting the action" to ensure that the stock fits with the frame and receiver; shaping the hardwood material to conform to the preferred rifle stock design; and sanding, whiskering, and applying an oil finish to the rifle stock. *See id.* Crafting a musket from scratch similarly

25

requires highly specialized knowledge and skill. *See Making Guns*, Springfield Armory, National Parks Service, https://www.nps.gov/ spar/learn/historyculture/making-guns.htm (last visited Aug. 2, 2023).

Furthermore, a scratch build of a more contemporary weapon, such as an AR pattern firearm, demands even more technical skill from the artisan. *See Understanding Headspace in an AR-15*, AT3 Tactical, https://www.at3tactical.com/blogs/news/what-is-headspace-in-an-ar-15-and-how-can-you-check-it-read-on (last visited Aug. 2, 2023) (explaining that specialized tools are required and that specific tolerances must be met to ensure appropriate lockup between the round, chamber, bolt face, bolt carrier, and recoil gas tube interface occurs safely and repeatably).

In sum, a scratch build is fundamentally different from a gun constructed from partially finished components as part of an easy-to-complete kit. *See supra* Section I.B. By affirmatively taking these differences into account, the Rule protects, rather than compromises, the rights of law-abiding gun owners to privately manufacture firearms from scratch. In both neglecting to distinguish scratch builds from kit builds and overstating the Rule's impact on kit builds, Plaintiffs misrepresent the scope of the Rule. Given that scratch builds are unaffected by the Rule, and that kit builds are

only minimally impacted, Plaintiffs' misleading representations must be rejected.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's vacatur of the Rule.

August 16, 2023                                   Respectfully submitted,

*s/ Jennifer L. Swize*
Jennifer L. Swize
Megan E. Ball
Joseph J. Kiessling
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
202.879.5417
jswize@jonesday.com

Dustin M. Lorenzo
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
216.586.7383
dlorenzo@jonesday.com

*Counsel for Amicus Curiae*
*Gun Owners for Safety*

## CERTIFICATE OF SERVICE

I, Jennifer L. Swize, hereby certify that on August 16, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Jennifer L. Swize*
Jennifer L. Swize

*Counsel for Amicus Curiae*
*Gun Owners for Safety*

**CERTIFICATE OF COMPLIANCE**

The attached brief complies with the requirements of Fed. R. App. P. 29(a)(5), 32(a)(5), and 32(a)(6) because it contains 5,172 words, excluding the parts of the brief specified by Fed. R. App. P. 32(f), and has been prepared using Microsoft Word for Windows in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Jennifer L. Swize*
Jennifer L. Swize

*Counsel for Amicus Curiae*
*Gun Owners for Safety*