No. 23-10718

# In the United States Court of Appeals for the Fifth Circuit

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,
*Plaintiffs-Appellees,*

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms; Defense Distributed; Second Amendment Foundation, Incorporated; Not An L.L.C., doing business as JSD Supply; Polymer80, Incorporated,
*Intervenor Plaintiffs-Appellees,*

*v.*

Merrick Garland, United States Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms and Explosives,
*Defendants-Appellants.*

On Appeal from the United States District Court for the
Northern District of Texas, Fort Worth Division,
Case No. 4:22-cv-691 (Hon. Reed O'Connor)

**Brief of *Amici Curiae* Gun Violence Prevention Groups in Support of Defendants-Appellants and Reversal**

KATHLEEN R. HARTNETT
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com

ADAM M. KATZ
RACHEL H. ALPERT
COOLEY LLP
500 Boylston St.
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com
ralpert@cooley.com

DANIEL GROOMS
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 776-2042
dgrooms@cooley.com

*Counsel for Amici Curiae Gun
Violence Prevention Groups*

# CERTIFICATE OF INTERESTED PERSONS

*VanDerStok, et al. v. Garland, et al.* (No. 23-10718)

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| *Plaintiffs-Appellees* | *Counsel for Plaintiffs-Appellees* |
|---|---|
| Jennifer VanDerStok | David H. Thompson |
| | Peter A. Patterson |
| Michael G. Andren | William V. Bergstrom |
| | Cooper & Kirk, PLLC |
| Tactical Machining, LLC | |
| | Richard Brent Cooper |
| Firearms Policy Coalition | Benjamin David Passey |
| | Cooper & Sculley, P.C. |

| *Intervenor Plaintiffs-Appellees* | *Counsel for Intervenor Plaintiffs-Appellees* |
|---|---|
| Blackhawk Manufacturing Group, doing business as 80 Percent Arms | Michael J. Sullivan |
| | Ashcroft Law Firm, L.L.C. |
| | |
| | Brian Daniel Poe |
| | Brian D. Poe, Attorney at Law PLLC |
| Defense Distributed | Chad Flores |
| Second Amendment Foundation | Flores Law, P.L.L.C. |
| Not An L.L.C., doing business as JSD Supply | J. Mark Brewer |
| | Brewer & Pritchard, P.C. |
| | |
| | Matthew Joseph Smid |
| | Evans, Daniel, Moore, Evans, Biggs, & Smid |

| Polymer80 | Dennis Daniels<br>Bradley Arant Boult Cummings, L.L.P. |

| *Defendants-Appellants* | *Counsel for Defendants-Appellants* |
|---|---|
| Merrick Garland, United States Attorney General | Sean Janda<br>Daniel M. Riess<br>Abby Christine Wright<br>U.S. Department of Justice |
| United States Department of Justice | |
| Steven Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives | |

| *Amici Curiae* | *Counsel for Amici Curiae* |
|---|---|
| Firearms Regulatory Accountability Coalition | Stephen Obermeier<br>Wiley Rein, L.L.P. |
| Brady Center to Prevent Gun Violence ("Brady") | Kathleen R. Hartnett<br>Daniel Grooms<br>Adam M. Katz<br>Rachel A. Alpert<br>Cooley LLP |
| Everytown for Gun Safety Support Fund ("Everytown") | |
| March For Our Lives ("MFOL") | |

*Amici* Brady, Everytown, and MFOL are nonprofit corporations with no parent corporations. No publicly held company owns 10% or more of Brady, Everytown, or MFOL. All parties have consented to the filing of this brief.

> Respectfully Submitted,
> By: */s/ Kathleen R. Hartnett*
> *Attorney of Record for Amici*
> *Brady, Everytown, and MFOL*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................ 1

INTRODUCTION ................................................................................ 2

ARGUMENT ...................................................................................... 7

    I.    The Rule Implements the Gun Control Act and Prevents its Subversion ........................................................ 7

        A.    The Rule Adheres to the Act's Definition of "Firearm" ........................................................... 7

        B.    The Rule Advances the Act's Purpose ........................ 10

    II.    The Rule Properly Considers the Reality that Ghost Guns Can be Quickly and Easily Assembled from Kits and Near-Complete Frames and Receivers ................. 21

    III.    The Rule Comports with ATF's Longstanding View that Not-Yet-Complete Firearms Can be Firearms Under the Act ....................................................... 26

CONCLUSION ................................................................................. 30

CERTIFICATE OF SERVICE ............................................................. 31

CERTIFICATE OF COMPLIANCE ...................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States,*
573 U.S. 169 (2014) ............................................................... 2, 14, 18

*Apolinar v. Polymer80, Inc.,*
2022 Cal. Super. Lexis 2591 (Cal. Sup. Ct. Feb. 2, 2022) ................. 22

*Barrett v. United States,*
423 U.S. 212 (1976) ................................................................... 13

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ............................................................... 30

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................................... 14

*District of Columbia v. Polymer80, Inc.,*
No. 2020-CA-002878-B (D.C. Sup. Ct. Aug. 10, 2022) ...................... 22

*Huddleston v. United States,*
415 U.S. 814 (1974) ............................................................... 11, 13

*Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella,*
350 F.3d 73 (2d Cir. 2003) ............................................................ 8

*Nat'l Shooting Sports Found., Inc. v. Jones,*
716 F.3d 200 (D.C. Cir. 2013) ...................................................... 19

*New York State Rifle & Pistol Ass'n., Inc. v. Bruen,*
142 S. Ct. 2111 (2022) ............................................................... 14

*Nicholas v. Saul Stone & Co. LLC,*
224 F.3d 179 (3d Cir. 2000) ........................................................... 8

*People v. Blackhawk Mfg. Grp., et al.,*
CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) ............................. 25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Quarles v. United States,*
  139 S. Ct. 1872 (2019) ................................................................. 15

*Shawano Gun & Loan, LLC v. Hughes,*
  650 F.3d 1070 (7th Cir. 2011) ..................................................... 17

*Slack Tech., LLC v. Pirani,*
  143 S. Ct. 1433 (2023) ................................................................... 8

*Standard Oil Co. of Calif. v. United States,*
  231 Ct. Cl. 112 (1982) ................................................................... 8

*United States v. Annis,*
  446 F.3d 852 (8th Cir. 2006) ....................................................... 22

*United States v. Carney,*
  387 F.3d 436 (6th Cir. 2004) ....................................................... 18

*United States v. Christmann,*
  193 F.3d 1023 (8th Cir. 1999) ..................................................... 22

*United States v. Cooper,*
  714 F.3d 873 (5th Cir. 2013) ....................................................... 22

*United States v. Dotson,*
  No. 1:11-cr-56, 2012 WL 76139 (S.D. Ind. Jan. 10, 2012) ................... 8

*United States v. Hardin,*
  889 F.3d 945 (8th Cir. 2018) ....................................................... 22

*United States v. Harris,*
  720 F.3d 499 (4th Cir. 2013) ....................................................... 18

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ..................................................... 18, 20

*United States v. Mobley,*
  956 F.2d 450 (3d Cir. 1992) ......................................................... 20

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Mullins,*
  446 F.3d 750 (8th Cir. 2006) ............................................................. 22

*United States v. Rivera,*
  415 F.3d 284 (2d Cir. 2005) .............................................................. 22

*United States v. Ryles,*
  988 F.2d 13 (5th Cir. 1993) ............................................................... 23

*United States v. Smith,*
  477 F.2d 399 (8th Cir. 1973) ............................................................. 22

*VanDerStok v. Garland,*
  --- F. Supp. 3d. ---, 2023 WL 4539591
  (N.D. Tex. June 30, 2023) ........................................................ *passim*

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**Statutes**

18 U.S.C.

§ 921 .................................................................................................. 2
§ 921(i) ............................................................................................. 19
§ 921(a)(3) ................................................................................. *passim*
§ 921(a)(3)(B) .................................................................................. 8
§ 922 ............................................................................................... 12
§ 922(a)(1)(A) ................................................................................ 12
§ 922(a)(6) ............................................................................... 14, 17
§ 922(b) ........................................................................................... 12
§ 922(d) ........................................................................................... 12
§ 922(k) ........................................................................................... 19
§ 922(m) .......................................................................................... 14
§ 922(t) ............................................................................................ 14
§ 922(t)(1) ....................................................................................... 13
§ 923(a) ........................................................................................... 12
§ 923(d) ........................................................................................... 12
§ 923(e) ........................................................................................... 12
§ 923(g)(1)(A) .......................................................................... 12, 19
§ 923(g)(1)(B) ................................................................................. 19
§ 923(g)(3) ...................................................................................... 12
§ 924 ............................................................................................... 12
§ 924(a)(3) ...................................................................................... 14

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 .......... *passim*

**Other Authorities**

27 C.F.R.

§ 478.92 ........................................................................................... 19
§ 478.99 ........................................................................................... 12
§ 478.101 ......................................................................................... 12
§ 478.102(a) .................................................................................... 13
§ 478.121 ......................................................................................... 19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

§ 478.121(b) ........................................................................ 19

*About,* R&B Tactical Tooling (last visited July 30, 2023),
    https://bit.ly/3oNKmZU ...................................................... 16

*Are Felons Restricted from Owning a Firearm that Was Built from an
    80% Receiver?*, Polymer80 Blog (Oct. 21, 2020) .................................. 16

ATF Form 4473 (5300.9), https://bit.ly/3CAv5Rl .................................... 17

Charles Duncan, *Ft. Bragg Soldier Had Plot to "Remove" Minorities,
    Pleads Guilty In Ghost Gun Case, Feds Say*, Spectrum News (Apr.
    27, 2023), https://bit.ly/3Od1d5k .......................................... 3

Commerce Department. Dep't of Commerce, FAQs for the Commerce
    Categories I–III (2020), https://tinyurl.com/3m4svmw4 .................... 21

*Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed.
    Reg. 24652 (Apr. 26, 2022)........................................... *passim*

*Following the Gun: Enforcing Federal Laws Against Firearms
    Traffickers*, U.S. Dept. of the Treasury at 10 (June 2000),
    https://bit.ly/3JXi6OP ...................................................... 17

*Ghost Gunner*, Ghost Guns, https://bit.ly/3pUjDvj ................................ 16

Glenn Thrush, *"Ghost Guns": Firearm Kits Bought Online Fuel
    Epidemic of Violence*, N.Y. Times (June 22, 2023) ............................ 24

*GST-9: 80% Pistol Build Kit*, 80% Arms, https://bit.ly/3x6n0T7............ 25

H. Rep. No.
    90-1577 (1968)....................................................... 10
    116-88 (2019)........................................................ 20

*The History of Legally Buying Firearms Without an FFL,* 80% Arms
    Blog (Dec. 3, 2019), https://bit.ly/3HClkFU ....................................... 16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*How-To Manuals*, Polymer80, https://bit.ly/3qUwobt ............................25

John Lauritsen, *Police: Teen Used Ghost Gun to Shoot, Kill 17-Year-Old Syoka Siko*, CBS News Minnesota (Dec. 1, 2022), https://cbsn.ws/3rJPW4F..............................................................3

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost Guns,' Authorities Say, and Then Killed His Sister with One*, Wash. Post. (Dec. 3, 2021)...............................................................24

*JSD 80% Lower Receivers, Jigs, and Gun Parts Kits*, JSD Supply, https://bit.ly/3rKrgqj ............................................................16

*Lower Receiver,* SS-Arms, https://bit.ly/3GAVvVo..................................16

Nic Garcia, *New Details Released in Deadly Shooting of Selma Police Officer*, ABC 30 (Feb. 4, 2023), https://tinyurl.com/38ffrnz8 ..............3

Press Release, *Fact Sheet: Update on Justice Department's Ongoing Efforts to Tackle Gun Violence*, Dep't of Justice (June 14, 2023), https://tinyurl.com/mt2wx2ce (2022 data) ...........................................3

Press Release, *Four Gun Traffickers Charged with Selling Over 50 Firearms in Brooklyn*, Dep't of Justice (Jan. 11, 2023), https://tinyurl.com/mweu2mnw .........................................................3

Press Release, *Four Men Federally Indicted for Hobbs Act Conspiracy, Firearms Charges, and a Kidnapping*, Dep't of Justice (July 28, 2023), https://tinyurl.com/yepzsju5....................................................3

Rob Low, *East High Shooting Suspect Killed Himself with Ghost Gun, Failed Prior Diversion Program*, KDVR (Mar. 23, 2023), https://tinyurl.com/yc7sx2wp....................................................3

S. Rep. No.
89-1866 (1966)....................................................................15
90-1501 (1968)....................................................................10

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*The Stockton Serial Killer Suspect Was Using an Untraceable Ghost Gun*, VICE (Oct. 20, 2022), https://bit.ly/3O7aOKp ............................. 3

*Trafficking & Straw Purchasing*, Giffords Law Center, https://bit.ly/3FBTtnv ........................................................................ 17

*Untraceable: The Rising Specter of Ghost Guns*, Everytown for Gun Safety (May 14, 2020), https://bit.ly/3OcBb1W .................................. 16

*Webster's Third New International Dictionary* 1889 (1965) ................... 28

## STATEMENT OF INTEREST[1]

Everytown for Gun Safety Support Fund ("Everytown"), Brady Center to Prevent Gun Violence ("Brady"), and March For Our Lives ("MFOL") ("Gun Violence Prevention Groups") submit this brief as *amici curiae* in support of Appellants. *Amici* are nonprofit organizations dedicated to reducing gun violence through education, research, and advocacy. Everytown is the education, research, and litigation arm of the nation's largest nonprofit committed to reducing gun violence. Brady is the nation's longest-standing, uniting gun owners and non-gun-owners alike. MFOL has mobilized hundreds of thousands of young people nationwide in support of reforms to prevent gun violence. *Amici* have studied ghost guns extensively and advocated for measures to halt their proliferation. *Amici* also regularly submit amicus briefs on gun violence, have litigated cases involving ghost guns, and filed amicus briefs below and in multiple parallel litigations.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no person or entity, other than *amici*, their members, or their counsel, paid for or otherwise contributed to the preparation or submission of this brief.

## INTRODUCTION

To advance public safety, the Gun Control Act of 1968 ("Act"), Pub. L. No. 90-618, 82 Stat. 1213, as amended, subjects "firearms" to critical requirements: background checks to prevent sales to certain persons, such as those who have committed felonies and who are mentally ill, or otherwise could not safely wield a firearm; licensing for manufacturers, importers, and dealers to ensure that firearms are built and sold responsibly; and serialization to allow law enforcement to trace firearms to their first retail sale. *See* 18 U.S.C. §§ 921–931. Congress adopted these requirements to "prevent guns from falling into the wrong hands" and "assist law enforcement … in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 172–80 (2014).

The recent proliferation of "ghost guns" has undermined the Act and its law-and-order objectives. A ghost gun is a fully operational, unserialized, and untraceable weapon that can be assembled in an hour or less from components or "kits" freely available online with no background check and no questions asked.

Absent coverage as "firearms" under the Act, ghost guns allow criminals and other individuals prohibited by law from acquiring a

firearm to do exactly that: obtain, use, and traffic firearms, all while remaining undetectable to law enforcement. For a law-abiding citizen, complying with the Act is an uncontroversial part of being a responsible gun-owner. For a would-be criminal, the Act is an existential problem and ghost guns—if unregulated—provide a fool-proof workaround.

It is therefore unsurprising that, in recent years, recoveries of ghost guns used to commit crimes have skyrocketed. In 2017, law enforcement reported 1,629 recoveries of such ghost guns; by 2022, recoveries jumped again to 25,785.[2] The details of these crimes are disturbing. Within the last 12 months alone, ghost guns have been connected to murder, drug trafficking, suicide, robbery, hate crimes, kidnapping, and rape.[3] Below,

---

[2] *See* 87 Fed. Reg. at 24,656 (2017 data); Press Release, *Fact Sheet: Update on Justice Department's Ongoing Efforts to Tackle Gun Violence*, Dep't of Justice (June 14, 2023), https://tinyurl.com/mt2wx2ce (2022 data).

[3] *The Stockton Serial Killer Suspect Was Using an Untraceable Ghost Gun*, VICE (Oct. 20, 2022), https://bit.ly/3O7aOKp (murder); John Lauritsen, *Police: Teen Used Ghost Gun to Shoot, Kill 17-Year-Old Syoka Siko*, CBS News Minnesota (Dec. 1, 2022), https://cbsn.ws/3rJPW4F (same); Nic Garcia, *New Details Released in Deadly Shooting of Selma Police Officer*, ABC 30 (Feb. 4, 2023), https://tinyurl.com/38ffrnz8 (same); Press Release, *Four Gun Traffickers Charged with Selling Over 50 Firearms in Brooklyn*, Dep't of Justice (Jan. 11, 2023), https://tinyurl.com/mweu2mnw (drug trafficking); Rob Low, *East High Shooting Suspect Killed Himself with Ghost Gun, Failed Prior Diversion Program*, KDVR (Mar. 23, 2023), https://tinyurl.com/yc7sx2wp (suicide); Charles Duncan, *Ft. Bragg Soldier Had Plot to "Remove" Minorities, Pleads Guilty In Ghost Gun Case, Feds Say*, Spectrum News (Apr. 27, 2023), https://bit.ly/3Od1d5k (hate crime); Press Release, *Four Men Federally Indicted for Hobbs Act Conspiracy, Firearms Charges, and a Kidnapping*, Dep't of Justice (July 28, 2023), https://tinyurl.com/yepzsju5 (kidnapping; robbery; rape).

Plaintiffs mocked the term "ghost guns" used by Plaintiffs' own marketing materials[4] as a label meant to "re-brand an American tradition" and "treat[] companies that exist to support that tradition as enabling criminals." ECF No. 16 at 23.[5] The recent epidemic of violence fueled by ghost guns should not be considered an "American tradition."

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") acted well within its authority in promulgating *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652 (Apr. 26, 2022) ("Rule"). The Rule confirms that ghost gun "kits" (that provide all the parts needed to quickly assemble an unserialized gun) and the core building blocks of ghost guns (near-complete frames and receivers) are "firearms" under the Act. The Act defines "firearm" to include not only complete firearms, but also "frame[s]" or "receiver[s]" that are "designed to" be or "may readily be converted" into complete, operable firearms. 18 U.S.C. § 921(a)(3). That unambiguously encompasses ghost gun kits and most commercially available near-complete frames and receivers,

---

[4] For example, Plaintiff Defense Distributed's website URL is "ghostgunner.net" and Plaintiff Polymer80's website contains an entire subsection entitled "Ghost Gunner," https://www.polymer80.com/GG.

[5] All "ECF" references are to the District Court docket, 4:22-cv-00691 (N.D. Tex.).

which are designed to be and can be readily converted into operable and unserialized weapons, or the frames and receivers of such weapons, in an hour or less. Indeed, their *only* purpose is to be quickly and easily converted into untraceable weapons. Neither the district court nor Plaintiffs have identified any other conceivable use for these products.

The district court's nationwide vacatur of the Rule should be reversed and *Amici* underscore three of the many reasons why.

***First***, the Rule adheres to the Act's text and public-safety purpose. The district court rejected the notion that the Act reaches kits, frames, and receivers that are "incomplete" or "nonfunctional," *VanDerStok v. Garland*, --- F. Supp. 3d. ---, 2023 WL 4539591 at *14 (N.D. Tex. June 30, 2023) ("Op."), but that is precisely what the language Congress adopted permits: regulation of items that are "designed to" be or "may readily be converted" into operable weapons. 18 U.S.C. § 921(a)(3). Such items are necessarily "incomplete" and "nonfunctional." Yet, under the district court's ruling, ghost gun kits and near-complete frames and receivers— all obviously designed to be and readily convertible into functional firearms—can be sold by and to anyone, free from the serialization that

5

assists law enforcement in doing its job to protect the public. Such a result is contrary to the Act's text and purpose.

***Second***, the Rule recognizes practical reality in accounting for the ease and speed with which ghost guns can be assembled. As ghost gun companies' advertising materials make clear, these items are designed with the sole purpose of being converted with relative ease into functioning firearms. True to that singular purpose, kits and near-complete frames and receivers allow novice and sophisticated purchasers alike to convert these items into operable firearms swiftly and easily. One need only spend a moment on the websites of Plaintiffs Polmyer80, Tactical Machining, or Blackhawk Manufacturing to see beyond doubt that the wares being sold are designed to be and are readily convertible into functional firearms.

***Third***, the Rule continues ATF's longstanding view that not-yet-complete firearms can be "firearms." Shortly after the Act's passage, ATF recognized that near-complete frames or receivers that could readily be converted into operable firearms were indeed "firearms," judging by the ease and speed with which they could be rendered functional. That the ghost gun industry has flouted ATF's oversight by seeking to obscure the

ease and speed with which ghost guns can be assembled confirms that the industry knows what the Act has said all along: near-complete frames and receivers "designed" to be or that may "readily be" converted into operable firearms or the frames and receivers of such firearms are "firearms." Plaintiffs' claim below that the Rule reaches items "that have never been regulated," ECF No. 16 at 1, is ahistorical and belied by the industry's behavior.

The district court's ruling should be reversed.

## ARGUMENT

### I. The Rule Implements the Gun Control Act and Prevents its Subversion

#### A. The Rule Adheres to the Act's Definition of "Firearm"

The Gun Control Act defines "firearm" as follows:

> (A) any weapon (including a starter gun) which will or *is designed to or may readily be converted* to expel a projectile by the action of an explosive; (B) *the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device.

18 U.S.C. § 921(a)(3) (emphases added).

Taken together, and as reflected by the Rule, subparagraphs (A) and (B) of this section classify as "firearms" not only operable weapons, but also ghost gun kits and near-complete frames and receivers that are

"designed to" be or that may "readily be converted" into either operable firearms or the frames and receivers of such firearms. "[F]irearm" is defined to include the "frame or receiver of any such weapon," with "such weapon" in (B) referring back to "weapon" in (A). And (A), in turn, includes "any weapon" that is "designed to or may readily be converted to expel a projectile by the action of an explosive." Thus, when (B) refers to "the frame or receiver of any such weapon," it incorporates the description of "weapon" in (A), which covers both items already configured to fire *and* items that are "designed to or may readily be converted" into operable firearms. *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 81 (2d Cir. 2003) ("any such action" "refers back to" the phrase providing a right to "institute an action") (citation omitted).[6] As the Supreme Court recently noted, the "word 'such' usually refers to something that has already been 'described.'" *Slack Tech., LLC v. Pirani*, 143 S. Ct. 1433, 1439–40 (2023). Because (A) encompasses not-yet-complete "weapon[s]," it follows that

---

[6] *See also*, *e.g.*, *Standard Oil Co. of Calif. v. United States*, 231 Ct. Cl. 112, 122 (1982) ("'Such' refers back to the first clause of the sentence…"); *Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 185 (3d Cir. 2000) ("The phrase 'such action' … refers back to the immediately preceding sentence…"); *United States v. Dotson*, No. 1:11-cr-56, 2012 WL 76139, at *3 n.6 (S.D. Ind. Jan. 10, 2012) (agreeing "any such weapon" in 18 U.S.C. § 921(a)(3)(B) "refers back [to] section (A)").

the reference to "frame or receiver of any *such* weapon" in (B) includes near-complete frames or receivers as well, so long as they are "designed to" be or may "readily be converted" into the frame or receiver of an operable firearm.  18 U.S.C. § 921(a)(3) (emphasis added).

The district court neglected this critical textual link between subparagraphs (A) and (B).  According to the district court, "that which *may become* or *may be converted* to a functional receiver is not itself a receiver" and because "Congress could have included" the "designed to" or "may readily be converted" language (contained in subparagraph (A)) in subparagraph (B) and chose not to, it foreclosed the application of this language to subparagraph (B).  Op. at *14.

In so reasoning, the district court wrongly read into the statute a word—"functional"—that is simply not there.  More fundamentally, Congress's reference to "any such weapon" in subparagraph (B) precludes the district court's siloed reading of subparagraphs (A) and (B).  Although it is subparagraph (A) that refers to "weapons" that are "designed to" be or that "may readily be converted" into an operable firearm, subparagraph (B) then immediately refers back to "any *such* weapon" (emphasis added), thereby incorporating the description from

9

subparagraph (A). Congress regularly employs this kind of economical drafting. *Supra* p. 8 & n.6. Yet the district court insisted, contrary to the Act's express cross-reference, that subparagraphs (A) and (B) each be read in isolation. That is not a defensible reading of the statutory text.

### B.  The Rule Advances the Act's Purpose

The Act's purpose demands the same interpretation. The Act has two principal ends and two principal means, all of which are directly served by the Rule and undermined by the district court.

The Act's core ends are: (1) promoting public safety by keeping guns out of the hands of persons who have committed felonies, who suffer from severe mental illness, or are otherwise dangerous, and (2) assisting law enforcement in fighting crime. S. Rep. No. 90-1501, at 22 (1968) ("Senate Report") ("The principal purposes of this act are to make it possible to keep firearms out of the hands of those not legally entitled to possess them … and to assist law enforcement … in combating … crime."); H. Rep. No. 90-1577, at 4412 (1968) (explaining the "need" to combat "the growing use of firearms in violent crime"). Because unregulated ghost gun kits and near-complete frames and receivers allow dangerous

individuals to obtain deadly and untraceable firearms, failing to regulate these items as "firearms" undermines the Act's ends.

The Act's core means are: (1) regulating who may buy or sell firearms; and (2) imposing strict rules on how firearms and firearm transactions are tracked. The Rule's coverage of ghost gun kits and near-complete frames and receivers as "firearms" is faithful to those means, as it ensures that such objects are subject to the Act's limits on purchase, sale, and distribution. Indeed, failing to regulate these items as what they are—firearms—would undermine the Act and other firearm safety regulations that cross-reference the Act's definition of "firearm."

**_Federal firearms licensees._** The Act designates federal firearms licensees ("FFLs")—those who manufacture, sell, or import firearms—the "principal agent of [law] enforcement" in "restricting … access to firearms." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). If ghost gun kits and near-complete frames and receivers were not treated as firearms (as the Act requires), the effect would be to sideline FFLs with respect to the sale and acquisition of a rapidly growing source of firearms being used to further criminal activity across the country.

Under the Act, *only* FFLs may "engage in the business of importing, manufacturing, or dealing in firearms."  18 U.S.C. § 922(a)(1)(A); *see id.* § 923(a).  In exchange for this license, FFLs must serve as the Act's frontline mechanism for implementation:

- FFLs may not "sell or deliver" firearms to individuals who are underage, reside out-of-state (with limited exceptions), or have a criminal history.  18 U.S.C. §§ 922(b), 922(d); *see* 27 C.F.R. § 478.99.

- FFLs must keep inventory and transaction records and must report suspicious purchases.  18 U.S.C. § 923(g)(1)(A) (requiring FFLs to keep "such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business"); 27 C.F.R. §§ 478.101 (record-keeping), 478.121–134 (same); 18 U.S.C. § 923(g)(3) (FFLs must report when an individual buys multiple handguns within a short timeframe).

- FFLs must make their records accessible to law enforcement officials, who can access these records to investigate and combat firearm-related crimes.  *See infra* pp. 18–20.

FFLs that fail to meet these or other duties under the Act may lose their license, 18 U.S.C. §§ 923(d), 923(e), and become susceptible to civil and criminal liability, *id.* §§ 922, 924.

The Act and its implementing regulations thus enshrine FFLs as scrutinizing gatekeepers at the point of sale, subject to harsh penalties for noncompliance.  In monitoring the point of sale, the Act keeps firearms out of dangerous hands in the first place, rather than forcing

law enforcement to restrict possession after the firearms enter circulation. That makes sense: public safety is better served by preventing a criminal from purchasing a gun than it is by recovering a gun after a crime has already occurred. *See, e.g.*, *Barrett v. United States*, 423 U.S. 212, 220 (1976) (recognizing the Act's "prophylactic provisions"). But these point-of-sale FFL duties attach only to "firearms." If ghost gun kits and near-complete frames and receivers are not treated as "firearms" under the Act, FFLs are removed from their post as the "principal agent of [law] enforcement" for this rapidly expanding source of deadly, untraceable guns. *Huddleston*, 415 U.S. at 824.

   ***Background checks.*** Under the Act, every individual who buys a firearm from an FFL must undergo a background check. 18 U.S.C. § 922(t)(1); 27 C.F.R. § 478.102(a). Allowing unfettered access to firearms would thus be the opposite of what Congress envisioned. The "structure" and "history" of the Act demonstrate that "Congress … sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett*, 423 U.S. at 218, 220. The Act's approach comports with a "longstanding" tradition of "prohibitions on the possession of firearms" that protect public safety, such as limiting

13

possession by "felons and the mentally ill." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008); *see New York State Rifle & Pistol Ass'n., Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022) (reaffirming that the Constitution protects "the right of … *law-abiding* citizen[s]" to carry arms for self-defense) (emphasis added).    The Act carries forward that tradition by "establish[ing] a detailed scheme to enable the dealer to verify … whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.

So important is the identity of the purchaser under the Act that it is a crime for an FFL to sell a firearm without running a background check on the transferee, 18 U.S.C. § 922(t); for a buyer to "make any false or fictitious … statement" concerning their identity, *id.* § 922(a)(6); or for FFLs to make "false" statements regarding a buyer's identity, *id.* §§ 922(m), 924(a)(3).    The Rule fulfills Congress's judgment of who may buy or possess a firearm and its scheme to prevent circumvention of that judgment.

The district court hardly disputed that its "interpretation create[d] loopholes" that would allow felons and other prohibited individuals from obtaining "a firearm with relative ease and efficiency."    Op. at *18. According to the district court, this was an unforeseen drafting problem

that was "up to Congress" to fix. *Id.* But, as the Government correctly notes, courts should "not lightly conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019). Plus, Congress *did* foresee the problem of would-be criminals attempting to evade background checks, and it designed the Act accordingly—with language defining "firearms" to cover more than just operable firearms, but also near-complete firearms. *See supra* pp. 5–8; *infra* pp. 11–12. It is thus the district court's ruling—not Congress'—that introduced a "loophole."

Notably, at the time of the Act's passage, Congress deemed the ability to "anonymously acquire firearms" a "serious national concern":

> The ready availability, that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles, without the knowledge or consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern.

Senate Report at 22. So concerned was Congress with the danger of anonymous purchases, that it rejected earlier proposed legislation that failed to "prohibit the mail-order sale" of firearms known for "their susceptibility to crimes." S. Rep. No. 89-1866, at 34, 100 (1966).

Absent regulation as firearms, ghost gun kits and near-complete frames and receivers would be the modern incarnation of mail-order guns: they allow anonymous persons to buy a gun remotely and have that gun shipped across state lines to facilitate crime, with no record-keeping or background check needed.  Indeed, prior to the Rule, ghost gun purveyors proudly marketed the ability to avoid background checks.[7]  And *amici*'s analysis of federal prosecutions involving ghost guns between 2010 and 2020 found that, "[i]n nearly half of the prosecutions reviewed, the defendants were prohibited from possessing any firearm and would not have passed a background check."  *Untraceable: The Rising Specter of Ghost Guns*, Everytown for Gun Safety (May 14, 2020), https://bit.ly/3OcBb1W.

**Straw purchases.**  Failing to classify ghost gun kits and near-complete frames and receivers as firearms would also dilute the Act's ban

---

[7] *See, e.g., Are Felons Restricted from Owning a Firearm that Was Built from an 80% Receiver?*, Polymer80 Blog (Oct. 21, 2020), *formerly at* https://bit.ly/3DDzXGo ("Convicted felons are not restricted from purchasing and owning 80% frames…"); *The History of Legally Buying Firearms Without an FFL,* 80% Arms Blog (Dec. 3, 2019), https://bit.ly/3HClkFU (no background check or serialization required); *JSD 80% Lower Receivers, Jigs, and Gun Parts Kits*, JSD Supply (last visited July 30, 2023), https://bit.ly/3rKrgqj (same); *Ghost Gunner*, Ghost Guns (last visited July 30, 2023), https://bit.ly/3pUjDvj (same); *Lower Receiver,* SS-Arms (last visited July 30, 2023), https://bit.ly/3GAVvVo (same); *About,* R&B Tactical Tooling (last visited July 30, 2023), https://bit.ly/3oNKmZU (same).

on "straw purchases," *i.e.*, gun purchases made by someone who can pass a background check on behalf of someone else—often a prohibited buyer. Purchasers of ghost gun kits or near-complete frames and receivers would not even need to cloak their identities with straw purchases if these items were not recognized as firearms.

The Act aims to prevent the diversion of firearms to the criminal market, including by preventing "straw purchases." Straw purchases have long fueled gun trafficking. *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, U.S. Dept. of the Treasury at 10 (June 2000), https://bit.ly/3JXi6OP; *Trafficking & Straw Purchasing*, Giffords Law Center (last visited Dec. 14, 2021) https://bit.ly/3FBTtnv ("30,000 attempted straw purchases each year").

The Act aims to block straw purchases through several interlocking mechanisms. Gun buyers must complete "Form 4473," attesting to their identity, ATF Form 4473 (5300.9), https://bit.ly/3CAv5Rl, and it is a crime to misrepresent—on Form 4473 or elsewhere—"any fact material to the lawfulness of the sale," 18 U.S.C. § 922(a)(6). Further, an FFL that fails to stop straw purchases at the point of sale can lose its license and face civil and criminal liability. *Shawano Gun & Loan, LLC v. Hughes,*

650 F.3d 1070, 1077–79 (7th Cir. 2011); *United States v. Carney*, 387 F.3d 436, 446 (6th Cir. 2004).

As the Supreme Court has recognized, protections against straw purchases are essential because, "[p]utting true numbskulls to one side, anyone purchasing a gun for criminal purposes would avoid leaving a paper trail by the simple expedient of hiring a straw." *Abramski*, 573 U.S. at 183. Yet if ghost gun kits and near-complete frames and receivers were wrongly deemed not to be firearms under the Act, then none of the tools that ATF employs to combat straw purchases would be available for this segment of the market, leaving criminal buyers with few roadblocks to obtaining firearms. Instead, criminal purchasers could—and surely would—simply procure directly the materials needed to quickly and easily assemble unserialized and untraceable weapons.

***Serialization, record-keeping, and public safety.*** Absent regulation as firearms, ghost gun kits and near-complete frames and receivers sidestep the Act's serialization and record-keeping provisions, making it more difficult for law enforcement to fight crime. *See*, *e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) ("[W]e think it plain that [serialization] serves a law enforcement interest."); *United*

*States v. Harris*, 720 F.3d 499, 502 (4th Cir. 2013).    By their nature, ghost guns are operational, unmarked, and *untraceable* firearms, which impede law enforcement's ability to prevent, detect, and prosecute violent crime by tracing illegal weapons to their source.

The Act mandates that every firearm bears a unique serial number and makes it a crime to tamper with a serial number or even "receive" a firearm with a tampered-with serial number.    27 C.F.R. § 478.92; 18 U.S.C. §§ 921(i), 922(k).    Serialization is key because it allows ATF "to link a suspect to a firearm." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 204 (D.C. Cir. 2013).

The Act also assists law enforcement by requiring FFLs to keep records that track firearm sales and inventory.    18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.121–134.    Law enforcement officers are permitted to "examine the inventory and records of [FFLs] … without … reasonable cause or warrant," in connection with any "reasonable inquiry" during a "criminal investigation."    18 U.S.C. § 923(g)(1)(B); *see* 27 C.F.R. § 478.121(b).    "FFL records" allow ATF to "trace a firearm" and identify its "path through the distribution chain." *Nat'l Shooting Sports*, 716 F.3d at 204 (cleaned up).

Without serialization and record-keeping, these law-enforcement tools cannot work.  It is "no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes" and reconstructing custody chains without "serial numbers" is "virtually impossible." *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992). The inherent difficulty of tracing an unserialized firearm is one reason why "[f]irearms without serial numbers are of particular value to those engaged in illicit activity." *Marzzarella*, 614 F.3d at 98.  As a House Committee report warned, "[g]host guns" pose a "homeland security challenge" because they "hamstring[] law enforcement's ability to investigate crimes."  H. Rep. No. 116-88, at 2 (2019).

The district court acknowledged these regulatory powers:  that the Act "requires … dealers of firearms to have a federal firearms license," that dealers "must … conduct background checks," and that dealers "must keep records of firearm transfers."  Op. at *2.  But under the district court's ruling, ghost gun kits and their key component parts—which can be converted into operable deadly firearms in an hour or less—are exempt

from this regulation altogether, at least in domestic commerce.[8]

In short, under the district court's ruling, dealers need not have a license to freely distribute ghost guns; would-be criminals need not face a background check before purchase of such weapons; and such purchases would leave no trace in the dealer's records. No reasonable reading of the Act could possibly require that bizarre result.

## II.  The Rule Properly Considers the Reality that Ghost Guns Can Be Quickly and Easily Assembled from Kits and Near-Complete Frames and Receivers

The Act defines "firearm" in practical terms, covering not only fully complete weapons, but also near-complete frames and receivers that are designed to be or may readily be converted into operable firearms or the frames or receivers of such firearms. 18 U.S.C. § 921(a)(3). The Rule applies this definition:  ghost gun kits and near-complete frames and receivers are not only openly advertised as being designed for conversion into operable firearms, but have been shown—time and again—to be readily convertible, with ease, in an hour or less.

---

[8] Exports of near-complete frames and receivers are regulated by the Commerce Department. Dep't of Commerce, FAQs for the Commerce Categories I–III, 9 (2020), https://tinyurl.com/3m4svmw4.

Preliminarily, courts have widely agreed that, under the Act, a "weapon designed to fire a projectile" that is "temporarily incapable of effecting its purpose," is not "removed from" the definition of "firearm." *United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005).[9] Just last year, the California Superior Court refused to dismiss claims that a ghost gun kit purveyor violated the Act by distributing "kits which could readily be converted into firearms."[10] Even more recently, the D.C. Superior Court held that near-complete frames, receivers, and kits sold by a ghost gun manufacturer—"regardless of their operability"—are "firearms" as they are "readily converted into firearms."[11]    Even here, the district court

[9] *See, e.g., United States v. Hardin*, 889 F.3d 945, 949 (8th Cir. 2018) (rejecting argument that "disrepair" of a gun, which rendered it inoperable, changed that the gun was "manufactured to be … a gun") (quotation marks omitted); *United States v. Cooper*, 714 F.3d 873, 881 (5th Cir. 2013) ("[W]e have consistently held that inoperable firearms can support convictions [under 18 U.S.C. § 921(a)(3).]"); *United States v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (gun that could be "modified" to function as a firearm, "without any specialized knowledge, in less than an hour," is "'readily convertible'"); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (gun that was not "operational" until "putting the bolt in" was a "firearm"); *United States v. Christmann*, 193 F.3d 1023, 1024 (8th Cir. 1999) (interpreting what it means to "readily" be convertible into a "firearm" under Sentencing Guidelines and explaining that it "turns on what the weapon is designed to do, not on whether it is capable of doing its job at the particular moment the crime was committed"); *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (gun that required "8-hour working day in a properly equipped machine shop" was "readily" convertible into an operational gun).

[10] *Apolinar v. Polymer80, Inc.*, 2022 Cal. Super. Lexis 2591, at *6 (Cal. Sup. Ct. Feb. 2, 2022).

[11] *District of Columbia v. Polymer80, Inc.*, No. 2020-CA-002878-B, at 5–6 (D.C. Sup. Ct. Aug. 10, 2022) ("On Polymer80's website, they provide instructions to consumers

acknowledged binding authority from this Court that a "disassembled shotgun was still a 'firearm' under the Gun Control Act's definition," a holding that plainly acknowledges that not-yet-operable firearms are "firearms" under the Act, so long as they are designed to be or are readily convertible into operable firearms.  Op. at *17 (citing *United States v. Ryles*, 988 F.2d 13 (5th Cir. 1993)).  In short, this Court and many others have had no trouble applying the Act's text and concluding that items that are "designed to or may readily be converted" into firearms are "firearms," even if they are not presently complete.

Reality illustrates why these well-reasoned decisions apply with full force in the context of ghost guns.  A mountain of evidence confirms that ghost gun kits and near-complete frames and receivers ***are*** designed to be and may readily be converted into operable firearms. Manufacturers and distributors have advertised that these kits, frames, and receivers are designed for the sole purpose of being assembled into functional guns.  And—consistent with that purpose—these items can, in fact, be easily assembled by the most novice of gun-builders, even a child.

---

on how to build firearms with these unfinished frames, receivers, and … kits."), https://bit.ly/3A1f4EN.

Numerous websites offer all-in-one gun-building kits—one was marketed expressly as a "buy build shoot kit"—that allow customers to buy a kit using a debit or credit card, sans background check, and have the kit shipped directly to the customer. *See, e.g.*, Glenn Thrush, *"Ghost Guns": Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. Times (June 22, 2023), https://tinyurl.com/pebsbctr. To prove "how easily a minor could buy a gun kit online," one father used his teenage daughter's name for an online kit order, checked a box that she was over 21, and then—as advertised—received a "box in the mail." *Id.* That father's daughter had, by the time of his order, been killed at age 15 by a ghost gun. *Id.*; *see also, e.g.*, 87 Fed. Reg. at 24,718 ("ATF found 71 companies selling such kits.").

Upon delivery, ghost guns are easy and quick to assemble. As the head of ATF's Los Angeles field office observed:

> If you can go to one of these big-box stores and put that type of furniture together, if you're putting together your kids Christmas toys, you can make a homemade gun. It's that easy.

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost Guns,' Authorities Say, and Then Killed His Sister with One*, Wash. Post. (Dec. 3, 2021), https://wapo.st/3Ggarb9. And as touted by manufacturers

and distributors of ghost-gun building kits, assembly is not just easy, it is *quick*.  Ghost-gun kit purveyors—including some Plaintiffs—have advertised that assembly can be done quickly and have published how-to guides to walk novices through the building process.  *See, e.g., GST-9: 80% Pistol Build Kit*, 80% Arms (last visited Aug. 11, 2023), https://bit.ly/3x6n0T7 ("Our goal was for you to be able to go from opening the mail, to a … pistol in under *15 minutes*."); *How-To Manuals*, Polymer80 (last visited Aug. 11, 2023), https://bit.ly/3qUwobt.  True to this advertising, amateurs and experts alike have assembled kits into fully functional firearms in around an hour or less.[12]  The district court suggested that whether such kits "may become" firearms is speculative.  Op. at *13–14.  But these advertisements make clear that these items have no purpose but to be made into functional firearms.  Indeed, certain Plaintiffs quietly conceded below that their products are designed solely

---

[12] *See, e.g.*, Compl. at ¶¶ 74, 115, *People v. Blackhawk Mfg. Grp., et al.*, CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) (officer assembled kit in "less than *25 minutes*" with hardware store tools (emphasis added)); *id.* at ¶ 73 (ATF agent built kit "in less than *nineteen minutes*" (emphasis added)); Prelim. Inj. Mem., *City of New York v. Arm or Ally LLC, et al.*, 22-CV-5525, Dkt. 9, at 11 (S.D.N.Y. June 29, 2022) (ghost gun assembled "in approximately an *hour and a half*") (emphasis added); Decl. of J. McFarlan, *City of Syracuse, et al. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 20-CV-6885, Dkt. 64-34, at ¶¶ 8, 10, 11 (S.D.N.Y. Dec. 9, 2020) ("*City of Syracuse*") (individual who had "never attempted to build a firearm using an unfinished frame or receiver" watched "videos on *YouTube* for thirty minutes" then built a "complete pistol from [a kit] in *86 minutes*") (emphasis added).

to allow their customers "to make … firearms," ECF No. 103 at 3, rendering absurd the effort by other Appellees to define these items "non-firearm objects," ECF No. 141 at 4.

In short, the reality embodied in the Rule—and ignored by the district court—is that ghost gun kits and near-complete frames and receivers are designed to be and are readily convertible into operable firearms.  Ghost gun purveyors *advertise* that design and, true to that design, experience confirms that these kits, frames, and receivers can be quickly converted into a deadly, untraceable weapon by anyone with an internet connection and a credit card.

## III.  The Rule Comports with ATF's Longstanding View that Not-Yet-Complete Firearms Can Be Firearms Under the Act

Below, Plaintiffs insisted that the Rule veers from ATF's historical views on what constitutes a firearm.  *See*, *e.g.*, ECF No. 16 at 1, 5, 15, 29, 38; ECF No. 145 at 13 (maintaining the "Rule jettisoned decades of classification determinations"); *id.* at 19 (contending the Rule "upends existing federal gun law").  This is wrong.  ATF has long understood that Congress defined "firearm" to include not-yet-complete firearms, and that the operative question is how "readily" a near-complete firearm can "be converted" into operable condition.  18 U.S.C. § 921(a)(3).  That some

manufacturers and distributors have sought to conceal from ATF the ease with which their wares can be assembled only reinforces that a near-complete frame or receiver is indeed a "firearm."

The Act was enacted in 1968. In 1976, ATF adopted a framework for assessing whether an "unfinished" frame or receiver is a "firearm." Record, *City of Syracuse*, ECF 60 (S.D.N.Y. Dec. 8, 2020), at ATF0265 (*see* https://bit.ly/3BTAgxX). The framework explained that if "unfinished frames" or "castings" *"may readily be converted"* into firearms, "they are firearms." *Id.* at ATF0266 (emphasis added). The framework noted that near-complete frames and receivers must be reviewed "case-by-case" to gauge if they are "readily convertible":

> [W]e view the current Bureau procedure in classifying "firearms" on a case-by-case basis as consistent with the letter and spirit of the [] Act. It is obvious that what constitutes "readily convertible" depends upon the nature of each firearm. That there may be cases where it is difficult to determine the side on which a particular "firearm" falls is not a sufficient reason to establish a rigid criterion for … "readily convertible."

*Id.* at ATF0267.

For decades, ATF followed that conclusion in classification letters that turned on whether items could "readily be converted" into an operable firearm. *Id.* at ATF0001, ATF0014, AATF0020, ATF0023,

ATF0050, AATF0051, AATF0053, ATF0065 (*see* https://bit.ly/3YJIZws).
Consistent with "readily" meaning "without much difficulty" or "with
fairly quick efficiency,"[13] several of these letters referenced the ease and
speed with which near-complete frames and receivers could be assembled
into operable firearms. *Id.* at ATF0020 (receiver was a "firearm" because
it required "75 minutes" of assembly); *id.* at ATF0024 (frame was a
"firearm" because it required "20 minutes").

Notwithstanding this history, Plaintiffs complain—erroneously—
that the Rule's focus on ease and speed of assembly marks a tectonic shift.
That is belied by the ghost gun industry's behavior. The industry has
tried to hide from ATF the extent to which ghost gun kits and parts can
"readily" be converted into firearms—a clear sign that, even before the
Rule, the industry knew that the Act reaches these items.

In an affidavit to support a warrant to search a facility operated by
Polymer80 (a major seller of ghost gun kits and parts), an ATF agent
stated that, in 2017, Polymer80 sought a determination that a near-
complete pistol frame is not a firearm by misleadingly submitting just

---

[13] *Webster's Third New International Dictionary* 1889 (1965) (defining "readily").

the near-complete frame without the rest of the kit sold with the frame. Aff. of T. Hart, *In the Matter of the Search of the Business and Federal Firearms Licensee known as Polymer80*, 3:20-mj-123, ¶¶ 42–43 (D. Nev. Dec, 9, 2020) (https://on.wsj.com/3pivOCi).  ATF responded to Polymer80 in a letter noting that, "the submitted sample is simply a component of a larger product," and directing Polymer80 to "submit the complete … [k]it." *Id.* at ¶¶ 43–44.  As of December 2020, Polymer80 had not "resubmitted the … kit." *Id.* at ¶ 45.  ATF eventually obtained a kit through an informant who bought the "Buy Build Shoot" kit—advertised as having "all the necessary components" for a gun—with no background check, and assembled it into an operable gun in 21 minutes. *Id.* at ¶ 69.

In short, ATF's recognition that not-yet-complete firearms can be "firearms" under the Act is almost as old as the Act itself.  The Rule merely tailors that long-held understanding to modern technology. *See*, *e.g.*, 87 Fed. Reg. 24,652–62 (explaining ATF reacted to a "technological advance[]").  ATF explained this history to the district court. *See*, *e.g.*, ECF 181 at 41–45.  In response, the district court did not deny that ATF has "previously determined that a particular component was … a 'firearm' for purposes of the [Act] based on the item's stage of

manufacture," but downplayed the import of this "historical practice" and concluded that ATF has been violating the law for "decades." Op. at *15. That is incorrect on its own terms, as set forth above. *Supra* pp. 7–21. But it is also contrary to the Supreme Court's instruction to account for how an agency's power under a statute "has been used" before. *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023). History—like text, structure, and practical reality—cuts firmly against the district court's decision.

## CONCLUSION

The district court's decision should be reversed.

August 16, 2023

Respectfully Submitted,
By: */s/ Kathleen R. Hartnett*

KATHLEEN R. HARTNETT
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 693-2000
khartnett@cooley.com

DANIEL GROOMS
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 776-2042
dgrooms@cooley.com

ADAM M. KATZ
RACHEL ALPERT
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com
ralpert@cooley.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished through this Court's CM/ECF system.


August 16, 2023                                    Respectfully Submitted,
                                                   By:  */s/ Kathleen R. Hartnett*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 6,445 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) and Fifth Circuit Local Rule 32 because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point (above the line) and 12-point (footnotes) Century Schoolbook font.

August 16, 2023                              Respectfully Submitted,

                                             By:  */s/ Kathleen R. Hartnett*