No. 23-10718

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,

*Plaintiffs-Appellees,*

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms; Defense Distributed; Second Amendment Foundation, Incorporated; Not An L.L.C., doing business as JSD Supply; Polymer80, Incorporated,

*Intervenor Plaintiffs-Appellees,*

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, and Firearms, and Explosives,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Northern District of Texas

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES AND INTERVENOR PLAINTIFF-APPELLEE POLYMER80

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Appellees VanDerStok, Andren, Tactical Machining, and Firearms Policy Coalition*

*Additional Counsel Listed on Inside Cover*

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
cwi@fpchq.org

Brian Abbas
MOUNTAIN STATES LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
wtrachman@mslegal.org
babbas@mslegal.org

*Counsel for Appellees VanDerStok, Andren, Tactical Machining, and Firearms Policy Coalition*

Dennis L. Daniels, Jr.
Bradley Arant Boult Cummings, LLP
Fountain Place
1445 Ross Avenue
Suite 3600
Dallas, Texas 75202
214-257-9800
dldaniels@bradley.com

John Parker Sweeney
James W. Porter, III
Marc A. Nardone
Connor M. Blair
Bradley Arant Boult Cummings, LLP
1615 L Street NW
Suite 1350
Washington, DC 20036
202-393-7150
jporter@bradley.com

*Counsel for Appellee Polymer80*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

*VanDerStok v. Garland*, No. 23-10718

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| *Plaintiffs-Appellees* | *Counsel for Plaintiffs-Appellees* |
|---|---|
| Jennifer VanDerStok | David H. Thompson |
| | Peter A. Patterson |
| Michael G. Andren | William V. Bergstrom |
| | COOPER & KIRK, PLLC |
| Tactical Machining, L.L.C., a limited | |
| liability company | Richard Brent Cooper |
| | Benjamin David Passey* |
| Firearms Policy Coalition, | COOPER & SCULLY, P.C. |
| Incorporated, a nonprofit corporation | |
| | Brian A. Abbas* |
| | Erin M Erhardt* |
| | MOUNTAIN STATES LEGAL FOUNDATION |
| | |
| | Cody J. Wisniewski* |
| | FPC ACTION FOUNDATION |
| | |
| | Kaitlyn D. Schiraldi* |
| | NEW CIVIL LIBERTIES ALLIANCE |

i

| *Intervenor Plaintiffs-Appellees* | *Counsel for Intervenor Plaintiffs-Appellees* |
|---|---|
| Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms<br><br>Defense Distributed<br>Second Amendment Foundation, Incorporated<br><br>Not An L.L.C., doing business as JSD Supply<br><br>Polymer80, Incorporated | Brian Daniel Poe<br>BRIAN D. POE, ATTORNEY AT LAW PLLC<br><br>Joseph Christopher Amrhein, Jr.*<br>Michael J. Sullivan*<br>Nathan P. Brennan*<br>ASHCROFT LAW FIRM, LLC<br><br>Chad Flores, Esq.<br>FLORES LAW, PLLC<br><br>Nicholas Bruno<br>BECK REDDEN LLP<br><br>Zachary Nelson*<br>LATHAM & WATKINS LLP<br><br>Matthew Joseph Smid<br>EVANS, DANIEL, MOORE, EVANS, BIGGS, & SMID<br><br>J. Mark Brewer*<br>BREWER & PRITCHARD, P.C.<br><br>Dennis Daniels<br>James W. Porter*<br>Marc A. Nardone*<br>BRADLEY ARANT BOULT CUMMINGS, L.L.P. |
| *Defendants-Appellants* | *Counsel for Defendants-Appellants* |

| | |
|---|---|
| Merrick Garland, in his official capacity as Attorney General of the United States<br><br>United States Department of Justice<br><br>Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives<br><br>Bureau of Alcohol, Tobacco, Firearms and Explosives | Sean Janda<br>Daniel M. Riess<br>Jeremy S.B. Newman*<br>Martin M. Tomlinson*<br>Taisa M. Goodnature*<br>U.S. DEPARTMENT OF JUSTICE |

Attorneys whose names are denoted with an asterisk entered appearances in the district court but have not entered appearances in the Fifth Circuit.

Dated: August 23, 2023

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

This Court has scheduled oral argument in this appeal for September 7, 2023.

**TABLE OF CONTENTS**

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS ............................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................................iv

TABLE OF AUTHORITIES .................................................. vii

INTRODUCTION ...................................................................1

STATEMENT OF THE CASE ..............................................................3

I.    Statutory Background .....................................................3

II.   Plaintiffs ..............................................................6

III.  Procedural Background ...................................................7

SUMMARY OF ARGUMENT ..............................................................9

STANDARD OF REVIEW ................................................................14

ARGUMENT ........................................................................14

I.    The District Court Correctly Held that the Rule Exceeds ATF's
      Authority by Expanding the Definitions of "Frame or Receiver"
      and "Firearm" Beyond Their Statutory Bounds. ...........................14

      A. The Items Newly Regulated by the Rule Are Not Frames
         or Receivers. ......................................................14

      B. A Parts Kit Is Not a "Firearm." ...................................25

      C. The Doctrines of Constitutional Avoidance and the Rule of
         Lenity Support the District Court's Interpretation. ...............33

II.   The District Court's Remedy Was Proper..................................36

A. Vacatur Is the Appropriate Remedy for a Rule Promulgated
In Excess of Agency Authority and It Is, By Its Nature,
Universal. ........................................................................................36

B. The Government's Argument That the Organizational Plaintiffs'
Members Should Not Be Covered By Any Relief Is Contrary to
Binding Precedent. ..........................................................................41

C. It Was Appropriate for the District Court to Vacate the
Whole Rule..........................................................................................48

CONCLUSION ..........................................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                             **Page**

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders*,
    553 U.S. 662 (2008)..................................................................16

*Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*,
    474 U.S. 361 (1986)............................................................24, 25

*Burgess v. United States*, 553 U.S. 124 (2008)................................17, 18

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) ...............................18

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) .....................................15, 16

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)..............................18

*Cream Wipt Food Prod. Co. v. Fed. Sec. Adm'r*,
    187 F.2d 789 (3d Cir. 1951).........................................................37

*Crowell v. Benson*, 285 U.S. 22 (1932)................................................33

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022)....................................................36, 41

*Driftless Area Land Conservancy v. Valcq*,
    16 F.4th 508 (7th Cir. 2021).....................................................40, 41

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) .......................36

*Franciscan All., Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022).....................................................37, 38

*Gun Owners of Am., Inc. v. Garland*,
    19 F.4th 890 (6th Cir. 2021) .........................................................5

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1977)...........44

*Luis v. United States*, 578 U.S. 5 (2016) ..............................................33

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)..........................39, 41

*MD/DC/DE Broad. Ass'n v. FCC*, 253 F.3d 732 (D.C. Cir. 2001) ..........49

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993)...................................24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)................................................................34

*O'Reilly v. U.S. Army of Eng'rs*, 477 F.3d 225 (5th Cir. 2007) ..............36

*Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022)........................33

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ............................................34

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001)....................14

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ...............................................45

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    143 S. Ct. 2141 (2023)....................................................................42

*Students for Fair Admissions, Inc. v. Presidents and Fellows of Harvard Coll.*
    *(Harvard Corp.)*, 261 F. Supp. 3d 99 (D. Mass. 2017) .................43

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ...............................39

*Swann v. Charolotte-Mecklenburg Bd. Of Educ.*,
    402 U.S. 1 (1971)...........................................................................39

*Trump v. International Refugee Assistance Project*,
    582 U.S. 571 (2017).......................................................................39

*United States v. Annis*, 446 F.3d 852 (8th Cir. 2006)...................19, 20, 27

*United States v. Brown*, 117 F.3d 353 (7th Cir. 1997) ............................30

*United States v. Christmann*, 193 F.3d 1023 (8th Cir. 1999)..................19

*United States v. Gwyn*, 481 F.3d 849 (D.C. Cir. 2007) ......................30, 31

*United States v. Martinez*, 964 F.3d 1329 (11th Cir. 2020) ...............29, 30

United States v. Prince, 593 F.3d 1178, 1183 (10th Cir. 2010)...............10

*United States v. Ruiz*, 986 F.2d 905 (5th Cir. 1993)................................19

*United States v. Ryles*, 988 F.2d 13 (5th Cir. 1993) ...............................28

*United States v. Stewart*, 451 F.3d 1071 (9th Cir. 2006)........................28

*United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992)............36

*United States v. Wada*, 323 F. Supp. 2d 1079 (D. Or. 2004)..................31

*United States v. Wick*, 697 F. App'x 507 (9th Cir. 2017) ..................27, 28

*VanDerStok v. Garland*, 625 F. Supp. 3d 570 (N.D. Tex. 2022) ..........7, 8

*Warth v. Seldin*, 422 U.S. 490 (1975).....................................................43

## **Constitution and Statutes**

U.S. Const. amend. II ............................................................................. 33

5 U.S.C.
    § 703 ..............................................................................................38

§ 706(2)............................................................................12
§ 706(2)(C) ...............................................................14, 37

15 U.S.C. § 901(3) (1967) .........................................................31

18 U.S.C.
§ 921(a)(3) ..................................................4, 10, 14, 15
§ 921(a)(3)(A)..................................................................29
§ 921(a)(3)(B)..................................................................29
§ 921(3)............................................................................4
§ 923(a)............................................................................1
§ 923(i)................................................................1, 2, 26
§ 926(a)............................................................................4

16 C.F.R. § 1512.2(a)(1) ......................................................16, 17

27 C.F.R.
§ 478.11...............................................................11, 12, 25, 35
§ 478.12(c) .............................. 5, 6, 10, 15, 21, 34, 35
§ 479.102 ......................................................................35
§ 479.11..........................................................................35

An Act to Amend Chapter 44 (Relating to Firearms) of Title 18,
United States Code, and for Other Purposes, §1(b)(2),
100 Stat. 449 (1986) ..............................................................5

Consolidated & Further Continuing Appropriations Act, 2013,
P.L. 113-6, § 514, 127 Stat. 198 (2013).................................47, 48

Federal Firearms Act of 1938, Ch. 850, Pub. L. 75-785,
52 Stat. 1250 (June 30, 1938) (repealed 1968)................................3

Internal Rev. Serv., Dep't of the Treasury, 33 Fed. Reg. 18,555
(Dec. 14, 1968) (to be codified at 26 C.F.R. pt. 178).....................5

National Firearms Act of 1934, Ch. 757, 48 Stat. 1236 (June 26, 1934) .................3

**Legislative Authorities**

*Ghost Guns Are Guns Act*, H.R. 1278, 115th Cong. (Mar. 1, 2017)
(not enacted) ................................................................32

S. Rep. No. 90-1097 (1968),
*as reprinted in* 1968 U.S.C.C.A.N. 2112.................................4, 31

*Stopping the Traffic in Overseas Proliferation of Ghost Guns Act*,
S. 459, 116th Cong. (Feb. 12, 2019)...................................33

*Untraceable Firearms Act of 2018*, H.R. 6643, 115th Cong. § 2(a)(36)
(July 31, 2018) (not enacted) ...........................................................32

*Untraceable Firearms Act of 2018*, S. 3300, 115th Cong. § 2(a)(36)
(July 31, 2018) (not enacted) ......................................................32, 33

## Other Authorities

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW (2012) ..................31, 32, 38

*Are "80%" or "unfinished receivers illegal?*, ATF,
https://bit.ly/3OEDgFt (last visited Aug. 22, 2023) .....................................21

ATF, *Open Letter to All Federal Firearms Licensees*, DEP'T OF JUST.
(Sept. 27, 2022), https://bit.ly/3OQf2H0 ..........................................22, 23, 35

*Bicycle*, MERRIAM-WEBSTER.COM ONLINE DICTIONARY,
https://bit.ly/3YJsrVU (last visited Aug. 22, 2023) ......................................16

CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS
(Henry Paolucci, tr., Bobbs-Merrill, 1963) (1764) ........................................47

*Convert*, MERRIAM-WEBSTER.COM ONLINE DICTIONARY,
https://bit.ly/47FxhYm (last visited Aug. 22, 2023) .....................................20

*Firearms Trace Data – 2019*, ATF, https://bit.ly/3rPBwQB
(last visited Aug. 22, 2023) ..............................................................47

Jacob Gershman, *California Considers Plastic-Gun Measure*,
THE WALL ST. J. (Jan. 14, 2014), https://on.wsj.com/3QLdnVT .................45

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*,
54 ST. MARY'S L.J. 35 (2023) ..........................................................33, 34

Margaret Davis, *Legal blank firing pistols being converted into deadly weapons,
police warn*, THE EVENING STANDARD (May 5, 2021),
https://bit.ly/3YMM2o9 ................................................................20

Mariel Alper and Lauren Glaze, *Source and Use of Firearms Involved in Crimes:
Survey of Prison Inmates, 2016*, BUREAU OF JUST. STAT.,
DEP'T OF JUST. (Jan. 2019), https://bit.ly/3fIswDC ..............................46, 47

*National Firearms Act*, ATF,
https://bit.ly/3Y2kzP9 (last visited August 22, 2023) ......................................3

*National Firearms Commerce and Trafficking Assessment Vol. II: Part III*,
ATF (Jan. 11, 2023), https://bit.ly/3q9q7e0 .......................................45, 46

Press Release, Fact Sheet: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership it Needs to Enforce Our Gun Laws, White House Briefing Room (Apr. 11, 2022), https://bit.ly/3Q59BX9 ........48

*Set aside*, BLACK'S LAW DICTIONARY (3d ed. 1933) ...............................................37

Spencer Amdur & David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 HARV. L. REV. F. 49 (2017).....................................................................39

Zusha Elinson, *Ghost-Gun Company Raided by Federal Agents*, WALL ST. J. (Dec. 11, 2020), https://on.wsj.com/44T1q4O ...................26, 27

**INTRODUCTION**

The Gun Control Act of 1968 reflects Congress's fundamental policy choice to regulate the commercial market for firearms while leaving law-abiding citizens free to exercise their right to make firearms for their own use. The Act is not, by any means, a blanket authorization for overbearing federal regulation.

By its terms, the Act regulates those "engage[d] in the business of . . . manufacturing [firearms]," 18 U.S.C. § 923(a), not individuals who make firearms for their own use. The Act includes a precise definition of what it takes for an item to be a "firearm," and it is only "firearms" so-defined whose commercial production and sale must comply with the federal regulatory regime. Specifically, Congress has defined "firearms" as (a) weapons that are or readily could be converted to become weapons that are ordinarily referred to as "firearms" or (b) the central component—known as the "frame" or "receiver"—of those weapons.

Congress's decision to limit its regulation of firearm parts to just *one* complete central component was an intentional choice designed to make the federal regulation of firearms more feasible, by intentionally declining to regulate any other firearm parts. Indeed, Congress clearly intended that *every* firearm under regulation would have a frame or receiver, as that is where Congress directed manufacturers to place serial numbers: "[l]icensed . . . manufacturers shall identify by means of a serial number engraved or cast *on the receiver or frame of the weapon*, . . . *each* firearm . . .

1

manufactured by such . . . manufacturer." *Id*. § 923(i) (emphasis added). Under the statute, *every* regulated "firearm" must at a minimum consist of a fully manufactured frame or receiver; items without a fully manufactured frame or receiver are not "firearms" and accordingly are not subject to the serialization and other requirements of the Gun Control Act.

The Gun Control Act's focus on fully manufactured frames and receivers reflects a choice by Congress not to interfere with the making of firearms by private citizens. After 50 years, however, ATF has opted to sweep in private citizens who make their own firearms. But rather than seeking to convince Congress that changing circumstances counsel in favor of revisiting the policy choices made in 1968, ATF has revisited those choices itself. To that end, in August 2022, ATF expanded the regulatory definition of "firearm" to include (a) items that are not *actually* "frames or receivers" but merely could *become* frames or receivers with additional manufacturing, and (b) "weapon part kits" that are not *actually* weapons and that may *lack* the frame or receiver that the Gun Control Act makes a necessary component of every regulated "firearm." The district court properly rejected ATF's attempt to unilaterally expand its regulatory authority in this way. This Court should affirm that decision.

2

## STATEMENT OF THE CASE

### I. Statutory Background

Congress enacted the National Firearms Act in 1934 "[t]o provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof." National Firearms Act of 1934, Ch. 757, 48 Stat. 1236, 1236 (June 26, 1934). The National Firearms Act "imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational) tax on persons and entities engaged in the business of importing, manufacturing, and dealing in [National Firearms Act] firearms." *National Firearms Act*, ATF, https://bit.ly/3Y2kzP9 (last visited August 22, 2023). "Firearms subject to the 1934 Act included [short barreled] shotguns and rifles, . . . certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers." *Id.*

Four years later, Congress enacted the Federal Firearms Act, which defined "firearm" more broadly to include "any weapon . . . designed to expel a projectile or projectiles by the action of an explosive . . . or any part or parts of such weapon." Federal Firearms Act of 1938, Ch. 850, Pub. L. 75-785, 52 Stat. 1250, 1250 (June 30, 1938) (repealed 1968).

Thirty years later, Congress enacted the Gun Control Act of 1968, which

amended the NFA and established a four-part definition of what constitutes a "firearm." *See* 18 U.S.C. § 921(3), *et seq.* As defined in the Gun Control Act, and as it has stood since 1968,

> [t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3). This definition superseded the Federal Firearms Act definition, in which "any part or parts of such a weapon [were] included." S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200. Experience had taught that "it [was] impractical to have controls over each small part of a firearm. Thus, the revised definition substitute[d] only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.' " *Id.*

As the Government indicates, Congress delegated to the Attorney General the authority to "issue 'rules and regulations as are necessary to carry out' " the Act. Br. for Appellants, Doc. 77-1, at 5, (Aug. 9, 2023) ("Gov't Br.") (quoting 18 U.S.C. § 926(a)). The Government elides, however, that this is no freewheeling delegation. Rather, as amended in 1986, the Act delegates to the Attorney General the authority to "prescribe *only* such rules and regulations as are necessary to carry out" the Act. 18 U.S.C. § 926(a) (emphasis added). The 1986 amendments to the Act were intended to

4

reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968, that 'it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms . . . for lawful purposes.'

An Act to Amend Chapter 44 (Relating to Firearms) of Title 18, United States Code, and for Other Purposes, §1(b)(2), 100 Stat. 449 (1986).

The Attorney General has delegated to ATF the power "to administer, enforce, and exercise the functions and powers of the Attorney General" under the Gun Control Act. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 897 (6th Cir. 2021). In 1968, ATF defined "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Internal Rev. Serv., Dep't of the Treasury, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (to be codified at 26 C.F.R. pt. 178).

The definition promulgated in 1968 prevailed until 2022. In August 2022, ATF changed this definition and purported to expand its own authority to cover items that "include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a . . . receiver." 27 C.F.R. § 478.12(c) (the "Rule"). The definition sweeps so broadly that ATF had to affirmatively exclude "a forging, casting, printing, extrusion,

unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material.)" *Id.* And the Rule even allows ATF to consider extrinsic factors when determining if an object is a frame or receiver, including "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with [or otherwise made available to the purchaser or recipient of] the item or kit." *Id.* Finally, the new rule purports to redefine "firearm" under the Gun Control Act to "include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11.

## II. Plaintiffs

The original Plaintiffs in this case are two individuals (Jennifer VanDerStok and Michael Andren), one producer and retailer (Tactical Machining, LLC), and one membership organization (Firearms Policy Coalition). ROA.4748–49. After this action was instituted, several producers and retailers intervened (BlackHawk Manufacturing Group, Inc., Defense Distributed, Not an LLC d/b/a JSD Supply, and Polymer80, Inc.) as did another membership organization (Second Amendment Foundation). ROA.4748–49. This brief is joined by the original Plaintiffs and Polymer80, Inc.

The individual Plaintiffs are Texas residents who own items implicated by the Rule that they have or intend to manufacture into firearms for personal, lawful use, and they wish to purchase additional products directly online to facilitate their manufacture of their own firearms. ROA.4748. Under the Rule, all such purchases would have to be channeled through a federal firearms licensee, incurring fees and adding time to the process. ROA.4748.

Tactical Machining produces and sells items that are subject to regulation under the Rule. ROA.4749. The sale of these newly regulated items constitutes more than 90% of Tactical Machining's business. ROA.4749. Polymer80 designs, manufactures, and distributes firearms and non-firearm products, and ATF has taken the position that some of its products are covered by the Rule. ROA.4750. FPC is a non-profit organization dedicated to promoting and defending the constitutionally protected rights of American Citizens through public education and legislative and legal advocacy. ROA.4749. In addition to itself owning items that are subject to regulation under the Rule, FPC has hundreds of thousands of members nationwide, including the individual Plaintiffs in this lawsuit. ROA.4749. FPC brings this suit on behalf of itself and its members.

## III.    Procedural Background

Plaintiffs filed this suit in August 2022, before the Rule took effect, and sought preliminary injunctive relief, which the district court granted. ROA.4754 & n.14; *see*

*also VanDerStok v. Garland*, 625 F. Supp. 3d 570 (N.D. Tex. 2022). That preliminary relief remained in effect until the district court granted Plaintiffs' motion for summary judgment and held that the Rule exceeded ATF's rulemaking authority in the way it defined "frame or receiver" and "firearm" and vacated the Rule. ROA.4779–80. As to "frame or receiver," the district court held that ATF's new definition was "in conflict with the plain statutory language" because, although the Rule equated them, "that which *may become* or *may be converted to* a functional receiver is not itself a receiver." ROA.4769. The new "firearm" definition, which includes "weapon parts kits," was similarly invalid because it conflicted with the plain language of the statute. The district court explained that "Congress's definition does not cover weapon *parts* or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile," if the weapon parts do not include a fully manufactured frame or receiver. ATF's rule inappropriately sought to return to a pre-Gun Control Act regime in which its authority to regulate firearms extended beyond "frames" or "receivers." ROA.4774. Because these shortcomings alone were sufficient to vacate the Rule, the district court did not reach Plaintiffs' other statutory claims raising procedural defects that might result in the remand of the Rule. ROA.4774. In particular, Plaintiffs raised claims that the Rule was not a logical outgrowth of the proposed rule, ATF had failed to provide adequate notice and comment before promulgating the Rule, and ATF

had acted arbitrarily and failed to consider important evidence. ROA.93–100. It similarly did not address Plaintiffs' constitutional claims. ROA.4765.

The Government petitioned the district court for a stay pending appeal. After the district court denied the stay, the Government then petitioned this Court. This Court denied the stay in part and granted it in part. *See* Unpublished Order, Doc. No. 45–1 (July 24, 2023). The panel declined the stay as to the vacatur of the "frame or receiver" and "firearm" definitions because it concluded that Plaintiffs were likely to succeed on appeal in showing that those definitions were promulgated in excess of agency authority. *Id.* at 3 The panel granted the stay with respect to the vacatur of other aspects of the Rule. *Id*. Finally, the panel set an expedited briefing schedule for this appeal. Briefing Not., Doc. 52 (July 25, 2023).

The Government petitioned the Supreme Court for a stay pending appeal. Over four dissenting Justices, the Supreme Court stayed the district court's final order and judgment "insofar as they vacate the final rule," pending resolution of this appeal and any petition for a writ of certiorari. Order, *Garland v. VanDerStok*, No. 23A82 (Aug. 8, 2023).

## SUMMARY OF ARGUMENT

The district court correctly held that the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") exceeded its authority by seeking to extend the definition of "firearm" and "frame or receiver" in federal law beyond what Congress

has permitted. The district court also correctly held that vacatur was the proper remedy when a federal agency has been found to exceed its statutory authority. This Court, which has already found that Plaintiffs are likely to succeed on the merits in showing the challenged rule is unlawful, should affirm the district court's decision.

As relevant here, the Gun Control Act defines "firearm" to mean "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). This definition, although it includes as "any weapon" those items that are merely "designed to" or "may readily be converted to" function as a firearm, conspicuously excludes similar language when discussing frames or receivers. *Id.* In other words, while a weapon "designed to . . . expel a projectile by the action of an explosive" is a firearm, as is a weapon that may be readily converted to do so, an item "designed to" or "that may readily be converted to" be a frame or receiver *is not*. Only items that actually are frames or receivers are regulated by Congress. *See, e.g., United States v. Prince*, 593 F.3d 1178, 1183 (10th Cir. 2010).

Prior to the promulgation of the Rule, ATF agreed with that position. But it now seeks to regulate items that are not frame or receivers as if they were, so long as those items "may readily be . . . converted to function as a frame or receiver." *See* 27 C.F.R. § 478.12(c). The district court correctly held that this change went beyond

what the Gun Control Act would permit. Ordinary principles of statutory interpretation hold that when Congress includes language in one part of a statute and declines to include similar language in another (here, the very next clause of a single sentence) it is wrong to read language from the first part into the second. The Government's claims that it was merely trying to "follow the statute's lead" or otherwise implement the intent, if not the language, that Congress employed falters on this fundamental principle.

Furthermore, even if it were not inappropriate to transplant the "designed to" or "may readily be converted" language from the first part of Congress's definition into the second, ATF is wrong to read that language as permitting it to reach *unfinished* items that potentially could *become* frames or receivers. In fact, the ordinary meaning of those terms in context and the legislative history of the Gun Control Act demonstrate that neither aims at unfinished firearms *at all*, but rather target completed firearms that have been disabled or merely disassembled ("designed to") or that were not intended to be able to fire live ammunition but could be made to do so ("may readily be converted"). ATF, which indisputably seeks to use this transplanted language to reach items that have not been manufactured into a "frame" or "receiver" exceeds the authority granted it by Congress under the Gun Control Act, even on its own terms.

The Rule also expands the definition of "firearm" to include "a weapon parts

kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11. This definition makes a difference only when the kit in question does not include a frame or receiver (since the frame or receiver is already a firearm under the Gun Control Act). It therefore represents an attempted end-run around Congress's decision to limit ATF's regulatory authority to that one, central part of the firearm. It furthermore is unjustifiable even with reference to the "designed to" or "may readily be converted" language from Congress's definition of the term because, as just discussed, that language properly applies only to *completed* weapons.

In addition to being right as a matter of statutory interpretation, the district court's reading of the Gun Control Act is bolstered by the fact that it, unlike ATF's interpretation, avoids serious questions under the Second Amendment and the due process guarantee against vague criminal legislation and comports with the rule of lenity. For these reasons, the district court was correct to hold the Rule's definition of firearm invalid under the APA.

The district court's choice of remedy follows directly from its merits decision. The APA expressly instructs courts to "hold unlawful and set aside agency action," that, like ATF's rule here, is "in excess of statutory . . . authority." 5 U.S.C. § 706(2). This Court has repeatedly held that this language means that an unlawful rule should be vacated when, as here, the rule cannot be fixed by additional procedures (such as

12

further explanations or deliberations regarding a rule).

The Government's arguments in response are unavailing. It claims that neither the APA nor Article III countenance such a "global" remedy, but the harm of an unlawful rule masquerading as enforceable law is similarly "global," and contrary to the Government's protestation, this Court has explained that such a remedy is more deferential to the agency than an injunction. There is nothing to the Government's claim that vacatur should have been limited to the parties before the Court—vacatur by definition operates globally. The Government's argument that even members of FPC should not be permitted to benefit from the Court's ruling (in addition to misunderstanding the inherent scope of vacatur) is foreclosed by Supreme Court precedent. And it would hardly be prudent to force every person injured by ATF's rule to come before the district court to seek a separate, individual vacatur.

The Government is wrong to suggest that the district court's remedy was overbroad in that it vacated the entire rule, rather than the portions of it that expanded the federal definition of "firearm." The definition is central to the Rule and, rather than guessing at what ATF would have done with the other provisions of the Rule had it known its definition was unsupportable, the order vacating the whole Rule and remanding to ATF leaves the ATF free to repromulgate, or not, the unoffending provisions of the Rule. Even if this Court determines vacatur of the entire Rule was

13

overbroad, this Court should still affirm the decision to the extent it vacated the specific portions of the final rule at issue in this appeal.

## STANDARD OF REVIEW

"This Court reviews the district court's grant of summary judgment *de novo*," and in assessing whether the Rule is lawful, the standards this Court must apply are prescribed by the APA. *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001). That means this Court must set aside an agency rule promulgated "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

## ARGUMENT

**I.    The District Court Correctly Held that the Rule Exceeds ATF's Authority by Expanding the Definitions of "Frame or Receiver" and "Firearm" Beyond Their Statutory Bounds.**

### A. The Items Newly Regulated by the Rule Are Not Frames or Receivers.

The Gun Control Act, in relevant part, defines "firearm" to include "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). While the statute considers "any weapon" that is "designed to" or could "readily be converted to expel a projectile by the action of an explosive" to be a firearm, it conspicuously does not include language defining as firearms items that are designed to be or could be

converted to become "the *frame or receiver* of any such weapon." *Id.* (emphasis added). Simply put, if an item potentially could be made into a frame or receiver but is not a frame or receiver, that item is not a "firearm" under the Act's plain text.

The Rule considers it sufficient anyway; it sweeps in "partially complete, disassembled, or nonfunctional frame[s] or receiver[s], including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, *or otherwise converted to function as a* . . . receiver." 27 C.F.R. § 478.12(c). The district court found that, by greatly expanding the universe of items that could be considered a "frame or receiver," the Rule conflicted with the controlling "plain and unambiguous meaning of the statutory language." ROA.4768 (quoting *NPR Invs., L.L.C. ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014)). As the district court explained, "that which *may become* or *may be converted to* a functional receiver is not itself a receiver," and though Congress *could have* included such items within the definition of firearm under the Act, it did not. ROA.4769 (emphasis in original).

The district court's reading was correct. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (quoting *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002)); *see also*

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008). That presumption should be even stronger here where the district court was not comparing different sections of the same statute but two clauses of the same sentence. Where Congress wanted to include items that could be converted to meet its definition of firearms, it did so explicitly. ATF, in inserting language Congress could have but did not use in the Gun Control Act's definition of "frame" or "receiver," violated Congress's narrow delegation of rulemaking authority.

In response, the Government argues that "ordinary usage" supports its Rule, suggesting that the new definition captures what is ordinarily understood to be a frame or receiver anyway, and analogizes to bicycles, noting that "a bicycle is still a bicycle even if it lacks pedals, a chain, or some other component needed to render it complete." Gov't Br. at 19. As an initial matter, this is an apples-to-oranges comparison, as the analogy concerns a bicycle itself, not the frame of the bicycle. Furthermore, the proposition that a bicycle that lacks pedals is still a bicycle is doubtful; indeed, Merriam-Webster defines a bicycle to mean "a vehicle with two wheels tandem, handlebars for steering, a saddle seat, *and pedals by which it is propelled*." *Bicycle*, MERRIAM-WEBSTER.COM ONLINE DICTIONARY, https://bit.ly/3YJsrVU (last visited Aug. 22, 2023) (emphasis added); *cf.* 16 C.F.R. § 1512.2(a)(1) (defining "bicycle" as "a two-wheeled vehicle having a rear drive wheel that is solely human-powered"). And a person who mounted and attempted to

ride a bicycle-like contraption without pedals or a chain would assuredly beg to differ with the Government's assertion that he had at his disposal a bicycle. In any event, an item that could become a frame or receiver with additional manufacturing is not just a frame or receiver that is missing a part like a bicycle without pedals; it is not a frame or receiver at all.

The Government's analogy, in addition to failing to advance its case on its own terms, also fails to account for the statutory context in which the terms frame and receiver appear. The key question in this case is: what is a "firearm?" Congress has defined it to be, for these purposes, one of only four things: (1) any weapon that fires a projectile by means of an explosive (the ordinary usage of the term), (2) any weapon that is designed to do so (an expansion of the ordinary usage to cover issues related to disassembled or disabled firearms), (3) any weapon that can be readily converted to do so (sweeping in weapons that operate by a different firing mechanism such as starter guns) or (4) "the frame or receiver" of any weapon in the prior three categories. In ordinary parlance, of course, a frame or receiver would not be understood to be a firearm. Instead, when used to mean "frame or receiver," "firearm" is a term of art, not intended to be understood in its ordinary sense, and appeals to the ordinary understanding of the term are unhelpful when the statutory definition must control. *See Burgess v. United States*, 553 U.S. 124, 129 (2008) ("Statutory definitions control the meaning of statutory words in the usual case.")

(internal quotation marks and ellipses omitted). But as the district court correctly explained, while *firearm* is a term of art, "frame or receiver" should be understood with reference to "the ordinary meaning of those terms" and the ordinary meaning of "frame or receiver" does not include "that which *may become* or *may be converted to* a functional [frame or] receiver." ROA.4769.

The Government further argues that its Rule fits within the statutory framework because "Congress has repeatedly made clear that non-operational weapons that are either 'designed to' or may 'readily' be converted or restored to operational weapons are included" within its regulatory purview, and that in setting this new definition, ATF is merely "follow[ing] the statute's lead." Gov't Br. 20, 23. This reading of the statute gets things backwards. As the district court recognized, "the structure of the law itself" is the "proper starting point" for any dispute over the meaning of a statute, ROA.4766 (quoting *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019)); *see also Cargill v. Garland*, 57 F.4th 447, 461 (5th Cir. 2023) (en banc), and "courts must presume that a legislature says in a statute what it means and means in a statute what it says," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). That Congress included these phrases in the first definition of "firearm" but *excluded* them from the second is strong evidence that Congress did not intend those phrases to be used in determining what counts as a frame or receiver.

In any event, it is odd to take the "designed to" and "readily be converted" language from the statute and presume that Congress intended to sweep in firearms that are not yet finished being manufactured. The most natural reading of "designed to" is that it captures nonfunctional *but complete* firearms—firearms that, if they functioned as *designed*, would be capable of expelling a projectile by means of an explosive but which cannot for one reason or another (e.g., malfunctioning or intentionally disabled firearms and those that are temporarily disassembled). For example, in *United States v. Ruiz*, 986 F.2d 905, 910 (5th Cir. 1993), this Court held that a gun that was inoperable because its hammer had been filed down was nonetheless a "firearm" because "the fling down of the gun's hammer did not change the fact that the gun was designed to expel a projectile, but rather it merely temporarily altered the gun's capability to accomplish the purpose for which it was designed." *See also United States v. Christmann*, 193 F.3d 1023, 1024 (8th Cir. 1999) ("The definition turns on what the weapon is designed to do, not on whether it is capable of doing its job at the particular moment that the crime was committed."); *see also United States v. Annis*, 446 F.3d 852, 857–58 (8th Cir. 2006). And "readily be converted" similarly does not mean "could be manufactured into," but points to "weapons" that are *already made* and operate by some mechanism other than "expel[ling] a projectile by the action of an explosive," but could readily be made to do so—like the starter guns that are expressly referenced in the statute. "Convert"

19

*can* refer to manufacturing, but it also indicates an "exchange for an equivalent"—*i.e.*, from one finished product to another—and is best read here as meaning simply "to change from one form or function to another," not to bring to a completely manufactured status. *Convert*, Merriam-Webster.com Online Dictionary, https://bit.ly/47FxhYm (last visited Aug. 22, 2023). This reading is buttressed by the fact that the statute provides, as an example of a firearm that is covered by this language, a starter gun which, as designed, is incapable of firing live ammunition but which can be *converted* to do so. *See, e.g.*, Margaret Davis, *Legal blank firing pistols being converted into deadly weapons, police warn*, The Evening Standard (May 5, 2021), https://bit.ly/3YMM2o9. If Congress had wanted to include firearms that had not yet been completed at all, it would have been easy to say so, but the best reading of the statute is that Congress declined to reach such items entirely (unless of course they contained a finished "frame or receiver"). So even if the Government were not wrong to read the phrases "readily be converted" and "designed to" into the definition of "frame" and "receiver" (and to be clear, it is wrong to do so), it would not support regulation of the items at issue here.

Indeed, the district court's opinion, and Plaintiffs' position here, could be boiled down to the sensible proposition that the term "frame or receiver" unambiguously excludes items that are *not* frames or receivers but merely could be made into them. ROA.4770–71. The Government disputes this reading, noting that

20

"[t]he Rule explains when a partially complete frame or receiver is a frame or receiver within the meaning of the statute," Gov't Br. at 24, but even saying such a thing—"a partially complete frame . . . is a frame"—demonstrates that the district court was right to find "a plain reading of the Final Rule's text belies this objection." ROA.4771.

In arguing in favor of the Rule, the Government fails to grapple with what the Rule actually says, preferring to cast it as merely delimiting the point at which an item is sufficiently manufactured to be considered a "frame" or "receiver." But that is the *old* policy of ATF, and it is not what the Rule, which specifically includes items that *are not* frames or receivers but merely intended to become, or able to become, frames or receivers, does. 27 C.F.R. § 478.12(c). This is most notable when the Government attempts to cast the Rule as merely the continuation of a longstanding ATF policy and "consisten[t] with previous regulatory practice." Gov't Br. at 21. But that is not true. Until now, ATF has consistently taken the position that these newly regulated items fall outside the scope of the Gun Control Act. *See Are "80%" or "unfinished receivers illegal?*, ATF, https://bit.ly/3OEDgFt (last visited Aug. 22, 2023). But now, while it considers those same items not to be firearms if sold alone, they have become firearms if they are "sold, distributed, or marketed with any associated templates jigs, molds, equipment, tools instructions, or guides":

21





**Firearm**

ATF, *Open Letter to All Federal Firearms Licensees*, at 3–4, 6, DEP'T OF JUST. (Sept.

27, 2022), https://bit.ly/3OQf2H0, ("Open Letter"). Although the same areas of the regulated item are solid and unmachined in both pictures, the latter is classed as a firearm because it is accompanied by a jig and tools.

The shift can also be seen in ATF's briefing. Just months before the Rule was proposed, ATF took that position in litigation:

> the 'designed to' and 'readily be converted' language are only present in the first clause of the statutory definition [of firearm]. Therefore, an unfinished frame or receiver does not meet the statutory definition of a 'firearm' simply because it is 'designed to' or 'can readily be converted into' a frame or receiver. Instead, a device is a firearm either: (1) because it is a frame or receiver or; (2) it is a device that is designed to or can readily be converted into a device that 'expel[s] a projectile by the action of an explosive.'

Fed. Defs.' Mem. of Law in Support of Mot. for Summ. J., Doc. 98 at 4, *Syracuse v. ATF*, No. 1:20-cv-06885 (S.D.N.Y. Jan. 29, 2021) ("*Syracuse* Br."). The Government's claim that it has "long held that a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a critical stage of manufacture," Gov't Br. at 21, may fit within the historical practice of "focus[ing] on the degree of machining a device has undergone (and hence its degree of completeness)," *Syracuse* Br. at 7, but is utterly inconsistent with ATF's new policy of asking whether an item is intended to or could become a frame or receiver.

This error can be seen as well in the Government's arguments that "it is entirely natural to refer to" one of Polymer80's products as a "frame" because it can be manufactured into a Glock-style handgun frame after removing certain portions

23

of the product with a "Dremel-type rotary tool," Gov't Br. at 20, and that the district court's opinion should be discounted because it failed to provide examples of "products on the market that cannot be assembled readily enough for ATF to regulate them as frames or receivers." Gov't Br. at 24–25. Both of these arguments are premised upon the misconception that the Rule depends, for its classification of an item as a "frame" or "receiver," upon the amount of manufacturing that has been done on a product to decide whether it has reached a sufficient state of manufacture. But those items are treated differently under the new Rule than they were under the Government's old application of the statute. The district court need not have shown an example of firearms that are too far from being frames and receivers to be regulated as such because the entire point of the Rule is to regulate items *that are not*, by the Government's own admission, frames or receivers, as if they were.

Last, the Government turns to "the practical realities of the district court's holding," warning that the Rule is necessary to avoid "frustrat[ing] . . . the statute's principal goals." Gov't Br. 25. But "vague notions of a statute's basic purpose are . . . inadequate to overcome the words of its text." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993) (quotation marks omitted); *see also Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986) ("Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of

congressional intent."). The district court was correct to dismiss these concerns. ROA.4772.

## B. A Parts Kit Is Not a "Firearm."

The district court also correctly held that the Rule exceeded ATF's statutory authority when it added, to the statutory definition of "firearm," "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11. The principal problem with this addition is that, if it has any meaning at all, it operates to regulate firearm parts *other than a frame or receiver*, when the Gun Control Act specifically limited ATF's purview to that *one* part of the weapon. *See* ROA.4774–75 (detailing history of Gun Control Act removing authority to regulate "any part or parts" of a firearm in favor of authority to regulate frames and receivers). As the district court explained, "[t]he statutory context repeatedly confirms that Congress intentionally chose not to regulate 'weapon' parts generally." ROA.4774–75 (collecting examples). "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." ROA.4774 (quoting *SEC v. Hallam*, 42 F.4th 316, 337 (5th Cir. 2022)). The Government's position, which would permit ATF to regulate all manner of parts that are not frames or receivers, is incompatible with this rule of interpretation.

The Government's position also would make a hash of the statute. Under the

Gun Control Act *every* commercially manufactured firearm must have a serial number placed *on its frame or receiver*. *See* 18 U.S.C. § 923(i). Since the only *marginal* difference made by regulating parts kits is to sweep in kits that *do not* contain a frame or receiver and treat them as firearms, the Rule, together with the statute, requires the serialization of a component in the kits that simply is not there. That would mean that the kit *cannot lawfully enter commerce*. A "firearm" without a frame or receiver is not contemplated by the statute.

The Government responds that treating weapon parts kits as "firearms" is a natural result of the statute's treating as a firearm a " 'weapon . . . which . . . may readily be converted' into an operational firearm" and "comport[]s with the design of the Gun Control Act." Gov't Br. at 27–28 (quoting 18 U.S.C. § 921(a)(3)(A)). But that is incorrect. First, as explained above, "readily be converted" should not be read to encompass incomplete firearms that could, if manufacture is completed, be functional, but rather other types of weapons (like starter guns) that could be converted to operate as firearms. Second, as just explained, the "design of the Gun Control Act" demonstrates that *every* regulated firearm must include a frame or receiver. A parts kit without a frame or receiver therefore cannot be covered. The "weapon parts kits" definition is ATF's attempt at an end-run around the (previously discussed) requirement that a frame or receiver must be a finished frame or receiver to be regulated—it targets, for example, so-called "Buy Build Shoot" kits that

include firearm parts alongside an item that, with time, equipment, and experience, can be privately manufactured into a frame. *See* Zusha Elinson, *Ghost-Gun Company Raided by Federal Agents*, Wall St. J. (Dec. 11, 2020), https://on.wsj.com/44T1q4O.

In support of its position, the Government points to cases that have found that "disassembled" weapons are "firearms" under the Gun Control Act and suggests that the Rule's regulation of "weapon[s] part kits" is no different. Gov't Br. at 27–28. But a disassembled firearm—which at one time was a functioning firearm—has all the components (including a finished frame or receiver) of a firearm. It makes sense to refer to that firearm as "designed to" expel a projectile since it would, had it not been merely disassembled, do exactly that. A "Buy Build Shoot" kit, on the other hand, is designed to be manufactured. Though it may, of course, ultimately be capable of expelling a projectile *after* the manufacturing process is complete, as sold it is not "designed" to do that and it contains no "frame" or "receiver" that would permit it to be regulated anyway. One of the Government's cases uses this "designed to" reasoning to conclude that disassembled firearms are nevertheless "firearms" under the act. *See Annis*, 446 F.3d at 857. Two other cases are irrelevant to this dispute. *See United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017) (holding that "complete" Uzi parts kits with "all the necessary components" were "firearms" and therefore declining to determine whether demilled (nonfunctional) receivers were "firearms");

*United States v. Stewart*, 451 F.3d 1071, 1073, n.2 (9th Cir. 2006) (decision focused on congressional authority to regulate machine guns; parts kit underlying warrant was not at issue).

The Government does cite one case, *United States v. Ryles*, which reasoned that a shotgun with the barrel removed from the stock was a "firearm" because it could have been " 'readily converted' to an operable firearm" by reattaching the barrel in thirty seconds. 988 F.2d 13, 16 (5th Cir. 1993). This case does not help the Government for several reasons. First, the case was applying the sentencing guidelines, not the Gun Control Act, so it is not strictly binding. Second, nothing in the case turned on drawing a precise distinction between the domain of the statutory terms "designed to" and "may readily be converted to." This Court viewed the shotgun without the barrel as a weapon that could be readily converted to a firearm by reattaching the barrel; it could just as easily have viewed it as a weapon designed to be a firearm. Third, the case does nothing to indicate that an item *without a frame or receiver* can be considered a firearm under the statutory definition.

It may be objected that reading the statute to require that every regulated "firearm" include a frame or receiver would introduce a superfluity problem, because it would mean that there are no items captured by the definition of Section 921(a)(3)(A) that are not also captured by Section 921(a)(3)(B). Requiring every "firearm" to include a frame or receiver would not, however, make Section

921(a)(3)(A) superfluous, and it is plainly the best reading of the statute's text.

As a reminder, the Gun Control Act defines "firearm," in relevant part, as follows: "The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) *the* frame or receiver of *any such weapon*." 18 U.S.C. § 921(a)(3)(A) & (B) (emphasis added). As the emphasized language makes clear, Part (B) singles out a *component* of weapons identified by Part (A) to be a "firearm"— the frame or receiver—and (through the use of the word "the") confirms that all such weapons will have a frame or receiver. This latter point is confirmed by Section 923(i), which requires commercial manufacturers and importers to put a serial number on the frame or receiver of every firearm they manufacture or import. Far from being superfluous, Part (A) is necessary to determine which frames and receivers are captured by Part (B). Without Part (A), Part (B) would be nonsensical. Putting the textual and contextual evidence together, Part (B) defines as a firearm "the frame or receiver of any" "weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Part (B) thus singles out one component part of a firearm (the frame or receiver) to be treated as a firearm even when the rest of the component parts are not present.

Caselaw confirms this interpretation of the statute. In *United States v.*

*Martinez*, for example, the Eleventh Circuit analyzed the propriety of the district court enhancing a criminal defendant's sentence based on his possession of a "firearm" in connection with another felony offense, when analyzing the Sentencing Guidelines' analogous definition of "firearm." 964 F.3d 1329 (11th Cir. 2020); *see also United States v. Brown*, 117 F.3d 353, 354–55 (7th Cir. 1997). Martinez had been arrested with a disassembled shotgun in the back seat of his car while possessing, among other things, plastic baggies containing meth. 964 F.3d at 1332. The Eleventh Circuit dismissed the argument that the shotgun was not an accessible firearm two ways, noting that "[a] disassembled shotgun is just as much of a firearm as an assembled one under the sentencing guidelines and the felon-in-possession statute," and since that definition includes even just the frame or receiver of a firearm, "[i]t was enough" for the court's purposes, "that the frame and receiver were in the backseat" of the car. *Id.* at 1340. Other courts and litigants have similarly noted that a firearm that qualifies as a firearm because it is disassembled will *also* meet the statutory definition because it contains a "frame" or "receiver," without concern that the two phrases are duplicative. *See, e.g.*, *United States v. Gwyn*, 481 F.3d 849, 855 (D.C. Cir. 2007) (detailing inmate's argument that he had been provided ineffective assistance of counsel when attorney made a "legally untenable" argument that an inoperable firearm was not a "firearm" under the Gun Control Act since the gun introduced into evidence "was, at the very least, a 'frame' of a gun" and noting that

"[u]nsurprisingly, the government [does not] contest[] Gwyn's interpretation of the statute"). And other examples exist of cases that have read Part (A) as functioning as a clause that limits Part (B). *See United States v. Wada*, 323 F. Supp. 2d 1079, 1082 (D. Or. 2004) ("Although 18 U.S.C. § 921(a)(3)(B) defines as a firearm 'the frame or receiver of any such weapon,' and each of the items as modified by Wada includes a 'frame' or a 'receiver,' the government's argument fails because only the frame or receiver of 'any such weapon' qualifies.").

The legislative history of the Gun Control Act confirms our interpretation of the statute. The previous definition of a "firearm" as "any weapon, by whatever name known, which is designed to expel a projectile or projectiles by action of an explosive and a firearm muffler or firearm silencer, *or any part or parts of such a weapon*," 15 U.S.C. § 901(3) (1967) (emphasis added), was undeniably duplicative. In *every case*, a firearm that met the first half of that definition would also meet the second half; it would not be possible to possess a firearm without possessing any of its component parts. The legislative history of the Gun Control Act shows that part (B)'s specification of "any frame or receiver" was included specifically as a substitute for the all-encompassing "any part or parts" language. S. Rep. 90-1097, 2200 (1968).

The ordinary rule that every word in a statute must be given effect is not the be-all and end-all of statutory interpretation—after all, "[s]ometimes drafters *do*

repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach." Antonin Scalia & Bryan A. Garner, Reading Law 177 (2012). For the reasons we have explained, Part (A) is not superfluous under our interpretation, and even if it were, the definition of "firearm" should not be twisted to allow Part (A) of the definition to cover items that would not also be covered by Part (B).

Finally, the Government argues that the district court's decision leads to "absurd consequences," suggesting that it is "difficult to discern any persuasive distinction between a 'disassembled' or 'nonfunctional' firearm . . . and a weapons parts kit." But as just discussed, a key distinction between the two is that one contains a "frame" or "receiver" and the other does not. There is nothing absurd about drawing the line between regulated and unregulated firearms precisely where the statute—and thus Congress—draws it. And there is likewise nothing absurd about giving effect to Congress's choice for how to regulate firearms, especially when Congress has had several chances to alter the definition of "firearm" to sweep in the items ATF now seeks to regulate and has repeatedly declined to do so. *See, e.g., Ghost Guns Are Guns Act*, H.R. 1278, 115th Cong. (Mar. 1, 2017) (not enacted); *Untraceable Firearms Act of 2018*, H.R. 6643, 115th Cong. § 2(a)(36) (July 31, 2018) (not enacted); *Untraceable Firearms Act of 2018*, S. 3300, 115th Cong. §

2(a)(36) (July 31, 2018) (not enacted); *Stopping the Traffic in Overseas Proliferation of Ghost Guns Act*, S. 459, 116th Cong. (Feb. 12, 2019) (not enacted).

### C. The Doctrines of Constitutional Avoidance and the Rule of Lenity Support the District Court's Interpretation.

The district court's interpretation of the statute is the best interpretation of the statute employing ordinary tools of statutory construction. To the extent there could be any uncertainty, the doctrine of constitutional avoidance and the rule of lenity further bolster its interpretation.

> When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.

*Crowell v. Benson*, 285 U.S. 22, 62 (1932). The district court's interpretation avoids at least two significant potential constitutional infirmities with the rule. It also properly resolves ambiguity, to the extent it exists, against the Government.

First, the Gun Control Act, as applied through the Rule, creates a substantial question under the Second Amendment to the United States Constitution. The Second Amendment, which protects "the right of the people to keep and bear Arms," U.S. CONST. amend. II, also protects, by necessary implication, the right to *acquire* arms, *see Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring); *see also Rigby v. Jennings*, 630 F. Supp. 3d 602, 615 (D. Del. 2022). One way of acquiring arms is by making them; indeed, self-manufacture of firearms is an

historically common way to acquire them. Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 45–70 (2023). And although certain restrictions on Second Amendment protected activity are acceptable if they can be shown to be "consistent with this Nation's historical tradition of firearm regulation," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022), there is no historical tradition of regulating privately made firearms, *supra* Greenlee, 54 ST. MARY'S L.J. at 78 ("All such restrictions [on the manufacture of arms for personal use] have been enacted within the last decade."). Instead, Congress has focused (as in the Gun Control Act) on regulating the *commercial* sale of firearms. The Rule breaks with this history and raises serious Second Amendment concerns that the district court's interpretation of the Act avoids.

Second, the district court's interpretation mitigates vagueness concerns. The Gun Control Act is a criminal statute, and "[t]he prohibition on vagueness in criminal statutes . . . is an essential of due process, required by both ordinary notions of fair play and the settled rules of law." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (quotations omitted). The Rule threatens to render the Gun Control Act unconstitutionally vague by making it unclear when an item that with some work could become a frame or receiver crosses the line to become a "frame or receiver" or when a "weapons parts kit" is sufficiently complete to be a "firearm." For example, under the Rule an item may be regulated as a frame or receiver when it is

34

in a state such that it "may readily be completed" to function as a frame or receiver. 27 C.F.R. § 478.12(c). "Readily" is, in turn, determined by reference to eight factors, which are not weighted, and include things like an evaluation of "parts availability" and "feasibility" of completing the manufacturing process. 27 C.F.R. § 479.11. The face of the regulation fails to provide clear guidance to law-abiding citizens about which items are or are not firearms under the Act.

The inclusion of "weapon parts kit[s]" within the definition of "firearm" creates similar problems. Such items are regulated when they are "designed to or may readily be completed" to become a firearm, 27 C.F.R. § 478.11, and in determining whether an item fits this definition, ATF may consider "any associated templates, jigs, molds, equipment, or tools that are made available by the seller" as well as "any instructions, guides, or marketing materials." 27 C.F.R. § 479.102. In other words, whether an item or parts kit is a "firearm" and therefore regulated under the Gun Control Act depends in part on the "marketing materials" and "tools" with which it is packaged. The same parts, sold in different contexts, may be regulated in some but not regulated in others. *See supra* Open Letter at 4, 6. If two companies decide to each sell *half* of a kit, with one selling a receiver blank and the other selling a jig and tools, none of it would be regulated, while if one company sells these items together, all of its contents are regulated together. Such a regulation, with criminal consequences, essentially creates a trap for the unwary.

35

Third, while the district court's interpretation of the statute is straightforwardly the best interpretation, even if that were not the case the statute would be at best ambiguous. Because the Gun Control Act is a criminal statute, the rule of lenity counsels that any such ambiguity must be resolved against the Government. *See United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 (1992).

## II. The District Court's Remedy Was Proper.

### A. Vacatur Is the Appropriate Remedy for a Rule Promulgated In Excess of Agency Authority and It Is, By Its Nature, Universal.

Based on these deficiencies, the district court vacated the Final Rule. There are two typical remedies available for violations of the APA: vacatur and remand. Remand is only appropriate when an agency can fix the APA violations underlying its action through additional investigation or explanation. *See O'Reilly v. U.S. Army of Eng'rs*, 477 F.3d 225, 238–39 (5th Cir. 2007) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). On the other hand, when an agency action is unlawful, the "ordinary practice" is to vacate the action. *See Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859–60 (5th Cir. 2022) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). In this case, the infirmity in the Rule was of the latter variety and vacatur therefore was the appropriate remedy.

The Government disputes this, challenging vacatur as a lawful remedy under

the APA, Article III of the Constitution, and "fundamental equitable principles," Gov't Br. at 38, and argues that instead the district court should have—at most— enjoined enforcement of the rule or vacated as to only the Plaintiffs in this case, Gov't Br. 39. The Government's argument that the APA does not recognize vacatur as a legitimate remedy is baseless and foreclosed by binding precedent. Though the Government claims "the APA itself does not reference vacatur, instead remitting plaintiffs to traditional equitable remedies like injunction," Gov't Br. at 36, the APA expressly instructs courts to "hold unlawful and set aside agency action" that, like ATF's rule here, is "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C). This language has long been understood to "affirmatively provide[ ] for vacation of agency action," *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951), which is unsurprising given that at the time the APA was enacted in 1946 Black's Law Dictionary defined "set aside" to mean "to cancel, annul or revoke," *Set aside*, BLACK'S LAW DICTIONARY (3d ed. 1933). Indeed, this Court has recently explained that "[u]nder prevailing precedent, § 706 extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to 'set aside'—*i.e.*, formally nullify and revoke—an unlawful agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 859. Indeed, this Court's precedent establishes that "[v]acatur is *the only* statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v.*

37

*Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) (emphasis added). Section 703, which the Government claims "remit[s] plaintiffs to traditional equitable remedies like injunctions," Gov't Br. at 36, does no such thing. Section 703 does not even purport to specify the remedies available to litigants suing agencies. It is a venue provision that clarifies an individual who has a claim against an agency that is not governed by a special statutory provision calling for judicial review—"including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus"—may file an action against the agency "in a court of competent jurisdiction." 5 U.S.C. § 703. Even if this provision *could* be read as providing for certain remedies in agency litigation, that the list begins with "including" indicates it is an exemplary, not an exclusive, enumeration of possible remedies. SCALIA & GARNER, READING LAW, *supra* at 132.

As to the Government's claim that vacatur violates Article III and principles of equity, it bases this argument on the suggestion that Article III limits the Court's remedial powers to just those plaintiffs before it. Gov't Br. at 38. This is wrong too. First, vacatur is *not* like a "nationwide injunction" which, on its terms, intentionally reaches beyond the parties before the Court to enjoin a defendant from enforcing a law nationwide. Vacatur, on the other hand, is the specific statutory remedy prescribed by the APA for rules promulgated in excess of agency authority and it provides direct relief to plaintiffs and only as a side effect of its operation benefits

others who are similarly situated. Second, Article III contains no limit on a remedy that has the incidental effect of benefitting others as it remedies the Plaintiffs' injuries. Indeed, the Supreme Court has recently sanctioned broad relief that extended beyond the parties before it. In *Trump v. International Refugee Assistance Project*, 582 U.S. 571 (2017) (per curiam), the Court stayed, in part, a nationwide injunction, but left it in place for those non-parties who were "similarly situated" to the Plaintiffs. *Id.* at 582. Contrary to the Government's argument, "[a]s long as a plaintiff has standing to challenge a policy, Article III is no barrier to enjoining it in full." Spencer Amdur & David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 HARV. L. REV. F. 49, 54 n.35 (2017); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting); *id.* at 890 n.2 (maj. op.). Unlike the injury-in-fact prong of the standing inquiry, the scope of redress available from a court is subject to adjustment by Congress without raising Article III concerns. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). And equity does not require any different result. "[B]readth and flexibility are inherent in equitable remedies," and "the nature of the violation determines the scope of the remedy." *Swann v. Charolotte-Mecklenburg Bd. Of Educ.*, 402 U.S. 1, 15–16 (1971). Where a court concludes (as the district court correctly did here) that an agency rule was promulgated in excess of congressional authorization, the scope of the violation established is global and so a global remedy is appropriate as a default.

The Government also argues that the district court nevertheless should have considered a more limited remedy, and that the error of the district court's analysis is apparent from "its comparison of vacatur to injunctions." Gov't Br. at 36–37. But the district court *did* consider more limited relief and held, for the reasons just laid out, that "illegitimate agency action is void *ab initio* and therefore cannot be remanded as there is nothing for the agency to justify." ROA.4778. And far from undermining the force of its opinion, the district court's comparison of vacatur to an injunction, noting that while an injunction "would prohibit the agencies from enforcing their unlawful Final Rule against only certain individuals," vacatur *must* operate globally but "does nothing but re-establish the status quo absent the unlawful agency action," ROA.4779 (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)), was in line with this Court's caselaw.

Failing these arguments against vacatur outright, the Government argues that, if it was going to vacate the rule, the district court should have limited the applicability of that decision to the Plaintiffs before the Court. But it makes no sense for the Government to discuss limiting *vacatur* to just the parties before the Court. The district court rejected this argument, noting that the Government had not cited any binding caselaw supporting its claim that vacatur *could be* so limited. ROA.4779. It cannot be. Vacatur is not like an injunction, it "retroactively undoes or expunges a past state action." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th

508, 522 (7th Cir. 2021), *reh'g denied* (Nov. 16, 2021); *see also Data Mktg.*, 45 F.4th at 859 (quoting same). It "unwinds the challenged agency action" as if it no longer exists. *Id*; *see also Lujan*, 497 U.S. at 912 (Blackmun, J., dissenting) ("In some cases the 'agency action' will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, *not simply that the court forbids its application to a particular individual*.") (emphasis added).

The Government claims that caselaw *does* suggest vacatur could be limited to certain parties, but it cites for that proposition only cases in which a *district court's judgment* had been vacated by an appellate court as to the parties that appealed, and left in place as to the parties who did not. Gov't Br. at 39–40. But the Rule is not like a district court judgment. The former is a rule of general applicability—it applies, if at all, globally—whereas the latter is a party-specific order that operates against each defendant to a case *individually*. It is verbal legerdemain to equate "vacatur" of a district court judgment with respect to particular parties to "vacatur" of an agency rulemaking, and this Court should reject the comparison.

### B. The Government's Argument That the Organizational Plaintiffs' Members Should Not Be Covered By Any Relief Is Contrary to Binding Precedent.

The Government does not even concede that vacatur or an injunction benefitting the Plaintiffs *in this case* was an appropriate remedy for a violation, as it objects to the members of the organizational Plaintiffs, including FPC. The

Government argues that FPC lacks standing to litigate on behalf of its members, as it has failed to identify "indicia of membership" and has not "explained how their members direct or control the organization." Gov't Br. at 40. This argument runs directly into the Supreme Court's recent decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141 (2023). In that case, the Supreme Court held that "[t]he indicia of membership analysis . . . has no [place] in" a case involving "a voluntary membership organization with identifiable members." *Id.* at 2158. In particular, the Supreme Court noted that the plaintiff organization in that case had "represented four members in particular" with standing, and explained that "where, as here, an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how that organization operates." *Id.* The very same can be said here of FPC, a traditional membership organization that counts as its members several other Plaintiffs in this lawsuit —VanDerStok, Andren, and Tactical Machining, BlackHawk Manufacturing Group, and Defense Distributed, ROA. 4749 n.10—with an interest in this litigation and has represented them, and its other members, in good faith.

The Government is simply wrong, therefore, when it claims FPC is not "purporting to litigate [on] behalf of specific 'identified members' but instead on behalf of hundreds of thousands or more unidentified members." Gov't Br. at 42. FPC is suing on behalf of *both* its identified *and* unidentified members, just like

SFFA. ROA.4749; *Students for Fair Admissions, Inc. v. Presidents and Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 103 (D. Mass. 2017). Though the Government claims that this Court has a "commonsense rule that, in these circumstances, an organizational plaintiff may not purport to litigate on behalf of such unidentified members," Gov't Br. at 42, it cites nothing for that proposition and in fact the Supreme Court has said precisely the opposite: "If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Indeed, this is *the* fundamental premise of associational standing, which renders participation of individual members unnecessary, but which requires, for the organization to have standing, that the *individual members* will be the ones that benefit from relief provided by the court.

The Government argues that "equitable principles . . . compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment," suggesting that this provides individual members of FPC with multiple bites at the apple, since they could also join organizations suing in other fora in the hopes of landing one enforceable injunction. Gov't Br. at 42–43. But, assuming for the sake of argument that the district court's order were reduced to an injunction that could be limited to certain individuals at all, this concern is

exaggerated. It is the necessary result of the organizational standing doctrine and, despite this concern, the Supreme Court has repeatedly sanctioned organizations suing on behalf of their members. In addition, the possibility of conflicting injunctive relief is particularly remote in this case, which involves the legitimacy of a rule with considerable national importance. Even if this Court held that the Rule was legitimate and members of FPC who are also members of another organization managed to secure an opposite decision in another jurisdiction, the hypothetical circuit split that would result would be nearly certain to get the attention of the Supreme Court and any divergence of opinions would very likely be short lived.

The Government argues that its concerns with extending relief to FPC's members are particularly salient because of the "substantial public-safety and law-enforcement interests that the Rule promotes—and . . . the minimal costs that it imposes on regulated entities." Gov't Br. at 43. This is unpersuasive. If this Court determines that the ATF promulgated the Rule in excess of agency authority, then there can be no legitimate government interest in enforcing it against anyone. *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1977) ("There is an overriding public interest . . . in the general importance of an agency's faithful adherence to [their] statutory mandate."). And in any event, the Government's statements on the importance of the Rule vastly overstate things. The Government asserts that "[i]n recent years, there has been an exponential rise in the number of

untraceable firearms commonly known as 'ghost guns,' " which has "undermine[d] law enforcement's ability" to trace crime guns. Gov't Br. at 1, 43. "Ghost gun" is, of course, a term that appears nowhere in federal law but rather continues the trend of lawmakers and activists promoting pejorative terms to advance an anti-gun agenda. *See, e.g.*, Jacob Gershman, *California Considers Plastic-Gun Measure*, THE WALL ST. J. (Jan. 14, 2014), https://on.wsj.com/3QLdnVT; *cf. Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) ("Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance.") (quotation marks omitted). But the Court should not accept these justifications from the Government. It claims that "nearly 20,000" unserialized firearms were recovered from potential crime scenes in 2021, Gov't Br. at 43, but that is a minuscule fraction of the overall firearm trace requests from that same year—460,024. *National Firearms Commerce and Trafficking Assessment Vol. II: Part III*, at 5, ATF (Jan. 11, 2023), https://bit.ly/3q9q7e0. Indeed, even though traces of unserialized firearms have increased in the past several years, ATF's success rate in tracing firearms to a purchaser has increased over the same period, from 75% in 2017 to 80% in 2021. *Id.* at 3. The overall increase of unserialized firearms has, therefore, not meaningfully impacted the Government's ability to trace firearms.

And to be clear, these firearms the Government highlights are ones that ATF *suspects* were privately made because they lack serial numbers. *Id.* They may have been privately made, or they may have simply been purchased and had their serial number illegally removed after purchase. Moreover, these "Crime Guns" are merely sent into the ATF for tracing by Law Enforcement Agencies and are not necessarily firearms used in crimes. *Id* at 1. There is no clear information that any of these firearms were actually used in crimes, how many firearms were merely stolen and recovered firearms, how many firearms were placed into safekeeping due to a domestic violence case, or how many were submitted only for having been suspected of having a defaced serial number (a felony itself).

Furthermore, the Government overstates the value of tracing as a crime solving tool. In many cases, successfully tracing a firearm does little to help police find a culprit. ATF considers a trace successful if it merely identifies a purchaser— it need not identify the final user. *Id.* at n.2. A firearm may be stolen from the first individual purchaser, reported, later recovered following a crime, sent to ATF, and traced to the person from whom it was stolen, and ATF would count that a successful trace. Criminals generally do not purchase their firearms at retail (nor do they generally build their own). *See* Mariel Alper and Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016* at Tbl. 5, BUREAU OF JUST. STAT., DEP'T OF JUST. (Jan. 2019), https://bit.ly/3fIswDC (10.1% of prisoners

purchased firearm used in crime at retail; no self-builds reported). So even a successful trace of a firearm to its retail purchaser will not, in most cases, connect it to the criminal. There is little reason to suspect that criminals desiring to have unserialized firearms will be substantially affected by the Rule. Such criminals could continue acquiring unserialized firearms on the black market or, if they come into possession of a serialized firearm, obliterate the serial number. *See* CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS 87–88 (Henry Paolucci, tr., Bobbs-Merrill, 1963) (1764) ("Can it be supposed that those who have the courage to violate the most sacred laws of humanity, the most important of the code, will respect the less important and arbitrary [laws], which can be violated with ease and impunity and which, if strictly obeyed, would put an end to personal liberty[?]").

In addition, it does not follow that because approximately 4% of firearms submitted for tracing in 2021 were suspected of having been privately made, that means that 4% of crime guns were privately made. According to ATF, "[t]he firearms selected for tracing are *not* chosen for purposes of determining which types, makes or models of firearms are used for illicit purposes." *Firearms Trace Data – 2019*, ATF, https://bit.ly/3rPBwQB (last visited Aug. 22, 2023) (emphasis added). "The firearms selected *do not* constitute a random sample and *should not* be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe." *Id*. (emphasis added). Congress agrees, as it instructed ATF to use

47

this language in any data releases about tracing. Consolidated & Further Continuing Appropriations Act, 2013, P.L. 113-6, § 514, 127 Stat. 198, 271–72 (2013). Tracing activity shows just that—tracing activity; nothing more.

### C. It Was Appropriate for the District Court to Vacate the Whole Rule.

As just discussed, the district court was correct to vacate the rule, and vacatur necessarily means that the rule is vacated for *everyone*. The Government argues, however, that the district court's remedy was overbroad in another sense—that it should have only vacated the portions of the new definitions of "frame or receiver" and "firearm" and that provisions regarding recordkeeping requirements, marking of suppressors, and even portions of the challenged definitions that constitute "updates [to] an outdated regulatory definition" should have been left in place under the Rule's severability clause. Gov't Br. at 32–35.

The Government points to the severability clause of the regulation to suggest that the district court should have gone through the Final Rule and excised only the problematic definitions and permitted the rest of the Final Rule to stand. *See* Gov't Br. at 32–33. But the definitions of "frame or receiver" and "firearm" are *central* to the Final Rule and the aims it was intended to serve. *See, e.g.,* Press Release, Fact Sheet: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership it Needs to Enforce Our Gun Laws, White House Briefing Room (Apr. 11, 2022), https://bit.ly/3Q59BX9. Where, as here, the putatively severable

provisions of a rule are in fact central to its aims, courts can and do chose to vacate the entire rule, leaving it to the agency that decided to enact the rule with the unlawful provisions in the first place how it would like to proceed. *See MD/DC/DE Broad. Ass'n v. FCC*, 253 F.3d 732, 735–36 (D.C. Cir. 2001) (denying reh'g en banc) ("[I]t is clear that severing one of the two options and thereby making the other mandatory would create a rule that the Commission did not consider and which, according to the Commission's own analysis in the course of rulemaking, would not have accomplished the Commission's two goals as it described them."). Moreover, the Government is free to publish new rules that address other, individual needs and provisions. The Government chose to draft and publish an omnibus rule covering several topics all focused around the central core of its redefinition of "firearm" and "frame or receiver." The district court's choice of remedy was appropriate.[1]

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: August 23, 2023                    Respectfully submitted,

/s/ David H. Thompson

Cody J. Wisniewski                        David H. Thompson
FPC ACTION FOUNDATION                     Peter A. Patterson
5550 Painted Mirage Road                  William V. Bergstrom

---

[1] The district court's choice of complete vacatur as a remedy was also significant because it formed the basis for the district court concluding that Plaintiffs' other claims were moot. ROA.4779.

Suite 320
Las Vegas, NV 89149
(916) 517-1665
cwi@fpchq.org

Brian Abbas
MOUNTAIN STATES LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
wtrachman@mslegal.org
babbas@mslegal.org

COOPER & KIRK PLLC
1523 New Hampshire Ave.,
NW

Washington, DC 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Appellees VanDerStok, Andren, Tactical Machining, and Firearms Policy Coalition*

Dennis L. Daniels, Jr.
Bradley Arant Boult Cummings,
LLP
Fountain Place
1445 Ross Avenue
Suite 3600
Dallas, Texas 75202
214-257-9800
dldaniels@bradley.com

John Parker Sweeney
James W. Porter, III
Marc A. Nardone
Connor M. Blair
Bradley Arant Boult
Cummings,
LLP
1615 L Street NW
Suite 1350
Washington, DC 20036
202-393-7150
jporter@bradley.com

*Counsel for Appellee Polymer80*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,361 words, excluding the parts exempted by FED. R. APP. P. 32(f).

This brief also complies with the typeface and type style requirements of FED. R. APP. P. 32(a)(5)–(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 (Version 2212) in Times New Roman 14-point font.

Dated: August 23, 2023

/s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs- Appellees*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit on August 23, 2023, by using the appellate CM/ECF system and that service was accomplished on all counsel of record by the appellate CM/ECF system.


Dated: August 23, 2023

/s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellees*