No. 23-10718

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C., a limited liability company; Firearms Policy Coalition, Incorporated, a nonprofit corporation,
Plaintiffs-Appellees,

Blackhawk Manufacturing Group, Incorporated, doing business as 80 Percent Arms; Defense Distributed; Second Amendment Foundation, Incorporated; Not an L.L.C., doing business as JSD Supply; Polymer80, Incorporated,
Intervenor Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,
Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

## REPLY BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ...........................................................................1

ARGUMENT .........................................................................................................3

I. The Rule Is Lawful ......................................................................................3

    A. The Rule Correctly Determines that Certain Nonfunctional
       Frames and Receivers Are Firearms .............................................3

    B. The Rule Correctly Explains that Certain Weapon Parts Kits Are
       Firearms ............................................................................................8

    C. Plaintiffs' Remaining Arguments Are Unavailing....................14

II. The District Court's Grant of Overbroad Relief Independently Requires
    Reversal ................................................................................................ 18

    A. Vacatur of the Entire Rule Was Improper ................................18

    B. Extending Relief to Non-Plaintiffs Was Improper ...................19

CONCLUSION ................................................................................................ 27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abramski v. United States,*
573 U.S. 169 (2014) ................................................................ 1

*Arizona v. Biden*:
31 F.4th 469 (6th Cir. 2022) ............................................. 24
40 F.4th 375 (6th Cir. 2022) ............................................. 21

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ........................................................... 20

*Cargill v. Garland,*
57 F.4th 447 (5th Cir. 2023) ............................................ 21

*Clark v. Martinez,*
543 U.S. 371 (2005) ............................................................. 8

*Delaware v. Pennsylvania,*
598 U.S. 115 (2023) ............................................................. 4

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .......................................................... 16

*eBay, Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) .......................................................... 22

*Johnson v. United States,*
576 U.S. 591 (2015) .......................................................... 17

*June Med. Servs., LLC v. Phillips,*
22 F.4th 512 (5th Cir. 2022) ............................................ 26

*Maryland v. King,*
567 U.S. 1301 (2012) ........................................................ 22

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) .......................................................... 16

*MD/DC/DE Broads. Ass'n v. FCC,*
253 F.3d 732 (D.C. Cir. 2001) ......................................... 19

*Morehouse Enters., LLC v. ATF,*
-- F.4th --, 2023 WL 5356626 (8th Cir. Aug. 22, 2023) ......................................... 2, 25

*NAACP v. Alabama,*
   357 U.S. 449 (1958) ........................................................................ 25

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ......................................................... 15, 16, 17

*PBGC v. LTV Corp.,*
   496 U.S. 633 (1990) ........................................................................ 14

*PDK Labs. Inc. v. U.S. DEA,*
   362 F.3d 786 (D.C. Cir. 2004) ...................................................... 16

*Perry v. Schwarzenegger,*
   591 F.3d 1147 (9th Cir. 2010) ...................................................... 25

*Rollins v. Home Depot USA,*
   8 F.4th 393 (5th Cir. 2021) ............................................................ 20

*Rutila v. US Dep't of Transp.,*
   12 F.4th 509 (5th Cir. 2021) .......................................................... 15

*Shinseki v. Sanders,*
   556 U.S. 396 (2009) ........................................................................ 15

*Skyworks, Ltd. v. CDC,*
   542 F. Supp. 3d 719 (N.D. Ohio 2021) ...................................... 21

*United States v. Annis,*
   446 F.3d 852 (8th Cir. 2006) ........................................................ 11

*United States v. Castleman,*
   572 U.S. 157 (2014) .......................................................................... 8

*United States v. Ron Pair Enters.,*
   489 U.S. 235 (1989) ........................................................................ 13

*United States v. Ryles,*
   988 F.2d 13 (5th Cir. 1993) .......................................................... 10

*United States v. Stewart,*
   451 F.3d 1071 (9th Cir. 2006) ...................................................... 12

*United States v. Wick,*
   697 F. App'x 507 (9th Cir. 2017) ................................................ 11

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
 455 U.S. 489 (1982) ............................................................... 18

*Warth v. Seldin*,
 422 U.S. 490 (1975) ............................................................... 24

*Williams v. Taylor*,
 529 U.S. 362 (2000) ............................................................... 12

**Statutes:**

Administrative Procedure Act (APA):
 5 U.S.C. § 703 ....................................................................... 21
 5 U.S.C. § 706 ....................................................................... 15

Gun Control Act:
 18 U.S.C. § 921(a)(3) ........................................................... 1, 8
 18 U.S.C. § 921(a)(3)(A) ..................................................... 6, 12

**Regulation:**

27 C.F.R. § 478.12(c) ................................................................ 3, 7

**Rule:**

Fed. R. Civ. P. 23 ...................................................................... 24

**Other Authorities:**

*Definition of "Frame or Receiver" and Identification of Firearms*,
 87 Fed. Reg. 24,652 (Apr. 26, 2022) ..................................... 2, 7, 10, 16, 17

*Webster's Third New International Dictionary of the English Language* (1968) ........................... 9

## INTRODUCTION AND SUMMARY

Plaintiffs do not seriously dispute what is at stake in this case: If left to stand, the district court's universal vacatur would allow anyone with access to the Internet to anonymously buy a parts kit or partially completed frame or receiver and easily assemble a working firearm in as little as 20 minutes. That result "would virtually repeal" the "core provisions" of the federal firearms laws. *Abramski v. United States*, 573 U.S. 169, 179-80 (2014). And by making untraceable guns freely available to felons, minors, and other prohibited persons, the district court's judgment would endanger the public and thwart efforts to prevent and solve serious crimes. Plaintiffs offer no compelling reason—either in defense of the merits or the scope of the district court's judgment—to uphold that result.

Congress has long required importers, manufacturers, and dealers of firearms to comply with licensing, background check, serialization, and recordkeeping requirements to ensure that firearms are not sold to those, such as felons, who are prohibited from possessing them and to enable law enforcement to trace firearms used in crimes. In enacting those requirements, Congress defined "firearm" to include, as relevant here, "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive," as well as the "frame or receiver" (that is, the major structural component) "of any such weapon." 18 U.S.C. § 921(a)(3). In the Rule at issue in this case, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) clarified, as relevant here, that kits or aggregations of parts that

enable a purchaser to readily assemble an operational weapon, or readily construct a functional frame or receiver, fall within the statutory definition of "firearm," and so must be sold in compliance with the Gun Control Act's requirements. *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022). As the Eighth Circuit recognized in affirming a denial of a request to enjoin the Rule, the Rule generally "creates no new obligations on individuals" who are not manufacturers or dealers. *Morehouse Enters., LLC v. ATF*, -- F.4th --, 2023 WL 5356626, at *4 (8th Cir. Aug. 22, 2023).

As the government demonstrated in its opening brief, the district court's decision to vacate the Rule was incorrect on every level: the Rule comports with the statute, and the universal vacatur of the entire Rule was overbroad in multiple respects. Plaintiffs rebut none of these showings. On the merits, plaintiffs fail to grapple with the text of the statute and instead advance a scattershot of unpersuasive arguments in an attempt to manufacture a conflict between the statute and the Rule. And on the remedy, plaintiffs fail to explain how the court's universal vacatur was required to remedy their asserted injuries or was justified by traditional equitable principles. This Court should reverse.

2

# ARGUMENT

## I. The Rule Is Lawful

### A. The Rule Correctly Determines that Certain Nonfunctional Frames and Receivers Are Firearms

The government demonstrated in its opening brief that the district court erred in concluding that the Rule's clarification that a "frame" or "receiver" includes a partially complete, disassembled, or nonfunctional frame or receiver that may "readily" be converted into a functional one, *see* 27 C.F.R. § 478.12(c), conflicts with the Gun Control Act. As explained, the statute does not provide any definition of "frame" or "receiver." In interpreting those terms to include a partially complete frame or receiver that may "readily" be converted to a functional one, ATF acted consistently with the ordinary meaning of the statutory text and with Congress's similar approach to defining other terms in similar contexts. Any contrary approach would permit individuals to circumvent federal firearms requirements that serve critically important functions by keeping firearms out of the hands of felons and other prohibited persons and enabling law enforcement to trace firearms used in crimes. And ATF's interpretation is supported by the agency's longstanding practice of treating certain partially complete frames or receivers as frames or receivers for these purposes. That interpretation plainly comports with the Gun Control Act. *See* Opening Br. 18-26.

3

Plaintiffs barely contest these points. Instead, plaintiffs advance a scattershot of arguments that rely on a fundamental misunderstanding of the Gun Control Act, the Rule, and ATF's longstanding approach to implementing the statute. *See* VanDerStok Br. 16-25; BlackHawk Br. 19-26; SAF Br. 11-12.

**1.** As explained, the Rule's definitions of "frame" and "receiver" comport with the ordinary meaning of the statutory text: no statutory language specifies that, to be subject to regulation, a "frame" or "receiver" must be "fully complete" or "functional," and ordinary usage counsels against reading that limitation into the statute. A bicycle remains a bicycle even if, for example, it includes plastic guards attached to the gears that must be removed before use—just as, for example, Polymer80's partially complete frame that merely contains temporary rails or tabs that must be removed before use remains a frame. *See* Opening Br. 19-20.

Plaintiffs have no persuasive response to this analogy, nor do they dispute the accuracy of ATF's description of how easy it is to remove the rails and tabs from Polymer80's product. Some plaintiffs contend that the analogy is misplaced because it overlooks that a "bicycle" is an ordinary word, while "frame" and "receiver" are terms in a "statute governing a federal regulatory agency." BlackHawk Br. 23. But of course, that is the point: undefined statutory terms, like "frame" and "receiver," must be given their "ordinary, contemporary, common meaning." *Delaware v. Pennsylvania*, 598 U.S. 115, 128 (2023) (quotation omitted). Other plaintiffs respond, no more persuasively, that a nonfunctional frame or receiver "is not just a frame or receiver

4

that is missing a part like a bicycle without pedals." VanDerStok Br. 16-17. But as the government has explained, many nonfunctional frames and receivers regulated by the Rule are indeed exactly that: they may, for example, be missing only a single hole required to function or may only include some additional easily removed material. *See* Opening Br. 7.

Plaintiffs' attempts to divine some ordinary meaning of "frame" and "receiver" more limited than the Rule's definitions fare no better. For example, plaintiffs contend (BlackHawk Br. 19-20) that ATF's interpretation is inconsistent with dictionary definitions of "frame"—as "the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm"—and "receiver"—as "the metal frame in which the action of a firearm is fitted and to which the breech end of the barrel is attached." That is incorrect. Neither of those definitions supports the idea that a product that, for example, is missing only "a single hole necessary to install the applicable fire control component" or that has "a small piece of plastic that can easily be removed to allow installation of that component," ROA.4895, ceases to be "the basic unit of a handgun" or "the metal frame" of a long gun. And like the statute, nothing in those definitions specifies that a frame or receiver must be "complete," "operable," or "functional."

Perhaps in response to the district court's recognition that "ATF does indeed have discretion to decide whether a particular component is a frame or receiver based upon that component's degree of completeness," ROA.4770 (quotation omitted),

some plaintiffs appear to acknowledge (VanDerStok Br. 19-20) that the Gun Control Act might sweep in some nonfunctional frames and receivers, but only those that have previously been functional. That proposal fails on multiple levels. For one, it is based on an interpretation of the word "converted" in 18 U.S.C. § 921(a)(3)(A), even though no similar language appears in § 921(a)(3)(B). And regardless, plaintiffs' suggestion that "converted" in the statute is limited to alterations made to firearms that are "finished being manufactured" and already "complete," VanDerStok Br. 19, cannot be squared with the ordinary meaning of "converted," as discussed more fully below, *see infra* p. 9.

**2.** Unable to support their position with the plain meaning of the statutory text, plaintiffs rely instead on a misunderstanding of statutory context. VanDerStok Br. 15-16, 18; BlackHawk Br. 21-22. Plaintiffs contend that Congress implicitly precluded the Rule's interpretation because Congress defined other statutory terms—like "firearm"—to include nonfunctional versions that may "readily" be converted or assembled to functional versions. But the government demonstrated the error of this argument in its opening brief: that argument would have force only if § 921(a)(3)(B) defined "frame or receiver"; because it does not, no inference may be drawn from the nonexistence of "readily" language in that provision. Opening Br. 23. Plaintiffs simply refuse to engage with this point. Nor do they engage with the fact that in defining the undefined statutory terms "frame" and "receiver," ATF reasonably followed

Congress's lead by including language similar to that used by Congress when it chose to define other related terms. *See* Opening Br. 20-21.

**3.** Missing the mark entirely, plaintiffs attempt to bolster their position that only functional frames and receivers may be "firearms" by ascribing it to ATF. VanDerStok Br. 21-24; BlackHawk Br. 24-26. As explained, *see* Opening Br. 21-22, ATF has long understood that certain partially complete frames and receivers constitute frames or receivers under the Gun Control Act. Thus, ATF has previously treated as a frame or receiver a product that has reached "a stage of completeness that will allow it to accept the firearm components [for] which it is designed," "using basic tools in a reasonable amount of time." 87 Fed. Reg. at 24,685 (quotation omitted). Contrary to plaintiffs' assertions, that previous approach closely parallels the Rule, which similarly defines frame or receiver to include products that "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). And that interpretive tradition is backed up by decades of classification letters in which ATF recognized that products that need minimal additional work to convert them into complete frames or receivers are frames and receivers. *See, e.g.*, ER Tab 5 (collecting letters from 1978, 1980, and 1983).

**4.** Contrary to plaintiffs' arguments (VanDerStok Br. 33-35; SAF Br. 17-19), neither constitutional avoidance nor the rule of lenity can justify adopting plaintiffs' incorrect interpretations of the statute. The rule of lenity has a role to play only if, "after considering text, structure, history, and purpose, there remains a grievous

ambiguity or uncertainty in the statute." *United States v. Castleman*, 572 U.S. 157, 172-73 (2014) (quotation omitted). And the constitutional-doubt canon applies only when there are "competing plausible interpretations of a statutory text." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Neither interpretive tool is relevant because the Rule reflects the best reading of the statute and plaintiffs' contrary interpretation of the challenged provisions is not plausible.

In any event, the Rule does not "raise[] serious constitutional doubts." *Clark*, 543 U.S. at 381. In arguing otherwise, plaintiffs contend (VanDerStok Br. 33-35; SAF Br. 17-18) that the Rule might raise Second Amendment, nondelegation, or vagueness concerns. But no party develops an argument that the Rule violates the Second Amendment or nondelegation principles. And regardless, the Rule is constitutional on all scores, as discussed more fully below. *See infra* pp. 16-18.

## B. The Rule Correctly Explains that Certain Weapon Parts Kits Are Firearms

**1.** Plaintiffs insist that a weapon parts kit that can readily be converted into a working firearm—and that is designed, marketed, and used for that specific purpose—is not a "firearm" under the statute. But plaintiffs barely acknowledge, much less refute, the government's plain-text analysis of 18 U.S.C. § 921(a)(3), which explicitly includes "any weapon" that "is designed to or may readily be converted to expel a projectile by the action of an explosive." *See* Opening Br. 26-27. That is fatal

to their argument: The parts kits covered by the Rule fall squarely within the statutory definition.

Indeed, the only argument plaintiffs develop that purports to rely on the statutory text (VanDerStok Br. 26) is the argument that only items that are or were already complete may be "converted" to functional firearms and a user who assembles a weapon parts kit, therefore, does not "convert" that kit into a functional weapon. But that interpretation of "convert" is not supported by the ordinary meaning of the term, nor does it make sense in the context of the statute. As explained, *see* Opening Br. 26, the plain meaning of "convert" is "to change or turn from one state to another: alter in form, substance, or quality: transform, transmute." *Webster's Third New International Dictionary of the English Language* 499 (1968) (formatting altered). Nothing about that definition requires that the starting item already be "complete" or fully "manufactured." Saying that one has converted a dining room into a bedroom does not suggest, let alone require, that the dining room was previously a bedroom. Nor should the consequences of plaintiffs' contrary theory be overlooked: for example, under plaintiffs' view, drilling a single hole in a partially complete firearm to render it operable for the first time does not qualify as "converting" the partially complete firearm to a complete one. Such a tortured reading of the statute must be rejected.

Separately, plaintiffs briefly suggest (SAF Br. 13) that weapon parts kits fall outside the statute because they are not "weapons." But plaintiffs do not explain what

independent content they would derive from the word "weapon" in the statute, nor do they explain how (for example) a disassembled firearm—that they agree is a "firearm"—is a "weapon" but an unassembled one is not. And in context, it is plain that Congress intended the definition of "firearm" to cover all instruments of combat that may readily be converted to fire a projectile by the action of an explosive—and that are, in an ordinary sense of the word, therefore weapons. *See also* 87 Fed. Reg. at 24,684 (dictionaries define a "weapon" simply as an "instrument of offensive or defensive combat" (quotation omitted)).

**2.** Nor do plaintiffs have any persuasive response to the substantial precedent, including from this Court, confirming that disassembled firearms—which are functionally identical to the weapon parts kits regulated under the Rule—are "firearms" within the meaning of the relevant definition. *See* Opening Br. 27-28.

In an attempt to distinguish this Court's decision in *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993), which held that a "disassembled" shotgun "could have been 'readily converted' to an operable firearm" and thus was a "firearm" for purposes of a provision of the Sentencing Guidelines mirroring the statutory definition, plaintiffs can do no more (VanDerStok Br. 28) than grasp at straws. At the outset, plaintiffs argue that *Ryles* is "not strictly binding" because it involved the Sentencing Guidelines, not the statute—but plaintiffs offer no persuasive reason to interpret the same definition differently in the two contexts. Second, plaintiffs suggest that the disassembled shotgun at issue in *Ryles* "could" have also been a firearm under

10

the "designed to" provision of the Guidelines. But that is irrelevant, both because this Court explicitly relied not on that provision but instead on the "readily converted" provision and because weapon parts kits—like disassembled weapons—are "designed to" operate as firearms. Finally, plaintiffs suggest that *Ryles* does not indicate that an item without a frame or receiver could be a firearm. But nothing in *Ryles* suggests that it mattered to the Court whether the disassembled shotgun contained a complete frame or receiver. And, as explained below, *see infra* pp. 12-13, plaintiffs' suggestion that all "firearms" must contain a functional frame or receiver is unpersuasive on its own terms.

Plaintiffs' undeveloped attempts (VanDerStok Br. 27-28) to distinguish the various other cases cited by the government (Opening Br. 27-28) are no more fruitful. In each case, the court of appeals relied on reasoning equally applicable to weapon parts kits to conclude that the disassembled weapon—or, in one case, kit—at issue constituted a firearm. *See United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (concluding a "partially disassembled" rifle was a firearm because the definition of "firearm" "turns on what the weapon is designed to do" (quotation omitted)); *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017) (declining to consider "whether a demilled receiver may, by itself, support a firearm conviction" because the "complete Uzi parts kits" being sold by the defendant "contained all the necessary components to assemble a fully functioning firearm with relative ease" and thus could "readily be converted to expel a projectile by the action of an explosive" (quotation omitted));

11

*United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (affidavit containing statements establishing "how easily [the defendant's] kits could be converted" to operable firearms "supported a finding of probable cause" that the kits constituted firearms under the readily-converted prong).

**3.** Rather than directly engaging with the statutory text or controlling precedent, plaintiffs primarily appear to argue (VanDerStok Br. 26-32; SAF Br. 14) that a weapon parts kit that does not contain a frame or receiver cannot be a "firearm" because all firearms must, by definition, contain a complete frame or receiver. That argument is incorrect on all levels.

For one, plaintiffs' argument simply ignores the plain text of the statute; the primary definition of "firearm" makes no mention of frames or receivers. As explained, the text of the statute defines weapons that may "readily be converted" into functional firearms as "firearms," 18 U.S.C. § 921(a)(3)(A), with no suggestion that the weapon must additionally include a complete or functional "frame" or "receiver."

Plaintiffs' interpretation also violates the "cardinal principle of statutory construction" that requires courts to "'give effect, if possible, to every clause and word of a statute.'" *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quotation omitted). To the extent that plaintiffs argue that any firearm must, by definition, contain a complete frame or receiver, then § 921(a)(3)(A)'s primary definition of "firearm" would be wholly superfluous, because all "firearms" would be captured by § 921(a)(3)(B). Apparently anticipating this problem with their interpretation, plaintiffs

12

urge that there is no superfluity because § 921(a)(3)(A) is still "necessary to determine

which frames and receivers are captured by" § 921(a)(3)(B). VanDerStok Br. 29. But

that is incorrect: Congress defined "firearm" separately in § 921(a)(3)(A) and

§ 921(a)(3)(B). Under plaintiffs' interpretation, no firearms would be captured by

§ 921(a)(3)(A) that are not already captured by § 921(a)(3)(B). That superfluity

demonstrates the error of plaintiffs' approach. And similarly, although plaintiffs note

(VanDerStok Br. 29-31) that some firearms—such as those that are fully complete

and functional—will qualify as "firearms" under both definitions, the fact that the two

definitions overlap in some circumstances does not provide any reason to read one of

them entirely out of the statute.

**4.** Finally, plaintiffs advance a handful of arguments based on context and

unenacted legislation. As an initial matter, when a "statute's language is plain, the sole

function of the courts is to enforce it according to its terms." *United States v. Ron Pair

Enters.*, 489 U.S. 235, 241 (1989) (quotation omitted). Plaintiffs' attempts to draw

inferences from other places to override statutory text must be rejected.

In any event, plaintiffs' arguments on this score fundamentally misunderstand

the Rule. Plaintiffs suggest (VanDerStok Br. 24; BlackHawk Br. 28) that Congress did

not intend to regulate individual firearm parts (aside from the frame or receiver of a

firearm), and therefore the Rule contravenes the statute. But the Rule does not

regulate individual firearm parts; instead, it regulates only weapon parts kits that may

readily be assembled into functional firearms. *See* Opening Br. 29-30. For the same

13

reason, plaintiffs' suggestion (BlackHawk Br. 29) that the Rule creates its own superfluity problem by permitting the regulation both of parts generally and of two specific parts—the frame and receiver—is incorrect. The statute regulates frames and receivers even when they are sold as standalone products; the statute only regulates other parts when they are sold in combinations that may readily be assembled into functional weapons. There is no superfluity.

Plaintiffs further hit wide of the mark in urging (VanDerStok Br. 32-33; BlackHawk Br. 16) that Congress's failure to enact proposed legislation that would have reiterated that the definition of "firearm" includes weapon parts kits provides probative evidence of the meaning of the statute. No implication from legislative history could overcome the statute's plain grant of authority. Congressional inaction "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction." *PBGC v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quotation omitted). That is especially true here, where the plain text of the Gun Control Act already clearly covers the weapon parts kits regulated under the Rule, and Congress may well believe that no further amendments to the statute are therefore necessary.

## C.    Plaintiffs' Remaining Arguments Are Unavailing

Beyond the claims on which the district court granted summary judgment, some plaintiffs contend that the court's judgment could be affirmed based on additional, and entirely distinct, claims regarding asserted errors in the Rule. SAF Br. 20-30. But the district court never evaluated those claims—which not only are

14

disconnected from the claims that the court did evaluate but might also require different or more tailored relief if successful—and as "a court of review, not of first view," this Court need not adjudicate them in the first instance. *Rutila v. US Dep't of Transp.*, 12 F.4th 509, 511 n.3 (5th Cir. 2021) (quotation omitted). In any event, those claims are unpersuasive.

**1.** Plaintiffs argue (SAF Br. 20-25) that the Rule's discussion of the Second Amendment is arbitrary and capricious because, in their view, the Rule does not follow the analysis required by *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). That contention fails on all levels.

As an initial matter, to the extent any aspects of the agency's discussion could be understood as reflecting a now-outdated legal test, *see Bruen*, 142 S. Ct. at 2125-31, that would not entitle plaintiffs to relief because they have not actually argued that the Rule violates the Second Amendment. The APA requires courts to take account of the "rule of prejudicial error." 5 U.S.C. § 706. Under that rule, "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009). Here, however, plaintiffs fail to develop any argument that the Rule violates the Second Amendment, nor have they suggested that anything has prevented them from advancing such an argument. They have thus failed to meet their burden of showing that any flaw in the agency's explanation related to this issue has prejudiced them. That alone is sufficient to reject their claim.

In attempting to avoid any burden to even argue that the agency's asserted error prejudiced them, plaintiffs suggest (SAF Br. 22-25) that the burden in this context should be on the government to disprove harmless error. But plaintiffs advance no persuasive justification for flipping the burden, relying (SAF Br. 22-23) on cases about the burden in criminal appeals and the burden when the agency's reasoning is "impossible to discern." *PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). Neither of those cases applies in this APA challenge where the agency undoubtedly provided a cogent explanation (even if plaintiffs disagree with its correctness).

Moreover, contrary to plaintiffs' protestations, ATF correctly concluded that the Rule does not violate the Second Amendment. The Supreme Court has long made clear that nothing in its decisions interpreting the Second Amendment "cast[s] doubt" on "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) (same). And nothing in *Bruen* undermines that longstanding recognition. *Cf. Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating this point). As ATF explained in the Rule, the statutory licensing, recordkeeping, and background check requirements implicated by the Rule are such commercial restrictions; they "do not prohibit individuals from assembling or otherwise making their own firearms." 87 Fed. Reg. at 24,676. Nor do those requirements "burden the ability of non-prohibited people to buy, sell, or

16

possess firearms." *Id.* Thus, as the Rule properly explains, nothing in the Rule or the underlying statute "prevents law-abiding citizens" from exercising the Second Amendment "right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156. The Rule therefore does not infringe the protected right, and there is no need for further analysis. *See id.* at 2126 (holding that the threshold inquiry is whether "the Second Amendment's plain text covers an individual's conduct").

**2.** Plaintiffs also contend (SAF Br. 27-30) that the Rule's provisions are unconstitutionally vague, because it may sometimes be challenging to determine whether a particular product is "readily converted" to an operational firearm. Like countless other laws, however, the Rule simply "call[s] for the application of a qualitative standard" to "real-world" facts. *Johnson v. United States*, 576 U.S. 591, 604 (2015). Nothing about that is problematic. And indeed, more than most laws, the Rule contains detailed definitions with clarifying examples and an extended discussion of how the term "readily" has been interpreted and applied in analogous contexts, *see* 87 Fed. Reg. at 24,678-79, 24,739. And because the term "readily" is used in other firearms statutes, *see* Opening Br. 20, ATF's adoption of that term enables ATF to incorporate definitions and understandings based on preexisting case law interpreting it. The Rule thereby "provides manufacturers with fair warning on how the factors in th[e Rule's] definition are evaluated." 87 Fed. Reg. at 24,663, 24,668. For similar reasons, plaintiffs' undeveloped suggestion (SAF Br. 18) that the Rule implicates

nondelegation concerns because the word "readily" may not contain intelligible principles to guide agency discretion is unavailing.

And to the extent that plaintiffs remain uncertain how the Rule might apply in a particular circumstance, the Rule provides a mechanism to resolve any uncertainty: parties may submit requests for voluntary classifications as to whether any particular item constitutes a "firearm" within the meaning of the statute and regulations. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (explaining that the ability to receive additional clarity "by resort to an administrative process" ameliorates any harm from claimed vagueness). And indeed, ATF has already issued more than 40 classifications to individual private parties and provided two Open Letters to the public to explain the application of the Rule's definitions of "frame" and "receiver." *See* Opening Br. 20, 25 (discussing Open Letters).

## II. The District Court's Grant of Overbroad Relief Independently Requires Reversal

### A. Vacatur of the Entire Rule Was Improper

As explained, *see* Opening Br. 32-35, the district court improperly vacated the entire Rule, even though it found only two discrete provisions of the Rule contrary to law. Plaintiffs do not contend that the remaining provisions of the Rule cause them any harm, nor do they dispute that the district court could have limited its vacatur to the challenged provisions.

18

Plaintiffs' only defense of the vacatur of the entire Rule is that the challenged provisions are "central to the Final Rule" and so the rest of the Rule should be vacated so "the agency" can decide "how it would like to proceed" with the rest of the provisions. VanDerStok Br. 48-49; *see also* BlackHawk Br. 36-37. But the agency has already made that decision: it made clear in the Rule that it intended for each provision to be severable. *See* Opening Br. 34-35. And unlike in the sole case plaintiffs cite to support their argument, it is undisputed that the remaining provisions of the Rule could "sensibly serve the goals for which [they were] designed" in the absence of the challenged provisions. *MD/DC/DE Broads. Ass'n v. FCC*, 253 F.3d 732, 734 (D.C. Cir. 2001). For example, plaintiffs nowhere contest that the utility of the Rule's provisions extending recordkeeping requirements or regulating silencers does not depend on the enforceability of the two provisions addressed by the district court. In short, the remaining provisions of the Rule operate independently of the challenged provisions and advance important public safety interests of their own, as the government has explained. *See* Opening Br. 32-34. Thus, at the least, the district court's vacatur of the remaining provisions of the Rule should be reversed.

### B.    Extending Relief to Non-Plaintiffs Was Improper

**1.** As explained, *see* Opening Br. 35-45, the district court's universal vacatur was erroneous because it extended relief beyond the parties, in contravention of constitutional and equitable principles.

In general, plaintiffs do not appear to dispute that courts must generally tailor relief to the parties before them. Although plaintiffs (VanDerStok Br. 38-39) emphasize that Article III permits a court to provide remedies to redress parties' injuries that may also have the incidental effect of benefitting nonparties, that does nothing to advance their claim. Plaintiffs nowhere contend that universal vacatur was in fact required to redress their injuries nor that the effects on other parties were merely incidental. In these circumstances, the district court was compelled to enter tailored relief that was "no more burdensome" than required to provide plaintiffs "complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).[1]

Failing to justify the district court's universal relief under usual remedial principles, plaintiffs next suggest (VanDerStok Br. 40-41) that "vacatur" under the APA inherently operates universally and cannot be limited to specific parties. But no such prohibition on tailored relief appears in the text of the APA. Thus, even assuming that this Court's cases recognizing vacatur as authorized under the APA are correct, there is no textual reason that vacatur can only operate universally. And

---

[1] Some plaintiffs also contend (SAF Br. 35, 41) that the government has forfeited any argument based on equitable considerations that relief should be limited to the parties or should not extend to unidentified members of plaintiff organizations. But the government argued below at summary judgment both that the plaintiff organizations lack standing to sue on behalf of their members—an argument that is, in any event, jurisdictional and not subject to forfeiture, *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021)—and that any relief had to be narrowly tailored to redressing plaintiffs' specific injuries. *See* ROA.3284-86; ROA.3343-44.

plaintiffs cannot persuasively contend that Congress intended that the APA not only permit but require such a radical departure from "the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring).

Plaintiffs furthermore have no response to the government's collection of authorities explaining that vacatur of a court judgment can operate with respect to some, but not all, parties, *see* Opening Br. 39-40, other than to suggest (VanDerStok Br. 41) that court judgments are, unlike regulations, inherently party specific. But as those authorities demonstrate, court judgments that operate as to a large set of parties may be vacated as to only a subset of those parties; so too a rule may be vacated only as to a subset of the general public. *See, e.g.*, *Skyworks, Ltd. v. CDC*, 542 F. Supp. 3d 719 (N.D. Ohio 2021) (vacating CDC eviction moratorium as to plaintiffs only).

Regardless, if plaintiffs were correct that vacatur must operate universally, that would only underscore that the district court should have forgone vacatur in favor of other party-specific equitable remedies. Although plaintiffs urge (VanDerStok Br. 38) that vacatur is "the only statutorily prescribed remedy" for an APA challenge, plaintiffs do not seem to dispute that—consistent with 5 U.S.C. § 703's specification that the "form of proceeding" under the APA is generally a traditional "form of legal action" such as an action for "declaratory judgment[]" or "injunction"—other traditional equitable remedies are also available in APA cases. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality op.) (concluding that the

21

district court could consider on remand "what remedy—injunctive, declarative, or otherwise—is appropriate").

As explained, *see* Opening Br. 43-45, properly applying equitable principles leads inexorably to the conclusion that the district court's order was overbroad, especially in light of the overwhelming public-safety interest in enforcing the Rule. Although plaintiffs quibble around the edges (VanDerStok Br. 44-47) of that interest, they cannot deny the basic point: Large and rapidly increasing numbers of ghost gun kits are being sold online; many of those guns inevitably wind up in the hands of prohibited persons, including minors and felons; and tens of thousands of such guns have been recovered at crime scenes. Nor are plaintiffs correct when they argue (VanDerStok Br. 44) that the public-safety interest evaporates if this Court believes the Rule is unlawful. At most, that conclusion might undermine the sovereign harm the government would otherwise experience from its inability to enforce the Rule, *cf. Maryland v. King*, 567 U.S. 1301, 1302-03 (2012) (Roberts, C.J., in chambers), but it does not erase the tangible harms experienced by the victims of ghost gun violence or by the government when it is unable to solve those crimes and prevent future ones. *Cf. eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006) (the Supreme Court "has consistently rejected invitations" in the copyright context "to replace traditional equitable considerations with a rule that an injunction automatically follows a determination" that a defendant acted illegally).

**2.** For similar reasons, relief cannot run to the unidentified members of the plaintiff organizations.

At the outset, plaintiffs fail to explain how any of the organizations have standing to seek relief on behalf of their unidentified members. In arguing otherwise, plaintiffs suggest (VanDerStok Br. 42-43; SAF Br. 38-41) that they have met the requirements for associational standing because they have all identified at least one member with standing. But that response avoids the relevant question. The government does not dispute that the organizational plaintiffs have standing to seek relief on behalf of their identified members; the relevant question is whether they also have standing to seek relief on behalf of hundreds of thousands or more other unidentified members, especially when "members" appears to include anyone who has donated to the organization. As the government explained, *see* Opening Br. 40-42, this Court's precedents reflect the commonsense rule that the plaintiff organizations must demonstrate that they have some authority to represent each members' interests—and bind them to any judgment. Plaintiffs do not even attempt to demonstrate the sort of structure or membership control that would give rise to such authority.

In any event, even if the plaintiff organizations had standing to represent their unidentified members, equitable principles would preclude extending relief to those unidentified individuals. In arguing in favor of such wide-ranging relief, plaintiffs nowhere grapple with the substantial inequities—including the circumvention of the

longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional, *see* Opening Br. 42-43—that such relief engenders. Instead, plaintiffs first argue (VanDerStok Br. 43) that such relief automatically flows when an organization is a plaintiff. But the sole case plaintiffs cite on this point suggests merely that an association may have standing to seek equitable relief on behalf of the association's "actually injured" members, *Warth v. Seldin*, 422 U.S. 490, 515 (1975); it nowhere suggests that courts should disregard traditional equitable principles and automatically provide such relief. Such a suggestion would be particularly surprising given that automatic relief for members of a plaintiff organization would permit organizations to end-run the carefully constructed requirements for class-action suits. *See* Fed. R. Civ. P. 23.

Beyond that, plaintiffs contend (VanDerStok Br. 43-44) that although there may sometimes be substantial equitable concerns with allowing overlapping associations to each litigate on behalf of their members, those concerns are minimal in this case because the Supreme Court will probably ultimately resolve any conflict over the Rule's validity. But of course, such intervention is far from certain. And even if it were likely, the "load[ing of] more and more carriage on the emergency dockets of the federal courts"—and the discretionary docket of the Supreme Court—is one of the substantial practical problems generated by overbroad relief. *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring). This Court should not adopt a rule permitting inequitably broad relief on the basis that the Supreme Court may serve as a

nationwide backstop; even if the Supreme Court fulfills that role in some cases, those cases will necessarily represent only a small fraction of cases in the federal courts.

And this case starkly illustrates the fundamental equitable and practical problems with providing such relief. In a different suit, other plaintiffs, including the Gun Owners of America (GOA), an organization that claims two million members, have sought to enjoin or vacate the Rule but have failed; indeed, just last week, the Eighth Circuit affirmed the denial of a preliminary injunction in that suit. *See Morehouse Enters., LLC v. ATF*, -- F.4th --, 2023 WL 5356626 (8th Cir. Aug. 22, 2023). GOA now appears in this Court as amicus in support of a district-court decision that effectively nullifies the Eighth Circuit's decision—and that, even if limited to the plaintiffs and their members, would effectively nullify the Eighth Circuit's decision as to any GOA members who are also members of a plaintiff organization here. Equity does not support a system in which the federal government must prevail in every case, but challengers need only prevail once.

Finally, plaintiffs argue (SAF Br. 42-43) that requiring individual members to identify themselves in order to receive the benefit of a judgment could chill First and Second Amendment activity. But the cases plaintiffs cite concern compelled disclosure of an organization's members or internal communications and have no bearing here. *See NAACP v. Alabama*, 357 U.S. 449, 451-52 (1958) (suit brought by State seeking NAACP's membership list); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1153 (9th Cir. 2010) (discovery request for defendant organization's internal

communications). The government is not seeking to compel the plaintiff organizations to do anything; it is the plaintiff organizations that filed suit and sought to obtain relief for their members. And, of course, parties seeking relief in court usually must identify themselves; "this court does not usually allow parties to proceed anonymously based on generalized concerns." *June Med. Servs., LLC v. Phillips*, 22 F.4th 512, 520 n.5 (5th Cir. 2022). In abiding by the judgment, the government must know to whom relief runs.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed. In the alternative, this Court should reverse that judgment as it applies to the non-challenged provisions of the Rule and to non-parties, including unidentified members of the plaintiff organizations.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

LEIGHA SIMONTON
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

 *s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

August 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2023, I electronically filed the foregoing

reply brief with the Clerk of the Court for the United States Court of Appeals for the

Fifth Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*s/ Sean R. Janda*
Sean R. Janda

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6454 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda