**ADDENDUM**

# TABLE OF CONTENTS

**<u>Page</u>**

Opinion & Order on Defense Distributed and Blackhawk Manufacturing Group, Inc. d/b/a 80 Percent Arms' Emergency Motions for Injunctive Relief Pending Appeal, ECF 261 (Sept., 14, 2023) ..................................................................................Add. 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JENNIFER VANDERSTOK, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **Civil Action No. 4:22-cv-00691-O** |
| | § | |
| **BLACKHAWK MANUFACTURING** | § | |
| **GROUP INC., et al.,** | § | |
| | § | |
| **Intervenor Plaintiffs,** | § | |
| | § | |
| v. | § | |
| | § | |
| **MERRICK GARLAND, et al.** | § | |
| | § | |
| **Defendants.** | § | |

## OPINION & ORDER ON DEFENSE DISTRIBUTED AND BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS' EMERGENCY MOTIONS FOR INJUNCTIVE RELIEF PENDING APPEAL

Before the Court are Defense Distributed and BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms' ("Intervenor-Plaintiffs") Emergency Motions for Injunction Pending Appeal (ECF Nos. 249, 251), filed August 9, 2023 and August 14, 2023; the Attorney General of the United States, the United States Department of Justice, the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Bureau of Alcohol, Tobacco, Firearms and Explosives' (the "Government Defendants") Objection and Response in Opposition (ECF No. 254), filed August 17, 2023; and Intervenor-Plaintiffs' Replies (ECF Nos. 256, 257), filed August 21, 2023. Having considered the parties' briefing and applicable law, the Court **GRANTS** Intervenor-Plaintiffs' emergency motions for injunctive relief pending appeal to enforce unstayed portions of the Court's Order Granting Summary Judgment (ECF No. 227) and Final Judgment (ECF No. 231) against the Government Defendants.

## I.    BACKGROUND

The United States Congress established the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to regulate "firearms" in interstate commerce under the Gun Control Act of 1986 ("GCA"). *See* 26 U.S.C. § 599A(a); 28 C.F.R. § 0.130(a); 18 U.S.C. § 921(a)(3). In April 2022, the ATF promulgated a Final Rule that purports to regulate partially manufactured firearm parts and weapon parts kits, which took effect on August 24, 2022. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, 479). The Final Rule departed from nearly a half century of ATF precedent, during which the agency declined to interpret the GCA's term "firearms" as encompassing partially manufactured frames and receivers.[1] ATF subsequently issued an "Open Letter to All Federal Firearms Licensees," declaring that certain products are considered "frames" (and thus qualify as "firearms") under the GCA pursuant to the Final Rule's redefinition of that term.[2] Those products include partially complete Polymer80, Lone Wolf, and similar striker-fired semi-automatic pistol frames, including those sold within parts kits.[3]

Jennifer VanDerStok, Michael Andren, Tactical Machining, LLC, and the Firearms Policy Coalition, Inc. (the "Original Plaintiffs") filed this suit on August 11, 2022, to challenge the Final Rule's validity, claiming that the regulation exceeds the lawful scope of statutory authority that Congress vested in the ATF.[4] The Original Plaintiffs subsequently moved for a preliminary injunction that sought to broadly enjoin the Government Defendants from enforcing the Final

---

[1] *See* First Op. 2–3, ECF No. 56 (discussing ATF's Title and Definition Changes, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978) and others)
[2] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives, Open Letter to All Federal Firearms Licensees (Dec. 27, 2022) ("ATF Open Letter (Dec. 27, 2022)"), https://www.atf.gov/rules-andregulations/docs/open-letter/all-ffls-dec2022-open-letter-impact-final-rule-2021-05f/download.
[3] *Id.*
[4] Compl. 1, ECF No. 1.

Rule.[5] On September 2, 2022, the Court issued its First Opinion in which it held that the Original

Plaintiffs were substantially likely to succeed on the merits of their claim that provisions of the

ATF's Final Rule—namely, 27 C.F.R. §§ 478.11, 478.12(c)—exceed the scope of the ATF's

lawful jurisdictional grant under the GCA.[6] Having made this preliminary finding, the Court

enjoined the Government Defendants, along with their officers, agents, servants, and employees,

from implementing or enforcing the Final Rule against Tactical Machining, LLC ("Tactical")—

the only Original Plaintiff to establish irreparable harm.[7] The Court denied injunctive relief to the

remaining Original Plaintiffs in its First Opinion.[8] The Court issued its Second Opinion (ECF No.

89) on the proper scope of the preliminary injunction on October 1, 2022, which expanded the

injunction to include the additional Original Plaintiffs and—for the purpose of providing Tactical

complete relief—Tactical's customers.[9] The Court declined any invitation to issue a "nationwide"

injunction.[10]

In the ensuing months, the Court further extended this injunctive relief to Intervenor-

Plaintiffs on the same grounds and with the same scope as that of the Original Plaintiffs.[11]

BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms ("BlackHawk") is a manufacturer

and retailer that sells products newly subject to the Final Rule, with most of its revenue earned

through sales of those products.[12] Defense Distributed is a private defense contractor that primarily

manufactures and deals products now subject to the Final Rule.[13] By March 2023, the Government

---

[5] Pls.' Mot. for Prelim. Inj., ECF No. 15.
[6] First Opinion 15, 22–23, ECF No. 56.
[7] *Id.*
[8] *Id.*
[9] Second Op. 20–22, ECF No. 89.
[10] *Id.* at 19.
[11] *See* Mem. Ops., ECF Nos. 118, 188.
[12] Lifschitz Decl. 6–8, ECF No. 62-5 ¶¶ 8, 11, 13.
[13] *See generally* Defense Distributed Compl., ECF No. 143.

Defendants and their officers, agents, servants, and employees were enjoined from implementing

and enforcing against Intervenor-Plaintiffs and their customers the provisions in

27 C.F.R. §§ 478.11 and 478.12 that the Court preliminarily held to be unlawful.[14] The

Government Defendants appealed these individualized, Plaintiff-specific preliminary injunctions,

but did not seek stays pending appeal.

On June 30, 2023, the Court ruled in favor of the Original Plaintiffs and Intervenor-

Plaintiffs on the merits and granted their motions for summary judgment.[15] The Court held on the

merits that both challenged provisions of the Final Rule were invalid and that the ATF "acted in

excess of its statutory jurisdiction by promulgating [the Final Rule]."[16] In Section IV(B)(4) of the

Memorandum Opinion and Order Granting Summary Judgment (ECF No. 227), the Court vacated

the entire Final Rule pursuant to section 706 of the Administrative Procedure Act ("APA").[17] The

Court predicated its APA vacatur on the "default rule" of the Fifth and D.C. Circuits with respect

to the appropriate statutory remedy for unlawful agency action.[18] On July 5, 2023, the Court

entered its Final Judgment (ECF No. 231), which categorically memorialized each of the Court's

June 30, 2023 determinations: (1) grant of summary judgment to Plaintiffs and (2) APA vacatur

of the Final Rule.[19]

The Government Defendants appealed the Memorandum Opinion and Order Granting

---

[14] *See* Mem. Ops., ECF Nos. 118, 188 (injunctive relief did not extend to customers prohibited from possessing firearms under 18 U.S.C. § 922(g)).

[15] Summ. J. Mem. Op. & Order 37–38, ECF No. 227.

[16] *Id.* at 35.

[17] *Id.* at 35–37 (setting forth the Court's "Remedy"); *see* 5 U.S.C. § 706(2)(C) (directing the reviewing court to "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

[18] *Id.* at 35–37 (citing *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022) (permitting APA vacatur under 5 U.S.C. § 706(2) as the "default rule"); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.")).

[19] Final J. 1, ECF No. 231.

Summary Judgment (ECF No. 227) and Final Judgment (ECF No. 231) to the United States Court of Appeals for the Fifth Circuit.[20] At the same time, the Government Defendants moved for this Court to issue an emergency stay pending appeal.[21] On July 18, 2023, the Court denied the Government Defendants' motion for stay of the Memorandum Opinion and Order (ECF No. 227) and the Final Judgment (ECF No. 231) pending appeal.[22] On July 24, 2023, the United States Court of Appeals for the Fifth Circuit granted the Government Defendants' request for a stay of this Court's APA vacatur remedy insofar as it applied to provisions of the Final Rule that were neither challenged by Plaintiffs nor held unlawful by this Court. *See VanDerStok v. Garland*, No. 23-10718, 2023 WL 4945360, at *1 (5th Cir. July 24, 2023) (per curiam). The Fifth Circuit otherwise declined to stay the APA vacatur of provisions of the Final Rule that this Court held unlawful on the merits. *See id.* The Fifth Circuit expedited the Government Defendants' appeal. *See id.*[23]

On July 5, 2023, the Government Defendants filed an application with the Supreme Court of the United States for a stay of this Court's Final Judgment (ECF No. 231).[24] In its application briefing, the Government Defendants sought a full stay of the Final Judgment, but secondarily argued that, "[a]t a minimum, the [Supreme] Court should stay the district court's judgment *to the extent it apples to nonparties*."[25] More specifically, the Government Defendants requested that, "*to the extent* the [Supreme] Court concludes that the June 30 [summary judgment] order might *continue to have independent effect*," the Supreme Court's order should "stay *both* the June 30

---

[20] Defs.' Notice of Interlocutory Appeal, ECF No. 234.

[21] Defs.' Emergency Mot. for Stay Pending Appeal, ECF No. 236.

[22] Order, ECF No. 238.

[23] *See* C.A. Doc. No. 63 (July 25, 2023). Following the Supreme Court's stay, the Fifth Circuit heard oral arguments on September 7, 2023.

[24] *See* Government's Application for a Stay of the Judgment Entered by the United States District Court for the Northern District of Texas, *Garland, Att'y Gen., et al. v. Vanderstok, Jennifer, et al.*, No. 23A82 (July 2023).

[25] Defense Distributed's Reply Ex., ECF No. 257-3, at 20 (emphasis added).

[summary judgment] order and the July 5 final judgment" of this Court.[26] On August 8, 2023, the

Supreme Court accepted the Government Defendants' secondary invitation and granted its

application for a stay. *See Garland v. VanDerStok*, No. 23A82, 2023 WL 5023383, at *1 (U.S.

Aug. 8, 2023) (mem.). The Supreme Court's Stay Order provides, in relevant part, that:

> [t]he June 30, 2023 [summary judgment] order and July 5, 2023 [final] judgment
> of the United States District Court for the Northern District of Texas, case No. 4:22-
> cv-691, *insofar as they vacate* the final rule of the [ATF], 87 Fed. Reg. 24652
> (April 26, 2022), is stayed pending the disposition of the appeal in the United States
> Court of Appeals for the Fifth Circuit and disposition of a petition for a writ of
> certiorari, if such a writ is timely sought.

*Id.* (emphasis added).

Following the U.S. Supreme Court's Stay Order, Intervenor-Plaintiffs each filed Opposed

Emergency Motions for Injunction Pending Appeal on August 9, 2023 and August 14, 2023,

respectively.[27] Following the completion of expedited briefing,[28] Intervenor-Plaintiffs' motions

are now ripe for the Court's review.[29]

## II.    JURISDICTION

The core issue in dispute between the parties is whether the Court, following the Supreme

Court's Stay Order, has jurisdiction to afford individualized, post-judgment equitable relief to

Intervenor-Plaintiffs enjoining the Government Defendants from enforcing the challenged

provisions of the Final Rule against each Intervenor-Plaintiff, pending final disposition of the

appellate process. Upon review of the parties' briefing and applicable law, the Court answers in

the affirmative and holds that it retains Article III jurisdiction to enforce—through party-specific

relief against the Government Defendants—the concrete aspects of its Summary Judgment Order

---

[26] *Id.* at 20–21, 21 n.4 (emphasis added).
[27] *See* Defense Distributed's Mot., ECF No. 249; BlackHawk's Mot., ECF No. 251.
[28] *See* Orders, ECF Nos. 250, 253.
[29] *See generally* Defense Distributed's Mot., ECF No. 249; BlackHawk's Mot., ECF No. 251; Defs.' Resp.,
ECF No. 254; BlackHawk's Reply, ECF No. 256; Defense Distributed's Reply, ECF No. 257.

(ECF No. 227) and Final Judgment (ECF No. 231) that the Supreme Court declined to stay.

### A. Legal Standard

The judicial power "extend[s] to all Cases, in Law and Equity," that arise under the Constitution and Laws of the United States. U.S. CONST. art. III § 2. When the demands of a particular case require a federal court to ascertain the scope of its Article III jurisdiction, it is instructed to look to "history and tradition" as a "meaningful guide." *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023) (cleaned up); *cf. Coleman v. Miller*, 307 U.S. 433, 460 (1939) (Frankfurter, J.) ("[T]he framers of [Article III] gave merely the outlines of what were to them the familiar operations of the English judicial system and its manifestations on this side of the ocean before the Union.").

The judicial power of Article III encompasses the inherent authority of federal courts to grant equitable remedies in the execution of their judgments. *See Bodley v. Taylor*, 9 U.S. (5 Cranch) 191, 222–23 (1809) (Marshall, C.J.); *see also Peacock v. Thomas*, 516 U.S. 349, 356 (1996). The question of whether a federal court can properly exercise this inherent authority over a given matter, therefore, is constrained by historical and traditional equity practice. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999); *see also Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 404–05 (1971) (Harlan, J., concurring in the judgment) (explaining that the reach of a federal court's inherent equitable powers is "determined according to the distinctive historical traditions of equity"). Congressional authorizations of equitable remedies must be construed and exercised in a manner compatible with the same pre-established body of rules and principles. *Guaranty Trust Co. v. York*, 326 U.S. 99, 105–06 (1945); *Boyle v. Zacharie*, 31 U.S. 648, 658 (1832) (Story, J.). A federal district court's equitable remedial power is further subject to the external constraints found elsewhere in the Constitution, as well as

in federal common law and congressional enactment. *See Peacock*, 516 U.S. at 354–59, 354 n.5; *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944).

### B. Analysis

Intervenor-Plaintiffs seek post-judgment injunctive relief pending the outcome of appeal of the Court's Summary Judgment Order (ECF No. 227) and Final Judgment (ECF No. 231). The requested relief would afford individualized, party-specific protection to Intervenor-Plaintiffs that enjoins the Government Defendants from implementing and enforcing against each Intervenor-Plaintiff and their respective customers the provisions of the Final Rule that this Court, preliminarily and on the merits, held are unlawful.[30]

In its Summary and Final Judgments,[31] the Court issued the default legal remedy prescribed by federal statute for unlawful agency action: vacatur of the entire Final Rule. *See* 5 U.S.C. § 706(2)(C) (authorizing courts to "hold unlawful and set aside agency action"); *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022) (discussing vacatur as the default remedy for unlawful agency action); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). Following the Supreme Court's Stay Order, however, Intervenor-Plaintiffs no longer enjoy the protection previously afforded to them by the default remedy at law that Congress provided in the APA. *See Vanderstok*, 2023 WL 5023383, at *1 (staying the Summary Judgment Order and Final Judgment

---

[30] *See* Defense Distributed's Mot., ECF No. 249 (citing 27 C.F.R. §§ 478.11, 478.12); BlackHawk's Mot., ECF No. 251 (same).
[31] Summ. J. Mem. Op. & Order 35–38, ECF No. 227; Final J. 1, ECF No. 231.

"insofar as they vacate the final rule"). Moreover, Intervenor-Plaintiffs will remain deprived of the standard statutory relief until "disposition of the appeal in the United States Court of Appeals for the Fifth Circuit and disposition of a petition for a writ of certiorari." *Id.*

On account of Intervenor-Plaintiffs' prolonged lack of shelter from the Final Rule under the default statutory relief, they now seek the refuge of this Court's equitable remedial authority in the interim. Intervenor-Plaintiffs pray for the Court to exercise its equitable jurisdiction—to the extent that Intervenor-Plaintiffs each receive individual interlocutory protection against the Government Defendants' enforcement of the Final Rule—and at least until such time that the pending appeal and potential certiorari, as well as the Supreme Court's Stay Order, have been exhausted upon final conclusion.

The Court finds that the injunctive relief prayed for by Intervenor-Plaintiffs accords with (1) the historical and traditional maxims of equitable remedial jurisdiction prescribed by the Framers in Article III; and (2) the additional jurisdictional constraints imposed by the Constitution and contemporary judicial doctrine.

### 1. The History and Tradition of Equity Support Jurisdiction

Article III vests in this Court the equitable power to enforce its federal judgments. *Zacharie*, 31 U.S. at 658 (Story, J.) ("The chancery jurisdiction [is] given by the constitution and laws of the United States."); *cf.* THE FEDERALIST NO. 80, at 415 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) ("[I]t would be impossible for the federal judicatories to do justice without an equitable as well as a legal jurisdiction"). The Court is further vested with general congressional grants of equity jurisdiction that are applicable in the pending motion.[32]

---

[32] *See* 5 U.S.C. § 705 (providing that "to the extent necessary to prevent irreparable injury," the Court "to which a case may be taken on appeal from . . . may issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings"); Fed. R. Civ. P. 62(d) (providing that the Court "may suspend, modify, restore, or grant an injunction" pending appeal of a final judgment);

"We are dealing here with the requirements of equity practice with a background of several hundred years of history." *Hecht*, 321 U.S. at 329. The equity jurisdiction vested in district courts is an authority to administer "the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939). Its contours are outlined by "the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution." *Grupo Mexicano*, 527 U.S. at 318 (citing A. DOBIE, HANDBOOK OF FEDERAL JURISDICTION AND PROCEDURE 660 (1928)); *see Hayburn's Case*, 2 U.S. (Dall.) 409, 410–11 (1792) (Jay, C.J.). Beyond the equity jurisdiction conferred by Article III, courts must also construe general statutory grants of equitable remedial authority to harmonize with "the body of law which had been transplanted to this country from the English Court of Chancery" at the Founding. *Guaranty Trust Co.*, 326 U.S. at 105. It is "settled doctrine" that broad congressional authorizations of "remedies in equity are to be administered . . . according to the practice of courts of equity in the parent country." *Id.* (quoting *Zacharie*, 31 U.S. at 658 (Story, J.)).[33] The Court finds that the rules, principles, and practices of equity familiar to the Founding generation counsel in favor of the Court's jurisdiction to enjoin the Government Defendants from enforcing challenged provisions of the Final Rule against Intervenor-Plaintiffs— at least until the outcome of those judgments are finalized on appeal and certiorari.

---

Fed. R. App. P. 8(a)(1) (providing that the Court may issue "an order suspending, modifying, restoring, or granting an injunction while an appeal is pending."); *see also* 28 U.S.C. § 1651 (providing that the Court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.")

[33] To be sure, the "substantive principles of Courts of Chancery remain unaffected" by the fusion of law and equity in our Federal Rules of Civil Procedure. *Stainback v. Mo Hock Ke Lok Po*, 336 U.S. 368, 382 n. 26 (1949).

Since King James I decreed the supremacy of English Chancery in 1616,[34] the reigning predominance of equity over law has remained a cornerstone of our Anglo-American legal tradition. *See* JOHN H. LANGBEIN ET AL., HISTORY OF THE COMMON LAW: THE DEVELOPMENT OF ANGLO-AMERICAN LEGAL INSTITUTIONS 335 (2009). Equity supremacy was originally intertwined with royal prerogative and divinely ordained absolutism.[35] Yet in spite of its philosophical underpinnings, the prevailing jurisdiction, principles, and practices of equity occupied such an "integral part in the machinery of the law," that the Court of Chancery and its wide body of jurisprudence nonetheless survived and maintained preeminent status after nearly two hundred years of war and revolution in England and the United States—which had been marked by bloody hostilities, violent overthrows, and abolitionist attempts against the English Crown—and by extension, the institution of equity itself. LORD NOTTINGHAM'S "MANUAL OF CHANCERY PRACTICE" AND "PROLEGOMENA OF CHANCERY AND EQUITY" 7–8 (D. E. C. Yale ed. 1965); *see generally* LANGBEIN ET AL., at 329–35, 345–55. Equity triumphed in the midst of these existential threats on account of the three "Great Chancellors,"[36] who carefully doctrinalized and enshrined centuries of deeply ingrained Chancery practices into a system of clearly established rules, jurisdictional contours, and binding precedents to govern the administration of equitable remedies. *See* 1 WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 465 (1922–1966) (16 vols.); 1 LORD

---

[34] *The King's Order and Decree in Chancery*, Cary 115, 21 Eng. Rep. 61 (1616) (decreeing the supremacy of "relief in equity . . . notwithstanding any proceedings at common law . . . as shall stand with the true merits and justice of [] cases")

[35] *See The King's Order and Decree in Chancery*, Cary 115, 21 Eng. Rep. 61 (1616) (decreeing that "God, who hath placed [the monarch] over" the people, had vested within the king's "princely care and office only to judge over all Judges, and to discern and determine such differences as at any time may or shall arise between our several Courts, touching their Jurisdictions, and the same to settle and decide as we in our princely wisdom shall find to stand most with our honor . . . .").

[36] LANGBEIN ET AL., at 348–55. Lord Nottingham (1673–1682), Lord Hardwicke (1737–1756), and Lord Eldon (1801–1806, 1807–1827) are widely accredited with the systemization of modern equity. *See* S. F. C. MILSOM, HISTORICAL FOUNDATIONS OF THE COMMON LAW 95 (2d ed. 1981).

NOTTINGHAM'S CHANCERY CASES xxxvii–lxxiii (D. E. C. Yale ed. 1957) (2 vols. 1957, 1961). It was this abundant and systematized body of equity jurisprudence that was peculiarly familiar to the jurists of our Founding generation. *See, e.g.*, 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 432–33 (Oxford 1765–1769) (describing relief in equity as a "connected system, governed by established rules, and bound down by precedents"); THE FEDERALIST NO. 83, at 438 n.* (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) (describing Article III relief in equity as mirroring "the principles by which that relief is governed [in England, which] are now reduced to a regular system").[37]

The equitable remedial jurisdiction exercised by the Court of Chancery was necessarily forged out of (and therefore mirrored) the remedial gaps left behind by the austerity and incompleteness of relief available at law. *See* FRANZ METZGER, "The Last Phase of the Medieval Chancery," *in* LAW-MAKING AND LAW-MAKERS IN BRITISH HISTORY 84 (Alan Harding ed. 1980). Equity jurisdiction was supplemental in nature—it neither competed with, nor contradicted, nor denied the validity of the law—but rather aided, followed, and fulfilled the law. *See* CASES CONCERNING EQUITY AND THE COURTS OF EQUITY 1550–1660, vol. I, p. xli (William Hamilton Bryson, ed. 2001); *Cowper v. Earl Cowper* (1734) 24 Eng. Rep. 930, 941–42; 2 P. Wms. 720, 752–54 (Jekyll, MR). The "primary use of a court of equity [was] to give relief in *extraordinary cases*" where ordinary law remedies could not, which held steady as a routine phenomenon in the Anglo-American system by and through the Founding Era. THE FEDERALIST No. 83, at 438 & n.* (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001); *see id.* NO. 80, at 415 (Alexander Hamilton) ("There is hardly a subject of litigation between individuals which may not

---

[37] Of course, the long legacy of equity's triumph over law endures in our fused-civil procedure system today. *See generally* Stephen N. Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective*, 135 U. PENN. L. REV. 909 (1987).

involve those ingredients . . . which would render the matter an object of equitable rather than legal jurisdiction"); *see also* CASES CONCERNING EQUITY, at li ("The term 'extraordinary' is used [in equity] in the sense of going beyond the basic rather than in the sense of unusual; equity is both extraordinary and quite usual and frequent").

Through the development of equity's complementary function toward law, the scope of its jurisdiction became defined by a series of maxims well known to early American jurists—principally, (i) that equity acts *in personam*, *see* JOSEPH STORY, COMMENTARIES ON EQUITY PLEADINGS § 72, at 74 (Boston, 2d ed. 1840); (ii) that equity "follows the law," 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 19, at 22 (Boston 1836); and (iii) that equity "suffers not a right to be without a remedy," RICHARD FRANCIS, MAXIMS OF EQUITY, no. 6, at 24 (London 1728). These primary maxims were crystalized in the rich tradition of injunctive relief practice in English Chancery and furthermore in the courts of equity of the Early Republic. The Court finds that the equitable maxims and their historic illustrations are in harmony with the injunctions presently sought by Intervenor-Plaintiffs in their motions before the Court.

### i. *The Prayed Injunctions Act in Personam*

Like the rest of its remedial toolbox, English Chancery's decree of injunction operated *in personam* (*i.e.*, on the person that is a party), rather than *in rem* (*i.e.*, on the underlying subject matter in dispute). *See* CASES CONCERNING EQUITY, at xlv, li; LORD NOTTINGHAM'S "MANUAL OF CHANCERY PRACTICE" AND "PROLEGOMENA OF CHANCERY AND EQUITY" 17 (D. E. C. Yale ed. 1965); ROBERT HENLEY EDEN, A TREATISE ON THE LAW OF INJUNCTIONS 141 (London 1821). This maxim served to demarcate the boundaries of equitable jurisdiction relative to that of law and to prevent conflict between the two. *See, e.g.*, *Massie v. Watts*, 10 U.S. 148, 156–59 (1810) (Marshall, C.J.) (adjudicating the issue of the court's equitable jurisdiction to issue the prayed relief based on

whether it operated *in personam*). Whereas relief *in rem* was cabined to courts of law, equity jurisdiction began at matters *in personam* and any relief touching upon the conduct of a person was the sole prerogative of Chancery. *See* L. B. CURZON, ENGLISH LEGAL HISTORY 106 (2d ed. 1979); CASES CONCERNING EQUITY, at li. Injunctions were crafted as orders directed upon a living person to either undertake or refrain from undertaking a specific act—subject to enforcement via contempt of court or imprisonment to ensure compliance. *See* LANGBEIN ET AL., at 286; *Penn v. Lord Baltimore*, 1 Ves. Sen. 444, 447–48, 27 Eng. Rep. 1132, 1134–35, 1139 (1750) (Ld. Hardwicke, Ch.) (decreeing that, on the basis of Chancery's *in personam* jurisdiction over any party to a proceeding that is present within England, the parties are compelled to specifically perform their agreed-upon contract terms governing the resolution of boundary disputes; but declining to exercise any equitable authority on the original right of the boundaries).

The *in personam–in rem* jurisdictional dichotomy is well documented in the landmark case that gave rise to equity's supremacy over the law. In *Glanvile's Case*, Richard Glanvile won a judgment on a sales contract that the buyer entered under Glanvile's fraudulent misrepresentations. 72 Eng. Rep. 939 (K.B. 1615). In a law court, Glanvile entered judgment for an exorbitant bond debt. *See id.*; CASES CONCERNING EQUITY, at xlvi. But in Chancery, Lord Ellesmere decreed an injunction that operated against Glanvile himself, rather than the underlying property or judgment at law. *See* LANGBEIN ET AL., at 333–34. The injunction restrained Glanvile from attempting to enforce the law court judgment and compelled him to pay back the buyer-debtor, repossess the merchandise, and acknowledge satisfaction of the judgment. *See Glanvile's Case*, 72 Eng. Rep. 939. When Glanvile refused to comply, Chancery exercised its contempt power over Glanvile and imprisoned him for breach of a decree. *Id.* From the King's Bench, Lord Coke ruled that a judgment at law prevails over Chancery decree and granted the common law writ of *habeas corpus*

for Glanvile's release from prison. *Id.* Lord Coke's maneuver "struck at the heart of the Court of Chancery's *in personam* power," *i.e.*, the remedial power over a party's own person that is backed by the force of contempt. Langbein et al., at 330. It also leveled a direct challenge to the finality and binding effect of an equity order when a conflicting legal order had been entered. The 1616 decree of King James settled equity's supreme status on both fronts and enshrined the rule of jurisdiction that endures to this day: where the results of an equity order acting *in personam* and the results of a legal order acting *in rem* "are in disagreement, the equity rule and decree will prevail." Cases Concerning Equity, at xlvii; *see The King's Order and Decree in Chancery*, Cary 115, 21 Eng. Rep. 61 (1616).

Decisions of the Chancery Court of New York under James Kent are instructive as to how traditional equity maxims applied to injunction practice in the Early Republic. *See, e.g.*, *Manning v. Manning*, 1 Johns. Ch. 527, 530 (N.Y. Ch. 1815) (Kent, Ch.) ("It is the duty of this Court to apply the principles of [English Chancery] to individual cases, . . . and, by this means, endeavor to transplant and incorporate all that is applicable in that system into the body of our own judicial annals, by a series of decisions.").[38] In officer suits, Chancellor Kent exercised equitable remedial jurisdiction to directly enjoin government officials from acting in excess of statutory authority and infringing upon the legal rights of private persons. *E.g.*, *Belknap v. Belknap*, 2 Johns. Ch. 463 (N.Y. Ch. 1817) (Kent, Ch.); *Gardner v. Vill. of Newburgh*, 2 Johns. Ch. 162 (N.Y. Ch. 1816) (Kent, Ch.); *see also Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 827, 831–34 (C.C.D.N.J. 1830) (collecting cases).

In *Belknap v. Belknap*, for example, private plaintiffs sought an injunction to restrain government inspectors, who were authorized by statute to drain certain swamps and bog meadows

---

[38] *See also generally* Charles Evans Hughes, *James Kent: A Master Builder of Legal Institutions*, 9 A.B.A. J. 353 (1923).

for the benefit of some properties, from proceeding to cut down the outlet to a pond that supplied the source of water to plaintiffs' mills. 2 Johns. Ch. 463, 463–67, 468–70 (N.Y. Ch. 1817) (Kent, Ch.). Chancellor Kent determined that the officers gave "too extended a construction to their powers under the act" and that "this power should be kept within the words of the act" through an injunction. *Id.* at 470, 472. On the question of jurisdiction to provide such relief, Kent concluded that if the court is "right in the construction of the act, then the jurisdiction of the Court, and the duty of exercising it, are equally manifest." *Id.* at 472–74. In *Gardner v. Village of Newburgh*, a private plaintiff prayed a similar injunction to restrain government trustees, who were authorized by statute to supply a village with water, from proceeding to divert a stream away from the plaintiff's farm that his brickyard and distillery depended on. 2 Johns. Ch. 162, 162–64 (N.Y. Ch. 1816) (Kent, Ch.). The Chancery Court found that the impending diversion exceeded the limits of the officers' authority under statute for failing to provide adequate compensation to the plaintiff pursuant to his rights vested under law. *Id.* at 164, 166–67. Chancellor Kent held that the statute "ought not to be enforced . . . until such provision should be made," *id.* at 164, asserting the Court's jurisdiction to enjoin the officers from proceeding to divert the water course until the plaintiff's legal rights were indemnified. *Id.* at 164–65, 167–69.

Applying on-point precedent from English Chancery, Chancellor Kent concluded that the equitable remedial jurisdiction in the cases before him was "well settled, and in constant exercise." *Belknap*, 2 Johns. Ch. at 473–74 (citing *Hughes v. Trs. of Morden Coll.*, 1 Ves. Sen. 188, 27 Eng. Rep. 973 (1748) (Ld. Hardwicke, Ch.); *Shand v. Henderson*, 2 Dow. P.C. 519 (1814) (Ld. Eldon, Ch.)); *see Gardner*, 2 Johns. Ch. at 168 (citing *Agar v. Regent's Canal Co.*, G Coop. 77, 14 R. R. 217 (1815) (Ld. Eldon, Ch.)). Moreover, in each of these cases where the controversy between parties "turn[ed] upon the construction of [an] act," Chancellor Kent tailored the injunctive decrees

to directly "confine [the officers] and their operations . . . within the strict precise limits prescribed by the statute," but not extend jurisdiction *in rem* over the underlying statute itself. *Belknap*, 2 Johns. Ch. at 471–74; *see Gardner*, 2 Johns. Ch. at 162. Each injunction acted strictly *in personam* on the officers themselves, dictating *only* their specific actions *in relation* to the law at issue between the parties. The impact *in rem* of each injunction on the underlying law was merely incidental. Thus, by operating exclusively within the territory of *in personam*, Chancellor Kent's injunctions could not be dissolved or superseded by an order or judgment at law with conflicting effects. *See Belknap*, 2 Johns. Ch. at 474 (Kent, Ch.) ("These cases remove all doubt on the point of jurisdiction, and the observation of Lord *Hardwicke* alludes to its preeminent utility."); CASES CONCERNING EQUITY, at xlvii; LANGBEIN ET AL., at 334–36 (citing *The King's Order and Decree in Chancery*, Cary 115, 21 Eng. Rep. 61 (1616)).

In the instant motions before the Court, Intervenor-Plaintiffs each seek injunctions that act *in personam* on the Government Defendants. The Court is asked to enjoin the Government Defendants from enforcing against Intervenor-Plaintiffs the two challenged provisions of the Final Rule—along the same lines as the relief issued by the Court during the preliminary injunction stage of the litigation.[39] Such relief would entail that the Government Defendants and their officers, agents, servants, and employees are enjoined from implementing and enforcing against Intervenor-Plaintiffs and their customers the provisions in 27 C.F.R. §§ 478.11 and 478.12(c) that the Court has determined are unlawful.[40] The Government Defendants contend that, following the Supreme Court's stay of the APA vacatur of the Final Rule, the prayed injunctions would carve out exemptions from the stayed vacatur and re-vacate the Final Rule for each Intervenor-Plaintiff.[41]

---

[39] Defense Distributed's Mot., ECF No. 249; BlackHawk's Mot., ECF No. 251.
[40] *See, e.g.*, Mem. Ops., ECF Nos. 118, 188.
[41] Defs.' Resp., ECF No. 254.

The Government Defendants further assert that the prayed injunctive relief before the Court—as it relates to the APA vacatur relief issued at Final Judgment and the stay relief issued after Final Judgment—are "distinctions without a difference," and thus the Court is without jurisdiction to grant the motions.[42] However, the Government Defendants misunderstand the nature of equitable relief and are wrong on all counts.

In the Summary and Final Judgments, the Court vacated the Final Rule, which is the default remedy prescribed by section 706 of the APA for successful challenges to an agency regulation. *See Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022). As courts uniformly recognize, vacatur "does not order the defendant to do anything; it only removes the source of the defendant's authority." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 23-10362, 2023 WL 5266026, at *30 (5th Cir. Aug. 16, 2023) (citing *Nken v. Holder*, 556 U.S. 418, 428–29 (2009)); *see also* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining Vacatur in legal parlance as the "act of annulling or setting aside"). In the agency context, "vacatur effectively rescinds the unlawful agency [rule]" upon a successful APA challenge. *Id.* (citations omitted). And where the final rule is vacated, that relief "neither compels nor restrains [any] further agency decision-making" on the part of the government. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). Applied here, the APA vacatur merely operated on the Final Rule *itself*—specifically the two provisions deemed unlawful—which was entirely annulled, and thus no longer in existence, until the Supreme Court placed its stay on that vacatur. In that sense, it can fairly be said that the vacatur relief prescribed under section 706 of the APA—and ordered by the Court in the Summary and Final Judgments—operated *in rem* on the underlying provisions of the Final Rule in controversy between the parties.

---

[42] *Id.*

The Supreme Court's stay on the Court's APA vacatur operates as an additional action *in rem* on the underlying provisions of the Final Rule. *See All. for Hippocratic Med.*, 2023 WL 5266026, at *30 (expounding that "a stay is the temporary form of vacatur"). It temporarily supplanted the vacatur *in rem* with a restoration *in rem* on the existence of the Final Rule *itself*. *See id.* But as the foundational history and tradition of equity practice demonstrate, this is wholly different than the prayed relief before the Court. Whereas APA vacatur "unwinds the challenged agency [rule]," an injunction "blocks enforcement" of it. *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021). Similar to the historical officer injunctions granted in English and Early Republic chancery courts, the preventive injunctions sought by Intervenor-Plaintiffs here operate to directly restrain the Government Defendants from taking actions (*i.e.*, enforcing provisions of the Final Rule) that are in excess of the ATF's statutory authority under the GCA. The injunctions confine the Government Defendants' investigative and enforcement actions regarding the Intervenor-Plaintiffs within the precise limits prescribed by the GCA.

In this sense, the prayed injunctions act purely *in personam* over the Government Defendants *themselves*. The relief would dictate *only* the Government Defendants' specific actions *in relation* to the Final Rule in controversy between the parties, without issuing any commands or alterations on the Final Rule *itself*. And the prayed injunctions' binding effect *in personam* over the Government Defendants' enforcement decisions is backed by the traditional force of contempt, which is wholly lacking in both the Court's original APA vacatur and the Supreme Court's stay that each act *in rem* over the Final Rule. *See All. for Hippocratic Med.*, 2023 WL 5266026, at *31. Furthermore, to the extent that the secondary impact of the prayed injunctions may incidentally conflict with the *in-rem* operation of the unvacated Final Rule, the force and effect of the *in personam* decree sought by Intervenor-Plaintiffs predominates. *See Belknap*, 2 Johns. Ch. at 474

(Kent, Ch.); CASES CONCERNING EQUITY, at xlvii; LANGBEIN ET AL., at 334–36 (citing *The King's Order and Decree in Chancery*, Cary 115, 21 Eng. Rep. 61 (1616)). Accordingly, the prayed injunctive relief satisfies the first maxim of equity jurisdiction.

### ii.    The Prayed Injunctions Follow the Law

An outflow of the *in personam* equity maxim is a companion contour that the exercise of equitable remedial jurisdiction "follows the law" and "seeks out and guides itself by the analogies of the law." 1 STORY, COMMENTARIES ON EQUITY JURISPRUDENCE §§ 19, 64 at 22, 71–72. This maxim neatly complements that of equity's *in personam* posture. That is, if equity power cannot be exercised *in rem*, it cannot modify judgments at law or declare new rights at law either. *See* CASES CONCERNING EQUITY, at xlv, li (citing *Ward v. Fulwood*, No. 118–[201] (Ch. 1598)). In this regard, the Chancellors of England drew upon the wisdom of the ancients. *See* 1 LORD NOTTINGHAM'S CHANCERY CASES, at lii, n. 2. Building upon a principle of Aristotle's original formulation of equity, the English Chancellors recognized that "laws properly enacted, should themselves define the issue of all cases as far as possible, and leave as little as possible to the discretion of the judges." ARISTOTLE, RHETORIC 1353a-b (J. H. Freese trans., Harvard 1926). By the 18th century, Chancery fleshed out this antique maxim into a more clearly defined framework: "[Equitable remedial] discretion, in some cases, follows the law implicitly, in others, assists it, and advances the remedy. In others again, it relieves against the abuse, or allays the rigour [sic] of it, but in no case does it contradict or overturn the grounds or principles thereof." *Cowper v. Earl Cowper* (1734) 24 Eng. Rep. 930, 942 (Jekyll, MR); *see also Dudley v. Dudley*, Prec. Ch. 241, 244, 24 Eng. Rep. 118, 119 (Ch. 1705) ("Equity therefore does not destroy the law, nor create it, but assist it.").

Specifically, where a rule of statutory law is directly on point and governs the entire case

or particular point at issue, a "Court of Equity is as much bound by it, as a Court of Law, and can as little justify departure from it." 1 STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 64 at 72 (citing *Kemp v. Pryor* (1802) 32 Eng. Rep. 96, 101; 7 Ves. Jr. 237, 249–51 (Ld. Eldon, Ch.)). To that end, it became a "familiar principle of equity jurisdiction to protect by injunction statutory rights and privileges which [were] threatened to be destroyed or rendered valueless to the party by unauthorized interference of others." *Tyack v. Bromley*, 4 Edw. Ch. 258, 271–72 (N.Y. Ch. 1843), *modified sub nom. Tyack v. Brumley*, 1 Barb. Ch. 519 (N.Y. Ch. 1846). If upon following the applicable law, it was conclusive that a party seeking injunctive relief was in "actual possession" of a "clear and undisputed" statutory right, the "settled" doctrine of chancery courts was that an "injunction is the proper remedy to secure to [that] party the enjoyment" of their right against invasion by others. *Croton Tpk. Co. v. Ryder*, 1 Johns. Ch. 611, 611, 615–16 (N.Y. Ch. 1815) (Kent, Ch.) (granting injunctive relief to secure a company's statutory right to a tollway and explaining that the "equity jurisdiction in such a case is extremely benign and salutary," without which "all our statute privileges . . . would be rendered of little value"); *see Newburgh & C. Tpk. Rd. Co. v. Miller*, 5 Johns. Ch. 101, 111–14 (N.Y. Ch. 1821) (Kent, Ch.) (granting a perpetual injunction to secure a company's statutorily vested right to a operate a bridge); 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 927, at 206 (Boston, 2d ed. 1839).

A favorable judgment at law on a statutory right asserted by the plaintiff was sufficient to establish the possession of a legally vested right entitled to the protection of an injunctive decree. *Tyack*, 4 Edw. Ch. at 271 (explaining that "it is discreet to await the decision of a court of law upon the legal right set up" for a court of chancery to enforce it in equity); 2 STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 927, at 207 ("And when the right is fully established a perpetual injunction will be decreed.") (citations omitted)); *see Livingston v. Livingston*, 6 Johns.

Ch. 497, 497, 499–501 (N.Y. Ch. 1822) (Kent, Ch.) (holding, after a right was decided in favor of

the plaintiff in one action and while another was still pending, that it was "just and necessary" to

grant injunctive relief to prevent "further disturbance" of the plaintiff's asserted legal right "until

the right is settled" at law).

The question of whether the prayed injunctions follow the law depends on whether

Intervenor-Plaintiffs are legally vested with the statutory right of having the Final Rule set aside.

*See* 5 U.S.C. § 706(2)(C) (providing a right of action for regulated entities to have courts "hold

unlawful and set aside agency [rules]" that are determined to be "in excess of statutory jurisdiction,

authority, or limitations"). And whether Intervenor-Plaintiffs are legally vested with the statutory

right to have the Final Rule set aside falls upon the "law of the case" with respect to that right.

Herein lies the dispute between the parties.

The law-of-the-case doctrine posits that "when a court decides upon a rule of law, that

decision should continue to govern the same issue in subsequent stages in the same case." *Med.*

*Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (cleaned up). In the present litigation,

the Court held on the merits that both challenged provisions of the Final Rule were unlawful and

that the Government Defendants "acted in excess of its statutory jurisdiction by promulgating [the

Final Rule]." Later on in the Court's Opinion and Order Granting Summary Judgment (ECF No.

227), the Court vacated the Final Rule pursuant to the default statutory remedy that Intervenor-

Plaintiffs were entitled to. The Court entered a Final Judgment (ECF No. 231) categorically

memorializing the grant of summary judgment to Intervenor-Plaintiffs (*i.e.*, statutory right) and

the vacatur of the Final Rule (*i.e.*, statutory remedy). By this point at least, or upon Summary

Judgment, Intervenor-Plaintiffs had been vested with the statutory right to have the unlawful

provisions of the Final Rule set aside under the APA. The Government Defendants contend that

that Intervenor-Plaintiffs were divested of that right by the Supreme Court's Stay Order, which now controls as the "law of the case" on that issue. *See VanDerStok*, 2023 WL 5023383, at *1 (mem.). The Stay Order provides, in relevant part, that this Court's Summary and Final Judgments are "staying pending the disposition of the appeal . . . *insofar as they vacate* the final rule of the [ATF]." *Id.* (emphasis added). The controlling "law of the case" that is dispositive of Intervenor-Plaintiffs' statutory right turns upon an interpretation of the Stay Order.

In any case involving the interpretation of an order, the Court examines the text to give each word its ordinary meaning and each phrase its intended effect. *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015); *Cargill v. Garland*, 57 F.4th 447, 458 (5th Cir. 2023). Here, the plain language of the Stay Order indicates that the Supreme Court did not order a full stay of the Court's Summary and Final Judgments. Rather, the inclusion of the phrase "insofar as" is an express limitation of the scope of the Stay Order. The meaning of "insofar as" in legal parlance is "[t]o the degree or extent that." BLACK'S LAW DICTIONARY (10th ed. 2014); *see Pub. Serv. Co. of Ind. v. EPA*, 682 F.2d 626, 635 n.15 (7th Cir. 1982) (noting "the primary definition of 'insofar as' is to such extent or degree") (cleaned up)). It is clear to the Court that this phrase narrows the operative scope of the Stay Order "to the extent that" it merely stays the portion of the Court's Summary and Final Judgments that issued an APA vacatur remedy on the Final Rule.

So too, if the Supreme Court intended to order a full stay, it certainly could have used the familiar phrase of "full stay" that it has in prior stay orders. *See, e.g., Morrison v. Olson*, 484 U.S. 1058 (1988) (granting "application for full stay"). The Supreme Court could have also crafted a verbatim stay order that simply omitted of any limiting or conditional language, as it did in a separate case just months before. *See Danco Lab'ys, LLC v. All. for Hippocratic Med.*, 143 S. Ct.

1075, 1075 (2023) (mem.).[43] Instead, the Supreme Court followed prior stay orders that incorporated "insofar as" and like phrases that narrow the scope and frame the specific target of the stay. *See, e.g.*, *Berbling v. Littleton*, 409 U.S. 1053, 1053–54 (1972) ("The application for stay of judgment . . . is granted *insofar as it applies to applicants O'Shea and Spomer* pending the timely filing of a petition for a writ of certiorari.") (emphasis added)); *see also Rsrv. Nat. Ins. Co. v. Crowell*, 507 U.S. 1015 (1993) ("The application for stay . . . is granted and it is ordered that execution *upon the punitive damages portion* of the judgment . . . is stayed pending the timely filing and disposition by this Court of a petition for a writ of certiorari") (emphasis added)).

Furthermore, in its application briefing, the Government Defendants requested that, "*to the extent* the [Supreme] Court concludes that the June 30 [summary judgment] order might *continue to have independent effect*," the Supreme Court's order should "stay *both* the June 30 [summary judgment] order and the July 5 final judgment" of this Court.[44] The Supreme Court accepted that invitation and combined it with language confining the stay to cover only this Court's grant of vacatur—the statutorily prescribed remedy for unlawful agency actions under the APA—and not the Court's judgment on the merits that the challenged provisions of the Final Rule are unlawful. Accordingly, the Court finds that the law of the case—with respect to the issue of Intervenor-Plaintiffs' legal rights—remains decided by the Court's own Summary and Final Judgments. Having decided in their favor, each Intervenor-Plaintiff remains legally vested with the statutory *right* to have the Final Rule set aside under the APA, even while the statutory *remedy* for that right is presently stayed pending appeal.

---

[43] "The April 7, 2023 order of the United States District Court for the Northern District of Texas, case No. 2:22–cv–223, is stayed pending disposition of the appeal in the United States Court of Appeals for the Fifth Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court." *Id.*

[44] Defense Distributed's Reply Ex., ECF No. 257-3, at 20–21, 21 n.4 (emphasis added).

Intervenor-Plaintiffs pray for the Court to preserve their statutory right against the Final
Rule through injunctive relief. In accordance with historical and traditional equity practice, the
Court's prior judgment of law in favor of Intervenor-Plaintiffs' asserted statutory right establishes
their possession of a legally vested right within the reach of equity jurisdiction. *Tyack*, 4 Edw. Ch.
at 271; 2 STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 927, at 207 (citations omitted); *see*
*Livingston*, 6 Johns. Ch. at 497, 499–501 (Kent, Ch.). Based on the law-following maxim of equity,
therefore, the Court may enforce Intervenor-Plaintiffs' APA-vested right against the Final Rule
with an injunctive decree.

### iii.    The Prayed Injunctions Relieve Rights Without Remedy

Lastly, and inversely proportional to "equity follow[ing] the law," is the maxim that "equity
suffers not a right to be without a remedy." FRANCIS, MAXIMS OF EQUITY, no. 6, at 24; *see* 1 STORY,
COMMENTARIES ON EQUITY JURISPRUDENCE § 56, at 75 ("[I]t cannot be generally affirmed, that,
where there is no remedy at law in the given case, there is none in Equity.") (citing *Kemp v. Pryor*
(1802) 32 Eng. Rep. 96, 101; 7 Ves. Jr. 237, 249–250, (Ld. Eldon, Ch.))).[45] This maxim reflects
the original teleology of equity in Western law, *see id.* §§ 2–3, at 2–5 (discussing the ancient and
natural law underpinnings of equity), which was "to give remedy in cases where none was before
administered" under the ordinary law. 3 BLACKSTONE, COMMENTARIES, at 50. Though historically
utilized to expand equitable intervention in the law, the maxim nonetheless functions as another
cabining mechanism on the scope of equity jurisdiction. *See* 1 STORY, COMMENTARIES ON EQUITY
JURISPRUDENCE § 33, at 32. In addition to the *in personam*- and law-following constraints,
equitable remedial jurisdiction is further confined to "cases of rights recognised [sic] and protected

---

[45] "The maxim that 'equity follows the law' is also reflected in the notion that injunctions were not to be
granted unless the legal remedy was inadequate—*equity begins when law ends*." Henry E. Smith, *Equity
as Meta-Law*, 130 YALE L. J. 1050, 1116 (2021) (emphasis added).

by municipal jurisprudence, where a plain, adequate, and complete remedy cannot be had in the . . . Law." *Id.* (citations omitted). The adequate remedy rule of traditional injunction practice posited, as it does today, that equity lacks jurisdiction in cases where remedies prescribed by law are at least as adequate as those available in chancery—measured against the deficiencies of the party seeking relief for a vested right. *See Lewis v. Lord Lechmere* (1722) 88 Eng. Rep. 828, 829; 10 Mod. 503, 506, (K.B.) ("The Lord Chancellor was of opinion, that the remedy the [plaintiff] had at law upon the articles was not adequate to that of a bill in equity for a specific performance."); *see also, e.g.*, *Bonaparte*, 3 F. Cas. at 834 ("[T]his is deemed an irreparable injury, for which the law can give no adequate remedy, or none equal to that which is given in equity, and is an acknowledged ground for [equity's] interference.").

The historical case law highlights several common threads that, each taken on their own, were sufficient to render legal relief inadequate *per se* and call upon preventive injunctive relief to secure plaintiffs' legal rights. The first, and most straightforward scenario, is where there is *no* statutory remedy available to enforce a party's legal right vested by that statute. In *Bodley v. Taylor*, for example, the Marshall Court was presented with the argument that because the legal right at issue was "given by a statute " and the "[statute] affords no remedy against a person who has defeated this right," that a "court of chancery, which can afford it, ought to consider itself as sitting in the character of a court of law, and ought to decide those questions as a court of law would decide them." 9 U.S. (5 Cranch) 191, 222 (1809). Chief Justice Marshall retorted that the "jurisdiction exercised by a court of chancery is *not* granted by statute; it is assumed by itself." *Id.* (emphasis added). In that case, the Marshall Court held that a federal court in such scenarios "will afford a remedy which a court of law cannot afford, but since that remedy is not given by statute, it will be applied by this court as the principles of equity require its application." *Id.* at 223

(Marshall, C.J.). A second scenario is where the "loss of trade, destruction of the means of subsistence, or permanent ruin to property, may or will ensure from the wrongful act." 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 926, at 204–205. "[I]n every such case," Justice Story observed, "Courts of Equity will interfere by injunction, in furtherance of justice and the violated rights of the party. *Id.* at 205 (citations omitted). It is of no significance that "an action for damages would lie at law," either, "for the latter can in no just sense be deemed an adequate relief in such a case." *Id.* (citations omitted). Thus, where either of these scenarios are present, traditional injunction practice dictates that equity subsume jurisdiction over the cause and secure the legal rights of plaintiffs.

The no-right-without-remedy maxim also played a prolific role in actions to enjoin the *ultra vires* conduct of public officers during the 18th and 19th centuries. *E.g.*, *Hughes v. Trs. of Morden Coll.*, 1 Ves. Sen. 188, 27 Eng. Rep. 973 (1748) (Ld. Hardwicke, Ch.); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 845 (1824) (Marshall, C.J.); *see also Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845) ("[R]elief may be given in a court of equity . . . to prevent an injurious act by a public officer, for which the law might give no adequate redress."); *Bonaparte*, 3 F. Cas. at 827 (collecting cases).

In *Hughes v. Trustees of Merton College*, English Chancery asserted its equity mandate over a bill to enjoin turnpike commissioners, acting under color of statute, from proceeding to take possession of, dig through, and destroy garden grounds that the plaintiff was legally entitled to. 1 Ves. Sen. 188, 27 Eng. Rep. 973 (1748) (Ld. Hardwicke, Ch.). The commissioners' authorizing statute had specifically excluded gardens from their lawful mandate. *Id.* Despite the availability of a remedy at law, Lord Hardwicke held that the plaintiff was entitled to a preventive injunction to restrain the commissioners from acting outside of the statute's provisions, at the expense of the

plaintiff's garden grounds, any further. *Id.* Lord Hardwicke's reasoning was grounded in the recognition that the plaintiff was a gardener by trade, and that the impending "destruction of what a man was using as his *trade or livelihood*" could never receive adequate remedy at law. *Jerome v. Ross*, 7 Johns. Ch. 315, 335 (N.Y. Ch. 1823) (Kent, Ch.) (citing *Hughes*, 1 Ves. Sen. 188, 27 Eng. Rep. 973). Thus, Lord Hardwicke found it squarely within the jurisdictional prerogative of equity to protect the pleading tradesman from permanent economic loss at the hands of government officers. *Id.* The precedent set by Lord Hardwicke in *Hughes*—that equity has jurisdiction to protect plaintiffs' trades and livelihoods entangled in their legal rights, by preventive injunctive relief, from impending destruction at the hands of officer actions that are *ultra vires*—was directly followed and extended in subsequent cases under the Court of Chancery of Lord Eldon. *See Agar v. Regent's Canal Co.*, G Coop. 77, 14 R. R. 217 (1815) (Ld. Eldon, Ch.) (granting an injunction to restrain defendants, empowered by act of parliament to cut a canal, from departing from the statutorily prescribed boundaries of the canal and destroying a tradesman's brickyard and garden).

By the 19th century, the equity jurisdiction head enshrined in *Hughes* had become "well settled" and of "preeminent utility" to traditional injunction doctrine. *Belknap*, 2 Johns. Ch. at 473–74 (Kent, Ch.). Its preeminence was demonstrated in *Osborn v. Bank of the United States*, where the Marshall Court affirmed an injunction that restrained the state auditor from acting outside of his lawful authority to impose an annual levy of $100,000 on the national bank, threatening both to destroy its franchise and expel it from the State of Ohio. 22 U.S. (9 Wheat.) 738, 838–40 (1824). The Supreme Court rejected the state auditor's challenge to the equitable jurisdiction of federal courts to provide or affirm injunctive relief, notwithstanding the availability of remedies at law. *See id.* at 841–45. The Supreme Court found that "the probability that remedy [at law] would be adequate, is stronger in the cases put in the books, than in this, where the sum is so greatly beyond

the capacity of an ordinary agent to pay." *Id.* at 845. Based upon this finding of impending destruction to the bank's statutory franchise and business operations, Chief Justice Marshall, writing for the Supreme Court, held that "it is the province of a Court of equity, in such cases, to arrest the injury, and prevent the wrong," and that the Court's injunctive decree "is more beneficial and complete, than the law can give." *Id.*

In the instant motions, the prayed injunctions embody both scenarios from classical injunction practice that implicate equitable remedial jurisdiction as a *per se* matter. First, Intervenor-Plaintiffs possess a legally vested *right* that is bereft of any legal *remedy*. Even assuming their businesses survive the appeals process, Intervenor-Plaintiffs will never be able to recoup monetary damages at law due to the Government Defendants' sovereign immunity. In traditional and modern injunction practice, this bar on recovery at law is already more than enough to justify equitable remedial intervention, as such harms cannot be undone through monetary remedies. *Dennis Melancon,* 703 F.3d at 279 (citation omitted); *Wages & White Lion*, 16 F.4th at 1142. Furthermore, the only statutory *remedy* available to vindicate Intervenor-Plaintiffs' statutory *right* is the vacatur prescribed by § 706(2) of the APA. But because this exclusive remedy is subject to stay pending appeal and Intervenor-Plaintiffs lack any other remedy at law, the grounds for equity jurisdiction over the prayed injunctive relief is without doubt at this stage in the litigation. *See Bodley*, 9 U.S. (5 Cranch) at 222–23 (1809) (Marshall, C.J.); *Louisiana v. Biden*, 55 F.4th at 1033–34. Otherwise, Intervenor-Plaintiffs "may be unable to . . . pursue [their] legal rights."[46]

Second, compliance with the unlawful interpretation of the GCA carries the potential for serious economic costs and existential threats to the trades and livelihoods of Intervenor-Plaintiffs. *Jerome*, 7 Johns. Ch. at 335 (Kent, Ch.) (citing *Hughes*, 1 Ves. Sen. 188, 27 Eng. Rep. 973); *Texas*

---

[46] BlackHawk's Mot. 8, ECF No. 251.

*v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). Without intervening equitable relief in the interim, Intervenor-Plaintiffs will suffer substantial economic costs should the Government Defendants enforce the Final Rule. Indeed, any resumed enforcement efforts against Intervenor-Plaintiffs would result in significant harm to their businesses. Defense Distributed has already shown that it "will go out of business and cease to exist."[47] This harm is even more salient today than when the Court first took up this issue. The longer the business sustains economic costs, the more likely that the Final Rule "will destroy Defense Distributed, soon, unless the government is enjoined from enforcing" the Final Rule in the interim.[48] Similarly, BlackHawk "will be unable to continue its core business operations" and "may cease to exist."[49] BlackHawk previously demonstrated that complying with the Final Rule's requirements would entail an overhaul of its entire online, direct-to-consumer business model, along with requiring it to incur costs through administrative compliance and other FFL-related fees.[50] While the vacatur of the Final Rule is on appeal, preventing the incurrence of such prohibitive costs will avoid irreversible damage to Intervenor-Plaintiffs' businesses.

But even if the Court's original APA vacatur remedy is ultimately affirmed on appeal, any incurred economic losses will be for naught. Harms that flow from "complying with a regulation later held invalid almost always produce[] the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (cleaned up). This is especially true when such harms "threaten the existence of the [Intervenor-Plaintiffs'] business[es]" and could lead to catastrophic economic losses—including closing the business—absent interim protection from an injunction pending appeal. *Atwood Turnkey*, 875 F.2d at 1179. Where a plaintiff occupied the status of

---

[47] Defense Distributed's Mot. 5, ECF No. 249.
[48] *Id.*
[49] BlackHawk's Mot. 8, ECF No. 251.
[50] Second Mem. Op. 7, ECF No. 118.

tradesman, traditional equity practice posited that the impending "destruction of what [that plaintiff] was using as his *trade or livelihood*" can never receive adequate remedy at law. *Jerome*, 7 Johns. Ch. at 335 (Kent, Ch.) (citing *Hughes*, 1 Ves. Sen. 188, 27 Eng. Rep. 973). Under the historical no-right-without-remedy maxim of equity, therefore, there can be no uncertainty as to the Court's equitable remedial prerogative over Intervenor-Plaintiffs' prayed injunctions. *See Osborn*, 22 U.S. (9 Wheat.) at 845 (Marshall, C.J.); *Carroll*, 44 U.S. (3 How.) at 463 (1845). Further than that, an injunctive decree awarded to Intervenor-Plaintiffs would affirm the maxim's core tenet that "equity suffers not a right to be without a remedy." FRANCIS, MAXIMS OF EQUITY, no. 6, at 24; *see* 1 STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 56, at 75.

Accordingly, the Court finds that the history and tradition of equity practice familiar to our Founding generation, along with its accompanying jurisdictional maxims, are in perfect parity with the injunctions presently sought by Intervenor-Plaintiffs in their motions before the Court. The Court proceeds by testing this holding against applicable constitutional and doctrinal restraints.

### 2.  Jurisdiction Lies Within Constitutional and Doctrinal Boundaries

Drawing from the classical roots of equity jurisprudence, contemporary judicial doctrine recognizes that "it is axiomatic that federal courts possess inherent power to enforce their judgments." *Thomas v. Hughes*, 27 F.4th 363, 368 (5th Cir. 2022) (cleaned up). "That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled." *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934). A court's ancillary enforcement jurisdiction over its orders and judgments is a "creature of necessity," *see Peacock*, 516 U.S. at 359, without which "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *Riggs v.*

*Johnson County*, 73 U.S. (6 Wall.) 166, 187 (1868); *Bank of U.S. v. Halstead*, 23 U.S. (10 Wheat.) 51, 53 (1825). This ancillary enforcement jurisdiction includes the power to "enter injunctions as a means to enforce prior judgments." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 577–78 (5th Cir. 2005) (citing *Santopadre v. Pelican Homestead & Sav. Ass'n*, 937 F.2d 268 (5th Cir.1991)). When a federal district court had subject-matter jurisdiction over the principal action containing the order or final judgment that a party seeks to enforce in a post-judgment proceeding, there is no doubt as to the jurisdiction of that same court to enjoin actions threatening to contravene that prior order or judgment in which the court itself had originally entered. *See Hunt*, 292 U.S. at 239; *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 551–52 (7th Cir. 2021). This is true of the instant injunction proceedings and is not disputed by either of the parties.

But a district court's ancillary equitable enforcement power is cabined by the additional constraints found within Article III and contemporary judicial doctrine. As "inferior Courts" ordained and established by Congress, the judicial power of a district court is limited by and subservient to the judicial power exercised by higher inferior courts, the judicial power exercised by the Supreme Court of the United States, and Congressional enactments defining or limiting the scope of the district court's judicial power. U.S. CONST. art. III §§ 1, 2; *see Martin v. Hunter's Lessee*, 14 U.S. 304, 314–15 (1816); *Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 330 (1938). To that end, a district court retains ancillary enforcement jurisdiction pending direct appeal only insofar as its prior order or judgment is not stayed or superseded by a superior federal court. *Nicol v. Gulf Fleet Supply Vessels, Inc.*, 743 F.2d 298, 299 n.2 (5th Cir. 1984); *Farmhand, Inc. v. Anel Eng'g Indus., Inc.*, 693 F.2d 1140, 1145–46 (5th Cir. 1982); *Deering Milliken, Inc. v. F.T.C.*, 647 F.2d 1124, 1128–29 (D.C. Cir. 1978). Moreover, its jurisdiction over an injunction pending appeal is "limited to maintaining the status quo" and cannot extend so far as to "divest the court of appeals

[of] jurisdiction" while the appealed issues are before it. *Coastal Corp. v. Texas E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) (citing FED. R. CIV. P. 62(c)); *see also EEOC v. Locs. 14 & 15, Int'l Union of Operating Engineers*, 438 F. Supp. 876, 880 (S.D.N.Y. 1977). The parties *are* in dispute over whether the Court would upset these boundaries by exercising jurisdiction over the prayed relief. The Court finds that the exercise of equitable remedial jurisdiction over the prayed relief is safely within the boundaries prescribed by the Constitution of the United States and federal judicial doctrine.

For starters, the Government Defendants' assertion that the Supreme Court's Stay Order functions as a bar to jurisdiction falls short. Guided by the history and tradition of equity and the plain meaning of the Supreme Court's Stay Order, the Court's prior analysis of how the equitable maxims comport with the prayed relief are dispositive of the matter. Very simply, the Stay Order merely acts *in rem* over the Final Rule, while the prayed injunctions act *in personam* on the Government Defendants and their conduct *in relation* to the Final Rule. Thus, if the Court were to issue the injunctive decrees sought by Intervenor-Plaintiffs, the Final Rule would remain on the books and carry the force and effect of law—unless and until the Supreme Court's stay is lifted and the Court's original APA vacatur remedy is reinstated. Moreover, the breadth of the Stay Order is limited to the statutory *remedy* decreed by the Court at Final Judgment, while the statutory *rights* decreed by the Court at Final Judgment remain the applicable law of the case. Under that law of the case, Intervenor-Plaintiffs are vested with a statutory *right* against the Final Rule that is enforceable in equity. And to the degree that the material results of the prayed injunctions, if granted, might intersect with the material results of the stay insofar as it concerns enforcement of the challenged provisions of the Final Rule against Intervenor-Plaintiffs, our system rests on the bedrock principle that "the equity rule and decree will prevail." CASES CONCERNING EQUITY, at

xlvii; *see The King's Order and Decree in Chancery*, Cary 115, 21 Eng. Rep. 61 (1616). In sum, the Stay Order does not bar the Court's equitable remedial jurisdiction to issue relief in equity to Intervenor-Plaintiffs.

Lastly, the injunctive decree sought by Intervenor-Plaintiffs would merely preserve the status quo pending appeal and potential certiorari. According to the Fifth Circuit, the *status quo ante* this litigation is the "world before the [Final] Rule became effective." *VanDerStok v. Garland*, No. 23-10718, 2023 WL 4945360, at *1 (5th Cir. July 24, 2023) (per curiam). With vacatur stayed, the full scope of the *status quo ante* is currently unattainable, as it would require some form of rescission operating *in rem* on the Final Rule itself. However, within the *status quo* world before the Final Rule became effective is the next closest analog at a lower level of generality, which is the world before the Final Rule became *enforceable* against Intervenor-Plaintiffs. And indeed, the Government Defendants themselves conceded this in their stay application briefing before the Supreme Court of the United States.[51] The Court agrees with the Government Defendants and finds that the injunctive relief sought by Intervenor-Plaintiffs would merely preserve the *status quo ante* this litigation with respect to the legal relationship between the parties before the Court in the present motion.

Accordingly, the Court finds that the exercise of equity jurisdiction over the prayed injunctions falls within constitutional and judicial constraints. The historical and traditional grounds for the Court's equity jurisdiction neatly trace the separate boundaries erected by the Constitution of the United States and federal judicial doctrine. Overall, the Court holds that it is properly vested with equitable remedial jurisdiction under Article III to afford injunctive relief to

---

[51] Defense Distributed's Reply Ex., ECF No. 257-1, at 41 ("To begin with, the [Final] Rule has been the "status quo" since August 2022 for everyone except some respondents and their customers who secured preliminary relief."); *Id.* No. 257-3, at 19 ("First, the Rule has been the "status quo" for nearly a year for everyone except some respondents who secured preliminary relief (and their customers).").

Intervenor-Plaintiffs, pending appeal, that would secure their legally vested rights under the APA against the Government Defendants' enforcement of the Final Rule. The Court proceeds to the merits of Intervenor-Plaintiffs' emergency motions for injunctive relief to determine if such shall warrant.

### III.    LEGAL STANDARD

Having established ancillary enforcement jurisdiction, the decision to extend interlocutory relief now rests with the sound discretion of this Court. *See Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (laying out the criteria for preliminary injunctive relief); *see also Hecht*, 321 U.S. at 329 ("An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity." (cleaned up)). The factors governing the Court's discretion on whether to grant an injunction pending appeal are virtually identical to those governing whether to grant a preliminary injunction. *See, e.g.*, *Chamber of Com. v. Hugler*, No. 3:16-CV-1476-M, 2017 WL 1062444, at *2 (N.D. Tex. Mar. 20, 2017); *Cardoni v. Prosperity Bank*, No. CIV.A. H-14-1946, 2015 WL 410589, at *1 (S.D. Tex. Jan. 29, 2015).

To establish entitlement to injunctive relief pending disposition of appeal, Intervenor-Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in their favor; and (4) that the issuance of injunctive relief will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The final two elements merge when the opposing party is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As movants, Intervenor-Plaintiffs seeking relief bear the burden of proving all four elements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

Upon determination that a party is entitled to injunctive relief, a court must make a separate determination regarding the appropriate scope of the prospective relief, which is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). As an extraordinary remedy, an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (cleaned up). Thus, an injunction must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted).

## IV.   ANALYSIS

### A.   Substantial Likelihood of Success on the Merits

At the outset, Intervenor-Plaintiffs must demonstrate that they are substantially likely to succeed on the merits of their APA claims. *Daniels Health Servs.*, 710 F.3d at 582. Intervenor-Plaintiffs contend that the Final Rule exceeds the scope of lawful authority that Congress conferred upon the ATF. The Court agrees.

Very simply, the Court has already decided on the merits that there exists no genuine dispute of material fact that the challenged provisions of the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceed the scope of the ATF's statutory jurisdiction under the GCA, *see* 18 U.S.C. § 921(a)(3), and that Intervenor-Plaintiffs are entitled to judgment as a matter of law on their APA claims. *See* 5 U.S.C. § 706(2)(c) (codifying the statutory cause of action and relief for agency actions "in excess of statutory jurisdiction, authority, or limitations").[52] In their motions before the Court, Intervenor-Plaintiffs seek injunctive relief from the Government Defendants' enforcement of the Final Rule on identical grounds.[53] As discussed earlier in this

---

[52] *See* Summ. J. Mem. Op. & Order 35, ECF No. 227 (holding on the merits that both challenged provisions of the Final Rule were invalid and that the ATF "acted in excess of its statutory jurisdiction by promulgating [the Final Rule].").

[53] *See* Defense Distributed's Mot., ECF No. 249; BlackHawk's Mot., ECF No. 251.

Opinion, the Court finds that its previous judgments on the merits of these APA claims have not been stayed by the Supreme Court and continue to embody the "law of the case." *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case.") (cleaned up)).

Based on the foregoing, Intervenor-Plaintiffs have demonstrated, *a fortiori*, an *actual* success on the merits of their claims.

### B. Substantial Threat of Irreparable Harm Absent Injunctive Relief

Intervenor-Plaintiffs are also obliged to show a substantial threat of irreparable harm. Irreparable harm exists where "there is no adequate remedy at law." *Louisiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir. 2022) (cleaned up). The Fifth Circuit considers harm irreparable "if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). A showing of economic loss is usually insufficient to establish irreparable harm because damages may be recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). However, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). Or where costs are nonrecoverable because the government-defendant enjoys sovereign immunity from monetary damages, as is the case here, irreparable harm is generally satisfied. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Irreparable harm must be concrete, non-speculative, and more than merely *de minimis*. *Daniels Health Servs.*, 710 F.3d at 585; *Dennis Melancon, Inc.*, 703 F.3d at 279. Finally, a movant's "delay in seeking relief is a consideration when analyzing the threat of

imminent and irreparable harm." *Anyadike v. Vernon Coll.*, No. 7:15-cv-00157, 2015 WL

12964684, at *3 (N.D. Tex. Nov. 20, 2015).

Compliance with an impermissible or illegal interpretation of the law carries the potential

for economic costs. *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). Without an injunction

pending appeal, Intervenor-Plaintiffs will suffer substantial economic costs should the

Government Defendants enforce the Final Rule. Indeed, any resumed enforcement efforts against

Intervenor-Plaintiffs would result in significant harm to their businesses. Defense Distributed has

already shown that it "will go out of business and cease to exist."[54] This harm is even more salient

today than when the Court first took up this issue. The longer the business sustains economic costs,

the more likely that the Final Rule "will destroy Defense Distributed, soon, unless the government

is enjoined from enforcing" the Final Rule in the interim.[55] Similarly, BlackHawk "will be unable

to continue its core business operations" and "may cease to exist."[56] BlackHawk previously

demonstrated that complying with the Final Rule's requirements would entail an overhaul of its

entire online, direct-to-consumer business model, along with requiring it to incur costs through

administrative compliance and other FFL-related fees.[57] While the vacatur of the Final Rule is on

appeal, preventing the incurrence of such prohibitive costs will avoid irreparable damage to

Intervenor-Plaintiffs' businesses.

If this Court's vacatur is ultimately affirmed on appeal, any incurred economic losses will

be for naught. Harms that flow from "complying with a regulation later held invalid almost always

produce[] the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at

433 (cleaned up). This is especially true when such harms "threaten the existence of the

---

[54] Defense Distributed's Mot. 5, ECF No. 249.
[55] *Id.*
[56] BlackHawk's Mot. 8, ECF No. 251.
[57] Second Mem. Op. 7, ECF No. 118.

[Intervenor-Plaintiffs'] business[es]" and could lead to catastrophic economic losses—including closing the business—absent interim protection from an injunction pending appeal. *Atwood Turnkey*, 875 F.2d at 1179. And even if the businesses somehow survive beyond the appeals process, Intervenor-Plaintiffs would never be able to recoup monetary damages due to the Government Defendants' sovereign immunity. This bar on recovery is enough to show irreparable harm because such harms cannot be undone through monetary remedies. *Dennis Melancon,* 703 F.3d at 279 (citation omitted); *Wages & White Lion*, 16 F.4th at 1142. In fact, only one remedy at law is available to the Intervenor-Plaintiffs: vacatur under § 706(2) of the APA. Because this exclusive remedy is the subject of the appeal and the parties lack any other remedy at law, the need for injunctive relief pending appeal is even more critical at this stage to preserve the status quo. *Louisiana v. Biden*, 55 F.4th at 1033–34 (explaining that irreparable harm exists where "there is no adequate remedy at law"). Otherwise, Intervenor-Plaintiffs "may be unable to . . . pursue [their] legal rights."[58]

Further underscoring the need for an injunction pending appeal is the timing of the requested relief. Intervenor-Plaintiffs filed their emergency motions immediately after the Supreme Court issued its stay order.[59] This timing demonstrates the urgency of the need for an injunction. *Anyadike*, 2015 WL 12964684, at *3. Because Intervenor-Plaintiffs are no longer protected by this Court's Final Judgment during the appeals process, an individualized injunction pending appeal is the only way to preserve the status quo and prevent irreparable harm in the interim until the appeals process concludes.

---

[58] BlackHawk's Mot. 8, ECF No. 251.

[59] The Supreme Court issued its Order staying the Final Judmgent on August 8, 2023. *Vanderstok*, 2023 WL 5023383, at *1. Defense Distributed filed its emergency motion *the very next day* on August 9, 2023. Defense Distributed's Mot., ECF No. 249. BlackHawk filed its emergency motion *less than a week* later on August 14, 2023. BlackHawk's Mot., ECF No. 251.

For these reasons, the Court finds that Intervenor-Plaintiffs have carried their burden to show that irreparable harms exist at this stage.

### C.  The Balance of Equities and Public Interest Favor Issuing Injunctive Relief

The final two elements necessary to support a grant of injunctive relief—the balance of equities (the difference in harm to the respective parties) and the public interest—merge together when the government is a party. *Nken*, 556 U.S. at 435. In this assessment, the Court weighs "the competing claims of injury" and considers "the effect on each party of the granting or withholding of the requested relief," paying close attention to the public consequences of granting an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations omitted).

The Court has established on multiple occasions—and again in this Opinion—that Intervenor-Plaintiffs each face a substantial threat of irreparable harm absent relief from enforcement of the Final Rule. But at the other end of the scale, there can be "*no* public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (emphasis added). As it relates to enforcement of the Final Rule against Intervenor-Plaintiffs, "neither [the Government Defendants] nor the public has *any* interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 5266026, at *28 (5th Cir. Aug. 16, 2023) (emphasis added). In this respect, the government-public-interest equities evaporate entirely upon adverse judgment on the merits. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013) (Jackson, J.) (expounding that public interest arguments are "derivative of . . . merits arguments and depend in large part on the vitality of the latter"). The controlling law of this case is that the Government Defendants' promulgation of the two challenged provisions of the Final Rule, *see* 27 C.F.R. §§ 478.11, 478.12(c), transgress the boundaries of lawful authority prescribed by Congress, *see* 18 U.S.C. § 921(a)(3), and are in

violation of the federal APA. *See* 5 U.S.C. § 706(2)(c). It follows, of course, that there is *no* injury that the Government Defendants and the public at-large could possibly suffer from.

Having no equities to balance against those of Intervenor-Plaintiffs, the Court finds that the public's interest is entirely undisturbed by a grant of the prayed-for relief.

*    *    *    *

Having considered the arguments, evidence, and applicable law, the Court holds that it has ancillary jurisdiction to enforce, in equity, the portions of its Summary Judgment Order (ECF No. 227) and Final Judgment (ECF No. 231) that remain in effect following the Stay Order of the Supreme Court of the United States. *See VanDerStok*, 2023 WL 5023383, at *1 (mem.). The Court also holds that the relevant factors weigh in favor of granting injunctive relief to Intervenor-Plaintiffs. The proper scope of relief is that which mirrors the relief previously granted to Intervenor-Plaintiffs at the preliminary injunction stage—plus an extended effective period that mirrors the expiration timetable of the stay ordered by the Supreme Court of the United States on August 8, 2023.

## V.    CONCLUSION

The Court is properly vested with the jurisdiction to dispense—and each Intervenor-Plaintiff has demonstrated their individual entitlement to—injunctive relief against the Government Defendants' enforcement of provisions of the Final Rule that this Court has repeatedly held to be void.

For the foregoing reasons, the Court **GRANTS** the Emergency Motions for Injunction Pending Appeal. Accordingly, the Court **ORDERS** that the Government Defendants—the Attorney General of the United States; the United States Department of Justice; the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the Bureau of Alcohol, Tobacco,

Firearms and Explosives—and each of their respective officers, agents, servants, and employees—are **ENJOINED** from implementing and enforcing against Intervenor-Plaintiffs Defense Distributed and BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms the provisions in 27 C.F.R. §§ 478.11 and 478.12 that the Court has preliminarily and on the merits determined are unlawful. Reflecting the scope of relief previously afforded to each Intervenor-Plaintiff, this injunctive relief shall extend to each of Defense Distributed's and BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms' respective customers (except for those individuals prohibited from possessing firearms under 18 U.S.C. § 922 (g)). Reflecting the scope of the stay on the final-judgment remedy decreed in this case, so ordered by the Supreme Court of the United States on August 8, 2023, this injunctive relief shall take effect immediately and shall remain in effect pending the disposition of the appeal in the United States Court of Appeals for the Fifth Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought, absent other order on this issue. Should certiorari be denied, this injunctive relief shall terminate automatically. In the event certiorari is granted, this injunctive relief shall terminate upon the sending down of the judgment of the Supreme Court of the United States.

The Court waives the security requirements of Federal Rules of Civil Procedure 62(d) and 65(c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).[60]

**SO ORDERED** this **14th day** of **September, 2023**.

_Reed O'Connor_
**UNITED STATES DISTRICT JUDGE**

---

[60] Because neither party raises the security requirement in Rule 65(c), no security is ordered. *See* FED. R. CIV. P. 65(c).