# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 9, 2023

Lyle W. Cayce
Clerk

No. 23-10718

---

JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING, L.L.C., *a limited liability company*; FIREARMS POLICY COALITION, INCORPORATED, *a nonprofit corporation*,

*Plaintiffs—Appellees*,

BLACKHAWK MANUFACTURING GROUP, INCORPORATED, *doing business as* 80 PERCENT ARMS; DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED; NOT AN L.L.C., *doing business as* JSD SUPPLY; POLYMER80, INCORPORATED,

*Intervenor Plaintiffs—Appellees*,

*versus*

MERRICK GARLAND, *U.S. Attorney General*; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, *in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives*; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, and EXPLOSIVES,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:22-CV-691

---

Before WILLETT, ENGELHARDT, and OLDHAM, *Circuit Judges*.

No. 23-10718

Kurt D. Engelhardt, *Circuit Judge*:

It has long been said—correctly—that the law is the expression of *legislative* will.[1] As such, the best evidence of the legislature's intent is the carefully chosen words placed purposefully into the text of a statute by our duly-elected representatives. Critically, then, law-making power—the ability to transform policy into real-world obligations—lies solely with the legislative branch.[2] Where an executive agency engages in what is, for all intents and purposes, "law-making," the legislature is deprived of its primary function under our Constitution, and our citizens are robbed of their right to fair representation in government. This is especially true when the executive rule-turned-law criminalizes conduct without the say of the people who are subject to its penalties.

The agency rule at issue here flouts clear statutory text and exceeds the legislatively-imposed limits on agency authority in the name of public policy. Because Congress has neither authorized the expansion of firearm regulation nor permitted the criminalization of previously lawful conduct, the

---

[1] "Positive law is a manifestation of the legislative will." *Arnold v. United States*, 13 U.S. 104, 119 (1815); *see also Farrar v. United States*, 30 U.S. 373, 379 (1831) ("[The President] cannot in the absence of *law* exercise the power of making contracts, and much less, as in this case, against the expression of the *legislative will*.") (emphasis added); *Kindle v. Cudd Pressure Control, Inc.*, 792 F.2d 507, 512 (5th Cir. 1986) (describing "the express legislative will" as "the determinant"); *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 820 (4th Cir. 1995) (noting the "deference to legislative will" inherent in statutory interpretation); *Winstead v. Ed's Live Catfish & Seafood, Inc.*, 554 So. 2d 1237, 1242 (La. Ct. App. 1989), *writ denied*, 558 So. 2d 570 (La. 1990) ("The supreme expression of legislative will . . . is of course the codes and statutes."); *In re Chin A On*, 18 F. 506, 506–07 (D. Cal. 1883) ("[I]t is the duty of the court to obey the law, as being the latest expression of the legislative will.").

[2] *See Forrest General Hospital v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019) ("The Constitution, after all, vests lawmaking power in Congress. How much lawmaking power? 'All,' declares the Constitution's first substantive word.").

proposed rule constitutes unlawful agency action, in direct contravention of the legislature's will. Accordingly, for the reasons set forth below, we AFFIRM IN PART and VACATE AND REMAND IN PART the judgment of the district court.

## I.    Statutory and Regulatory Background

In April of 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") issued a Final Rule in which the terms "firearm" and "frame or receiver," among others, were given "an updated, more comprehensive definition." Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (Apr. 26, 2022) (the "Final Rule"). The Final Rule was almost immediately the subject of litigation claiming that ATF had exceeded its statutory authority. It is that Final Rule that is before this Court now.

First, a brief history of the regulatory agency under fire here. ATF was created in 1972 as an independent bureau of the U.S. Department of the Treasury.[3] The Homeland Security Act of 2002 later transferred ATF to the U.S. Department of Justice, where it remains active today. *See* 6 U.S.C. § 531. Upon its creation, ATF obtained jurisdiction to act under earlier legislation, including the Gun Control Act of 1968 ("GCA"),[4] which

---

[3] *ATF History Timeline*, Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/our-history/atf-history-timeline.

[4] The GCA's predecessor statutes include the National Firearms Act of 1934 and the Federal Firearms Act of 1938, both of which involved the taxation and regulation of firearms. *See* National Firearms Act of 1934, ch. 757, Pub. L. 73-474, 48 Stat. 1236; Federal Firearms Act of 1938, ch. 850, Pub. L. No. 75-785, 52 Stat. 1250 (1938) (repealed 1968).

Of particular note, the Supreme Court has stated: "The Nation's legislators chose to place under a registration requirement only a very limited class of firearms, those they considered especially dangerous." *Staples v. United States*, 511 U.S. 600, 622 (Ginsburg, J.,

permits the regulation and taxation of certain "firearms." Under the GCA, Congress granted to the Attorney General the power to prescribe rules and regulations necessary to carry out the GCA's provisions. *See* 18 U.S.C. § 926. The Attorney General thereafter delegated this authority to ATF, to "[i]nvestigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson, and perform other duties as assigned by the Attorney General." 28 C.F.R. § 0.130. Pursuant to this authority, ATF proposed the Final Rule as an extension of the GCA's regulation of firearms.

The GCA requires all manufacturers and dealers of firearms to have a federal firearms license; manufacturers and dealers are thus known as "Federal Firearms Licensees" or "FFLs." When those FFLs sell or transfer "firearms," they must conduct background checks in most cases, record the firearm transfer, and serialize the firearm. *See* 18 U.S.C. §§ 922(t), 923(a), 923(g)(1)(A), 923(i).

The primary method by which the GCA ensures that the manufacture and sale of firearms are regulated as intended is through the imposition of criminal penalties.[5] As one example, the GCA generally prohibits "any

---

concurring) (noting also "the purpose of the *mens rea* requirement—to shield people against punishment for apparently innocent activity").

[5] The GCA is found in Title 18 of the United States Code, which bears the label "Crimes and Criminal Procedure." *See* 18 U.S.C. § 922.

Interestingly, Congress's jurisdictional hook whereby it finds authority to regulate firearms in the manner described is the requirement that the firearm travelled in interstate commerce. *See generally id.*; 18 U.S.C. § 921(2) (defining "interstate or foreign commerce"); *see also, e.g.*, *2.43D Possession of a Firearm by a Convicted Felon*, Fifth Circuit District Judges Association Pattern Jury Instructions Committee, Pattern Jury Instructions, Criminal Cases (2019) (requiring, under element number four of the offense, that the Government prove beyond a reasonable doubt "[t]hat the firearm [ammunition] possessed traveled in [affected] interstate . . . commerce; that is, before the defendant possessed the firearm, it had traveled at some time from one state to another"). While not

person" who is not "a licensed importer, licensed manufacturer, or licensed dealer" (i.e., an FFL) from "importing, manufacturing, or dealing in firearms" and from "ship[ping] or transport[ing] in interstate or foreign commerce any firearm to any person." *Id.* at § 922(a). As another example, the GCA prohibits a large class of persons from not only shipping or transporting firearms, but from possessing them at all. *Id.* at § 922(g). Should a person commit these or any of the other unlawful acts found in the twenty-six subsections of section 922, section 924 authorizes various penalties, including fines, imprisonment, or both. *Id.* at § 924.

The bedrock of the GCA and its plethora of requirements and restrictions is the word "firearm." The GCA defines a "firearm" as: "(A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* at § 921(a)(3)(C). As no definition for "frame or receiver" is given in the GCA, ATF previously defined a "frame or receiver" in 1978 as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Title and Definition Changes, 43 Fed. Reg. 13531, 13537 (Mar. 31, 1978). This definition remained unchanged for over forty years, until ATF issued the Final Rule in 2022.

ATF's 1978 regulatory definition sufficiently captured most firearms of the era. Modern firearms, however, have developed such that many firearms no longer fall within the definition. In the Final Rule, ATF states that "the majority of firearms in the United States" no longer have a clear

---

challenged in this appeal, the interstate-commerce requirement may call into question ATF's jurisdictional authority to promulgate certain provisions of the Final Rule.

"frame" or "receiver" that includes all three elements of the prior definition (that is, a hammer, bolt or breechblock, and firing mechanism). 87 Fed. Reg. at 24655. ATF uses the example of an AR-15,[6] which does not have a single housing for the bolt (which is part of the "upper assembly") and the hammer and trigger (which is part of the "lower assembly"). *Id.* Thus, as several district courts have recently recognized, the lower assembly of the AR-15, taken alone, is likely not covered by federal regulations. *See, e.g.*, *United States v. Rowold*, 429 F. Supp. 3d 469, 475–76 (N.D. Ohio 2019) ("The language of the regulatory definition in § 478.11 lends itself to only one interpretation: namely, that under the GCA, the receiver of a firearm must be a single unit that holds three, not two, components: 1) the hammer, 2) the bolt or breechblock, and 3) the firing mechanism."). Likewise, weapons such as Glock semiautomatic pistols, which use a "striker" rather than a "hammer" as a firing mechanism, and the Sig Sauer P320 pistol, which has no one unit containing those three parts, seemingly may not be regulated under the prior GCA-related definitions. 87 Fed. Reg. at 24655.

The Final Rule was also concerned with the rise of privately made firearms ("PMFs").[7] These PMFs, also known colloquially as "ghost guns," are often made from readily purchasable "firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers." *Id.* at 24652. Because the kits and standalone parts were not

---

[6] The Supreme Court has held that, to be banned, a weapon must be "both dangerous and unusual," and thus, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring). Of course, for many years now, millions of AR-15 rifles have been sold to civilians, who may lawfully possess them.

[7] The Final Rule defines a PMF as: "A firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced." 87 Fed. Reg. at 24735.

themselves considered "firearms" under any interpretation of the GCA and ATF's related definitions, manufacturers of such kits are neither subject to licensing requirements nor required to conduct background checks on purchasers. *Id.* Further, when made for personal use, PMFs "are not required by the GCA to have a serial number placed on the frame or receiver." *Id.* These facts, ATF contends, make PMFs attractive to criminal actors and "pose a challenge to law enforcement's ability to investigate crimes." *Id.* at 24658.

Notably, the PMFs that play a central role in the Final Rule were not unknown at the time of the GCA's—or, for that matter, its predecessors'—enactment. "Because gunsmithing was a universal need in early America, many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 66 (2023). The tradition of at-home gun-making predates this nation's founding, extends through the revolution, and reaches modern times. *See id.* at 48 ("During the Revolutionary War, when the British attempted to prevent the Americans from acquiring firearms and ammunition, the Americans needed to build their own arms to survive."). Considering this long tradition, "[t]he federal government has never required a license to build a firearm for personal use." *Id.* at 80. "In fact, there were *no* restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries." *Id.* at 78 (emphasis added). And in perfect accord with the historic tradition of at-home gun-making, Congress made it exceedingly clear when enacting the GCA that "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." Pub. L. 90-618, Title I, § 101, 82 Stat. 1213, 1213 (Oct. 22, 1968). ATF's Final Rule alters

this understanding by adding significant requirements for those engaged in private gun-making activities.

In response to the observed changes in modern firearm construction, the Final Rule provides (in part) that "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun." 87 Fed. Reg. at 24739. The Final Rule also supplements the definition of "firearm" to include a "weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by action of an explosive." *Id.* at 24728.[8] The Final Rule took effect on August 24, 2022. *Id.* at 24652.

## II.    **Factual and Procedural Background**

On August 11, 2022, the plaintiffs in this case[9] filed a petition for review in the Northern District of Texas. The plaintiffs claimed that two

---

[8] Among other things not substantially challenged in this litigation, the Final Rule also defined the term "frame" in relation to handguns and the term "receiver" in relation to long guns, defined what "variant" means relative to firearms, required that FFLs serialize PMFs that they accept into inventory, and required FFLs to maintain records on firearms transactions for the entirety of their business operations, replacing a prior twenty-year requirement. Finally, the Final Rule contains a severability clause. *See* 87 Fed. Reg. at 24730.

[9] The plaintiffs and plaintiff-intervenors in this action are two individuals, Jennifer VanDerStok and Michael Andren; Tactical Machining, LLC; Firearms Policy Coalition, Inc.; BlackHawk Manufacturing Group, Inc. d/b/a 80 Percent Arms; Defense Distributed; Second Amendment Foundation, Inc.; Not An LLC d/b/a JSD Supply; and Polymer80, Inc.

portions of the Final Rule, which redefine "frame or receiver" and "firearm," exceeded ATF's congressionally mandated authority. The plaintiffs requested that the court hold unlawful and set aside the Final Rule, and that the court preliminarily and permanently enjoin the Government from enforcing or implementing the Final Rule.

Roughly a month later, the district court issued its first of several preliminary injunctions. In this first injunction, the district court found that ATF's new definition of "frame or receiver" is facially unlawful because it included "firearm parts that are *not yet* frames or receivers" in contravention of Congress's clear language in the GCA. *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 578–79 (N.D. Tex. 2022), *opinion clarified*, No. 4:22-CV-00691-O, 2022 WL 6081194 (N.D. Tex. Sept. 26, 2022) (emphasis in original). The district court also found that weapon parts kits cannot be regulated by ATF under the GCA because "Congress's definition does not cover weapon parts, or aggregations of weapon *parts*, regardless of whether the parts may be readily assembled into something that may fire a projectile." *Id.* at 580 (emphasis in original). Relying on this same logic, the district court subsequently expanded the preliminary injunction and extended similar injunctions to other plaintiffs. The Government timely appealed each of these injunctions.

While those two appeals were pending, the district court granted summary judgment to the plaintiffs and vacated the Final Rule in its entirety. *VanDerStok v. Garland*, No. 4:22-CV-00691-O, 2023 WL 4539591 (N.D. Tex. June 30, 2023). The logic of the district court's order closely tracked its

---

The defendants in this action are Merrick Garland, U.S. Attorney General; the United States Department of Justice; Steven Dettelbach, in his official capacity as Director of ATF; and ATF. These defendants are collectively referred to herein as "the Government."

No. 23-10718

logic at the injunctive stage: the court held that "the Final Rule's amended definition of 'frame or receiver' does not accord with the ordinary meaning of those terms and is therefore in conflict with the plain statutory language." *Id.* at *14. ATF "may not," the court continued, "properly regulate a component as a 'frame or receiver' even after ATF determines that the component in question is *not* a frame or receiver." *Id.* (emphasis in original). Additionally, the court held that because "Congress did not regulate firearm parts as such, let alone aggregations of parts," ATF had no authority to regulate weapon parts kits. *Id.* at *17. Holding that vacatur is "the 'default rule' for agency action otherwise found to be unlawful," the court vacated the Final Rule under 5 U.S.C. § 706(2)(C). *Id.* at *18.

The Government promptly filed a notice of appeal, and subsequently filed an emergency motion to stay pending appeal. The district court denied the request for a stay pending appeal but granted a seven-day administrative stay so that the Government might seek emergency relief from this Court. The Government did so.

This Court considered and denied the Government's emergency motion to stay the district court's judgment as to the two challenged portions of the Final Rule but granted a stay as to the non-challenged provisions of the rule. *VanDerStok v. Garland*, No. 23-10718, 2023 WL 4945360 (5th Cir. July 24, 2023). The Government then requested a full stay from the Supreme Court. Without discussion, the Supreme Court stayed the district court's order and judgment "insofar as they vacate the [F]inal [R]ule" pending (1) this Court's decision and (2) either denial of certiorari thereafter or judgment issued by the Supreme Court after grant of certiorari. *Garland v. Vanderstok*, No. 23A82, 2023 WL 5023383 (U.S. Aug. 8, 2023).

This Court held oral argument on September 7, 2023. Shortly beforehand, the Government voluntarily dismissed the two appeals relating

to the injunctions. Thus, all that remains before this Court now is the appeal of the district court's final judgment vacating the Final Rule in its entirety.

## III.    Standard of Review

"We review a grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007) (citing *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## IV.    Analysis

The plaintiffs challenged two portions of the Final Rule in the underlying lawsuit: (1) ATF's proposed definition of "frame or receiver" including incomplete frames and receivers; and (2) ATF's proposed definition of "firearm" including weapon parts kits. We analyze each challenged portion of the Final Rule in turn below, before addressing the appropriate relief should these specific portions of the Final Rule be held unlawful.

At the outset, we must ensure that we look through the proper lens when analyzing ATF's actions here.[10] "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S.

---

[10] Notably, the *Chevron* doctrine has not been invoked on appeal. Even if the Government had done so, *Chevron* would likely not apply for several reasons, including the GCA's unambiguous text and its imposition of criminal penalties. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 464–66, 472–73 (5th Cir. 2023).

No. 23-10718

204, 208 (1988); *see also Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019) ("To be sure, agencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions."). In the GCA—the source of ATF's capacity to promulgate the Final Rule—Congress delegated authority to ATF through the Attorney General to "prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." 18 U.S.C. § 926(a). Such a grant of authority from the legislature to an executive agency is generally policed by the Administrative Procedure Act ("APA"), which allows courts to set aside agency action found to be, among other things, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Thus, a core inquiry in a case such as this one is whether the proposed agency rule is a lawful extension of the statute under which the agency purports to act, or whether the agency has indeed exceeded its "statutory jurisdiction, authority, or limitations." *See id.*

How do we know when an agency has exceeded its statutory authority? Simple: the plain language of the statute tells us so. Therefore, "[w]e start, as we always do, with the text." *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 671 (2023); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("[T]he best evidence of Congress's intent is the statutory text."). "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). Here, we read the words of the GCA "in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989). Only where the statutory text shows that ATF has "clear congressional authorization" to enact a regulation can such a regulation withstand judicial scrutiny. *See West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2614 (2022) (quoting *Util. Air Regul. Grp. v. E.P.A.*,

No. 23-10718

573 U.S. 302, 324 (2014)). As explained below, we hold that ATF lacked congressional authorization to promulgate the two challenged portions of the Final Rule.

    a.  <u>ATF's proposed definition of "frame or receiver"</u>

The GCA includes as a "firearm" the "frame or receiver" of a weapon. 18 U.S.C. § 921(a)(3)(C). The GCA itself does not define the term "frame or receiver." *See id.* The Final Rule, however, newly defines the term "frame or receiver" to include "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 87 Fed. Reg. at 24739.

Because Congress did not define "frame or receiver" in the GCA, the ordinary meaning of the words control. *See Bouchikhi v. Holder*, 676 F.3d 173, 177 (5th Cir. 2012). Both a "frame" and a "receiver" had set, well-known definitions at the time of the enactment of the GCA in 1968. In 1971, Webster's Dictionary defined a "frame" as "the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm" and a "receiver" as "the metal frame in which the action of a firearm is fitted and which the breech end of the barrel is attached." *Webster's Third International Dictionary* 902, 1894 (1971). Similarly, ATF's 1978 definition of frame and receiver—the most recent iteration of the definition before the Final Rule's proposed change—defined "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward position to receive the barrel."[11] 43 Fed. Reg. at 13537. As is apparent from a comparison of the

---

[11] ATF's 1968 definition of "frame or receiver" was identical: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism,

dictionary definitions and the regulatory definition, ATF's previous understanding of "frame or receiver" closely tracked the public's common understanding of such terms at the time of enactment.[12]

After almost fifty years of uniform regulation, ATF, via the Final Rule, now purports to expand the terms "frame" and "receiver," as they were understood in 1968, to include changes in firearms in modern times. But the meanings of statutes do not change with the times. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). "This Court normally interprets a statute in accord with the ordinary public meaning of its terms *at the time of its enactment*. After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Id.* (emphasis added). ATF's inclusion now of "partially complete, disassembled, or nonfunctional" frames and receivers materially deviates from past definitions of these words to encompass items that were not originally understood to fall within the ambit of the GCA. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("[W]ords generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute" because "if judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands.") (cleaned up). As such, the proposed definition is an impermissible extension of the statutory text approved by Congress.

---

and which is usually threaded at its forward portion to receive the barrel." Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968).

[12] The Government itself acknowledged that "ATF's prior regulatory definitions have been 'consistent with common and technical dictionary definitions.'" *VanDerStok*, 2023 WL 4539591, at *13 (quoting Defs.' Supp. Br.) (emphasis removed).

No. 23-10718

A plain reading of the Final Rule demonstrates ATF's error. In the GCA's definition of "firearm," the first subsection includes flexible language such as "designed to or may readily be converted to expel a projectile by the action of an explosive." *See* 18 U.S.C. § 921(a)(3)(A). But the subsection immediately thereafter, which contains the term "frame or receiver," does not include such flexibility. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (citation omitted). ATF's assertion that Congress has repeatedly used language such as "designed to" and "readily" in other definitions or statutes only emphasizes the point: Congress explicitly declined to use such language in regard to frames or receivers. Thus, we presume the exclusion of the phrase "designed to or may readily be converted" in the "frame or receiver" subsection to be purposeful, such that ATF cannot add such language where Congress did not intend it to exist. *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

There is also a clear logical flaw in ATF's proposal. As written, the Final Rule states that the phrase "frame or receiver" includes things that are admittedly not yet frames or receivers but that can easily become frames or receivers—in other words: parts. As the district court put it, under the Final Rule, "ATF may properly regulate a component as a 'frame or receiver' even after ATF determines that the component in question is *not* a frame or receiver." *VanDerStok*, 2023 WL 4539591, at *14 (emphasis in original). Such a proposition defies logic: "a part cannot be both *not yet* a receiver and a receiver at the same time." *Id.* (emphasis in original). This confusion

No. 23-10718

highlights ATF's attempt to stretch the GCA's language to fit modern understandings of firearms without the support of statutory text.[13]

The Government argues that ATF has historically regulated parts that are not yet frames or receivers as frames or receivers, thus making the Final Rule a valid extension of past agency practice. This argument fails for two reasons. First, as the district court aptly stated, "historical practice does not dictate the interpretation of unambiguous statutory terms." *VanDerStok*, 2023 WL 4539591, at *15. Simply because ATF may have acted outside of its clear statutory limits in the past does not mandate a decision in its favor today. Second, the Government's current argument regarding the "readily converted" language as it applies to frames and receivers is at odds with its recent arguments in other courts. For example, in its briefing for a case in the Southern District of New York in early 2021, the Government stated that "the 'designed to' and 'readily converted' language are only present in the first clause of the statutory definition. Therefore, an unfinished frame or receiver does not meet the statutory definition of a 'firearm' simply because it is 'designed to' or 'can readily be converted into' a frame or receiver." Fed. Defs.' Mem. of Law in Support of Mot. for Summ. J., Doc. 98 at 4, *Syracuse v. ATF*, No. 1:20-cv-06885 (S.D.N.Y. Jan. 29, 2021). Clearly, the Government has arbitrarily reversed course since authoring the *Syracuse* brief, yet it offers no explanation for its new regulatory position. *See Acadian Gas Pipeline Sys. v. FERC*, 878 F.2d 865, 868 (5th Cir. 1989) ("[A]ny

---

[13] Perhaps noticing the error in its incredibly broad and murky proposal, ATF affirmatively excluded from the definition's scope "a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material.)." 87 Fed. Reg. at 24739. ATF's attempt to carve out this vague laundry list of unfinished products further demonstrates that the proposed definition lacks any objective hook in the statute.

No. 23-10718

departure from past interpretations of the same regulation must be adequately explained and justified."). The sharp change in the Government's argument over a few short years emphasizes the harm in relying so heavily on an agency's historical practice, rather than the unambiguous text of the statute.

Because it clearly conflicts with the plain language of the GCA, the challenged portion of the Final Rule that redefines "frame or receiver" to include partially complete, disassembled, or nonfunctional frames or receivers constitutes unlawful agency action.

b. ATF's proposed definition of "firearm"

The Final Rule purports to supplement the GCA's definition of "firearm" by including the following language: "The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 87 Fed. Reg. at 24728. In other words, ATF expanded the scope of the GCA from the explicit "firearm" to now include aggregations of weapon parts that can be "readily" assembled into a functional weapon. *See id.*

The district court correctly held that ATF has no authority whatsoever to regulate parts that might be incorporated into a "firearm" simply because Congress explicitly *removed* such authority when it enacted the GCA. The GCA's predecessor statute, the Federal Firearms Act ("FFA"), had specific language that authorized regulation of "any part or parts of" a firearm. *See* Federal Firearms Act of 1938, Ch. 850, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968). However, Congress *removed* this language when it enacted the GCA, replacing "any part or parts" with just "the frame or receiver of any such weapon." Thus, the GCA does not allow for regulation of all weapon parts; rather, it limits

No. 23-10718

regulation to two specific types of weapon parts.[14] The Final Rule ignores this change completely and improperly rewrites and expands the GCA where Congress clearly limited it. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.") (citation omitted). Again, the legislative will has been expressed, and we are bound to follow it.

Further, Congress has shown that it knows how to regulate "parts" of weapons when it so chooses. For example, section 921(a)(4)(C) of the GCA, in defining a "destructive device" (one of the four subsections of the "firearm" definition), states that such term means "any combination of parts either designed or intended for use in converting any device into any destructive device." 18 U.S.C. § 921(a)(4)(C). Congress thus clearly regulated combinations or aggregations of "parts" in one section of the GCA, yet it did not do so when it defined "firearm" within the same statute.[15] Another helpful example is the definition of "machinegun" in 26

---

[14] In the Senate Report connected to the passage of the GCA, the committee stated in reference to the amended definition of "firearm" in section 921(a)(3): "It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'" S. Rep. No. 90-1097 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2200.

[15] Yet another example within the same statute: Congress defined "firearm silencer" and "firearm muffler" in section 921(a)(25) to include "any combination of *parts*, designed or redesigned, and intended for us in assembling or fabricating a firearm silencer or firearm muffler." 18 U.S.C. § 921(a)(25) (emphasis added).

And another example: In section 921, Congress defined "handgun" to include "any combination of *parts* from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30)(B) (emphasis added).

And another: In section 922, when defining certain unlawful acts under the GCA, Congress explicitly stated that "[i]t shall be unlawful for any person to assemble from

No. 23-10718

U.S.C. § 5845(b), which includes "any part . . . or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled." Conversely, in defining "firearm" under the GCA, Congress used more constrained language aimed at specifically named weapon parts, not any and all combinations of weapon parts that could later be assembled into a functioning weapon. In sum, the word "parts" is conspicuously absent from the definition of "firearm" in section 921, despite Congress's consistent—and meticulous—use of the word in other statutory provisions. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 n.3 (2006) ("Our more natural reading is confirmed by the use of the word . . . elsewhere in the United States Code."). The point is a simple one: If Congress wanted to regulate aggregations of weapon parts with respect to "firearms," it could have. Congress, however, chose not to do so,[16] and ATF may not alter that decision on its own initiative. ATF cannot legislate.

---

imported *parts* any semiautomatic rifle or any shotgun." 18 U.S.C. § 922(r) (emphasis added).

    Moreover, to further demonstrate the particular use by Congress of the term "parts" and the assembling of parts: The 1990 Crime Control Bill, H.R. 5269, would have made it unlawful to assemble a semi-automatic rifle or shotgun that is identical to one that could not be imported. *See* Crime Control Act, § 2204, P.L. 101-647 (1990), enacting current 18 U.S.C. § 922(r). Congresswoman Jolene Unsoeld (D., Wash.) offered an amendment to kill the ban on domestic manufacturing by inserting "from imported parts" into the bill such that the enactment, as passed, made it unlawful "to assemble from imported parts any semi-automatic rifle or any shotgun which is identical to any rifle or shotgun prohibited from importation . . ." She argued—correctly—that "Congress, not a nameless, faceless bureaucrat in the Treasury Department, should decide which firearms Americans can own." 136 Cong. Rec. H8863–64 (Oct. 4, 1990). The Unsoeld amendment passed by a vote of 257 to 172. *See id.* at H8867; 18 U.S.C. § 922(r).

    [16] The Government apparently recognized as much in recent litigation, arguing that "Congress has chosen to exclude firearm parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm." Gov't's Mot. to Dismiss, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov.

No. 23-10718

ATF finds its primary justification for regulating weapon parts kits in the "designed to or may readily be converted to" language in the GCA's definition of "firearm." The Government argues that the statute captures any item or items that may be transformed or changed into a working firearm, based on the dictionary definition of "convert"[17] at the time of the GCA's enactment. Because weapon parts kits allow individuals to "convert" various parts into an operational firearm, the Government argues, the Final Rule's proposed definition falls clearly within the GCA's ambit.

But this stretches the words too far. The Government wants the word "convert" to be all-encompassing, such that any process or procedure that could ultimately lead to a finalized firearm can be regulated under the GCA's language. The language, however, is much more precise than that. In fact, the Government's emphasis on the word "convert" ignores the surrounding words: the GCA does not just regulate anything that can be "converted" (or, to use the Government's proposed synonym, "transformed") into a firearm but rather regulates "any weapon" that "may *readily* be converted" into a functional firearm. The phrase "may readily be converted"[18] cannot be read

---

30, 2020). Notably, the Government went on to assert that "Congress has also chosen to permit the home manufacture of unserialized firearms for personal use." *Id.* Much like in the *Syracuse* brief, *supra*, the Government seemingly took a completely opposite position in previous litigation than it takes before this Court in the present matter.

[17] The Government cites to Webster's 1968 edition to define "convert" as "to change from one state to another; alter in form, substance, or quality; transform, transmute." *Webster's Third New International Dictionary of the English Language* 499 (1968) (formatting altered).

[18] Further demonstrating its misunderstanding and misuse of the statutory text, ATF apparently equates the phrase "readily be converted" from the GCA with the phrase "be readily restored" in the National Firearms Act ("NFA"). However, these two different statutes have radically different regulatory scopes: the former regulates ordinary firearms (like a standard-issue pistol or rifle), while the latter regulates machine guns, suppressors, and short-barreled shotguns that are among the most heavily controlled items in our country (if not the world). It is unsurprising that, given their very different scopes,

to include any objects that could, if manufacture is completed, become functional at some ill-defined point in the future. This would strip the word "readily"[19] of its meaning, revert the GCA to its prior articulation in the FFA, and allow for regulation of weapon parts generally, which, as we have seen, was not Congress's intent in passing the GCA. Look no further than the words ATF used in the Final Rule's proposed "firearm" definition: it includes weapon parts kits that "may readily be completed, assembled, restored, or otherwise converted to expel a projectile." 87 Fed. Reg. at 24728. Reading "converted" in conjunction with the other listed verbs— "completed, assembled, restored"—we can see that the definition itself contemplates less drastic measures than the full transformation actually

---

courts have interpreted these texts to reach very different results. *Compare United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F.2d 463, 465 (2d Cir. 1971) (interpreting the GCA's "readily be converted" text to mean something as short as twelve minutes), *with United States v. Smith*, 477 F.2d 399, 400–01 (8th Cir. 1973) (interpreting the NFA's "be readily restored" text to mean up to eight hours of work, done in a professional shop, by an individual with an advanced understanding of metallurgy). Despite these differences, in the Final Rule, ATF expressly conflates the two statutory phrases and claims that it can regulate partially complete "frames or receivers" using *either* standard. *See, e.g.*, 87 Fed. Reg. at 24661 n.43 (relying on *Winlee Derringer* and *Smith*); *id.* at 24678–79 (relying on NFA and GCA interchangeably). This haphazard combination of standards employed by ATF in its Final Rule is the direct result of an agency that has strayed too far from its statutory foundation provided by Congress.

[19] ATF itself understood the importance of the word "readily" in the statute—the Final Rule includes numerous factors that might help ATF determine when something can "readily" be made into a working firearm. 87 Fed. Reg. at 24735. The appellees make many well-reasoned arguments regarding the ambiguity and vagueness of the Final Rule's "readily" standard. To the extent ATF relies on such a subjective multi-factor test to determine on a case-by-case basis when parts may "readily" be converted into a working firearm, this Court looks to the wisdom of the Supreme Court: "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable . . ." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158–59 (2012).

required by these parts kits. *See Hilton v. Sw. Bell Tel. Co.*, 936 F.2d 823, 828 (5th Cir. 1991) ("When general words follow an enumeration of . . . things, such general words are not to be construed in their widest extent, but are to be held as applying only to . . . things of the same general kind or class as those specifically mentioned."). The Government's attempt to use the word "convert" to justify its unprecedented expansion of the GCA thus collapses upon a cursory reading of the text.

The Government responds that courts have long recognized that disassembled, or nonoperational, weapons constitute "firearms" under the GCA, and cites our decision in *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993). There, a defendant was in possession of a "disassembled [firearm] in that the barrel was removed from the stock and that it could have been assembled in thirty seconds or less." *Id.* We held that because this "disassembled shotgun could have been 'readily converted' to an operable firearm," it constituted a firearm under the GCA. *Id.* Unlike the firearm in *Ryles*, weapon parts kits are far from being "operable." Assembling a weapon parts kit takes much longer than thirty seconds, and the process involves many additional steps. Because of these differences, weapon parts kits are not "'readily converted' to an operable firearm," and thus they do not constitute "firearms" under the GCA. *Id.*

Consider the long-standing tradition of at-home weapon-making in this country. *See* Greenlee, *supra*. We assume Congress was familiar with the relevant historical context when writing the GCA, yet Congress made no clear reference to aggregations of weapon parts or PMFs generally in the text of the GCA. Rather, as noted above, Congress clearly stated that the GCA "is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." 82 Stat. at 1213. Congress also emphasized that "it is not the purpose of [the GCA] to place any undue or unnecessary Federal restrictions or burdens on law-abiding

citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity." *Id.* at 1213–14. ATF's Final Rule, however, places substantial limits on the well-known and previously unregulated right to "the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.* at 1213.

Take, for example, an individual who buys a weapon parts kit containing several unfinished parts he later intends to build and adapt into a functional firearm for his personal use. Section 922 of the GCA, which uses the term "firearm" to describe many of the "unlawful acts" contained therein, may place additional burdens on this individual now that ATF has included aggregations of parts in the definition of "firearm." Parts contained in the kit, which were previously unregulated, could now fall into the Final Rule's new definitions, such that the individual cannot sell,[20] transport to another state,[21] or, in some instances, possess the parts at all.[22] And key determinations, like which parts are regulated, what stage of manufacture they must be in, and how many together constitute an actual "firearm," are exceedingly unclear under the Final Rule, such that the individual must guess at what he is and is not allowed to do.[23] By expanding the types of items that are considered "firearms," ATF has cast a wider net than Congress

---

[20] 18 U.S.C. § 922(a)(1).

[21] *Id.* at § 922(a)(2).

[22] *Id.* a § 922(g).

[23] *See United States v. Nat'l Dairy Corp.*, 372 U.S. 29, 32–33 (1963) ("[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."); *Johnson v. United States*, 576 U.S. 591, 595 (2015) ("Government violates [the due process clause] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.").

No. 23-10718

intended: under the Final Rule, the GCA will catch individuals who manufacture or possess not just functional weapons, but even minute weapon parts that might later be manufactured into functional weapons. The Final Rule purports to criminalize such conduct and impose fines, imprisonment, and social stigma on persons who, until the Final Rule's promulgation, were law-abiding citizens. ATF cannot so transform the GCA to include aspects of the nation's firearm industry that were previously—and purposefully—excluded from the statute.[24]

As the district court succinctly stated, "the Gun Control Act's precise wording demands precise application." *VanDerStok*, 2023 WL 4539591, at *17. Yet ATF's proposed definition is not only imprecise, ambiguous, and violative of the statutory text, it also *legislates*. Thus, the challenged portion of the Final Rule that redefines "firearm" to include weapon parts kits constitutes unlawful agency action.

c. Public policy concerns

The Government and *amici* argue that the challenged portions of the Final Rule must be upheld to promote important public policy interests and carry out the essential purpose of the GCA. They point to serious concerns regarding public safety, the apparent rise in criminal usage of "ghost guns," and the current difficulties in firearm tracing for law enforcement. Without the Final Rule, they argue, bad actors will use the "substantial loopholes" in

---

[24] Congress has been particular in limiting ATF's authority in a number of respects. In fact, when the NFA was reenacted as Title 2 of the GCA, and remained a chapter of the Internal Revenue Code, it set forth definitions including "machine gun" and "rifle," as well as for particular parts. It also excluded from the definition of "firearm" certain weapons. Thereafter, ATF began removing excepted weapons from this category, thus bringing them within the NFA's definition of prohibited weapons. Congress responded in kind and acted to prevent ATF from doing so. *See* Consolidated and Further Continuing Appropriations Act, 2012, P.L. 112-55, 125 Stat. 552, 609 (Nov. 18, 2011).

No. 23-10718

the text to completely circumvent the GCA and, ultimately, gut the law entirely.

"However, the fact that later-arising circumstances cause a statute not to function as Congress intended does not expand the congressionally-mandated, narrow scope of the agency's power." *Texas v. United States*, 497 F.3d 491, 504 (5th Cir. 2007). Likewise, "an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Where the statutory text does not support ATF's proposed alterations, ATF cannot step into Congress's shoes and rewrite its words, regardless of the good intentions that spurred ATF to act.

As this Court stated in *Cargill v. Garland*, "it is not our job to determine our nation's public policy. That solemn responsibility lies with the Congress." 57 F.4th 447, 472 (5th Cir. 2023). While the policy goals behind the Final Rule may be laudable, neither ATF nor this Court may, on its own prerogative, carry out such goals. That heavy burden instead falls squarely on Congress. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) ("The question here is not whether something should be done; it is who has the authority to do it."). "If judges could add to, remodel, update, or detract from old statutory terms . . . we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." *Bostock*, 140 S. Ct. at 1738. Any "loopholes" in the law must be filled by Congress, not by ATF, and not by this Court. *See Cargill*, 57 F.4th at 461 ("Perhaps Congress's choice of words was prudent, or perhaps it was not. That is not for us to decide.").

No. 23-10718

Our concern for strict adherence to statutory text is especially heightened here where the Final Rule purports to criminalize what was previously lawful conduct. As described above, section 922 of the GCA describes a plethora of "unlawful acts" related to firearm possession, use, and sale, and section 924 describes the penalties for any violations, including hefty fines and imprisonment of up to ten years. *See* 18 U.S.C. §§ 924, 926. Because ATF's Final Rule expands the scope of the GCA to include previously unregulated conduct, an ordinary citizen who owns certain firearm-related items (and which items are included is only ATF's guess) may now be subjected to the criminal penalties contained within the GCA practically overnight, without the input of Congress. While agencies may enact regulations under a penal statute that result in criminal liability, the agencies must always look to statutory authority to sanction their actions. Only Congress can actually criminalize behavior.[25] Yet the Final Rule plainly exceeds the limits Congress itself placed on criminal liability in the realm of firearm regulation.[26] We therefore hold unlawful the two challenged portions of the Final Rule as improper expansions of ATF's statutory authority.

---

[25] *See, e.g.*, 1 Charles E. Torcia, Wharton's Criminal Law § 10 (15th ed. 2019) ("It is for the legislative branch of a state or the federal government to determine . . . the kind of conduct which shall constitute a crime."); *but see* Brenner M. Fissell, *When Agencies Make Criminal Law*, 10 U.C. Irvine L. Rev. 855 (2020) (analyzing the growing trend in "administrative crimes," or crimes created and defined by agencies' rules).

[26] Even if the Court (and the parties) were wrong in concluding that the statute is unambiguous, we would nevertheless reach the same conclusion here because under the rule of lenity, we construe ambiguous statutes against imposing criminal liability—precisely what ATF has done here. The rule of lenity is a "time-honored interpretive guideline" used by this Court and others "to construe ambiguous statutes against imposing criminal liability." *Cargill*, 57 F.4th at 471 (quoting *Liparota v. United States*, 471 U.S. 419, 429 (1985)). This interpretive rule mandates that, should the GCA's text be at all unclear, we err on the side of those citizens who now face unforeseen criminal liability under ATF's new definitions. *See United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 (1992)

d.  The remedy

We turn now to the appropriate remedy. The Government argues that the district court's universal vacatur of the entire Final Rule (i.e., not just the two challenged portions) was overbroad, regardless of the merits of the case. While this Court's precedent generally sanctions vacatur under the APA,[27] we VACATE the district court's vacatur order and REMAND to the district court for further consideration of the remedy, considering this Court's holding on the merits.

## V.  Conclusion

ATF, in promulgating its Final Rule, attempted to take on the mantle of Congress to "do something" with respect to gun control.[28] But it is not the province of an executive agency to write laws for our nation. That vital

---

("Making a firearm without approval may be subject to criminal sanction, as is possession of an unregistered firearm and failure to pay the tax on one," and therefore, it is "proper . . . to apply the rule of lenity and resolve the ambiguity in [the citizens'] favor."); *Crandon v. United States*, 494 U.S. 152, 168 (1990) ("[W]e are construing a criminal statute and are therefore bound to consider application of the rule of lenity."). To the extent an argument for the statute's ambiguity holds any water, we would rely on the rule of lenity to further bolster the conclusion that ATF, a non-legislative government agency, exceeded its statutory authority in promulgating the challenged portions of the Final Rule. *See Cargill*, 57 F.4th at 471 ("[A]ssuming the definition . . . is ambiguous, we are bound to apply the rule of lenity.").

[27] *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy" for unlawful agency action.); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."); *accord United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.").

[28] As Justice Thurgood Marshall once wisely advised: "History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure . . . [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting).

No. 23-10718

duty, for better or for worse, lies solely with the legislature. Only Congress may make the deliberate and reasoned decision to enact new or modified legislation regarding firearms based on the important policy concerns put forth by ATF and the various *amici* here. But unless and until Congress so acts to expand or alter the language of the Gun Control Act, ATF must operate within the statutory text's existing limits. The Final Rule impermissibly exceeds those limits, such that ATF has essentially rewritten the law. This it cannot do, especially where criminal liability can—and, according to the Government's own assertions, *will*—be broadly imposed without any Congressional input whatsoever. An agency cannot label conduct lawful one day and felonious the next—yet that is exactly what ATF accomplishes through its Final Rule. Accordingly, the judgment of the district court is AFFIRMED to the extent it holds unlawful the two challenged portions of the Final Rule, and VACATED and REMANDED as to the remedy.

No. 23-10718

Andrew S. Oldham, *Circuit Judge*, concurring:

I join my esteemed colleagues' majority opinion without qualification. I write only to explore additional problems with the Final Rule promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (Apr. 26, 2022) ("Final Rule"). Part I provides additional background. Part II discusses ATF's unlawful conflation of two fundamentally different statutory regimes. Part III addresses the weapon parts kit provision. And Part IV considers the unfinished frame or receiver provision.

## I.

ATF's overarching goal in the Final Rule is to replace a clear, bright-line rule with a vague, indeterminate, multi-factor balancing test. ATF's rationale: The new uncertainty will act like a Sword of Damocles hanging over the heads of American gun owners. Private gunmaking is steeped in history and tradition, dating back to long before the Founding. Millions of law-abiding Americans work on gun frames and receivers every year. In those pursuits, law-abiding Americans (and the law-abiding gun companies that serve them) rely on longstanding regulatory certainty to avoid falling afoul of federal gun laws. But if ATF can destroy that certainty, it hopes law-abiding Americans will abandon tradition rather than risk the ruinous felony prosecutions that come with violating the new, nebulous, impossible-to-predict Final Rule.

## Old Rule (a.k.a. 80% Rule)

Let's start with the Old Rule. Since 1968, Congress has defined the word "firearm" to mean "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive [or] *the frame or receiver of any such weapon*." 18 U.S.C.

No. 23-10718

§ 921(a)(3)(A)–(B) (emphasis added). What is a "frame or receiver"? ATF defined that by regulation in 1968, too: The "frame or receiver" of a firearm is "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (to be codified at 26 C.F.R. pt. 178); *see also* 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978) (formerly codified at 27 C.F.R. § 478.11 (2020)). That is clear: It tells law-abiding gun owners, hobbyists, and gunsmiths when a piece of metal stops being a just a piece of metal and starts being the "frame or receiver" of a federally regulated firearm subject to federal gun laws and felony penalties.

The Old Rule even came with numerical certainty. In longstanding regulatory guidance, ATF took the position that a hunk of metal became a federally regulated "frame or receiver" only after it was 80% complete: "ATF has long held that items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm [under the 1968 Old Rule]." ATF, *Are 80% or "Unfinished" Receivers Illegal?*, https://perma.cc/QX2X-8UHQ (last reviewed Apr. 6, 2020). The uninitiated might wonder what constitutes an unmachined receiver blank or solid fire-control area. So ATF helpfully provided pictures. Here are ATF's Old Rule pictures for an AR-15's frame or receiver:

No. 23-10718



No. 23-10718

*Ibid.* (annotations in original). This Old 80% Rule is thus easy to understand, predict, and apply: the top two silver receiver pictures are only 80% complete; they are thus "unfinished"; and they do not constitute "firearms" under federal gun laws. Under the Old 80% Rule, any law-abiding American consumer or manufacturer knew that as long as the fire-control area remained solid, the silver pieces of metal were just that—metal. They could be bought and sold without concern for the federal gun laws.[1]

For decades, millions of Americans have lawfully purchased pieces of metal like those silver ones and worked on them in garages and workshops across the country. Such homemade firearms have a rich history and tradition, dating back to the Founding. *See, e.g.*, Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 45–71 (2023). So the Old Rule allowed Americans to purchase the silver pieces of metal, to machine the final 20% of the metal in their homes or garages, and thus to make 100%-complete receivers. *See* ROA.228–44 (ATF's pre-2022 Old Rule classification letters on partially complete frames and receivers). An enthusiast or amateur gunsmith might mill the fire-control area with a drill press so the receiver could hold a trigger assembly. And the enthusiast or amateur gunsmith might drill three holes through the receiver to hold the safety selector, trigger, and hammer pins. And voila: the modern analogue to the homemade rifle Daniel Boone's father gave him when he was 12. Greenlee, *supra*, at 69.

---

[1] Insofar as the Old Rule applied to frames and receivers that were, say, 81% complete, ATF regulated pieces of metal that were both (1) frames and receivers and (2) things that were not yet frames and receivers. As the majority opinion notes, *see ante*, at 15, it is unclear how the GCA permits that. My point in this separate concurrence is that even if the GCA permits the Old 80% Rule, it cannot permit ATF's attempt to regulate any piece of metal that has been machined beyond its "primordial" state. *E.g.*, Final Rule, 87 Fed. Reg. at 24678.

No. 23-10718

## NEW RULE (A.K.A. FINAL RULE)

Congress has done nothing to change the statutory definition of "firearm" or "frame or receiver" since 1968.[2] And for 54 years, the regulatory text stayed the same too. Then in 2022, without any direction or authorization from Congress, ATF changed everything:

- ATF eliminated the 80% threshold for unfinished "frames or receivers." And it replaced that numerical certainty with "I-know-it-when-I-see-it" subjectivity that is evocative of Justice Stewart's obscenity standard. *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). Under the New Rule, a hunk of metal turns into a federally regulated "frame or receiver" when ATF thinks "it is *clearly identifiable* as an unfinished component part of a weapon." Final Rule, 87 Fed. Reg. at 24728 (emphasis added).

- ATF promulgated a non-exhaustive list of eight factors that its Director may balance in considering whether a hunk of metal constitutes a partially complete or disassembled "frame or receiver": "[T]he Director may consider any associated [1] templates, [2] jigs, [3] molds, [4] equipment, [5] tools, [6] instructions, [7] guides, or [8] marketing materials that are sold, distributed, or possessed with [or otherwise made available to the purchaser or recipient of] the item or kit." *Id.* at 24739. So the silver pieces of metal in the pictures above

---

[2] Indeed, Congress has considered several bills to regulate so-called "ghost guns" and rejected them. *See, e.g.*, Untraceable Firearms Act of 2021, S.1558, 117th Cong. (2021). No such bill has made it past bicameralism and presentment. Thus, ATF and the Executive Branch sought to do through this Final Rule what they could not do through the normal legislative process. *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) ("The Secretary's assertion of administrative authority has conveniently enabled him to enact a program that Congress has chosen not to enact itself." (internal quotation and citation omitted)).

are now federally controlled firearms, so long as they are sold with a jig, template, or other item useful in finishing the receiver. *See ibid.*

- ATF promulgated a non-exhaustive list of eight factors that its Director may balance in considering whether a hunk of metal can be "readily" converted to a "frame or receiver": "(1) Time, i.e., how long it takes to finish the process; (2) Ease, i.e., how difficult it is to do so; (3) Expertise, i.e., what knowledge and skills are required; (4) Equipment, i.e., what tools are required; (5) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained; (6) Expense, i.e., how much it costs; (7) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and (8) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction." *Id.* at 24735.

- And ATF changed the statutory definition of firearm to include "weapon parts kit[s]." *Id.* at 24727–28. Such a "kit" consists of gun parts. And ATF concedes that *none* of those parts is a "firearm" under federal law. Still, ATF says that a collection of parts is "firearm" if ATF, in its wisdom and its subjective judgment, determines the parts *look* like the building blocks of a firearm. *Id.* at 24689 (weapon parts kits are firearms if they are "clearly identifiable" as such).

Why did ATF promulgate a 98-page Final Rule—replete with multiple, non-exhaustive, eight-factor balancing tests and subjective standards evocative of *Jacobellis*—to replace the Old 80% Rule? ATF says its concern is so-called "ghost guns": Frames and receivers finished in private homes and garages do not have serial numbers, and that makes it difficult for the Government to track the homemade guns. *Id.* at 24652. (Hence the Government's "ghostly" moniker.) But if that was all ATF cared about, it would just require serialization of all frames and receivers—even those (like

No. 23-10718

the silver pieces of metal pictured above) that are only 80% complete. *See* 27 C.F.R. § 479.102 (requiring "a manufacturer" to serialize frames and receivers). ATF expressly did not do that, however; it instead expressly *exempted* private individuals from serializing their frames and receivers. *See* Final Rule, 87 Fed. Reg. at 24653. That is the precise opposite of what ATF would do if it cared about tracing so-called "ghost guns."

ATF instead chose to change the meaning of "firearm" so that it can apply to any piece of metal that has been machined beyond its "primordial" state. Why? ATF wants the "flexibility" to regulate unformed, unfinished pieces of metal when it, in its judgment, thinks regulation is "necessary." *Id.* at 24669. And ATF wants to "deter" people from relying on "a minimum percentage of completeness (e.g., '80.1%')." *Id.* at 24686. So it deleted the Old 80% Rule and replaced it with new, indeterminate, multi-factor-balancing, and eye-of-the-beholder standards. But it never pointed to a single homemade gun that escaped regulation under the Old Rule but would stay out of criminals' hands under the New Rule.

## II.

ATF's foundational legal error is that it conflated two very different statutes: the Gun Control Act of 1968 and the National Firearms Act of 1934. Those two statutes give ATF very different powers to regulate very different types of weapons. To take just one very obvious example, when it comes to things like machine guns, the National Firearms Act empowers ATF to maintain a central registry called "the National Firearms Registration and Transfer Record." 26 U.S.C. § 5841(a). That database requires registration of every machine gun; registration of every person who ever possesses it; and strict limitations on every machine gun transfer (including a $200 tax on each sale and six-to-twelve month waiting periods). None of these restrictions apply to transactions involving ordinary firearms under the Gun Control Act.

No. 23-10718

And ATF promulgated the Final Rule under the Gun Control Act to apply to *all* firearms—not just machine guns. Still, ATF mushed the statutes together and then liberally borrowed terms from both.

I first (A) explain the statutory conflation. Then I (B) explain how ATF exploited that conflation to generate its multi-factor balancing tests.

## A.

First, the statutory conflation. As the majority notes, *see ante* n.16, ATF's Final Rule repeatedly uses the word "restored":

> Firearm . . . . The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, *restored*, or otherwise converted to expel a projectile by the action of an explosive.
>
> . . .
>
> Partially complete, disassembled, or nonfunctional frame or receiver. The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, *restored*, or otherwise converted to function as a frame or receiver.

Final Rule, 87 Fed. Reg. at 24735, 24739 (emphasis added).

This is unlawful because (1) ATF took the word "restored" from a different statute with a very different scope and meaning. And (2) ATF cannot defend that choice by pretending that the relevant statute fairly includes the word "restored."

### 1.

First, the two very different gun control statutes. The first is the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ("GCA"). The GCA was Congress's response to the assassination of President Kennedy.

No. 23-10718

According to the FBI, Lee Harvey Oswald used the pseudonym "A. Hidell" to purchase a 6.5x52mm Carcano bolt-action hunting rifle from a mail-order advertisement in the back of *American Rifleman* magazine. Vincent Bugliosi, Reclaiming History: The Assassination of John F. Kennedy 200 (2007). "A. Hidell" mailed a money order for $21.45 ($19.95 for the rifle and $1.50 for postage) and later picked up the rifle from P.O. Box 2915 in Dallas, Texas. *Ibid.* Congress's response in the GCA was, *inter alia*, to prohibit mail-order weapons and to impose identification requirements that prohibit pseudonymous purchases. *See Interstate Shipment of Firearms: Hearings on S. 1975 and S. 2345 Before S. Comm. on Com.*, 88th Cong. (1964). The GCA regulates interstate transactions involving *any* firearm—including common bolt-action hunting rifles.[3]

By contrast, the National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 ("NFA") applies to a much narrower class of firearms and firearm accessories—such as fully automatic machine guns.[4] The NFA was Congress's response to gangster shootouts like the St. Valentine's Day Massacre of 1929. On that bloody Valentine's Day, seven members of Bugs Moran's gang were gunned down in Chicago. The four shooters used at least two Thompson submachine guns. Congress's response in the NFA was, *inter alia*, to impose a 100% tax on machine gun purchases in an effort to reduce or

---

[3] Throughout this opinion, I use "GCA" and "ordinary" to refer to the firearms captured in 18 U.S.C. § 921(a)(3)(A)–(B). That includes the types of firearms Americans can buy at sporting-goods and big-box stores, like semiautomatic pistols, revolvers, hunting rifles, and shotguns.

[4] Throughout this opinion, I use "NFA items" to refer to the items captured in 26 U.S.C. § 5845. These include suppressors, *id.* § 5845(a)(7), and destructive devices, *id.* § 5845(f). Both are NFA items even though they also appear in 18 U.S.C. § 921(a)(3)(C)–(D). For the sake of simplicity, I use "machine guns" and "NFA items" interchangeably—both because machine guns are prototypical NFA items and because ATF's Final Rule relies extensively on court precedents involving machine guns. *See infra* Part II.B.2.

No. 23-10718

eliminate them. *See* National Firearms Act: *Hearings Before the H. Comm. on Ways & Means on H.R. 9066*, 73d Cong. 12 (1934). That explains why the NFA appears in Title 26 (the Internal Revenue Code), as opposed to alongside the GCA in Title 18. Today, the NFA applies only to weapons like machine guns, short-barreled shotguns and rifles, and suppressors. And it imposes numerous restrictions (including transfer taxes and registration requirements) that apply *only* to NFA weapons and not to non-NFA weapons like common bolt-action hunting rifles. *See, e.g.*, 26 U.S.C. § 5821 (taxes on NFA weapons).

ATF promulgated the Final Rule under the GCA—not the NFA. *See, e.g.*, Notice of Proposed Rulemaking, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720, 27726–27 (May 21, 2021) ("NPRM") (citing as statutory basis the terms "firearm," "frame," and "receiver" in GCA); Final Rule, 87 Fed. Reg. at 24734 (same). That makes some sense because ATF wants the Final Rule to apply to *every* firearm, *every* frame, and *every* receiver (the GCA's scope)—not just to NFA items like machine guns.

The problem is that Congress chose to use the word "restored" *only* in the NFA and not in the GCA. "That is significant because Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015); *see also Russello v. United States*, 464 U.S. 16, 23 (1983). When Congress defined NFA weapons like machine guns, it chose to reach weapons that could be "restored" to be machine guns. *See, e.g.*, 26 U.S.C. § 5845(b) ("The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily *restored* to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.") (emphasis added). But when Congress defined ordinary GCA "firearms," it chose not to reach weapons that could be "restored" to function as firearms.

No. 23-10718

Rather, the GCA defined "firearm" in relevant part to mean "any weapon (including a starter gun) which will or is designed to *or may readily be converted* to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A) (emphasis added). We must interpret the two statutes to have different scopes consistent with their different texts.[5]

2.

At oral argument, ATF's counsel conceded the agency took the word "restored" from the NFA and inserted it into a GCA regulation. *See* Oral Arg. at 0:30–8:00. Counsel defended conflating the two statutes by arguing that "restored" (used only in the NFA) is close enough to the text used in the GCA ("converted") that the Government could mush together the two statutes and promulgate a Final Rule that uses both terms interchangeably.

This argument fails for two reasons. First, the ordinary meaning of "converted" is not the same as "restored." To "convert" means to change something from one form to a new, different form: "To alter, as a vessel or *firearm*, so as to change from one class or type to another." *Convert*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 583 (2d ed. 1934; 1950) ("WEBSTER'S SECOND") (emphasis added). To "restore," by contrast, means to bring something back to its original form: "To bring back to, or put back into, the former or original state; to repair; to renew; specif. [] To rebuild; reconstruct." *Restore*, WEBSTER'S SECOND at 2125. Thus, a firearm *A* can be *converted* to a new, different *B*. Or an old, broken firearm *A*

---

[5] The textual distinction is particularly powerful because Congress knew how to use the word "converted" in the NFA when it wanted to. For example, the GCA added the definition of "destructive device" to the NFA in 1968. And when it did so, Congress used "converted" in the definition of the NFA item "destructive device." 18 U.S.C. § 921(a)(4)(B). That further underscores the textual anomaly of the word "restored"—which appears only in the NFA provisions governing things like machine guns, short-barreled rifles, and short-barreled shotguns. 26 U.S.C. § 5845(b)–(e).

can be *restored* to new, functional *A*. But it makes no sense to say *A* is *restored* to *B*, nor does it make sense to say *A* is *converted* to *A*.[6]

For example, a semi-automatic rifle like an AR-15 can be "converted" to function as a fully automatic machine gun. Such conversions can be accomplished by filing away internal parts of a semi-automatic firearm. *See Staples v. United States*, 511 U.S. 600, 603 (1994). Or by replacing them. *See Roe v. Dettelbach*, 59 F.4th 255, 257 (7th Cir. 2023). But either way, the firearm is "converted" from one thing (*A*, a semi-automatic weapon) into a different class or type of firearm (*B*, a fully automatic weapon). And either way, the AR-15 is *not* "restored" into a machine gun because its original state (semi-automatic) was not an old version of the renewed one (fully automatic). *Cf. United States v. TRW Rifle 7.62x51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 691 (9th Cir. 2006) ("The United States argues, and we agree, that the 'former or original state' of the rifle refers to the essential definition of a machinegun, that is whether it was ever capable of firing automatically more than one shot, without manual reloading, by a single function of the trigger.").

Consider another example. If a lifelong Anglican decides to become Roman Catholic, a "reasonable person, conversant with the relevant social and linguistic conventions" might say that she "converted" from *A* (Anglicanism) to *B* (Catholicism). *Cf.* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2392–93 (2003). But no one would say

---

[6] Note that this critique of "restored" also applies to the Final Rule's similarly inappropriate uses of the words "completed" and "assembled." *See* Final Rule, 87 Fed. Reg. at 24735, 24739. Neither word appears in the pertinent text of the GCA. *See* 28 U.S.C. § 921(a)(3). And both words have definitions that diverge from that of the relevant word in § 921(a)(3), "converted."

the lifelong Anglican "restored" her new Catholic faith.[7] In faith as in firearms, the words "converted" and "restored" are not interchangeable.

Thus, in the context of ordinary GCA firearms, like bolt-action hunting rifles, Congress used the word "converted." In the context of NFA machine guns, Congress used the word "restored." That means the GCA covers firearms (*B*) and things (*A*) that can be readily converted into firearms (*B*). Whereas the NFA concerns firearms that start as machine guns (*A*) and can be restored to functioning machine guns (*A*).

### B.

All of this matters because the central dispute in this case is how far back ATF can reach to regulate the *A* that can be converted to *B*. Everyone agrees ATF can regulate the gun itself, *B*. But how far back in the manufacturing process of the gun *B* can ATF reach to regulate things *A* that can be *theoretically converted* into guns? ATF concedes that it cannot reach all the way back to "unformed blocks of metal" or metal in its "primoradial state." Final Rule, 87 Fed. Reg. at 24663. So primordial ooze is not *A*. But anything more refined than that is subject to the Final Rule's multi-factor balancing tests and eye-of-the-beholder standards.

The GCA, however, says nothing about primordial ooze, unformed blocks of metal, or any of ATF's various indeterminate standards for *A*. Rather, the GCA says ATF can regulate *A* as a "firearm" only if *A* can

---

[7] Some may dismiss such "homey examples" on the grounds that ordinary meaning is a legal concept without concern for everyday conversation. *See, e.g.*, Tara Leigh Grove, *Foreword: Testing Textualism's 'Ordinary Meaning'*, 90 Geo. Wash. L. Rev. 1053, 1082–83 (2022); Tara Leigh Grove, *Is Textualism at War with Statutory Precedent?*, 102 Tex. L. Rev. (forthcoming 2024). To the extent that the critique has purchase as a theoretical matter, it is irrelevant here. ATF has provided no argument that the analysis of ordinary meaning as a legal concept changes the definition of commonplace words like "converted" or "restored."

No. 23-10718

"readily be converted" into a firearm *B*. 18 U.S.C. § 921(a)(3)(A). That is, a firearm is anything (*B*) that expels a projectile with an explosive, or anything (*A*) that can be *readily converted* to a thing (*B*) that fires a projectile with an explosive.

Consider (1) how courts distinguish "readily be converted" from "readily restored." Then consider (2) how ATF ignores that distinction. The result is (3) a fatally vague Final Rule.

### 1.

Let's start with ordinary GCA firearms. When it comes to ordinary firearms, like bolt-action hunting rifles, courts have interpreted "readily be converted" to mean minimal effort—something like "three to twelve minutes" with a drill and no special skills. *See, e.g.*, *United States v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*, 443 F.2d 463, 465 (2d Cir. 1971). The GCA standard arises with some frequency when criminal defendants are charged with possessing gun parts or inoperable guns that nonetheless count as firearms because they can "readily be converted" to fire. *See ibid.* For example, this disassembled Tec-9 handgun is still a "firearm":



*United States v. Morale*s, 280 F. Supp. 2d 262, 277 (S.D.N.Y. 2003). That is because it might be reassembled "in about five seconds." *Id.* at 272. Similarly, an inoperable shotgun can "readily be converted" to GCA firearm if it only requires "about fifteen to twenty minutes" of manipulation. *United States v. Reed*, 114 F.3d 1053, 1056 (10th Cir. 1997). And a starter gun—which is expressly mentioned in the text of § 921(a)(3)—is a GCA firearm because it can be converted to expel projectiles using basic tools, without any specialized knowledge, "in a matter of minutes" and "easily [in] less than an hour." *United States v. Mullins*, 446 F.3d 750, 755–56 (8th Cir. 2006).

NFA weapons like machine guns are a different story. Recall that machine guns face an entirely different and more onerous regulatory regime—including registration requirements for every machine gun,

No. 23-10718

registration requirements for every seller and purchaser, $200 taxes for every transfer, and multi-month waiting periods. Owing in part to the significantly heavier burdens that attach to machine gun ownership, courts have interpreted the NFA's text ("readily restored") to reach *much* further than the GCA's text ("readily be converted"). While the GCA only reaches conversions that can be accomplished in *minutes* using *minimal* effort, the NFA reaches restorations that can be accomplished in *hours* using *maximal* effort.

Take, for example, *United States v. Smith*, 477 F.2d 399 (8th Cir. 1973) (per curiam). That case concerned possession of an unregistered Thompson submachine gun. The gun had been permanently decommissioned: Its barrel had been filled with metal. *Id.* at 400. And the gun was welded in *two* places to make it impossible to fire: "The barrel of the gun was welded closed at the breech and was also welded to the receiver on the outside under the handguard." *Ibid.* Nonetheless, the Government proffered an expert to prove that a permanently decommissioned weapon could be "readily restored":

> [The Government's expert] testified that there are two possible ways by which the firearm could be made to function as such. The most feasible method would be to cut the barrel off, drill a hole in the forward end of the receiver and then rethread the hole so that the same or another barrel could be inserted. To do so would take about an 8-hour working day in a properly equipped machine shop. Another method which would be more difficult because of the possibility of bending or breaking the barrel would be to drill the weld out of the breech of the barrel.

*Ibid.* The court held that was sufficient to support Smith's NFA conviction because eight hours in a properly equipped shop with a sophisticated understanding of metallurgy constituted a ready restoration. *See id.* at 400–01. Other courts have interpreted the NFA to reach a machine gun that was

No. 23-10718

permanently decommissioned by the military "by torch-cutting its receiver—the frame portion of the rifle that contains the firing mechanisms, located between the barrel and the stock—into two pieces." *TRW Rifle*, 447 F.3d at 688. The court reasoned the machine gun could be "readily restored" by welding the two pieces back together and then using "a hand grinder (or dremel tool), a splitting disk, a drill press, and hand files" to restore its firing mechanism. *Id.* at 692. The court credited expert testimony that someone with the proper tools and knowledge could do that in two hours. *Ibid.* A similar case estimated that the same restoration could be done in six hours. *See United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 422–24 (6th Cir. 2006).

\*     \*     \*

These cases illustrate what should be obvious to any law-abiding American: Federal law treats NFA machine guns differently from ordinary GCA firearms like bolt-action rifles.

### 2.

The distinction was not obvious to ATF, however. In Footnote 43 of the Final Rule, ATF says "readily" means *either* "readily be converted" under the GCA *or* "readily restored" under the NFA—terms ATF understands as interchangeable in a string cite of cases arising under both statutes. *See* Final Rule, 87 Fed. Reg. at 24661 n.43. ATF points to Footnote 43 and its mishmash of GCA-NFA precedents over and over throughout the Final Rule. *See id.* at 24684 n.96, 24685 n.103, 24698 n.123, 24700 n.125 (pointing to footnote 43). As ATF explains, "this rule is guided by . . . relevant case law." *Id.* at 24698.

The problem is that NFA precedents are not "relevant case law." *Ibid.* As to ordinary GCA firearms, ATF is limited to regulating things that can "readily be converted" into firearms. 18 U.S.C. § 921(a)(3). That means

things that are close enough to firearms that they can be finished "in about five seconds," *Morale*s, 280 F. Supp. 2d. at 272, in "about fifteen to twenty minutes," *Reed*, 114 F.3d at 1056, or in "easily less than an hour," *Mullins*, 446 F.3d at 755. ATF cannot avail itself of the NFA's *much* broader for machine guns. Yet in interpreting the GCA's ordinary-gun standard, ATF expressly relied on cases like *Smith* and its eight-hours-in-a-professional-shop-with-expertise standard. *See* Final Rule, 87 Fed. Reg. at 24662 n.43; *see also id.* at 24678–79 (explicitly linking the Final Rule's understanding of "readily" to the machine-gun-restoration standard under the NFA).

The practical implications of ATF's position are staggering. According to ATF, the word "readily" means the same thing in the GCA, the NFA, and the Final Rule. If that were true, then millions and millions of Americans would be felons-in-waiting. That is because the AR-15 is the most popular rifle in America; almost 20 million of them were in American homes as of 2020. *See* NSSF Releases Most Recent Firearm Production Figures, https://perma.cc/TBS8-JSSH (Nov. 16, 2020). But every single AR-15 can be converted to a machine gun using cheap, flimsy pieces of metal—including coat hangers. *See* Mike Searson, *Turning Your AR-15 into an M-16*, Recoil Magazine, https://perma.cc/L5G9-E9BJ (June 5, 2019). That is obviously far easier than the 8-hour-in-a-professional-shop standard announced in *Smith* to govern "ready restoration" under the NFA.

For decades, America's AR-15 owners have relied on the fact that AR-15s are not subject to the NFA's ready-restoration standard. Recall the NFA applies to machine guns *B* and things that can be "readily restored" to function as machine guns *B*. *See supra* Part II.A.2. By contrast, an AR-15 was never a machine gun *B* and hence cannot be "readily restored" to a machine gun *B*. Of course, an AR-15 *A* could be "converted" to a machine gun *B*. But unless that conversion could be done in a few seconds or minutes, *see Morale*s, 280 F. Supp. 2d. at 272; *Reed*, 114 F.3d at 1056, AR-15 owners had no reason

No. 23-10718

to worry that their rifles were capable of ready conversion into unregistered machine guns. The Final Rule eliminates that certainty, says "readily" means the same thing in the GCA and the NFA, and says Americans violate federal gun laws if they could in theory manufacture a prohibited weapon in eight hours in a professional shop with metallurgical expertise. *See Smith*, 477 F.2d at 400; Final Rule, 87 Fed. Reg. at 24661 n.43 (relying on *Smith*).

3.

After conflating the GCA and the NFA, the Final Rule includes a list of eight non-exhaustive factors to guide ATF's understanding of "readily":

> (1) Time, i.e., how long it takes to finish the process; (2) Ease, i.e., how difficult it is to do so; (3) Expertise, i.e., what knowledge and skills are required; (4) Equipment, i.e., what tools are required; (5) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained; (6) Expense, i.e., how much it costs; (7) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and (8) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction.

Final Rule, 87 Fed. Reg. at 24735. The Final Rule emphasizes this list is "nonexclusive." *Id.* at 24698. And ATF explicitly disclaimed the need to explain how any of these factors would balance in practice: "It is not the purpose of the rule to provide guidance so that persons may structure transactions to avoid the requirements of the law." *Id.* at 24692.

This approach violates the Fifth Amendment and its guarantee of fair notice. *See FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). The "Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary

people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Even if "some conduct [] clearly falls within the provision's grasp," a law can still be vulnerable to a vagueness challenge. *Id.* at 602. With its nonexclusive list of eight factors and lack of concrete examples, the Final Rule produces "more unpredictability and arbitrariness than the Due Process Clause tolerates." *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1215 (2018) (citation omitted).

ATF dismisses the problem by pointing to courts that have rejected vagueness challenges to the term "readily." Final Rule, 87 Fed. Reg. at 24700, n.126 (pointing to cases listed in 87 Fed. Reg. at 24679 n.79). But that argument fails for two reasons. Nearly all of ATF's cited precedents involve the NFA, not the GCA. *See id.* at 24679 n.79 (also citing cases on state laws and the ADA). And as discussed above, courts have interpreted the NFA more expansively than the GCA. But more relevantly, the cited precedents dealt with the word "readily" as it exists in statutory text. They did not consider ATF's nonexclusive eight-factor balancing test with no concrete examples. It is the text of the Final Rule, not the text of the statute, which falls short of the Due Process Clause.[8]

ATF also argues that it could provide sufficient guidance in individual cases: Where "persons remain uncertain" as to the exact scope of the Rule,

---

[8] ATF essentially responded with variation of the motte-and-bailey argument. *See* Scott Alexander*, All in All, Another Brick in the Motte*, Slate Star Codex (Nov. 3, 2014), https://perma.cc/PA2W-FKR9. The Final Rule is clearly more expansive than the text of § 921(a)(3). When pressed on due process concerns with the Final Rule, ATF retreated to the text of § 921(a)(3) and argued that courts have rejected such attacks on the GCA. But the Final Rule is not the GCA. ATF may either have the text of the GCA, as upheld against due process challenges by various courts, or the more expansive Final Rule, which has never encountered such a challenge. But it may not mix and match legal texts with defenses.

"they may submit a voluntary request to ATF for a classification." Final Rule, 87 Fed. Reg. at 24692. But this does nothing to cure the Final Rule's vagueness. As important as the Fifth Amendment's guarantee of fair notice to individuals is the Amendment's prohibition against "arbitrary enforcement" by government officials. *See Johnson*, 576 U.S. at 595 (citing *Kolender v. Lawson*, 461 U.S. 352, 357–358 (1983)). It is thus of no use for ATF to say that it will tell ordinary people what they can do. The law exists to tell both the people *and* government officials what they can do. *See Sessions*, 138 S. Ct. at 1228 (Gorsuch J., concurring in part and concurring in the judgment) ("Vague laws [] threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions.") (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)). The nonexclusive eight-factor balancing test provides no guidance to anyone and hence is void for vagueness.

## III.

Next consider the Final Rule's approach to weapon parts kits. The Final Rule expands the GCA's definition of "firearm" to include weapon parts kits:

> Firearm . . . . The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive.

Final Rule, 87 Fed. Reg. at 24735. But this expansion cannot stand for two reasons.

First, as the majority cogently explains, *see ante* at 19, Congress knows how to regulate gun parts, either individually or as a collection. The GCA's predecessor, the Federal Firearms Act, defined "firearm" to mean "any weapon . . . *or any part or parts of such weapon*." Pub. L. No. 75-782, 52 Stat.

No. 23-10718

1250, 1250 (1938) (repealed 1968) (emphasis added). But Congress removed this language when it enacted the GCA. Moreover, Congress regulates parts elsewhere in the GCA (as well as in the NFA). *See, e.g.*, 18 U.S.C. § 921(a)(4)(C) (defining "destructive device" as, *inter alia*, "any combination of parts . . . ."). The omission of any reference to "parts" in § 921(a)(3) indicates that Congress did not sweep "parts" into the GCA's definition of firearm.

Second, the structure of § 921(a)(3) presumes that all covered firearms have either a frame or a receiver. Therefore, a weapon parts kit that does not include a frame or receiver cannot be regulated under § 921(a)(3).

Start with the statutory text. Section 921(a)(3) defines the term "firearm" in four sub-sections: (A), (B), (C), and (D). Consider only (A) and (B). Subsection (A) defines "firearm" to include "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Subsection (B) defines "firearm" to include "the frame of receiver of *any such weapon*." *Id.* § 921(a)(3)(B) (emphasis added). With its placement immediately following (A), we can easily understand (B)'s "any such weapon" language to incorporate the definition of "weapon" in (A). Thus, Subsection (B) defines "firearm" to include "the frame of receiver of any such weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Or put another way, § 921(a)(3) defines "firearms" to include, *inter alia*, certain weapons (A) and the frame or receiver of said weapons (B). Section 921(a)(3) does not contemplate a weapon covered by (A) that does *not* have a frame or receiver covered by (B).

Contrast the statute with two hypothetical weapon parts kits covered by the Final Rule. The first kit contains a frame as defined by § 921(a)(3)(B).

No. 23-10718

That means that the kit contains a firearm under § 921(a)(3). The frame (separate and apart from anything else in the kit) triggers the GCA and its various requirements. *See, e.g.*, 18 U.S.C. § 923(i) ("Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."). In this hypothetical, the frame is doing all the work—it is sufficient to trigger the GCA, so it does not matter what else is included in the frame-containing kit.

Now consider a different kit covered by the Final Rule: This second kit contains *no* frame or receiver as defined by § 921(a)(3)(B). *See* Final Rule, 87 Fed. Reg. at 24685 ("The Department disagrees with the comment that weapon parts kits must contain all component parts of the weapon to be 'readily' converted to expel a projectile."). This kit is incomplete because it does not contain a frame or receiver—and hence contains *nothing* that triggers § 921(a)(3)'s text. It beggars belief to suggest that such an incomplete parts kit is a weapon in any sense of the word. An incomplete weapon parts kit will *never* turn itself into a functioning weapon of any sort. Any argument to the contrary is "[p]ure applesauce." *King v. Burwell*, 576 U.S. 473, 507 (2015) (Scalia, J., dissenting).

ATF's only response is to say that it'll deem incomplete kits as "firearms" based on "a case-by-case evaluation of each kit." Final Rule, 87 Fed. Reg. at 24685; *cf. Jacobellis*, 378 U.S. at 197 (Stewart, J., concurring). How is any American supposed to know when a collection of gun parts meets that standard?

In sum, § 921(a)(3) contemplates that a covered "weapon" (A) has a "frame or receiver" (B). Insofar as the Final Rule seeks to regulate weapons that do not, the rule is unlawful.

No. 23-10718

## IV.

Finally, consider the Final Rule's treatment of *unfinished and incomplete* frames and receivers. This is perhaps ATF's most aggressive attempt to bootstrap hunks of metal and plastic into the GCA's definition of a "firearm." As explained in the preceding sections of this opinion, the GCA's definition of a "firearm" includes (1) functioning guns, (2) weapons that are "designed" to be functioning guns, (3) weapons that can "readily be converted" to functioning guns, and (4) the "frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3)(A)–(B). Thus, if a felon possesses a functioning handgun, that obviously violates the GCA. If the same felon possesses a non-functioning handgun, that still might violate the GCA if the gun was "designed" to be a functioning gun. And if the same felon possesses a field-stripped handgun,[9] that violates the GCA in two separate ways: the gun can be reassembled (and hence "readily be converted" to a functioning gun), and the frame or receiver of the field-stripped weapon is a "firearm" under § 921(a)(3)(B) even without reassembly.

But that statutory definition is not capacious enough for ATF. In the Final Rule, ATF asserts that anything beyond primordial ooze, liquid polymer, and wholly unformed raw metal *can* constitute a firearm. Here's how ATF explains the bootstrapping:

> (c) Partially complete, disassembled, or nonfunctional frame or receiver. The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or

---

[9] Field stripping a firearm involves disassembling it without any special tools for routine cleaning and maintenance. *See, e.g.*, Bob Boyd, *DIY Guide: Field-Stripping a Glock*, Shooting Illustrated (Dec. 17, 2019), https://perma.cc/A7CA-YVKC; *cf. United States v. Spencer*, 439 F.3d 905, 911 (8th Cir. 2006) (noting a "field stripped" machine gun was disassembled "into approximately ten to fifteen different parts" and "could be reassembled in about five or ten minutes") (quotation omitted).

No. 23-10718

>receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).

Final Rule, 87 Fed. Reg. at 24739. But this expansion cannot stand, because (A) a frame or receiver parts kit is not a frame or receiver, (B) the Final Rule's examples defining "frame or receiver" are nonsensical, and (C) the Final Rule fails to sufficiently engage with then-contemporaneous definitions of "frame" or "receiver."

## A.

To begin, a frame or receiver *parts kit* is not a frame or receiver within the meaning of § 921(a)(3)(B).

Seven years before the GCA was passed, WEBSTER'S THIRD defined *frame* as "the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm," WEBSTER'S THIRD INTERNATIONAL DICTIONARY 902 (1961), and *receiver* as "the metal frame in which the action of a firearm is fitted and which the breech end of the barrel is attached." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1894 (1961). Now, the Final Rule attempts to expand those definitions, so that "frame" includes a "frame parts kit" and "receiver" includes a "receiver parts kit." Final Rule, 87 Fed. Reg. at 24739.

No. 23-10718

But ATF cannot simply add the phrase "parts kit" and regulate as if the frame/receiver *parts* are the frames/receivers themselves. A frame parts kit does not serve as "the basic unit of a handgun which serves as a mounting for the barrel"; it is a collection of parts that could in theory be assembled into a frame. A receiver parts kit is not a "metal frame"; it is a collection of parts that can be assembled into a metal frame. Thus, as a matter of common-sense statutory interpretation, the parts kits cannot qualify as frames or receivers under § 921(a)(3)(B). *See Pensacola Tel. Co. v. W. Union Tel. Co.*, 96 U.S. 1, 12 (1877) (presuming that words in statutory text are to be given "their natural and ordinary signification.").

ATF's contrary view has no stopping point. For example, ATF says it will regulate "[a] complete frame or receiver of a weapon that has been disassembled, damaged, split, or cut into pieces, but not destroyed in accordance with paragraph (e)." Final Rule, 87 Fed. Reg. at 24739. Paragraph (e) in turn states that "[a]cceptable methods of destruction include completely melting, crushing, or shredding the frame or receiver." *Ibid.* It is thus unclear if any gun part could *ever* fall outside ATF's definition of a "firearm." On the front end, anything that has been refined beyond primordial ooze or raw liquid polymer could one day be a firearm. And on the back end, anything that has not been melted down into primordial ooze or raw liquid polymer could one day be restored to function as a firearm.

This makes little sense. If I went to a junk yard and picked up a piece of metal that used to be part of a truck, no reasonable person would say I'm holding a truck because the metal has been formed beyond primordial ooze and hence could be "completed, assembled, restored, or otherwise converted to function" as either a truck or truck frame. Likewise, if I cut a truck into 100 pieces, scattered them on the ground, and then picked up some, no reasonable person would say I'm holding a truck or truck frame because the piece hadn't been melted down to its primordial state.

No. 23-10718

## B.

Next, the Final Rule says even unformed pieces of metal or plastic can constitute frames and receivers when they are found with instructions or jigs. In the section on frames and receivers, the Final Rule gave multiple examples of what is or is not a frame or receiver within the meaning of § 921(a)(3)(B). *See* Final Rule, 87 Fed. Reg. at 24739. Examples 1 and 4 are key. Example 1 provides:

> Frame or receiver: A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver.

*Ibid.* In contrast, Example 4 provides:

> Not a receiver: A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver.

*Ibid.* Note the difference between Example 1 (frame or receiver) and Example 4 (not a frame or receiver): the presence of a jig or other template. Thus, it is the jig or template that triggers the GCA.

The implication of these examples is stark. On a workbench you find two receiver blanks like the silver ones pictured on page 3 of this opinion. Neither has "critical interior areas" that are "indexed, machined, or formed." *Ibid.* But the right receiver blank is accompanied by a plastic jig. The left one is not. Under the Final Rule, the right receiver blank is a frame

or receiver, thus triggering a five-year prison sentence for unlicensed manufacturing, importing, or dealing. *See* 18 U.S.C. §§ 922(a)(1)(B), 924 (a)(1). The left is just innocuous metal. How can this be? It seems that the presence of the jig changes that receiver blank from something that is not a firearm under § 921(a)(3) to something that is. But § 921(a)(3)(B) only refers to frames and receivers. Section 921(a)(3)(B) does not mention jigs (or instructions, templates, equipment, tools). How can the jig or template change the nature of the receiver blank, such that the blank goes from unregulable to regulable under § 921(a)(3)(B)?

It obviously cannot. Consider the lumber in every Home Depot across America. It obviously has been machined beyond its primordial state; much of it has been pressure treated, and all of it has been cut to specified lengths. The same is true about every screw, nut, and bolt in the store; all of them have been machined beyond their primordial states and cut to specified lengths. Now, if I walk into the Home Depot with instructions for making a chair, would any reasonable person say I possess a chair? Of course not.[10]

## C.

Let's close with the ATF's eye-of-the-beholder standard. As noted in previous sections of this opinion, dictionaries define *frame* and *receiver*—like the Old 80% Rule—in terms of critical components, parts, and functions. For

---

[10] In its briefing before our court, ATF attempts to engage a related hypothetical by arguing that a person possesses a bicycle when they buy a disassembled one. See Blue Br. 19. That is a red herring for two reasons. First, a disassembled bicycle is no different than a field-stripped gun; the former is a bicycle just as the latter is a gun. *See supra* note 9 and accompanying text. Second, the Final Rule reaches far, far beyond a bicycle "shipped with plastic guards attached to the gears or brakes that must be removed before it is used." Blue Br. 19. To make the analogue work, ATF would have to contend that metal machined beyond its primordial state and rubber machined beyond liquid ooze constitutes a bicycle if possessed with a template or instructions for manufacturing the bike.

example, the frame or receiver must be able to hold a trigger or the breechblock. Or it must have certain parts milled, etc. In the place of these standards, ATF said metal or plastic is a frame or receiver if it has "reached a stage of manufacture where it is *clearly identifiable* as an unfinished component part of a weapon." Final Rule, 87 Fed. Reg. at 24739 (emphasis added). Or rather, once an ordinary person can look at an object and say that it looks like an "unfinished component part of a weapon," *see ibid.*, it has become a frame or receiver within the meaning of § 921(a)(3)(B). How does this interact with ATF's assertions throughout the Final Rule that it now regulates anything machined beyond primordial ooze and liquid polymer? Unclear. What does "clearly identifiable" mean? Also unclear. What objects do ordinary people (who might associate "receivers" more readily with football than guns) think are "clearly identifiable" as firearm components? Yet again, unclear. All we know is that ATF, like Justice Stewart, is confident that it can identify a GCA firearm when it sees one.

ATF's problem is that § 921(a)(3)(B) covers objects that *are* frames and receivers, not objects that *look* like frames or receivers.[11] A recent Internet fad illustrates the point. Consider the "cakes that look like food" Internet trend. *See, e.g.*, Chelsweets, *Cakes That Look Like Food: 10 Amazing Cakes*, YᴏᴜTᴜʙᴇ (Jan. 22, 2018), https://perma.cc/UGH6-MXA2. One could make a cake that looks like a hamburger, just as one could make a cake that looks like a gun frame or receiver. One is "clearly identifiable" as a

---

[11] It is no answer to say that the Old 80% Rule allowed the regulated community to escape regulation by making 79%-complete frames and receivers. *See* Final Rule, 87 Fed. Reg. at 24686. Such a response might be valid on public policy grounds, but as the majority notes above, *see ante* at 24–26, public policy is the purview of Congress, not the federal courts. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent.").

No. 23-10718

hamburger, just as the other is "clearly identifiable" as a gun part. But that does not make the former taste like a Big Mac, just as it does not make the latter covered by the GCA.

\*        \*        \*

The Final Rule is limitless. It purports to regulate any piece of metal or plastic that has been machined beyond its primordial state for fear that it might one day be turned into a gun, a gun frame, or a gun receiver. And it doesn't stop regulating the metal or plastic until it's melted back down to ooze. The GCA allows none of this. I concur in the majority's opinion holding the Final Rule is unlawful. And I further concur that the matter should be remanded to the district court to fashion an appropriate remedy for the plaintiffs.